**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **STONE ENERGY CORPORATION**, *et al.*,[1] | § | **CASE NO. 16-36390** |
| | § | |
| **Debtors.** | § | **(Joint Administration Pending)** |

**DECLARATION OF KENNETH H. BEER, EXECUTIVE VICE PRESIDENT AND
CHIEF FINANCIAL OFFICER OF STONE ENERGY CORPORATION, IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, Kenneth H. Beer, declare as follows under penalty of perjury:

1.       I am the Executive Vice President and Chief Financial Officer of Stone Energy Corporation ("Stone"), a corporation organized under the laws of the state of Delaware and the ultimate parent corporation of the other debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 Cases.  I am authorized to submit this declaration (the "First Day Declaration") on behalf of the Debtors.

2.       As the Chief Financial Officer of Stone, I am responsible for formulating and supporting tactical initiatives and financial strategies, directing the implementation of strategic business plans, arranging for debt and equity financing, reviewing and approving all Securities and Exchange Commission filings, managing the accounting, financial reporting, investor relations, tax and treasury functions, the information technology group and engaging in human resource and legal issues.  As a result of my tenure with Stone, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I

---

[1] The Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Stone Energy Corporation (5413); Stone Energy Holding, L.L.C. (3151); and Stone Energy Offshore, L.L.C. (8062).  The above-captioned Debtors' mailing address is 625 E. Kaliste Saloom Road, Lafayette, Louisiana 70508.

am familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisors who report to me in the ordinary course of business. I am authorized by each of the Debtors to submit this First Day Declaration. References to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters, are based on my understanding of such matters in reliance on the explanation, and the advice, of counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On the date hereof (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>"). The Debtors will continue to operate their businesses and manage their properties as debtors in possession. I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "<u>First Day Motions</u>"). The Debtors seek the relief set forth in the First Day Motions to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses. I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

4.      Part I of this First Day Declaration provides an overview of the oil and gas industry and recent developments therein, offers detailed information about the Debtors' businesses, operations, organizational structure, capital structure, and significant prepetition

indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings.[2]  Part II sets forth the relevant facts in support of the First Day Motions.

## PRELIMINARY STATEMENT

5.      The Debtors have filed with the Court the *First Amended Joint Prepackaged Plan of Reorganization of Stone Energy Corporation and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "Plan").[3]  The Plan will enable the Debtors to continue to operate their business while substantially de-levering their balance sheet.  The Plan provides for the reduction of approximately $1.2 billion of the Debtors' existing net debt and approximately $46 million of the Debtors' annual cash interest expense.  As set forth in the Disclosure Statement (as defined below), the Plan will result in an estimated recovery for the Unsecured Noteholders of between 36% and 49%.

6.      As set forth in further detail below, the prices of crude oil and natural gas declined dramatically starting in mid-year 2014, having reached multi-year lows in the first quarter of 2016.  Over a hundred North American exploration and production companies have filed for chapter 11 relief in the last 18 months.  In particular, the Debtors had positioned themselves to be active in the deep water in the Gulf of Mexico ("GOM") in 2015 and 2016, and made deep water drilling rig commitments during 2014, as well as ancillary support and personnel commitments, all of which significantly strained the Debtors' cash flow.  Additionally, the offshore operators in the GOM have experienced additional regulatory scrutiny, financial pressures and increased cost. Despite the Debtors' best efforts to actively manage and restructure their balance sheet to reduce

---

[2] Many of the financial figures presented in this declaration are unaudited and potentially subject to change, but reflect the Debtors' most recent review of their business.  The Debtors reserve all rights to revise and supplement the figures presented herein.

[3] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the First Day Motions or the Plan, as applicable.

their interest expense and debt obligations, the significant and sustained drop in oil prices has caused uncertainty regarding the long-term viability of the Debtors' current leveraged capital structure.  As a result of this decline in oil prices, among other things, the Debtors determined that their enterprise could no longer operate with their current capital structure and began to explore potential transactions that would allow the Debtors to deleverage their balance sheet and allow for growth and long-term success.  Accordingly, the Debtors commenced substantial negotiations with its creditors who hold the funded indebtedness of the Debtors, which ultimately led to the filing of these Chapter 11 Cases to implement the terms of the prepackaged Plan.

7.     As discussed in further detail below, through extensive negotiations over the past several months, the Debtors built consensus around the terms of a comprehensive financial restructuring, which culminated in the Debtors entering into that certain Amended and Restated Restructuring Support Agreement, dated as of the date hereof (together with all exhibits and attachments thereto and as may be subsequently amended in accordance with its terms, the "Restructuring Support Agreement") with (a) holders of approximately 100% of the outstanding principal amount under the Debtors' Prepetition Credit Agreement (as defined herein) (collectively, the "Consenting Banks") and (b) with holders of approximately 79.7% of the outstanding principal amount of the Debtors' Unsecured Notes (as defined herein) (collectively, the "Consenting Noteholders" and together with the Consenting Banks, the "Restructuring Support Parties").  A copy of the Restructuring Support Agreement is attached hereto as Exhibit A.  Pursuant to the Restructuring Support Agreement, the Restructuring Support Parties have agreed, subject to the terms of the Restructuring Support Agreement, to vote in favor of the Plan.

8.     The Plan (i) contemplates the sale of the Debtors' business in Appalachia (as defined below) and the reorganization of the Debtors around their off-shore business in the

GOM, (ii) leaves unsecured creditors other than the Holders of Prepetition Notes Claims unimpaired, (iii) provides the Holders of Prepetition Banks Claims with either replacement commitments under a new revolving credit facility, combined with a significant repayment of the obligations currently outstanding (subject to the Debtors' ability to re-borrow certain of the amounts pursuant to the terms of the Amended Credit Agreement) or the New Senior Secured Term Loans, (iv) enables equity holders to receive a recovery equal to 4% of the equity of reorganized Stone and warrants that may be exercised for up to an additional 10% of the equity of reorganized Stone, and (v) provides for the Holders of Prepetition Notes Claims to receive $100 million in cash, $225 million of new junior secured notes, and 96% of the equity of reorganized Stone, which will result in the reduction of up to approximately $1.2 billion of the Debtors' existing net debt.

9.      The Debtors have agreed under the Restructuring Support Agreement to use reasonable best efforts to meet certain milestones for the restructuring process, including that confirmation of the Plan occur no later than seventy-five (75) days after the Petition Date and that the Plan become effective no later than ninety (90) days after the Petition Date. To meet these deadlines, the Debtors have proposed the following timetable:

| Event | Date/Deadline | Days Before/After the Petition Date |
|---|---|---|
| Voting Record Date | November 9, 2016 | 35 days before the Petition Date |
| Commencement of Solicitation | November 17, 2016 | 27 days before the Petition Date |
| Voting Deadline | December 16, 2016, at 5:00 p.m. (Prevailing Central Time) | 2 days after the Petition Date and 28 days after the commencement of solicitation |
| Publication Notice Deadline | January 18, 2017 | 35 days after the Petition Date |
| Plan Supplement Filing Deadline | January 19, 2017, at 5:00 p.m. (Prevailing Central Time) | 36 days after the Petition Date |
| Confirmation Order Filing Deadline | January 19, 2017, at 5:00 p.m. (Prevailing Central Time) | 36 days after the Petition Date |

| Event | Date/Deadline | Days Before/After the Petition Date |
|---|---|---|
| Objection Deadline | January 23, 2017, at 5:00 p.m. (Prevailing Central Time) (if hand-delivered to the Clerk of Court)<br><br>January 26, 2017, at 5:00 p.m. (Prevailing Central Time) (if filed electronically) | 40 days after the Petition Date<br><br>43 days after the Petition Date |
| Reply Deadline | February 9, 2017, at 2:00 p.m. (Prevailing Central Time) | 57 days after the Petition Date |
| Equity Opt Out Deadline | February 13, 2017, at 5:00 p.m. (Prevailing Central Time) | 61 days after the Petition Date |
| Confirmation Hearing | February 15, 2017 | 63 days after the Petition Date |

10.     In an effort to limit the length of these Chapter 11 Cases and adhere to the milestones set forth in the Restructuring Support Agreement, the Debtors began soliciting votes on the Plan before commencing these Chapter 11 Cases.  On November 17, 2016, the Debtors served the *Proposed Disclosure Statement for Joint Prepackaged Plan of Reorganization of Stone Energy Corporation and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (together with all exhibits thereto, the "Disclosure Statement") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code on holders of impaired claims entitled to vote and have requested that the voting creditors submit their ballots after the Petition Date, by the voting deadline of December 16, 2016, at 5:00 p.m. (prevailing Central Time).  The Debtors expect that the votes tabulated and received from the Restructuring Support Parties will be overwhelmingly in favor of the Plan.

11.     In parallel with the Debtors' negotiations with the holders of their funded indebtedness, the Debtors commenced a marketing process with respect to the Debtors' approximately 86,000 net acres in the Appalachia regions of Pennsylvania and West Virginia (the "Appalachia Assets").  On October 20, 2016, the Debtors entered into a purchase and sale agreement (as amended on December 9, 2016 and as may be subsequently amended, the "PSA")

with TH Exploration III, LLC, an affiliate of Tug Hill, Inc. ("Tug Hill").  Pursuant to the terms

of the PSA, the Debtors agreed to sell the Appalachia Assets to Tug Hill (the "Disposition") for

$360 million in cash, subject to customary purchase price adjustments (the "Purchase Price").

Importantly, the PSA provides that the Debtors will assume and assign to Tug Hill all executory

contracts and leases in connection with the Appalachia Assets, with the exception of two drilling

contracts and one unexpired lease of an office building.  The Disposition has an effective date of

June 1, 2016.  In connection with the execution of the PSA, Tug Hill deposited $5 million in

escrow, which amount may be supplemented by an additional $31 million at a later date upon

satisfaction of certain conditions.  Upon a closing, the deposit will be credited against the

Purchase Price.  From October 20, 2016 through December 19, 2016 (the "Diligence Period"),

Tug Hill intends to conduct customary due diligence to assess the aggregate dollar value of any

title and environmental defects associated with the Appalachia Assets.  The Debtors and Tug Hill

expect to close the Disposition by February 27, 2017, subject to customary closing conditions

and approval by the Court.

12.     Thanks, in large part, to fruitful negotiations among the Debtors, the Consenting

Banks, the Consenting Noteholders, and Tug Hill, the Debtors are before the Court with the Plan,

which provides recoveries, in the form of cash, new equity, and warrants, to creditors and

interest holders—including to the holders of the Debtors' Unsecured Notes (as defined herein)

and existing Equity Interests.   I believe that the Plan, and the restructuring transactions

contemplated thereby, represents the best outcome available in these Chapter 11 Cases.

## PART I

## I.     OIL AND GAS INDUSTRY BACKGROUND AND RECENT HISTORY

13.     The search for hydrocarbons in the United States dates to the middle of the 19th

century and subsequently developed into one of the most important and influential industries in

the country, and the world.  Today, oil and gas industry activities occur both onshore and offshore and are typically divided into three major sectors: "upstream," "midstream," and "downstream."  Businesses that explore for and produce oil, gas and other hydrocarbons from the earth (like the Debtors) comprise the upstream sector.  The midstream sector includes companies engaged in gathering, transporting, and storing unrefined hydrocarbons.  The downstream sector is comprised of refiners, distributors, and marketers of refined hydrocarbon products.  The discussion that follows provides (i) a brief historical account of GOM oil and gas exploration and production activities, as a significant percentage of the Debtors' historical operations have focused, and post-emergence activities will focus, on the GOM basin, (ii) an overview of oil and gas exploration, development, production and decommissioning activities, (iii) an overview of hydraulic fracturing technology ("Fracking"), and (iv) how Fracking has more recently affected U.S. oil and gas production, global commodity prices, and U.S. oil and gas producers.

14.     Originally, oil and gas production in the United States was confined to onshore locations.  However, technological advancements in the 1890s and early 1900s allowed the industry to expand operations into shallow water depths, with the first offshore wells drilled in the GOM in the 1920s.  Once offshore, the oil and gas industry faced new and unique circumstances.  The challenges associated with offshore exploration and production include, among other things, (i) developing technologies that support the identification of hydrocarbon reservoirs and the design, construction, installation, operation and decommissioning of equipment and infrastructure needed to support drilling, production and transportation activities in increasingly significant water depths, and (ii) the ability to recruit, develop and retain highly skilled professional and field employees to safely manage a vast array of technically sophisticated activities occurring in environmentally sensitive areas.

US-DOCS\46533009.39

15.     Historically, the majority of drilling activities in the GOM occurred on the outer continental shelf ("OCS"), which generally extends from 3 to 200 nautical miles (230.2 miles) from the U.S. coast.  More recently, drilling activity has moved off of the OCS into deeper water, with wells being drilled in water depths of up to 10,000 feet.  All activities conducted on the OCS and in deeper water are within federal jurisdiction.  Given the longevity and sophistication of offshore oil and gas operations, the GOM is home to a vast array of infrastructure, support equipment and people who are all working to meet the nation's growing energy demands.



16.     ***Exploration***.  The search for offshore oil and gas begins with seismic data gathering activities.  Vessels carrying seismic equipment pull seismic lines that shoot acoustic and sound waves through the rock layers of the Earth in targeted areas of interest.  These waves reflect off of various sub-surface layers and travel back to recording equipment at the surface.  The resulting data paints a three-dimensional picture of sub-surface formations that geophysicists analyze in order to identify potential hydrocarbon-rich pockets ("prospects") in which to drill.



17.     Once a prospect is identified, drilling engineers design an exploration well to target that prospect and upstream companies engage a drilling contractor and various oilfield service companies to drill the well.  Offshore shelf wells generally take 60 to 90 days to drill to their objective depths, with deepwater wells averaging 90 to 180 drilling days, depending on well depth.  Once the targeted depth is reached, the prospect is analyzed using electric logging and core sample collecting tools, which test the formation to determine whether commercially viable quantities of hydrocarbons are present in the area.

18.     ***Development***.  If the initial exploratory well is determined to be commercially viable, additional wells, or development wells, may be designed and drilled to delineate the size of the hydrocarbon-bearing reservoir.  Given the high cost of developing infrastructure offshore, this process may be repeated in order to determine the type and size of infrastructure needed to deliver the hydrocarbons to a midstream or downstream company.  In addition, geologists and geophysicists continue to look for additional prospects in the surrounding area that could also be

produced from the same infrastructure to extend the life of a geologic area and create economies of scale.

19.     ***Production***.  If a well contains a commercial volume of hydrocarbons, the well is completed and tied back to a production platform.  The completion process includes fracturing the rock at the production interval and inserting casing and production tubing, to protect the integrity of the well and allow the hydrocarbons to flow to the surface, and installing a tree, to control the flowrate.  Depending on the available capacity of existing production platforms in the area, production may be tied back to an existing platform, or construction of a new platform may be required.  Production is transported from the well to the production platform through a series of underwater pipelines.  Production platforms house a variety of production equipment designed to capture and separate the flow stream.  While in a formation, hydrocarbons are under pressure, and production activities occur on a 24/7/365 basis, so highly trained field personnel must be employed to monitor changes in flow rate and well pressure in order to detect anomalies in well activities and prevent potential uncontrolled flows of hydrocarbons.  Highly trained personnel are even more essential in the deep water, which has additional risks and safety factors to consider.



20. ***Decommissioning***.  The average life of production from a GOM shelf well is approximately 5 years and from a deepwater GOM well is approximately 10 years.  Once the wells associated with a production platform stop producing commercial quantities of hydrocarbons, and no prospects for future drilling activity are identified, according to applicable regulations, the platform and all associated equipment must be decommissioned.  The decommissioning process includes (i) plugging and abandoning all wells, (ii) removing, reefing or abandoning in place, the platform, production equipment and all associated pipelines, and (iii) scanning the surrounding seafloor to recover any ancillary debris to return the area to pre-drilling conditions.

21. ***Fracking Technology***.  As offshore oil and gas producers moved further into deeper waters, onshore oil and gas producers began widespread use of Fracking techniques on horizontal wells.  Fracking refers to the use of fluids injected at pressures exceeding the natural stresses on formation rock to cause the rock to crack.  Once cracked or fractured, the fissures are propped open with sand or ceramics.  The sand and ceramics allow for oil and gas to be more easily extracted through the cracks in the rock formation.  Horizontal wells are those wells whose upper sections are drilled vertically and lower sections are drilled horizontally through a particular productive zone in a formation.  While Fracking first became commercially successful in the mid-twentieth century and horizontal drilling was first developed in the earlier part of the twentieth century, additional technological breakthroughs in the last decade that combined Fracking with horizontal drilling allowed onshore oil and gas producers to exploit and commercially produce the vast, previously unproductive shale oil and gas resources in the United States.

22.     The exploitation of shale formations caused a significant increase in oil and gas production in the United States.  Before the rise of shale oil, oil production in the United States had steadily declined from its all-time high of 10 million barrels per day in 1970 to approximately 5 million barrels per day at the end of 2005.  However, by October 2014, oil production increased to approximately 9.1 million barrels per day, before peaking at 9.7 million barrels per day in April 2015.  The increased production from the United States, coupled with a decision by the Organization of Petroleum Exporting Countries ("OPEC") not to reduce production quotas to stabilize oil prices, eventually led to an oversupply of oil in the global markets.  After generally staying above $80 per barrel since October 2009 and reaching more than $105 per barrel as recently as June 2014, oil prices dropped to below $54 per barrel at the end of 2014 and closed below $30 per barrel in February 2016.[4]  On December 13, 2016, the price of oil closed at approximately $53 per barrel.  Like oil prices, gas prices also fell as a result of increased gas production from shale formations.  Average U.S. daily gas production reached a record high of 79 billion cubic feet in 2015 with gas prices dropping from a high of over $15 per thousand cubic feet ("Mcf") in December 2005 to less than $2 per Mcf in December 2015.  On December 13, 2016, the price of gas closed at approximately $3.47 per Mcf.[5]  Oil and natural gas prices remain volatile, and future prices are difficult to forecast.

23.     As a result of sustained, low oil and natural gas commodity prices, the oil and gas industry is in severe crisis.  Independent oil and gas producers have been significantly affected, with over 100 companies, including Quicksilver Resources Inc., American Eagle Energy

---

[4] "Oil prices" in this paragraph refers to the price of a barrel of oil, as measured by reference to the price of a prompt month futures contract referencing West Texas Intermediate crude oil, delivery to Cushing, Oklahoma, traded on the New York Mercantile Exchange.

[5] "Gas prices" in this paragraph refers to the price of a thousand cubic feet of gas, as measured by reference to the price of a prompt month futures contract referencing natural gas meeting the specifications set forth in the FERC-approved tariff of Sabine Pipe Line Company as then in effect at the time of delivery, delivery to Henry Hub, Louisiana, traded on the New York Mercantile Exchange.

US-DOCS\46533009.39

Corporation, Saratoga Resources Inc., Sabine Oil & Gas Corporation, Samson Resources Corporation, Magnum Hunter Resources Corporation, Swift Energy Company, Energy XXI, Ltd., Midstates Petroleum Corporation, Penn Virginia Corporation, Breitburn Operating LP, Sandridge Energy, Inc., and Linn Energy, LLC filing for bankruptcy in 2015 and 2016.

## II.      BUSINESS OF THE DEBTORS

### A.      Overview

24.      Stone was incorporated in Delaware in 1993 and is an independent, publicly traded oil and gas company engaged in the acquisition, exploration, exploitation, development, and operation of both onshore and offshore oil and gas properties.  Stone, the primary operating entity and owner of substantially all of the Debtors' assets, is based in Lafayette, Louisiana, with satellite offices in New Orleans, Louisiana; Houston, Texas; and Morgantown, West Virginia. The Debtors' oil and gas properties are principally located in the GOM basin and the Marcellus and Utica shales in the Appalachia regions of Pennsylvania and West Virginia ("Appalachia").

25.      The Debtors typically serve as the operator of leases in which they have a significant economic interest, or working interest.  As operator, the Debtors are responsible for all exploration, development, production and decommissioning activities, including the collection of oil and gas sales revenue, and subsequent distribution of such revenue to non-operating working interest owners who participate for their working interests in activities on a lease or designated unit covered by a joint operating agreement, pooling order, or similar agreement, if any.  In areas where the Debtors own a non-operating working interest, the operator of that lease collects the oil and gas revenue and distributes a portion to the Debtors.

26.      Stone reported total assets, which does not necessarily represent distributable value, of approximately $1.24 billion on its unaudited consolidated balance sheet as of September 30, 2016, of which approximately $263.8 million were current assets, and total assets

of approximately $1.41 billion on its consolidated balance sheet as of December 31, 2015, of which approximately $150.4 million were current assets.   Stone reported total liabilities of approximately $1.76 billion on its unaudited consolidated balance sheet as of September 30, 2016, of which approximately $423.5 million were current liabilities, and total liabilities of approximately $1.45 billion on its consolidated balance sheet as of December 31, 2015, of which approximately $159.2 million were current liabilities.   Stone reported a consolidated net loss of approximately $474.2 million for the nine months ended September 30, 2016 and a consolidated net loss of approximately $1.09 billion for the year ended December 31, 2015.

    27.     As of December 31, 2015, the Debtors' estimated proved oil and gas reserves, as determined by Netherland Sewell & Associates, were approximately 57 million barrels of oil equivalent ("MMBoe"), or approximately 342 billion cubic feet of gas equivalent ("Bcfe") compared to December 31, 2014 estimated proved oil and gas reserves of approximately 153 MMBoe, or approximately 915 Bcfe.   As described further below, a significant portion of the reduction in proved reserves resulted from substantially all of the Debtors' Appalachian reserves no longer being characterized as proved reserves as of December 31, 2015 due to the effect of reduced prices for gas and natural gas liquids ("NGLs").   As described further below, as of December 31, 2015, the Debtors' GOM basin properties accounted for approximately 99% of their estimated proved oil and gas reserves on a volume equivalent basis.

    28.     The Debtor's oil and gas revenues for the nine months ended September 30, 2016 totaled approximately $262.5 million, of which approximately $204.1 was attributable to oil sales, $43.3 million was attributable to natural gas sales, and $15.1 million was attributable to natural gas liquids sales.   Production volumes for the nine months ended September 30, 2016 totaled approximately 9.4 MMBoe, or 56.3 Bcfe.   The Debtors' oil and gas revenues for full year

2015 totaled approximately $532.3 million, of which $416.5 million was attributable to oil sales, $83.5 million was attributable to gas sales, and $32.3 million was attributable to NGL sales. Production volumes for full year 2015 totaled approximately 14.5 MMBoe, or 86.8 Bcfe.

29.     As of the Petition Date, the Debtors' workforce consisted of approximately 247 employees (collectively, the "Employees"), of whom (a) 143 were located at the Debtors' headquarters in Lafayette, Louisiana (the "Headquarters"); (b) 20 were located in the Debtors' facilities located in Morgantown, West Virginia; (c) 11 were located in the field, supporting the Debtors' operations in New Martinsville, West Virginia; (d) 3 were located in the Debtors' facilities located in Houston, Texas; (e) 7 were located in the Debtors' facilities in New Orleans, Louisiana; and (f) 63 were located in field positions, supporting the Debtors' offshore oil and gas operations.  Approximately 99% of the Debtors' current Employees are salaried Employees and approximately 1% are hourly Employees.  As of the Petition Date, two (3) of the hourly Employees work part-time, whereas none of the salaried Employees work part-time.  From time to time, the Debtors also employ several temporary Employees to participate in the Debtors' summer internship program, and the Debtors' workforce currently includes 9 independent contractors and 102 supplemental workers.

**B.     The Debtors' History, Operations, and Properties**

30.     The Debtors' management has been operating in the GOM basin since before Stone's incorporation in 1993 and has established a technical and operational expertise in that area.  Historically, the Debtors focused on the shallow waters of the GOM, also known as the U.S. Gulf Coast conventional shelf (the "GOM Shelf"), but after the sale of a majority of their GOM Shelf properties in 2013 and 2014, the Debtors significantly reduced their ownership in the GOM Shelf, retaining primarily two fields that provide production and cash flow.  Since Stone's incorporation, the Debtors have expanded their assets and reserve base into the deepwater of the

GOM (the "GOM Deepwater"), onshore and offshore deep gas (the "Deep Gas") and the Appalachian basin, all of which together with the GOM Shelf, are described in further detail below.

31.    ***GOM Basin – GOM Deepwater***.  As of December 31, 2015, the Debtors held leasehold interests in approximately 363,000 net (600,000 gross) acres in the GOM Deepwater, where the water is typically 1,000 to 9,000 feet deep.  GOM Deepwater properties accounted for approximately 90% of the Debtors' estimated proved oil and gas reserves on a volume equivalent basis as of December 31, 2015.  Projects in the GOM Deepwater typically require substantially more time, planning, manpower and capital than an onshore project.  The Debtors have made significant investments in seismic data, leasehold interests, and infrastructure, and have assembled a technical team with prior geological, geophysical, engineering, and operational experience in the GOM Deepwater arena (including drilling and construction experts who can execute more complicated deepwater projects such as subsea tie-backs) to evaluate potential exploration, development, and acquisition opportunities.  For example, the Debtors have utilized subsea tie-backs, which allow multiple satellite fields to be linked to an existing production facility, on recently drilled wells in the GOM Deepwater.  This improves the economics of the marginal fields because it requires less capital and start-up time than constructing new deepwater facilities.  Since 2006, the Debtors made significant acquisitions that included two deepwater platforms ("Pompano" and "Amberjack").  The Debtors paid approximately $451.2 million[6] in the aggregate for these assets.  Together, Pompano and Amberjack contribute greatly to Stone's reserves and production, and can serve numerous leases.  As of December 31, 2015, production

---

[6] The Debtors initially acquired a 33% interest in Amberjack in 2001 for $53.7 million.  In 2006, the Debtors acquired the remaining 67% interest in Amberjack for $190.5 million and a 100% interest in Pompano for $260.7 million.  Thus, the total consideration paid for both Amberjack and Pompano was $504.9 million, but the total consideration paid since 2006 was only $451.2 million.

tied, or expected to be tied, to Pompano (including development of Stone's Pompano, Cardona, and Amethyst prospects) contributed approximately 265 Bcfe of proved oil and gas reserves and handled 21.8 Bcfe of Stone's 2015 production, while Amberjack contributed approximately 43 Bcfe of proved reserves and handled 6.7 Bcfe of Stone's 2015 production.  The Debtors' GOM portfolio includes deepwater projects ranging from lower risk development projects utilizing tie-backs to existing facilities to higher risk exploration prospects that would require construction of a new production facility.  These exploration prospects include the Derbio, Rampart and Apple prospects with estimated oil and gas reserves ranging from an aggregate of 69 MMBoe to 730 MMBoe.  As of December 31, 2015, the Debtors had completed 47 net (54 gross) wells in the GOM Deepwater.



32.    On June 28, 2016, the Enterprise Products Partners LP gas processing plant in Pascagoula, Mississippi experienced an explosion that shut down the facility (the "Pascagoula

Outage"), which is currently expected to return to production in mid-December 2016. Although the Debtors do not have a direct interest in the plant, it processed approximately 20-25 million cubic feet of gas equivalent ("MMcfe") per day (gross) of gas produced from Pompano. On July 21, 2016, the Debtors negotiated an agreement to flow gas to an alternate market, which allowed the Debtors to produce oil and gas from Pompano with no additional pipeline curtailments. As the Debtors' arrangement does not guarantee available capacity, gas re-injection remains a fallback option if needed.

33.     In April 2016, production from the Debtors' deepwater Amethyst well in the GOM was shut in to allow for a technical evaluation following an unexpected production decline. During the first week of November 2016, the Debtors initiated acid-stimulation work and intermittently flowed the well during the month of November at a rate of 10-15 MMcfe per day, while observing and evaluating the well's performance. On November 30, 2016, the Debtors performed a routine shut in of the well to record pressures and determined that pressure communication exists between the production tubing and production casing strings, resulting from a suspected tubing leak. The Debtors are diagnosing the pressure information in an attempt to determine the most likely failure points and expect to have a better understanding by mid-to-late December. The Debtors have communicated their findings to date with the Bureau of Safety and Environmental Enforcement ("BSEE") and will be working with BSEE in determining their next steps. The Debtors will evaluate their options to restore production from the well, and all potential impacts on their estimated proved oil and gas reserves, which the Debtors anticipate will continue for at least several months. The estimated proved reserves associated with the Amethyst well at year-end 2015 were approximately 79 Bcfe. The Debtors can provide no assurance that they will be able to restore the well's production to previous levels, or at all. The

Debtors also cannot ensure that a replacement or sidetrack well would be economic, or that the Debtors would have sufficient liquidity if significant capital is needed to restore the well's production.

34. ***GOM Basin – GOM Shelf and Deep Gas***. As of December 31, 2015, the Debtors held leasehold interests in approximately 60,000 net (83,000 gross) acres in the GOM Shelf and 11,000 net (37,000 gross) acres in the Deep Gas. Water depths in the GOM Shelf range from 0 to 1,000 feet. Deep Gas reserves are approximately 15,000 to 25,000 feet below the earth's surface.

35. In late 2013 and 2014, the Debtors sold their non-core GOM Shelf properties for an aggregate of $300 million in cash and the buyers' assumption of the associated future undiscounted liabilities estimated at approximately $140 million. As a result, limited exploitation and exploration projects remain for the Debtors on their GOM Shelf properties. As of December 31, 2015, the Debtors owned a working interest in 35 net (36 gross) wells in the GOM Shelf and 1 net (5 gross) well(s) in the Deep Gas.

36. ***Appalachia***. Since 2006, the Debtors have secured numerous oil and gas leasehold interests in the Appalachian basin in Pennsylvania and West Virginia. As of December 31, 2015, the Debtors held leasehold interests in approximately 89,000 net (110,000 gross) mineral acres and had completed 95 net (136 gross) wells. As of December 31, 2014, the Debtors' Appalachian properties accounted for approximately 58% of their estimated proved oil and gas reserves on a volume equivalent basis. As of December 31, 2015, however, substantially all of the Debtors' Appalachian reserves were no longer booked and carried as proved reserves because of lower oil, gas and NGL prices.



37.     The Debtors assembled a team in Appalachia to execute the leasehold acreage acquisition, drilling and production of this resource play.  Substantially all of the Debtors' Appalachian reserves are focused in three fields in West Virginia: the Mary, Heather and Buddy fields.  There are potential or prospective resources in the Christine, Andie/Josie and Tanner fields.



38.     In response to low commodity prices and the high cost of midstream gathering, processing, and marketing, the Debtors shut in production at their Mary field on September 1, 2015, which resulted in the curtailment of approximately 100 MMcfe per day of production. Additionally, the Debtors suspended completion operations on 25 drilled wells in Appalachia until commodity price and margin improvements could be realized.  The Debtors' 2016 capital expenditure budget assumed only minimal activity in Appalachia.  In late June 2016, however, the Debtors entered into an interim Appalachian midstream contract, allowing the Debtors to resume production at the Mary field.  The interim agreement provided near-term relief for the Debtors by permitting them to resume profitable production and positive cash flow at the Mary field.  The initial term of the interim agreement was through August 31, 2016, and it continues on a month-to-month basis thereafter unless terminated by either party.  Subsequent to the execution of the interim agreement, production from much of the Mary field resumed in late June and averaged over 90 MMcfe per day during the third quarter of 2016, with total Appalachia volumes averaging 112 MMcfe per day during the third quarter of 2016.  Daily production rates from Appalachia are expected to average 120 MMcfe to 140 MMcfe per day in the fourth quarter of 2016.

39.     On February 4, 2016, a lawsuit was filed against Stone by ICO Marcellus I, LLC ("ICO") and B&R Holdings, Inc. ("B&R"), in the Circuit Court of Wetzel County, West Virginia, alleging that Stone breached the applicable joint venture agreement and joint operating agreement between the parties by overcharging for lease operating expenses and underpaying royalties, or alternatively, that Stone did not disclose the true extent of the costs required to invest in the joint venture, thereby inducing ICO and B&R into an investment in which they would not have otherwise participated.  On November 17, 2016, Stone entered into confidential

settlement agreements with B&R, ICO, and other parties pursuant to which certain lawsuits were dismissed and Stone purchased certain interests in a prospect area defined by the parties.

### C.    Corporate Structure

40.    The Debtors' corporate organization structure is as follows:



41.    Stone is the ultimate corporate parent, the issuer of publicly traded common stock, and the issuer of certain senior convertible unsecured notes and senior unsecured notes, all as further described herein.  Stone's direct and indirect subsidiaries include all of the other Debtors.

42.    Prior to the Petition Date, Stone's direct subsidiaries included SEO A LLC and SEO B LLC (the "SEO Entities").  On August 26, 2016, each of the SEO Entities entered into an Agreement and Plan of Merger with Stone Energy Offshore, L.L.C. ("Stone Offshore") whereby the SEO Entities merged with and into Stone Offshore, with Stone Offshore remaining as the surviving entity (the "Merger").  The Merger was approved by Stone, as the sole member of Stone Offshore and the SEO Entities.  All liabilities of the SEO Entities vested in Stone

Offshore, including decommissioning liabilities and all rights of creditors against, and all liens upon, any property of the SEO Entities.  Accordingly, all debts, liabilities, and duties of the SEO Entities attached as a matter of law to Stone Offshore and are now enforceable against Stone Offshore to the same extent as if such debts, liabilities, and duties had been incurred or contracted by Stone Offshore.

43.      In addition, prior to the Petition Date, Stone had a non-U.S. indirect subsidiary and affiliate, Stone Energy Canada ULC ("Stone Canada"), an entity organized under the laws of Alberta, Canada that did not have any active business operations or material assets.[7]   On December 2, 2016, Stone Canada was dissolved pursuant to subsection 211(2) of the *Business Corporations Act* (Alberta).

### D.      Customers

44.      The Debtors' oil and gas production is primarily sold at current market prices under short-term contracts.  In connection with the sale of their production, the Debtors obtain credit protections, such as a parental guarantee or a letter of credit, from certain of their counterparties.   Phillips 66 Company and Shell Trading (US) Company accounted for approximately 53% and 13%, respectively, of the Debtors' oil and gas revenue generated during the year ended December 31, 2015.

45.      Because the Debtors' production revenue is driven largely by market-based commodity prices, the Debtors enter into transactions that hedge the price of oil and gas, as described further below.

---

[7] On February 3, 2016, Stone Canada entered into a Conveyance Agreement with Shale Petroleum Ltd. in which it assigned all of its right, title and interest in its Canadian leases and licenses, plus its 87.5% working interest in the applicable wells.  Under the provisions of the Conveyance Agreement, Shale Petroleum Ltd. also agreed to assume the abandonment obligations for the wells, including restoration of the pad sites, and assumed the liability for the wells, indemnifying Stone Canada against any environmental liabilities.

US-DOCS\46533009.39

### E.       Competition

46.      The oil and gas industry is highly competitive, particularly with respect to the acquisition of producing oil and gas properties and undeveloped acreage. The Debtors compete with major oil and gas companies and other independent producers of varying sizes in acquiring properties, contracting for drilling equipment, and securing trained personnel. Securing capital for investment in the oil and gas industry is also competitive. Many of the Debtors' competitors have superior access to financial resources and the benefit of exploration and development budgets that are substantially larger than those of the Debtors.

### F.       Outer Continental Shelf Regulations

47.      The Debtors' operations on federal oil and gas leases in the GOM Shelf are subject to regulation by the Bureau of Ocean Energy Management ("BOEM"), BSEE, and the Office of Natural Resources Revenue ("ONRR"), requiring compliance with BOEM, BSEE and ONRR regulations and with applicable federal and state law, including the Outer Continental Shelf Lands Act. These laws and regulations are subject to change, and many new requirements were imposed by BSEE, BOEM and ONRR after and since the April 2010 Deepwater Horizon incident. For offshore operations, lessees, including the Debtors, must obtain BOEM and BSEE approval for exploration, development, and production plans prior to the commencement of such operations. In addition to permits required from other agencies, such as the United States Environmental Protection Agency, lessees, including the Debtors, must obtain a permit from BSEE prior to commencing drilling and comply with regulations governing, among other things, engineering and construction specifications for production facilities, safety procedures, plugging and abandonment of wells, and removal of infrastructure facilities. The ONRR is responsible for management of all revenues associated with both federal offshore and onshore mineral leases,

including royalty and revenue collection, distribution, auditing and compliance, investigation and enforcement, and asset management.

48.     To cover the various obligations of lessees on the OCS, such as the cost to plug and abandon wells and decommission and remove platforms and pipelines at the end of production, BOEM generally requires that lessees post bonds or provide other acceptable assurances that such obligations will be met, unless BOEM exempts the lessee from such financial assurance requirements.  Historically, the Debtors and many other operators have been able to obtain an exemption from most security (bonds, letters of credit, or other forms of financial assurance) posting obligations ("Waiver") based on their financial net worth.

49.     On March 18, 2016, the Debtors received notice letters from BOEM stating that the Debtors no longer qualified for a supplemental bonding Waiver under the financial criteria specified in BOEM's guidance to lessees at that time.  In late March, the Debtors met with BOEM and proposed a tailored plan for financial assurances relating to their abandonment obligations, which provides for posting some incremental financial assurances in favor of BOEM.  On May 13, 2016, the Debtors received notice letters from BOEM, rescinding their demand for supplemental bonding with the understanding that the Debtors will continue to make progress with BOEM in finalizing and implementing a long-term tailored plan.

50.     On July 14, 2016, BOEM issued a new Notice to Lessees ("NTL") that augments requirements for the posting of additional financial assurance by offshore lessees, among others, to assure that sufficient funds are available to perform decommissioning obligations with respect to offshore wells, platforms, pipelines and other facilities.  The NTL, effective September 12, 2016, does away with the agency's past practice of waiving supplemental bonding obligations where a company could demonstrate a certain level of financial strength.  Instead, BOEM will

allow companies to "self-insure," but only up to 10% of a company's "tangible net worth," which is defined as the difference between a company's total assets and the value of all liabilities and intangible assets. The NTL provides new procedures for how BOEM determines a lessee's decommissioning obligations and, consistent with those procedures, BOEM has tentatively proposed an implementation timeline that offshore lessees will follow in providing additional financial assurance, including BOEM's issuance of (i) "Self-Insurance" letters beginning September 12, 2016 (regarding a lessee's ability to self-insure a portion of the additional financial assurance), (ii) "Proposal" letters beginning October 12, 2016 (outlining what amount of additional security a lessee will be required to provide), and (iii) "Order" letters beginning November 14, 2016 (triggering a lessee's obligations (A) within 10 days of such letter to notify BOEM that it intends to pursue a "tailored plan" for posting additional security over a phased-in period of time, (B) within 60 days of such letter, provide additional security for "sole liability" properties (leases or grants for which there is no other current or prior owner who is liable for decommissioning obligations), and (C) within 120 days of such letter, provide additional security for any other properties and/or submit a tailored financial plan). BOEM tentatively expects to approve or deny tailored plans submitted by lessees on or around September 11, 2017, although extensions may be granted to companies actively working with BOEM to finalize tailored plans.

51.    The Debtors received a Self-Insurance letter from BOEM dated September 30, 2016 stating that the Debtors are not eligible to self-insure any of their additional security obligations. The Debtors also received a Proposal letter from BOEM dated October 20, 2016 indicating that additional security will be required. The Debtors intend to work with BOEM to adjust their previously submitted tailored plan for the provision of new financial assurances required to be posted as a result of the new NTL. The Debtors' revised proposed plan would

require approximately $35 million to $40 million of incremental financial assurance or bonding

for 2016 through 2017, a portion of which may require cash collateral.  Under the revised plan,

additional financial assurance would be required for subsequent years.  As of the Petition Date, I

have been informed that the Debtors have an aggregate of approximately $139 million posted in

surety bonds in favor of BOEM, third party bonds and letters of credit, all relating to offshore

abandonment obligations.  The Debtors' discussions with BOEM regarding a long-term tailored

plan are ongoing and such discussions will continue post-petition.

## III.   OVERVIEW OF THE DEBTORS' PREPETITION CAPITAL STRUCTURE

52.    Prior to the Petition Date, the Debtors entered into various financing

arrangements.  Each of the financing facilities and the amounts owed thereunder is described in

further detail below.

| Type of Prepetition Indebtedness | Approximate Amount of Outstanding Debt as of the Petition Date[8] |
|---|---|
| *Bank Debt* | $341.5 million |
| *1.75% Senior Convertible Notes due 2017* | $300.0 million |
| *7.5% Senior Notes due 2022* | $775.0 million |
| *4.20% Building Loan* | $11.4 million |
| *Other Unsecured Debt* | $17-27 million |

### A.    Bank Debt

53.    On June 24, 2014, Stone, as borrower, Stone Offshore, as guarantor, Bank of

America, N.A., as administrative agent (the "Prepetition Agent") and issuing bank, and other

syndicated banks party thereto (collectively with Bank of America, N.A., the "Prepetition

Lenders"), entered into that certain Fourth Amended and Restated Credit Agreement (as

---

[8] These amounts exclude interest, fees, and expenses.

amended or restated, the "Prepetition Credit Agreement"), which provided the Debtors with a reserve-based revolving credit facility and other commitments in an aggregate principal amount of up to $900 million.

54.     The maturity date for the revolving cash borrowings under the Prepetition Credit Agreement is July 1, 2019.  All amounts outstanding under the Prepetition Credit Agreement are secured by a first-lien security interest in certain of the Debtors' existing assets, and the obligations under the Prepetition Credit Agreement are guaranteed by Stone Offshore (in such capacity, the "Guarantor Subsidiary").  The Prepetition Lenders do not have a security interest in all of the Debtors' assets.  For example, as of December 31, 2015, under the Prepetition Credit Agreement, the Prepetition Lenders' minimum collateral value (the Mortgaged Property Value)[9] was eighty percent (80%) of the Debtors' Aggregate Oil and Gas Property Value.[10]   This coverage ratio was raised to eighty-six percent (86%) pursuant to that certain Amendment No. 3 to the Prepetition Credit Agreement, dated as of June 14, 2016 (the "Third Amendment").  However, the Appalachia Assets were not included in the Mortgaged Property Value in the latest submission to the Prepetition Lenders, as such assets had no present value according to the Debtors' most recent engineering report using pricing provided by the Prepetition Lenders, and no additional mortgages were granted on such assets pursuant to the Third Amendment.  In addition, the Prepetition Credit Agreement does not grant a security interest in certain Excluded

---

[9] "Mortgaged Property Value" means, as of any date of its determination, the aggregate present value of the future net income with respect to the Mortgaged Properties as set forth in the applicable engineering report, discounted at the stated per annum rate utilized in such report; provided, however, that the Mortgaged Property Value does not include any Oil and Gas Properties acquired by any Credit Party after the recordation of the Mortgages in the real property records of the jurisdiction where such Oil and Gas Properties are located unless an amendment or supplement to such Mortgages sufficiently describing such after-acquired Oil and Gas Properties has been recorded in such real property records.  All defined terms in the aforementioned definition shall have the meanings ascribed to them in the Prepetition Credit Agreement.

[10] "Aggregate Oil and Gas Property Value" means as of any date of its determination, the aggregate Oil and Gas Property Value of all proved Oil and Gas Properties of the Debtors as set forth in the applicable Oil and Gas Reserve Report, discounted at the stated per annum rate utilized in such report.

Assets.[11]   The Prepetition Credit Agreement does, however, require that the Debtors grant a perfected security interest on their cash (*i.e.*, control agreements with the Debtors' depositary banks are required).  Accordingly, the Debtors do not have any significant unencumbered cash as of the Petition Date.

55.     The borrowing base under the Prepetition Credit Agreement is re-determined by the Prepetition Lenders semi-annually, typically in May and November, taking into consideration the estimated asset values of Stone's oil and gas properties and those of the Guarantor Subsidiary, in accordance with the Prepetition Lenders' customary practices for oil and gas credit facilities.  In addition, Stone and the Prepetition Lenders each have discretion at any time, but not more than two additional times in any calendar year, to have the borrowing base re-determined.  On October 13, 2015, the borrowing base under the Prepetition Credit Agreement was reaffirmed at $500 million, which was the borrowing base in effect on March 9, 2016.

56.     As of March 8, 2016, the Prepetition Credit Agreement had approximately $389 million of credit available.  To ensure full access to this liquidity, on March 9-10, 2016, the

---

[11] "Excluded Assets" means any of the following property or assets of any Debtor: (i) Excluded Equity Interests; (ii) motor vehicles or other assets subject to certificates of title; (iii) commercial tort claims where the amount of the damages claimed by the applicable Debtor is less than $5,000,000; (iv) any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) or any other applicable law, constitute or result in (A) the abandonment, invalidation or unenforceability of any material right, title or interest of the applicable Debtor therein or (B) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or become invalid or any condition thereto (including any consent) shall be satisfied; (v) once paid, any amounts constituting the payment of a dividend or the repurchase or redemption of the shares of the Borrower's common stock, in each case to the extent such dividend, repurchase or redemption is permitted under Section 6.5 of the Credit Agreement; (vi) Realty Collateral (as such term is defined in the Mortgages); and (vii) assets subject to a Lien securing Capital Leases or purchase money debt obligations, in each case permitted under Section 6.1(c) and 6.2(c) of the Credit Agreement, if the contract or other agreement in which such Lien is granted prohibits the creation of any other Lien on such assets (other than to the extent that any such prohibition would be rendered ineffective pursuant to the UCC or any other applicable Legal Requirement), provided that such asset (x) will be excluded from the Collateral only to the extent and for so long as the consequences specified in this clause (vii) will result and (y) will cease to be excluded from the Collateral and will become subject to the Lien granted hereunder, immediately and automatically, at such time as such consequences will no longer result.  All defined terms in the aforementioned definition shall have the meanings ascribed to them in the Prepetition Credit Agreement.

Debtors borrowed substantially all of such remaining undrawn amount that was available under the Prepetition Credit Agreement.   Access to this cash was critical both in restructuring negotiations and as a source of cash to fund the Debtors' ongoing restructuring efforts, future operations, and these Chapter 11 Cases.   As of March 10, 2016, following the funding of this borrowing, the aggregate principal amount of borrowings under the Prepetition Credit Agreement was $477 million, in addition to $19.2 million of outstanding letters of credit thereunder.   A repayment of $20 million of borrowings under the Prepetition Credit Agreement was made on March 31, 2016, resulting in $457 million of aggregate principal amount of borrowings outstanding thereunder on such date.   On April 11, 2016, approximately $0.9 million of letters of credit were cancelled, resulting in approximately $18.3 million of outstanding letters of credit on such date.

57.     On April 13, 2016, the Prepetition Lenders provided notice to the Debtors of a request for a re-determination of the borrowing base.   Pursuant thereto, the Prepetition Lenders reduced the borrowing base to $300 million, which resulted in an approximate $175.3 million borrowing base deficiency.   As a result, the Debtors were required to cure the deficiency through any combination of the three methods of cure permitted under the Prepetition Credit Agreement: (1) repay amounts outstanding sufficient to cure the borrowing base deficiency within ten (10) days after the Debtors' written election to do so; (2) add additional oil and gas properties (that were acceptable to the Prepetition Lenders) to the borrowing base and take such actions necessary to grant the Prepetition Lenders a mortgage in such oil and gas properties within thirty (30) days after the Debtors' written election to do so; and/or (3) pay the deficiency in six (6) equal monthly installments.   At the time, the Debtors elected to cure the borrowing base

deficiency by paying the deficiency in six (6) equal monthly installments, making the first two (2) payments of $29.2 million in May and June 2016.

58.     The Debtors have, from time to time, addressed issues arising under the Prepetition Credit Agreement with the Prepetition Lenders.  In May 2015, the Debtors and the Prepetition Lenders desired to clarify the Prepetition Credit Agreement with respect to the extent to which the Prepetition Lenders would permit the Debtors to grant liens securing other obligations.  Accordingly, Stone, the Guarantor Subsidiary, and the Prepetition Lenders entered into that certain Amendment No. 1 to the Prepetition Credit Agreement, dated as of May 1, 2015, to effectuate an increase in the aggregate amount of obligations with respect to which the Debtors could grant liens securing such obligations.   In addition, Stone, the Guarantor Subsidiary, and the Prepetition Lenders entered into that certain Amendment No. 2 to the Prepetition Credit Agreement, dated as of February 3, 2016, to reflect that the indebtedness incurred pursuant to the Unsecured Notes (as defined below) was permitted under the Prepetition Credit Agreement.

59.     After extensive negotiations, Stone, the Guarantor Subsidiary, and the Prepetition Lenders entered into the Third Amendment, to (i) increase the borrowing base to $360.0 million from $300 million; (ii) provide a moratorium on redetermination of the borrowing base until January 15, 2017, other than an automatic reduction of $100 million upon the sale of the Appalachia Assets; (iii) permit second lien indebtedness to refinance the Unsecured Notes; (iv) revise the maximum consolidated funded leverage ratios; (v) require minimum liquidity of at least $125.0 million until January 15, 2017; (vi) impose limitations on capital expenditures from June through December 2016; (vii) grant the Prepetition Lenders a perfected security interest in all deposit accounts, (viii) increase the mortgage coverage ratio to eight-six percent (86%) of the

Debtors' oil and gas properties, and (ix) provide for anti-hoarding cash provisions for amounts in excess of $50.0 million to apply after December 10, 2016.  In conjunction with the Third Amendment, on June 14, 2016, the Debtors repaid $56.8 million in borrowings under the Prepetition Credit Agreement, curing the borrowing base deficiency, and resulting in the Debtors having $341.5 million outstanding under the Prepetition Credit Agreement.  On August 1, 2016, a $5.8 million reduction in an outstanding letter of credit resulted in $12.5 million of outstanding letters of credit under the Prepetition Credit Agreement.

60.     Most recently, the Debtors entered into Amendment No. 4 to the Prepetition Credit Agreement, dated December 9, 2016, to modify the anti-hoarding cash provisions under the Prepetition Credit Agreement, which became effective on December 10, 2016.

**B.      1.75% Senior Convertible Notes due 2017**

61.     On March 6, 2012, Stone completed an offering of $300 million in aggregate principal amount of 1.75% senior convertible notes due on March 1, 2017 (the "2017 Senior Convertible Notes").  The 2017 Senior Convertible Notes were issued pursuant to an Indenture, dated as of March 6, 2012 (the "2017 Senior Convertible Notes Indenture"), among Stone, Stone Offshore, and The Bank of New York Mellon Trust Company, N.A., as trustee.

62.     The 2017 Senior Convertible Notes are convertible by the holders into cash, shares of common stock, or a combination of cash and shares of common stock, at the election of Stone, based on an initial conversion rate of 23.4449 shares of common stock per $1,000 principal amount of the 2017 Senior Convertible Notes.  The conversion rate, and accordingly the conversion price, may be adjusted under certain circumstances as described in the 2017 Senior Convertible Notes Indenture.  On June 10, 2016, the Debtors completed a 1-for-10 reverse stock split with respect to their common stock.  Proportional adjustments were made to the conversion price and shares as they relate to the 2017 Senior Convertible Notes, resulting in a

conversion rate of 2.34449 shares of the Debtors' common stock with a corresponding conversion price of $426.50 per share.

63.     Interest under the 2017 Senior Convertible Notes is payable on March 1st and September 1st of each year.  The 2017 Senior Convertible Notes are fully and unconditionally guaranteed on an unsecured basis by the Guarantor Subsidiary.  As of the Petition Date, a total of approximately $300 million in face amount of the 2017 Senior Convertible Notes were outstanding.

### C.     7.5% Senior Notes due 2022

64.     On November 8, 2012, Stone completed an offering of $300 million in aggregate principal amount of 7.5% senior unsecured notes due November 15, 2022 (the "7.5% Senior Notes").  The 7.5% Senior Notes were issued under the Second Supplemental Indenture, dated as of November 8, 2012, to the Indenture, dated as of January 26, 2010 (the "7.5% Senior Notes Indenture"), among Stone, Stone Offshore, and The Bank of New York Mellon Trust Company, N.A., as trustee.

65.     On November 27, 2013, Stone issued an additional $475 million in aggregate principal amount of the 7.5% Senior Notes.

66.     Interest under the 7.5% Senior Notes is payable on May 15th and November 15th of each year.  The 7.5% Senior Notes are fully and unconditionally guaranteed on an unsecured basis by the Guarantor Subsidiary.  As of the Petition Date, a total of approximately $775 million in face amount of the 7.5% Senior Notes was outstanding.  The Debtors elected not to make the interest payment due on November 15, 2016 and instead chose to utilize the 30-day grace period provided by the 7.5% Senior Notes Indenture in order to allow the Debtors additional time to assess their restructuring alternatives.

### D.    4.20% Building Loan

67.    On November 20, 2015, Stone entered into a 4.20% term loan (the "Building Loan"), maturing on December 20, 2030.  Stone received $11.8 million in cash, net of debt issuance costs related to the Building Loan.  The proceeds are being used for general corporate purposes.  The Building Loan bears interest at a rate of 4.20% per annum and is to be repaid in one hundred and eighty (180) equal monthly installments commencing on December 20, 2015. The Building Loan is collateralized by the Debtors' two Lafayette, Louisiana office buildings. The appraised value of the underlying collateral (*i.e.*, the office buildings) exceeds the outstanding amount of the Building Loan.  As of the Petition Date, a total of $11.4 million was outstanding under the Building Loan.

### E.    Common Stock

68.    Stone is a publicly held company listed on the New York Stock Exchange (the "NYSE") under the symbol "SGY."  Stone is authorized to issue 30,000,000 shares of common stock, par value $.01 per share.  As of the Petition Date, Stone has 5,690,253 issued and outstanding shares of common stock.

69.    Beginning on March 24, 2016, Stone's common stock traded at less than $1.00 per share.  On April 29, 2016, Stone received a deficiency notice from the NYSE notifying Stone that, based upon the average closing price of its common stock for the last thirty (30) consecutive trading-days, the stock did not meet the minimum bid price of $1.00 per share required by section 802.01C of the NYSE continued listing standards.  Further, on May 17, 2016, Stone received a written deficiency notice from the NYSE notifying Stone that its average global market capitalization over a consecutive thirty (30) trading-day period was less than $50 million at the same time that Stone's stockholders' equity was less than $50 million, which constitutes non-compliance with section 802.01B of the NYSE continued listing standards.

70.     At Stone's 2016 Annual Meeting of Stockholders held on May 19, 2016, Stone's stockholders approved the adoption of a proposal that permitted Stone's board of directors (the "Board") to implement a reverse stock split of Stone's common stock as a means to address Stone's non-compliance with the NYSE's minimum bid price requirement of $1.00 per share. On May 27, 2016, the Board approved a reverse stock split whereby every ten shares of Stone's common stock would be converted into one share of Stone's common stock (the "Reverse Stock Split").  At the close of business on June 10, 2016, Stone effected the Reverse Stock Split to increase the market price per share of its common stock in an effort to regain compliance with the NYSE's minimum share price requirement.  This action resulted in (i) the number of Stone's outstanding shares of common stock being reduced from 56,864,607 to 5,686,461 and (ii) the number of authorized shares of common stock being reduced from 300,000,000 to 30,000,000. Without the Reverse Stock Split, Stone may not have regained compliance with the minimum bid requirement by October 29, 2016, which could have resulted in the NYSE delisting Stone's common stock.  As of the Petition Date, 30,000,000 shares of Stone's $0.01 par value common stock had been authorized with 5,690,253 shares of common stock issued and outstanding.

### F.     Other Secured Debt

71.     In the ordinary course of business, the Debtors routinely transact business with a number of third-party contractors and vendors who may be able to assert liens against the Debtors and their property (such as equipment and, in certain circumstances, mineral interests) if the Debtors fail to pay for goods delivered or services rendered.  These parties perform various oil field services, including manufacturing and repairing equipment and component parts, necessary for the Debtors' oil field activities.

### G.     Trade Debt

72.     In the ordinary course of business, the Debtors incur trade debt with numerous vendors in connection with products and services that support their oil and gas exploration, development, production and decommissioning activities.  I am informed that, as of the Petition Date, the Debtors' unsecured trade debt ranges from approximately $17 million to $27 million in the aggregate on account of prepetition goods and services provided to the Debtors.

### H.     Hedging Arrangements

73.     To reduce its exposure to declines in oil and natural gas prices, the Debtors routinely enter into hedging arrangements ("Hedges") with certain counterparties (the "Hedge Counterparties").   The Debtors' determine the volume and price at which to hedge their production based upon their view of existing and forecasted production volumes and current and future market conditions.   Historically, the Debtors' preferred hedging instruments are fixed-price swaps and costless collars.   All of the Hedge Counterparties are also parties to the Prepetition Credit Agreement.   As of the Petition Date, the fair market value of the Debtors' Hedges was approximately $1.2 million.

### I.     Performance Bonds

74.     As discussed above, as a lessee and operator of oil and gas leases on the GOM Shelf, the Debtors must comply with, among other things, rules and regulations promulgated by BOEM.  In particular, the Debtors must establish their financial capability to comply with such regulations, including the ability to pay royalties and satisfy plugging and abandonment obligations.  Historically, to meet BOEM's financial assurance requirements, the Debtors have provided surety bonds to BOEM; however, letters of credit, U.S. Treasury Security, decommissioning escrow agreements, or other similar forms of financial assurance instruments may be employed.  As of the Petition Date, I have been informed that the Debtors have posted an

aggregate of approximately $139 million in financial assurance instruments, including surety bonds issued in favor of BOEM, surety bonds issued in favor of third-party obliges, and letters of credit issued in favor of third-party obligees, all relating to offshore abandonment obligations. Argonaut Insurance Company, one of the Debtors' surety bond underwriters, has obtained cash collateral security from the Debtors totaling $7.3 million pursuant to that certain Collateral Security Agreement dated April 25, 2016. As of the Petition Date, I have been informed that no other surety company holds any collateral security. Because the Debtors would be unable to operate their federal leases without satisfying their financial assurance obligations to BOEM, I believe that the Debtors' surety bond program is vitally important to their operations.

## IV.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Commodities Downturn and Industry Distress

75.    Notwithstanding their positive market and competitive positions, beginning in late 2014, the Debtors began to experience significant revenue, cash flow, and liquidity challenges, due in large part to the recent collapse in the market price for crude oil and natural gas. As noted above, crude oil prices decreased significantly in the latter part of 2014 and have remained low throughout 2016, reaching their lowest levels since 2003. Similarly, natural gas prices decreased significantly beginning in the latter part of 2014 and remain low through the Petition Date. Declining revenues have made it increasingly difficult for the Debtors to continue to service their debt obligations.

76.    The recent collapse in oil and natural gas prices is among the most severe on record. West Texas Intermediate crude oil spot prices have fallen from a high of $107.26 per barrel on June 20, 2014 to a daily closing low of $26.21 per barrel on February 11, 2016 — a nearly 76% decline. Natural gas prices have also experienced a precipitous decline. The average natural gas price paid to the Debtors dropped from $3.67 per Mcf for the year ended December

31, 2014 to $1.63 per Mcf for the third quarter of 2016, representing an approximate 56% decline.  Market prices have recently increased, with West Texas Intermediate crude oil spot prices reaching $52.74 per barrel on December 12, 2016, but remain volatile.

77.     Low commodity prices have caused wide-ranging distress in the oil and gas industry.  Independent exploration and production companies like Stone have been particularly hard hit because they rely primarily on sales of oil and gas to generate revenues.  The Debtors' revenue streams, earnings, and cash flows have been significantly impacted by the sustained decrease in commodity prices.  In the third quarter of 2016, Stone's oil and gas revenues decreased by roughly 27%, or $35 million, as compared to the same period in 2015, primarily due to lower commodity prices.  Stone reported net cash provided by operating activities of $247.5 million for the year ended December 31, 2015, as compared to $401.1 million generated during the year ended December 31, 2014.  Finally, largely as a result of a non-cash write down of oil and gas properties, Stone reported a consolidated net loss of approximately $1.09 billion for the year ended December 31, 2015.

### B.     Efforts to Boost Liquidity

78.     As discussed herein, the Debtors' operations have been significantly impacted by the recent and dramatic decline in oil prices, the continued low prices of natural gas and the general uncertainty in the energy market.  These macro-economic factors, coupled with the Debtors' substantial debt obligations, have pushed the limits of the Debtors' ability to effectively operate with their capital structure and devote capital needed to maintain and grow the business.

79.     *Revolver Draw*.  Given the significant disruptions and uncertainty in the oil and gas industry and a need to improve liquidity to maximize flexibility as it considered potential restructuring options, Stone determined that fully drawing available funds under its Prepetition Credit Agreement was necessary to best position Stone in the short and longer term.  As noted

above, on March 9-10, 2016, Stone drew the remainder of available capacity under the Prepetition Credit Agreement.  Following a series of amendments to the Prepetition Credit Agreement and repayments by the Debtors, as of the Petition Date, the Debtors have approximately $341.5 million in borrowings and $12.5 million in letters of credit outstanding under the Prepetition Credit Agreement, with $6 million in remaining availability under its $360 million borrowing base.

80.    ***Cost-Cutting Initiatives***.    The Debtors' management initiated a series of operational and financial actions in reaction to the substantial and rapid decline of commodity prices with the goal of improving the Debtors' liquidity position.  For example, the Debtors reduced their workforce by eighty (80) employees (a 23% reduction) in 2015, resulting in a gross salary reduction of approximately $8.6 million (or approximately $11.1 million when including salary, taxes, and benefits).  The Debtors further reduced their workforce in 2016 by fifty (50) employees (a 21% reduction), resulting in a gross salary reduction of approximately $6.4 million (or approximately $10.2 million when including salary, taxes, and benefits).  The Debtors also decreased the number of field contractors in the GOM by 32% and significantly decreased the number of field contractors in Appalachia.  The Debtors reduced their lease operating expenses from $176 million in 2014 to approximately $80 million to $90 million in 2016 by selling the majority of their GOM Shelf assets, which carried high production and plugging and abandonment costs, in addition to implementing a variety of operational cost cutting initiatives, including aggressively pursuing price concessions from third-party vendors providing goods and services.    The Debtors also attempted to sell down their working interests in exploratory prospects and other wells to various interested parties.  As a result of these efforts, the Debtors

were able to sell approximately $37 million worth of working interests and to decrease their future costs in operating these wells.

81.      *Reduction in Capital Expenditures*.  The Debtors have also significantly reduced their capital expenditures from $884 million in 2014 to $465 million in 2015, and to approximately $160 million to $170 million in 2016.   As part of their capital cost cutting efforts, the Debtors negotiated the termination of two long-term drilling rig contracts and a long-term vessel contract, discussed below, and renegotiated the rates for a third rig contract and temporarily stacked the rig in place on the Pompano platform in the GOM.  The Debtors currently expect to reinstate drilling operations on the Pompano platform in early 2017.  The 2016 capital expenditure budget excludes material acquisitions and capitalized salaries, general and administrative expenses and interest as well as potential subsidy expenses associated with rig farm outs, rig-stacking charges, and termination consideration.

82.      *Renegotiation of Above-Market Contracts*.  The Debtors are also parties to a number of executory contracts that contain commercial terms that are significantly less favorable than current market rates.  One category of these contracts are certain long-term gas gathering and processing agreements pursuant to which all natural gas production from a significant portion of the Debtors' Appalachian assets is delivered from field delivery points to market.  The Debtors entered into these gas gathering and processing agreements at a time when there was much less access to available gas gathering and processing infrastructure in Appalachia than is currently available.  As a result, such contracts contain above-market commercial rates and other terms and conditions that prohibit the Debtors from operating at a profit in Appalachia.

83.      The Debtors initiated negotiations with counterparties to the most significant contracts in this category in the months prior to the Petition Date, with the goal of obtaining

41

revised rates, terms, and conditions more reflective of current market conditions. As discussed above, in late June 2016, the Debtors entered into an interim Appalachian midstream contract, allowing the Debtors to resume production at the Mary field. The interim agreement provided near-term relief for the Debtors by permitting them to resume profitable production and positive cash flow at the Mary field. The initial term of the interim agreement was through August 31, 2016, and it continues on a month-to-month basis thereafter unless terminated by either party. Subsequent to the execution of the interim agreement, production from much of the Mary field resumed in late June and averaged over 90 MMcfe per day during the third quarter of 2016, with total Appalachia volumes averaging 112 MMcfe per day in the third quarter of 2016. Daily production rates from Appalachia are expected to average 120 MMcfe to 140 MMcfe per day in the fourth quarter of 2016.

84.     The Debtors were also party to several executory contracts with various vendors providing essential services in connection with the Debtors' business in the GOM that were based on commercial rates and other terms and conditions that were not reflective of current market rates. These contracts were integral for the development and production of hydrocarbons from the Debtors' GOM assets, but the commercial terms provided thereunder were cost-prohibitive in a depressed commodity price environment.

85.     For example, during 2016, the Debtors negotiated the termination of (i) a long-term deep water drilling rig contract, and (ii) an Appalachian rig contract. First, in October 2014, the Debtors entered into a long-term deep water day rate drilling contract pursuant to which the Debtors were obligated to pay an operating day rate of $341,000—which was market-favorable at the time of execution but became above market as commodity prices dropped—until the agreement expired in August 2017, regardless of whether such services were actually used.

In April 2016, the Debtors initiated negotiations with the counterparty to the day rate drilling contract to decrease the day rates payable under the contract to reflect current market conditions and provide the counterparty potential upside incentives in the event that conditions improved. On June 24, 2016, the Debtors and the counterparty agreed to terminate the drilling contract for a total consideration of $20 million, approximately $5.25 million of which was a deposit previously provided to the counterparty pursuant to the drilling services contract.  Further, the Debtors agreed to provide the counterparty the opportunity to perform certain drilling services commenced before December 31, 2019, and paid the counterparty a $5 million deposit to be used against future drilling activities initiated before March 31, 2017, subject to extension in certain circumstances.

86.     In addition, the Debtors entered into an offshore vessel contract specifically for obtaining access to services of certain vessels for work in conjunction with the day rate drilling contract discussed above.  In light of the termination of the day rate drilling contract, in August 2016, the counterparty to the offshore vessel contract agreed to terminate the contract on terms the Debtors viewed as acceptable.

87.     During the nine months ended September 30, 2016, the Debtors incurred $7.5 million in charges for the offshore vessel and Appalachian drilling rig contract terminations, a $20 million charge related to the termination of the deep water drilling rig contract, and approximately $15.3 million of rig subsidy and stacking charges related to the deep water drilling rig and the Appalachian drilling rig, prior to their respective terminations, and the platform rig at Pompano.

88.     Further, the Debtors had several outstanding purchase orders with a supplier of materials for the operation of their wells in the GOM under a master services and goods

agreement.  The goods to be provided under these purchase orders were in various stages of completion and were no longer necessary to the Debtor' operations.  Thus, in November 2016, the Debtors negotiated an amicable termination of certain portions of the open purchase orders. Other portions of the underlying purchase orders and the master goods and services agreement, however, were not terminated as part of the settlement agreement.

89.     Despite these cost-reduction initiatives, the Debtors still have a number of upcoming obligations that would have drastically reduced the Debtors' liquidity absent the filing of these Chapter 11 Cases.  The Debtors have an interest payment obligation under the 7.5% Senior Notes of approximately $29 million, which was due on November 15, 2016.  The indenture governing the 7.5% Senior Notes provides a 30-day grace period that extends the latest date for making this interest payment to December 15, 2016, before an event of default occurs under the indenture.  Although the Debtors had sufficient liquidity to make the interest payment by the due date, and indeed have approximately $160 million of cash on hand as of the Petition Date, the Debtors elected to not make this interest payment on the due date and utilized the 30-day grace period provided by the indenture.  Further, the next semi-annual interest payment on the 7.5% Senior Notes in the approximate aggregate amount of $29 million becomes due on May 15, 2017.  In addition, the principal amount of $300 million under the 2017 Senior Convertible Notes matures on March 1, 2017.  Finally, the Debtors will incur approximately $11 million to $14 million in additional scheduled interest payments on account of the loans under the Prepetition Credit Agreement over the next year.

### C.     The Debtors' Restructuring Efforts

90.     Among other things, as a result of the Debtors' weakening balance sheet, since March 2016, the Board has actively pursued and examined a number of potential strategic alternatives.  These efforts included engaging advisors to assist the Debtors in their efforts to

raise external capital from both debt and equity providers for the purpose of de-leveraging the Debtors' balance sheet and exploring a sale of assets in Appalachia. Specifically, in March 2016, the Debtors retained Lazard Frères & Co. LLC and Latham & Watkins LLP to assist the Debtors in analyzing their financial position and exploring potential financing and restructuring alternatives. The Debtors also retained Alvarez and Marsal North America, LLC in March 2016 to perform a variety of restructuring related services. In early March 2016, the Debtors, with the assistance of their advisors, initiated a process to evaluate and consider various potential strategic and financial alternatives for the Debtors with a view to maximizing enterprise value, including, among other alternatives, a debt or equity financing, or a recapitalization, either in or out of court.

91.     Given the lack of alternatives available in the market and that the vast majority of claims against the Debtors arise from the 7.5% Senior Notes and the 2017 Senior Convertible Notes (together, the "Unsecured Notes") and the Prepetition Credit Agreement, the Debtors focused their restructuring efforts on discussions with the holders of the Unsecured Notes (together, the "Unsecured Noteholders") and the Prepetition Lenders. The primary goal of those discussions, and in these Chapter 11 Cases, was and is to restructure the Debtors' balance sheet through a consensual plan of reorganization supported by their Unsecured Noteholders and Prepetition Lenders.

92.     After the Prepetition Lenders' advisors and advisors to an ad hoc committee of the Unsecured Noteholders collectively holding more than 50% of the Unsecured Notes outstanding (the "Ad Hoc Committee") commenced due diligence on the Debtors through information provided in an online data room, the Debtors commenced good-faith, arm's-length negotiations regarding a potential restructuring of the Prepetition Credit Agreement and the

Unsecured Notes that would materially de-lever the Debtors' balance sheet and allow the Debtors to retain sufficient liquidity to continue to operate their businesses going forward. In the course of these negotiations, the Debtors, the Prepetition Lenders, and the Ad Hoc Committee exchanged and considered, with the assistance of their respective advisors, numerous restructuring proposals which contemplated both in-court and out-of-court transactions. Concurrently, the Debtors also continued to negotiate with certain key counterparties to their above-market contracts described above.

93.     In parallel with the foregoing restructuring efforts, the Debtors, in consultation with their advisors, also diligently evaluated a number of options, including the sale of their Appalachia Assets. Thereafter, the Debtors ultimately determined that a sale of the Appalachia Assets was the best way to maximize value for all stakeholders as part of the Debtors' overall restructuring efforts. In fact, the sale of the Appalachia Assets is essential to the Restructuring Support Agreement negotiated between the Debtors and the Restructuring Support Parties, with the consummation of the sale being a condition precedent to the confirmation of the Plan.

94.     To provide expertise into the value of the Appalachia Assets and current market conditions, the Debtors retained Tudor, Pickering, Holt & Co., LLC ("TPH") to serve as the Debtors' exclusive financial advisor and investment banker with respect to the Appalachia Assets. In February 2016, TPH commenced marketing initiatives that generated several expressions of interest from various parties. As part of that process, the Debtors and TPH worked closely with potential strategic and financial buyers, many of which entered into confidentiality agreements as part of their due diligence. As described above, after considering various inquiries and proposals, and following several months of arm's-length negotiations, on October 20, 2016, the Debtors and Tug Hill entered into the PSA, pursuant to which, subject to

Court approval, Tug Hill has agreed to purchase substantially all of the Debtors' Appalachia Assets for approximately $360 million, subject to customary purchase price adjustments.  I believe that the PSA represents the best offer currently available to the Debtors and their estates for the Appalachia Assets.

95.     The PSA contains customary representations, warranties and covenants.  From and after the closing of the Disposition, the Debtors and Tug Hill, respectively, have agreed to indemnify each other and their respective affiliates against certain losses resulting from any breach of their representations, warranties or covenants contained in the PSA, subject to certain customary limitations and survival periods.   Additionally, from and after closing of the Disposition, the Debtors have agreed to indemnify Tug Hill for certain identified retained liabilities related to the Appalachia Assets, subject to certain survival periods, and Tug Hill has agreed to indemnify the Debtors for certain assumed obligations related to the Appalachia Assets.

96.     The PSA may be terminated, subject to certain exceptions, (i) upon mutual written consent, (ii) if the closing has not occurred by March 1, 2017, (iii) for certain material breaches of representations and warranties or covenants that remain uncured, (iv) if, on or prior to the end of the Diligence Period, title and environmental defect amounts (after application of customary thresholds and deductibles), casualty losses and the value of any assets excluded from the Appalachia Assets due to the exercise of preferential purchase rights or consents equal or exceed $10 million in the aggregate, (v) if the Debtors failed to file for bankruptcy on or before December 14, 2016, (vi) if the Court does not enter an order approving the Debtors' assumption of the PSA and certain other matters within 30 days of the Debtors filing for bankruptcy, (vii) if

the Court does not enter a sale order for the Disposition by February 10, 2017, and (viii) upon the occurrence of certain other events specified in the PSA.

97.      I believe that, after the prepetition marketing process conducted by the Debtors with the assistance of TPH, the PSA with Tug Hill represents the highest and best offer available to the Debtors and their estates for the Appalachia Assets.  The Debtors do not currently believe that a remarketing process and/or an auction process (a "Remarketing/Auction") is likely to lead to a higher or better offer for the Appalachia Assets.  The PSA provides that the Debtors will assume and assign to Tug Hill essentially all of the executory contracts relating to the Appalachia Assets—avoiding tens of millions of rejection damages claims and attendant litigation resolving such claims.  Moreover, Tug Hill has already completed substantially all of the due diligence, including title diligence necessary to consummate any acquisition in the upstream oil and gas industry, on the Debtors' approximately 86,000 net acres comprising the core of the Appalachia Assets.  An alternative buyer would likely take many months to repeat such diligence, significantly delaying the Debtors' Chapter 11 Cases, increasing the costs in connection therewith and jeopardizing the Debtors' ability to confirm a chapter 11 plan in accordance with the timeframe established by the Restructuring Support Agreement.  While the Debtors were subject to a prohibition on soliciting offers for the Appalachia Assets, the Debtors are aware of at least two expressions of interest received by the Consenting Noteholders, neither of which have, to date, progressed into a binding offer for the Appalachia Assets with a purchase price approaching that of Tug Hill.

98.      Notwithstanding the foregoing, and although I do not currently believe a Remarketing/Auction is necessary, the Debtors have structured the PSA with maximum

flexibility such that, if the Court finds that a Remarketing/Auction process is necessary, Tug Hill will serve as a traditional Bankruptcy Code Section 363 stalking horse bidder.

99.     Throughout this process, the Board continued to seek refinancing alternatives and out-of-court restructuring options.  As discussed above, negotiations with the Prepetition Lenders resulted in the Third Amendment to the Prepetition Credit Agreement in June 2016, which, among other things, granted a security interest on the Debtors' cash, permitted the Debtors to incur second-lien indebtedness to refinance the Unsecured Notes, increased the borrowing base under the Prepetition Credit Agreement, and provided for a moratorium on redetermination of the borrowing base until January 15, 2017, other than an automatic reduction upon the sale of the Appalachia Assets.  The Debtors were unable to refinance the Unsecured Notes with second-lien indebtedness and began negotiations with the Consenting Noteholders on a comprehensive restructuring commencing in August 2016.  The Debtors reached agreement with the Consenting Noteholders on October 20, 2016 and began documentation of a plan of reorganization and eventually commenced solicitation of votes in connection therewith on November 17, 2016.

100.     Shortly thereafter, following renewed negotiations with the Consenting Banks, the Debtors, the Consenting Noteholders, and the Consenting Banks agreed on a modified version of the existing support agreement and plan of reorganization, acceptable to all parties.  These negotiations culminated in the Restructuring Support Agreement and the Plan in December 2016. Thus, faced with a lack of viable options available in the financial markets and the significant upcoming payments due to the Prepetition Lenders and the Unsecured Noteholders, the Board, after engaging in months of good faith and arm's-length negotiations with the Ad Hoc Committee's advisors and the Prepetition Agent's advisors, ultimately determined that entry into the Restructuring Support Agreement and, thereafter, commencement of these Chapter 11 Cases

to consummate the transactions contemplated by the Restructuring Support Agreement, was necessary to preserve the Debtors' going concern value by de-levering their balance sheet and addressing operational issues associated with above-market contracts, thereby maximizing recoverable value for all of the Debtors' stakeholders.

101.    The Restructuring Support Agreement contains certain covenants on the part of the Debtors and the Restructuring Support Parties, including that such Restructuring Support Parties will vote in favor of the Plan and otherwise facilitate the restructuring transaction, in each case subject to certain terms and conditions in the Restructuring Support Agreement.  The consummation of the Plan will be subject to customary conditions and other requirements, as well as the sale by the Debtors of the Appalachia Assets for a cash purchase price of at least $350 million and approval of the Court.  The Restructuring Support Agreement also provides for termination by each party, or by either party, upon the occurrence of certain events, including without limitation, termination by the Restructuring Support Parties upon the failure of the Debtors to achieve certain milestones set forth in Schedule 1 to the Restructuring Support Agreement.

102.    The Debtors launched the solicitation of votes on the Plan on November 17, 2016, which will conclude twenty-nine (29) days thereafter on December 16, 2016, or approximately two (2) days following the Petition Date.  The Debtors expect that the Consenting Banks and the Consenting Noteholders will overwhelmingly vote in favor of the Plan.

## PART II

103.    In furtherance of the objective of successfully restructuring their capital structure, the Debtors have sought approval of the First Day Motions and related orders (the "Proposed Orders"), and respectfully request that the Court consider entering the Proposed Orders granting such First Day Motions.  For the avoidance of doubt, the Debtors seek authority, but not

direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

104.     I have reviewed each of the First Day Motions, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Motions:  (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal interruption and disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in the Debtors' ability to successfully restructure their capital structure and maximize value for the benefit of the Debtors' estates and all stakeholders.

## I.     ADMINISTRATIVE AND PROCEDURAL PLEADINGS

### A.     Joint Administration Motion

105.     The Debtors seek the joint administration of their Chapter 11 Cases, three in total, for procedural purposes only.  Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.  I also believe that joint administration of these Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest.

### B.     Retention Applications

106.     I believe that the retention of chapter 11 professionals is essential to the Chapter 11 Cases.  Accordingly, in connection with these Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals:  (a) Latham & Watkins LLP, as co-counsel; (b) Porter Hedges LLP, as co-counsel; (c) Vinson & Elkins LLP, as

special counsel; (d) Alvarez & Marsal North America, LLC, as restructuring advisor; (e) Lazard Frères & Co. LLC, as investment banker; (f) Tudor, Pickering, Holt & Co., LLC, as investment banker; (g) Ernst & Young, LLP, as tax advisor; and (h) Epiq Bankruptcy Solutions, LLC, as claims, noticing, soliciting and balloting agent.  I believe that the above professionals are well qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of these Chapter 11 Cases, and the professionals will coordinate their services to avoid duplication of efforts.  I understand that the Debtors may find it necessary to seek retention of additional professionals as the Chapter 11 Cases progress.

## II.      BUSINESS OPERATION MOTIONS

### A.      Cash Management Motion

107.    In the Cash Management Motion, the Debtors seek entry of an order, (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of the Debtors' existing bank accounts, checks, and business forms; (ii) granting the Debtors a waiver of certain bank account and related requirements of the Office of the United States Trustee for the Southern District of Texas (the "United States Trustee") to the extent that such requirements are inconsistent with (a) the Debtors' existing practices under the cash management system or (b) any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Cases; (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing investment and deposit practices notwithstanding the provisions of Bankruptcy Code Section 345(b); (iv) authorizing, but not directing, the Debtors to continue ordinary course intercompany transactions; and (v) granting superpriority status to postpetition claims arising from ordinary course intercompany transactions.  The Debtors also request in the Cash Management Motion that the Court authorize all banks with which the Debtors maintain

accounts to continue to maintain, service and administer such accounts, and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtors.

          a.          The Debtors' Cash Management System and Bank Accounts

108.    In the ordinary course of their businesses, the Debtors maintain a complex cash management system (the "Cash Management System") that includes checking accounts, money market accounts, savings accounts, brokerage accounts, certain accounts used for the administration of specific employee benefits, and other accounts. I believe the Cash Management System is integral to the operation and administration of the Debtors' business and allows the Debtors to efficiently (a) identify the Debtors' cash requirements, (b) transfer cash as needed to respond to cash requirements, and (c) efficiently monitor and control all of the Debtors' cash receipts and disbursements. I also believe that the Cash Management System is similar to those used by many other companies of comparable size and complexity to collect, transfer, and disburse funds in a cost-effective and efficient manner.

109.    The Cash Management System is managed by the financial personnel in the Debtors' Treasury Department at the Debtors' Headquarters in Lafayette, Louisiana (the "Treasury Department"). I believe that the Treasury Department's control over the administration of the various bank accounts to effect the collection, disbursement, and movement of cash facilitates accurate cash forecasting and reporting and enables the Debtors to, among other things, monitor the collection and disbursement of funds.

110.    I believe that the Cash Management System is organized in a way that respects the separate cash funding and operating needs of the Debtors. A summary of the Cash Management System is annexed as Attachment 1 to the Cash Management Motion. As of the Petition Date, it is my understanding that the Debtors maintain approximately 18 bank accounts

(collectively, the "Bank Accounts") at 8 financial institutions.[12]  All of the Bank Accounts are held in the name of Stone or Stone Energy Holding, L.L.C.  A detailed schedule of the Bank Accounts is annexed as Attachment 2 to the Cash Management Motion.  As further reflected in Attachment 2 to the Cash Management Motion, the Bank Accounts are maintained at US Bank, Whitney Bank, IberiaBank, Regions, Capital One, Branch Banking and Trust Company, Wells Fargo Advisors and Texas Capital Bank.  The Texas Capital Bank account is an escrow account used to fund plug and abandonment work in the Gulf of Mexico as required by the Federal Government.

    b.  Continued Use of the Debtors' Existing Cash Management System and the Bank Accounts

   111.  I believe that the Cash Management System is an ordinary-course, customary, and essential business practice, the continued use of which is essential to the Debtors' business operations during these Chapter 11 Cases and their goal of maximizing value for the benefit of all parties in interest.  It also allows the Debtors to efficiently identify their cash requirements, transfer cash as needed to respond to those requirements, and track all intercompany transfers.  I believe that any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize value and successfully restructure.  Moreover, such a disruption would be wholly unnecessary, because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the my knowledge, the Bank Accounts are in financially stable institutions that are insured by the Federal Deposit Insurance Corporation ("FDIC") (up to an applicable limit per Debtor per institution).  Consequently, maintaining the

---

[12] Certain of the Bank Accounts are subject to deposit account control agreements with the applicable financial institutions, as noted on Attachment 2 to the Cash Management Motion.

existing Cash Management System without disruption is both essential to the Debtors' ongoing operations and in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and continue to use the Cash Management System and the Bank Accounts.

112.    If the relief requested in the Cash Management Motion is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court.  To prevent the possible inadvertent payment of prepetition claims, except those otherwise authorized by the Court, I have been informed that the Debtors will work closely with the banks at which the Bank Accounts are maintained (the "Banks") to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval and to ensure that no third-party with automatic debit capabilities is able to debit amounts attributable to prepetition obligations.

113.    The Debtors request that no Bank that implements such handling procedures and then honors a prepetition check or other item drawn on any Bank Account that is the subject of the Cash Management Motion (a) at the direction of the Debtors to honor such prepetition check or item, (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of a good-faith error made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition.  I believe that such flexibility should be afforded to the Banks to ensure that the Banks continue providing cash management services to the Debtors.

114.    Additionally, for the Banks that are party to a Uniform Depository agreement with the United States Trustee, I have been informed that the Debtors will (a) contact each such Bank, (b) provide the Debtors' employer identification numbers, and (c) identify each Bank Account held at such Banks as being held by a debtor in possession in a bankruptcy case.  For the Banks that are not party to a Uniform Depository agreement with the United States Trustee, my understanding is that the Debtors will use their good-faith efforts to cause each such Bank to execute a Uniform Depository agreement in a form prescribed by the United States Trustee.

115.    In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of these Chapter 11 Cases, in the Cash Management Motion, the Debtors request that all of the Banks be authorized to continue to administer, service, and maintain the Bank Accounts as such accounts were administered, serviced, and maintained prepetition, without interruption and in the ordinary course (including making deductions for bank fees), and to honor any and all checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts in connection with a claim arising on or after the Petition Date.

116.    Further, the Debtors have designated one of their current Bank Accounts maintained with Capital One identified on Attachment 2 to the Cash Management Motion as the depository for its adequate assurance deposit for certain utilities (the "Adequate Assurance Deposit") as required by the Utilities Motion (as further discussed in Section D below).  The Adequate Assurance Deposit will be maintained during the Chapter 11 Cases with a minimum balance equal to fifty percent (50%) of the Debtors' estimated monthly cost of utility services, which may be adjusted by the Debtors to account for the termination of utility services by the

Debtors or other arrangements with respect to adequate assurance of payment reached with individual utility companies.

117.    The Debtors further request in the Cash Management Motion that they be authorized to implement such reasonable changes to the Cash Management System as the Debtors may deem necessary or appropriate, in consultation with the Required Consenting Noteholders and Required Consenting Banks, including, without limitation, closing any of the Bank Accounts or opening any additional Bank Accounts following the Petition Date (the "New Accounts"), wherever the Debtors deem that such accounts are needed or appropriate, and whether or not the Banks in which the New Accounts are opened are designated depositories in the Southern District of Texas.  My understanding is that, notwithstanding the foregoing, any New Account that the Debtors open will be (a) at one of the existing Banks or with a bank that is organized under the laws of the United States of America or any state therein, and that is insured by the FDIC or the Federal Savings and Loan Insurance Corporation and (b) designated a "Debtor in Possession" account by the relevant bank.  The Debtors request that the relief sought in the Cash Management Motion extend to any New Accounts and that any order approving the Cash Management Motion provide that the New Accounts are deemed to be Bank Accounts and are similarly subject to the rights, obligations, and relief granted in any order granted pursuant to the Cash Management Motion.  I understand that the Debtors will provide the United States Trustee, the Administrative Agent under the Prepetition Credit Agreement (as defined in the Cash Management Motion), and counsel for the Required Consenting Noteholders and counsel for the Required Consenting Banks with written notice of any New Accounts that are opened, and any such New Accounts will be in accordance with the Prepetition Credit Agreement.  In furtherance of the foregoing, the Debtors also request that the relevant Banks be authorized to

honor the Debtors' requests to open or close (as the case may be) such Bank Account(s) or New Account(s).

c.     Continued Use of the Debtors' Existing Checks and Business Forms

118.    To minimize expenses to their estates, I understand the Debtors are also seeking authorization in the Cash Management Motion to continue using all existing checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession; provided, however, that when the Debtors generate new checks during the pendency of these Chapter 11 Cases such checks will include a legend referring to the Debtors as "Debtor in Possession."  The Debtors also seek authority to use all existing correspondence and other business forms (including, without limitation, letterhead, purchase orders and invoices) without reference to the Debtors' status as debtors in possession.

119.    I believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates. Further, such changes would be disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.  For these reasons, the Debtors request that they be authorized to use their existing check stock, all correspondence, and other business forms, without being required to place the label "Debtor in Possession" on any of the foregoing.

d.     Waiver of Certain Requirements of the United States Trustee

120.    The Debtors further request in the Cash Management Motion, that this Court grant a waiver of certain bank account and related requirements of the United States Trustee to the extent that such requirements are inconsistent with (a) the Debtors' existing practices under the Cash Management System or (b) any action taken by the Debtors in accordance with any order granting the Cash Management Motion or any other order entered in the Chapter 11 Cases.

I understand that to supervise the administration of chapter 11 cases, the United States Trustee has established certain operating guidelines for debtors in possession in order to supervise the administration of chapter 11 cases.  I have been informed that these requirements (the "UST Requirements") require chapter 11 debtors to, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate debtor in possession account for cash collateral; and (iv) obtain checks for all debtor in possession accounts that bear the designation "Debtor In Possession," the bankruptcy case number, and the type of account.  It is my understanding that the UST Requirements are designed to draw a clear line of demarcation between prepetition and postpetition transactions and operations and prevent the inadvertent postpetition payment of prepetition claims.  As set forth above, I believe that (i) the Debtors are able to work with their current Banks to ensure that this goal of separation between the prepetition and postpetition periods is observed and (ii) enforcing certain of these UST Requirements would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

121.    In light of the complexity of the Cash Management System, I believe that it would be significantly onerous for the Debtors to meet the requirement of closing all existing bank accounts and opening new debtor in possession bank accounts.  Indeed, not only would the Debtors be unnecessarily inconvenienced, but so would the counterparties with whom the Debtors do business (the majority of whom wire remittances directly to the Debtors' US Bank Revenue and Operating accounts as further described in the Cash Management Motion).

122.    Furthermore, I believe that it would be unnecessary and inefficient to require the Debtors to abide by the UST Requirements to establish specific debtor in possession accounts for

tax payments (including payroll taxes) and to deposit to such specific tax accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll and other tax obligations would be unnecessarily burdensome.  I believe that the Debtors can pay their tax obligations most efficiently from the existing disbursement and checking accounts maintained at US Bank and Whitney Bank in accordance with their existing practices; that the United States Trustee can adequately monitor the flow of funds into and out of such accounts; and that the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessary and inefficient.

123.    Additionally, I believe it is unnecessary to require the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for cash collateral.  As set forth in the Debtors' Cash Collateral Motion, the Debtors have provided significant safeguards to ensure that those who have an interest in cash collateral are adequately protected and such persons have been provided with notice of the proposed use of such cash collateral.

124.    Finally, for the reasons noted above, I believe that compliance with the UST Requirement that a debtor must immediately obtain checks for all debtor in possession accounts that bear the designation "Debtor In Possession," the bankruptcy case number, and the type of account, is unnecessarily burdensome in these Chapter 11 Cases.

e.    Continued Deposit and Investment Practices

125.    As part of the Cash Management System, funds in three of the Debtors' accounts could be invested in fixed-income securities such as U.S. government agency bonds, mortgage-backed securities, and commercial paper on an overnight basis only.  I have been informed that the amount that is invested is the amount in excess of limits that are established by the Debtors and can be changed at their discretion.  The Debtors are not involved in other investment practices.  The Debtors request in the Cash Management Motion (a) authorization to continue to

deposit and invest funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes to the Cash Management System that the Debtors may implement at the request of the United States Trustee in consultation with the Required Consenting Noteholders and Required Consenting Banks (the "Deposit and Investment Practices") and (b) a waiver of the investment and deposit requirements of Bankruptcy Code Section 345(b) to the extent that such requirements are inconsistent with the Deposit and Investment Practices.

126.    The Debtors are large, sophisticated entities with a complex Cash Management System that relies on multiple Banks and Bank Accounts on a daily basis. The Bank Accounts are in stable financial institutions that are insured by the FDIC. Moreover, it is my understanding that the Deposit and Investment Practices are designed to ensure the safe return of estate funds by, among other things, preserving capital, providing liquidity, and generating returns to the Debtors' estates that are consistent with reasonably prudent investment practices.

>       f.      Continued Ordinary-Course Intercompany Transactions and Postpetition Intercompany Claims and Granting of Superpriority Status

127.    In connection with the daily operation of the Debtors' businesses, as funds are moved within the Cash Management System, at any given time, I understand that there may be intercompany claims owing by one Debtor to another Debtor. Specifically, Stone makes payments for operating expenses on behalf of Stone Offshore, and Stone receives income on behalf of Stone Offshore. In addition, I have been informed that there is an intercompany balance between Stone and Stone Energy Holding, L.L.C. related to prior funding of a subsidiary that is no longer operating. As of September 30, 2016, Stone Energy Corporation owed Stone Energy Offshore, L.L.C. $13 million and Stone Energy Corporation owed Stone Energy Holding, L.L.C. $1 million.

128.     With respect to all of the intercompany transactions undertaken by the Debtors (collectively, the "Intercompany Transactions"), I understand that the Debtors maintain records of all fund transfers and can ascertain, trace, and account for the Intercompany Transactions.  At the same time, if the Intercompany Transactions were to be discontinued, I believe that the Cash Management System and the related administrative controls would be disrupted to the Debtors' detriment.

129.     To ensure that each individual Debtor will not fund the operations of another entity at the expense of such Debtor's creditors, the Debtors request that all postpetition claims arising from Intercompany Transactions (the "Intercompany Claims") against a Debtor by another Debtor, arising after the Petition Date, be granted superpriority administrative claim status, subject and subordinate only to other superpriority administrative claims granted pursuant to any order of the Court.  I believe that if postpetition Intercompany Claims are granted superpriority administrative claim status, then each individual Debtor on whose behalf another Debtor has used funds or incurred expenses will continue to bear ultimate repayment responsibility, thereby protecting the interests of each individual Debtor's creditors. Accordingly, I believe that the Court should grant superpriority status to the Intercompany Claims.

**B.     Cash Collateral Motion**

130.     In the Cash Collateral Motion, the Debtors request the ability to use cash receipts and equivalents constituting the Cash Collateral of the Prepetition Secured Parties.  Prior to the Petition Date, the Debtors, the Prepetition Secured Parties, the Consenting Noteholders and each of their respective advisors engaged in extensive, arm's length negotiations regarding the terms and conditions of a proposed consensual cash collateral order.  These efforts resulted in an

US-DOCS\46533009.39

agreement with the Prepetition Secured Parties regarding the consensual use of Cash Collateral that is reflected in the Cash Collateral Motion and Interim Order.

131.    I understand that, as part of the consensual arrangement, and as adequate protection for any diminution in value during these cases, the Debtors have agreed to provide the Prepetition Secured Parties with adequate protection that includes: (a) granting of adequate protection liens to the Prepetition Secured Parties on all property and assets of the Debtors; (b) granting of allowed superpriority claims solely to the extent of the aggregate diminution in value of the Prepetition Secured Parties' interest in the Prepetition Collateral from and after the Petition Date, if any; (c) monthly payment of postpetition interest at the non-default rate and fees and expenses (including professional fees); and (d) certain other budget and reporting requirements.

132.    Moreover, I have been informed that in the Cash Collateral Motion and Interim Order the Debtors have admitted, stipulated and agreed to various facts, including but not limited to: (a) that the Debtors have granted Prepetition Liens in, to, and against all of the real and personal property (including all of the oil and gas leases, rights of way, and property interests, including wells, improvements, and other property located on such oil and gas properties) described in the Prepetition Security Agreements to the Prepetition Administrative Agent and the other Prepetition Secured Parties; (b) that all amounts payable under the Prepetition Credit Documents are now fully due and payable by the Debtors and that the Debtors are each jointly and severally indebted and liable to the Prepetition Administrative Agent and the other Prepetition Secured Parties for such amounts without defense, counterclaim or offset of any kind; (c) this prepetition indebtedness owed by the Debtors is secured by valid, binding, perfected,

enforceable, non-avoidable, first-priority liens and security interests in, to and against the Prepetition Collateral

133.    I understand that, subject to paragraph 18 of the Interim Order, these stipulations and admissions by the Debtors contained in the Interim Order are binding upon all other parties in interest, including any committee or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors, for all purposes, unless subject to a successful challenge that specifically challenges the Debtors' stipulations prior to the Investigation Termination Date (as defined in the Interim Order). As to the Debtors, however, and subject to paragraph 18 of the Interim Order, I understand that all such challenges are irrevocably waived pursuant to the Interim Order and relinquished effective as of the Petition Date.

134.    I have also been informed that notwithstanding the Debtors' stipulations in the Interim Order, upon the earlier of (i) any Termination Date (as defined in the Restructuring Support Agreement) or (ii) the termination of the Restructuring Support Agreement by the Required Consenting Banks, each of the Debtors, each party to the Restructuring Support Agreement and any committee shall have a Supplemental Investigation Termination Date (as defined in the Interim Order) to exercise a supplemental challenge to the validity, enforceability, priority or perfection of any asserted security interests or liens alleged to secure the Prepetition Indebtedness under the Prepetition Credit Documents or otherwise with respect to the Prepetition Wetzel County Liens. I understand that the Debtors' stipulations and admissions with respect to the Prepetition Wetzel County Liens will be binding upon the Debtors and any successors thereto in all circumstances, unless a supplemental challenge that specifically challenges the Debtors' stipulations is received prior to the Investigation Termination Date or Supplemental Investigation

Termination Date, and the Court rules in favor of the plaintiff sustaining any such supplemental challenge.

135.    I believe that the Debtors need authorization to use the Cash Collateral to pay operating expenses associated with their business operations, all in accordance with the budget (the "Budget").  Indeed, I believe that absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

136.    I also believe that the Debtors' use of Cash Collateral is critical to preserve the value of their assets and property during the Chapter 11 Cases and will avoid immediate and irreparable harm to the Debtors' estates and creditors.  The use of Cash Collateral constituting proceeds of the Prepetition Collateral generated following the Petition Date will also allow the Debtors to avoid the increased costs and administrative burdens that would follow if the Debtors were required to immediately segregate and not use their operating cash.  I believe that the terms and conditions on which the Debtors may use Cash Collateral have been carefully designed, and extensively negotiated, to meet the dual goals of Bankruptcy Code Sections 361 and 363.  If the Interim Order is entered, I believe the Debtors will have ample working capital to operate their businesses and provide an opportunity to maximize value for the benefit of their stakeholders.  At the same time, I believe that the Prepetition Secured Parties will be adequately protected with the adequate protection liens on all assets of the Debtors, superpriority claims, current payment of interest at the non-default rate and reimbursement of professional fees and expenses.

137.    As discussed above, a significant portion of the Prepetition Collateral consists of the Debtors' oil and gas properties and related assets (including real property and personal property related thereto), which includes the hydrocarbons extracted by the Debtors from those

properties and the proceeds generated from sales thereof.  The Debtors' business model is predicated upon their ability to exploit their hydrocarbon assets, bring them to market, and use the proceeds in their business operations.  Thus, I believe the orderly continuation of the Debtors' operations and the preservation of their going concern value is largely dependent upon their ability to regularly convert the Prepetition Collateral into Cash Collateral and use it in their operations.  The Debtors rely on the Cash Collateral generated from their operations to fund working capital, capital expenditures, research and development efforts, and for other general corporate purposes.

138.    I have been informed that the Debtors, with the assistance of their financial advisors, have prepared a Budget showing sources and uses of cash necessary for the Debtors' operations on a weekly basis for the first four (4) weeks of these Chapter 11 Cases.  Specifically, the Budget shows the Debtors' forecasted receipts and disbursements from the Petition Date through January 13, 2017 (such initial four-week period, the "Budget Period").  As set forth in the Interim Order and the Budget, the Debtors intend to use Cash Collateral for, among other things, (i) working capital, general corporate purposes, and administrative costs and expenses of the Debtors incurred in the Chapter 11 Cases, including first-day related relief subject to the terms hereof; and (ii) monthly adequate protection payments to the Building Loan Lender in an amount not to exceed $75,000, and (iii) adequate protection payments to the Prepetition Administrative Agent and the other Prepetition Secured Parties.

139.    The Debtors will adhere to the Budget during the Budget Period, subject to their ability to: (i) carry over any amounts not expended for weekly budgeted items not paid through any subsequent week within a four-week period thereafter, (ii) expend up to fifteen percent (15%) more than the budgeted amount (plus any permitted carry forward) for a specific week in

such week so long as the aggregate expenditures during the Budget Period do not exceed the total shown on the Budget for such interim period by more than fifteen percent (15%) (excluding Excluded Disbursements (as defined in the Cash Collateral Interim Order)) payable to the professionals of the Prepetition Secured Parties), and (iii) pay amounts incurred from and after the Petition Date, in addition to or for categories not listed in the Budget with the prior written consent of the Prepetition Agent (collectively, the "Authorized Variances").

140.    I understand that the Authorized Variances will be tested initially on January 13, 2017 and will continue thereafter, each test covering the trailing four-week period (each, a "Monthly Testing Period").    In the event the Debtors' expenditures exceed any Authorized Variances during any Monthly Testing Period, I have been informed that the Debtors reserve the right to modify the Budget and seek further relief from this Court regarding their continued use of Cash Collateral in accordance with such modified Budget.

### C.    Workforce Obligations Motion

141.    In the Workforce Obligations Motion, the Debtors seek entry of an order authorizing them, in their discretion, to pay, continue, or otherwise honor various prepetition labor-related obligations (collectively, the "Prepetition Workforce Obligations") to or for the benefit of their current, former, full-time, part-time, permanent, and temporary Employees and retirees, independent contractors, employment agencies, and their supplemental workforce (together with the Employees, the "Workforce") for compensation, benefits, and expense reimbursements under all plans, programs, and policies maintained or contributed to, and agreements entered into, by the Debtors prior to the Petition Date (as described below, the "Workforce Programs").    In addition, the Debtors request that the Court confirm their right to continue each of the Workforce Programs in the ordinary course of business during the pendency of these Chapter 11 Cases in the manner and to the extent that such Workforce Programs were in

effect immediately prior to the filing of such cases and to make payments in connection with expenses incurred in the postpetition administration of any Workforce Program.

142.    The Workforce Programs under which the Prepetition Workforce Obligations arise are described more fully in the Workforce Obligations Motion and include, without limitation, plans, programs, policies, and agreements providing for (a) wages, salaries, bonuses, earned time off, and other accrued compensation; (b) reimbursement of business, travel, relocation, and other reimbursable expenses and payment of business-related credit card obligations; and (c) benefits, with coverage as applicable for eligible retirees, their spouses and dependents, as well as current and former employees, and their spouses and dependents, in the form of medical, dental, and vision coverage, pre-tax contribution flexible-spending accounts, basic term life, supplemental life, accidental death and dismemberment, long-term disability, savings, retirement, pension and related types of benefits, ordinary-course severance including standard severance and reduction-in-force severance, change of control incentive plans, and miscellaneous other benefits provided to the Workforce in the ordinary course of business.

143.    The Debtors also request authorization to pay any and all local, state, and federal withholding and payroll-related or similar taxes relating to the Prepetition Workforce Obligations, including, but not limited to, all withholding taxes, social security taxes, unemployment taxes and Medicare taxes.  In addition, the Debtors request authorization to pay to third parties, on behalf of the Employees, any and all amounts deducted from the Employees paychecks for garnishments, charitable contributions, support payments, savings programs, benefit plans, insurance programs, and other similar programs.

144.    The Debtors also request that, with respect to any Workforce Programs that are administered, insured, or paid through a third-party administrator or provider, the Debtors be

expressly authorized, in their discretion, to pay any prepetition claims of such administrator or provider in the ordinary course of business to insure the uninterrupted delivery of payments or other benefits to the Employees.

145.    Lastly, in support of the Workforce Obligations Motion, the Debtors request that the Court authorize and direct all banks and financial institutions to receive, process, honor, pay, and, if necessary, reissue all prepetition and postpetition checks and fund transfers, including prepetition checks and electronic payment and transfer requests that the Debtors reissue or re-request postpetition, drawn on the bank accounts used by the Debtors to satisfy their obligations in connection with Prepetition Workforce Obligations, upon receipt by each bank or financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.  The Debtors additionally request that the Court authorize them to issue new postpetition checks to replace any checks that may nevertheless be dishonored and to reimburse any expenses that holders of claims in connection with Prepetition Workforce Obligations may incur as a result of any bank's failure to honor a prepetition check.

146.    As discussed above, as of the Petition Date, the Debtors' Workforce consisted of approximately 247 current Employees.  Of the Employees, approximately 99% of the Debtors' current Employees are salaried Employees and approximately 1% are hourly Employees.  The Debtors' Workforce also currently includes approximately 9 Independent Contractors and 102 Supplemental Workers.  Stone employs the Debtors' entire Workforce.

147.    The Workforce performs a variety of critical functions, including the acquisition, exploration, development, and production of onshore and offshore oil and gas, sales, purchasing, repair and maintenance, information and technology, and a variety of administrative, accounting, legal, finance, marketing, management, supervisory, human resources, and other related tasks,

including tasks in connection with the maintenance of transactions and records affecting the Debtors' oil and gas interests as well as the health, safety, environmental, and regulatory aspects of the Debtors' operations.

148.    I believe that the Debtors' ability to preserve their businesses, safely and productively operate their businesses, and successfully reorganize their capital structure is dependent on the expertise and continued enthusiasm and service of their Workforce.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I believe that the continuity and competence of the Debtors' Workforce would be jeopardized if the relief requested in the Workforce Obligations Motion is not granted.

149.    It is my belief that if the Debtors fail to pay the Prepetition Workforce Obligations in the ordinary course of business, the Employees will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  This would have a highly negative impact on Workforce morale and productivity, thereby resulting in immediate and irreparable harm to the Debtors' continuing operations and their estates.   Accordingly, I believe that continuation of the Workforce Programs is vital to preventing the loss of key members of the Workforce during the pendency of these Chapter 11 Cases and to maintaining the continuity and stability of the Debtors' operations.

a.    Prepetition Workforce Compensation

150.  ***Employee Payroll and Payroll Deductions***.  Current Employees are paid semi-monthly (on or around the fifteenth and last day of each month), with an average payroll each pay period of approximately $1,587,761.  The Employees are paid all compensation on time, except with respect to overtime pay for the Debtors' hourly and eighty-nine (89) non-exempt Employees, which occasionally must be paid on the next scheduled pay date.  The Debtors manage and administer their payroll from within the Human Resources department, located at

the Headquarters, by way of the Ultimate Software Human Resource Information System ("UltiPro"), which is a subscription-based system for which the Debtors pay, on average, a fee of approximately $22,000 per quarter.  I have been informed that the Debtors do not have any amounts due and owing on account of subscription fees for UltiPro.

151.    It is my understanding that in the ordinary course of their businesses, the Debtors make deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state, and local income, employment taxes (FICA, FUTA, SUTA and Medicare) and other taxes, as well as for charitable contributions, garnishments, support payments, savings programs, benefit plans, flexible savings accounts, insurance programs, and other similar programs (collectively, the "Deductions").  I have been informed that over the past twelve (12) months, the Debtors' average semi-monthly Deductions for Employees aggregated approximately $539,684.

152.    I have also been informed that certain of the Employees are owed certain prepetition amounts.  Where Employees are owed prepetition compensation amounts, the applicable Deductions have not yet been taken.  Additionally, the Debtors may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions that have been withheld from Employees' paychecks.  I have been informed that, as of the Petition Date, the Debtors are holding Deductions aggregating approximately $22,602, which the Debtors seek to pay to third parties in accordance with their prepetition practice.

153.    I have been informed that, as of the Petition Date, accrued but unpaid wages and other compensation, including the Deductions, total approximately $76,417 (comprised of $53,815 owed to Employees and $22,602 attributable to the Deductions).

154. ***Supplemental Workforce and Independent Contractors***.   In addition to the Employees, the Debtors also retain supplemental workers pursuant to formal and informal arrangements (the "Supplemental Workforce," and each member thereof, a "Supplemental Worker").   The Supplemental Workforce includes, for instance, contract pumpers, mechanics, information technology support specialists, engineers, legal professionals, geologists, and geophysicists, to perform a variety of tasks related to the Debtors' operations in the ordinary course of business.   The Debtors also retain independent contractors pursuant to formal and informal arrangements (the "Independent Contractors").   The Independent Contractors provide a variety of services for the Debtors, including accounting, legal, geophysical, engineering, and clerical services.   The Debtors utilize the services of certain employment agencies (the "Agencies") in connection with providing or engaging the Supplemental Workers.   Though both the Supplemental Workers and Independent Contractors fluctuate to meet the Debtors' business needs, as discussed above, as of the Petition Date, the Supplemental Workforce consisted of approximately 102 Supplemental Workers (all of whom are located in field positions) and the Independent Contractors consisted of approximately nine (9) individuals, five (5) of whom are located in office positions and four (4) of whom are located in field positions. The Debtors do not pay wages, withhold taxes, or provide benefits or earned time off for the Independent Contractors or Supplemental Workers.   Instead, the Debtors make payments to (a) the Independent Contractors based upon the relevant agreement and (b) the Agencies generally based upon the number of hours worked by the Supplemental Workers.   The Agencies are responsible for paying the Supplemental Workers' wages and other amounts to which they are entitled.   The Debtors remit payments to most of the Agencies on a monthly basis.   I have been

informed that, on average, a monthly spend of approximately $1,800,000 is paid for the services of Independent Contractors and Supplemental Workers.

155.   ***Vacation Days, Paid Sick Leave Days, and Paid Holidays***.  As part of their overall compensation, salaried and hourly Employees are entitled to receive a certain number of vacation and sick days each year (collectively, "Earned Time Off").[13]  Employees earn between ten (10) and twenty-five (25) vacation days per year, depending upon their length of service with the Debtors, with those Employees who have been employed by the Debtors for a longer period of time or who have equivalent years of industry experience being entitled to a greater number of vacation days than those Employees who have been with the Debtors for a shorter period of time or who do not have equivalent years of industry experience.[14]  In lieu of sick leave, the Employees are entitled to an additional five (5) paid days per year.  The Employees also receive ten (10) paid holidays per year.

156.   I have been informed that Employees are not entitled to use accrued but unused Earned Time Off in subsequent years and, therefore, may not carry over from one year to the next any accrued but unused Earned Time Off.  Nevertheless, upon termination or retirement, Employees receive a cash payment on account of any accrued but unused Earned Time Off.  It is my understanding that this policy is consistent with the laws of most states, which provide that paid-time-off benefits are vested and must be paid upon termination of employment.  I have been informed that, as of the Petition Date, the Debtors' total liability for accrued but unused Earned Time Off is approximately $1,012,452.  This accrued amount, however, does not represent a true

---

[13] Prior to 2016, vacation and sick leave were granted separately.  In 2016, these programs were combined into a single earned time off program.

[14] By way of example, Employees who have been employed by the Debtors for (a) less than five (5) years or have equivalent years of industry experience are entitled to ten (10) vacation days; (b) greater than five (5) years but less than ten (10) years are entitled to fifteen (15) vacation days; (c) greater than ten (10) years but less than twenty (20) years are entitled to twenty (20) vacation days; and (d) greater than twenty (20) years are entitled to twenty-five (25) vacation days.

"cash" liability for the Debtors, as I anticipate that Employees will use most of their Earned Time Off in the ordinary course of business.

157. **_Bonus Programs_**.   In the ordinary course of business, as an incentive to encourage and reward outstanding performance, the Debtors have historically offered certain of their Employees the opportunity to earn bonuses under certain bonus programs, including, most recently, the Stone Energy Corporation 2016 Performance Incentive Compensation Plan (the "Performance Bonus Plan"), which was approved and implemented by the Debtors on March 10, 2016.  The Performance Bonus Plan is a performance-based incentive program, the purpose of which is to motivate the Employees to make extraordinary efforts to achieve short-term target goals that are crucial to the Debtors.  For 2016, the Performance Bonus Plan comprised the entire incentive-based compensation opportunity for all Employees.

158. Each Employee that is eligible to participate in the Performance Bonus Plan has an award opportunity (an "Award Opportunity"), the amount of which may vary depending upon whether a threshold, target, or maximum performance level is achieved.  The Award Opportunity is expressed as a percentage of the value achieved for each performance level for the current quarter and on an annual basis.   Award Opportunities were earned based on company performance during quarterly three-month performance periods for the twelve (12) months of fiscal year 2016 (each such period, a "Quarterly Period") and settled after the end of each Quarterly Period, with the ability to catch-up any quarterly amount at the end of fiscal year 2016, based on company performance over the full twelve-month performance period of fiscal year 2016 (the "Annual Period").   To be entitled to receive payment on an Award Opportunity, eligible Employees must be employed by the Debtors on the last day of a Quarterly Period and on the date payment is made with respect to an Award Opportunity earned relative to such

Quarterly Period.  It is my understanding that if an Employee is terminated due to death, disability, or retirement on or before the last day of a Quarterly Period (or on or before an applicable Quarterly Period payment date), such Employee may have his or her Award Opportunity for such Quarterly Period determined to be earned, and the award paid, on a pro rata basis.  Otherwise, if an Employee is terminated (either voluntarily or involuntarily), such Employee's Award Opportunity for the Quarterly Period in question is void as of the date of termination, and not subject to being earned, and such Employee is not entitled to receive payment relative to such Quarterly Period Award Opportunity.

159.    Payments to eligible Employees under the Performance Bonus Plan are tied to the achievement of certain target financial metrics at the corporate level, including certain EBITDA targets, capital expenditure targets, and compliance targets related to health, safety, and environmental regulations regarding the production of oil and gas.

160.    I have been informed that, prior to the Petition Date,  the Debtors paid a total of $15,818,169, which represents the total amount of bonuses paid year to date, and includes payments made for the first three quarters of 2016 under the Performance Bonus Plan.

161.    The Debtors' executive-level Employees participated in the Performance Bonus Plan through the Petition Date.  These Employees agreed to forgo any payments under the Performance Bonus Plan for the fourth quarter of 2016, or the year-end catch-up for performance over the full Annual Period.  Accordingly, any remaining payments under the Performance Bonus Plan will only be made to non-executive Employees.[15]

162.    In the ordinary course of business, as an incentive to encourage and reward compliance with certain safety measures, the Debtors also offer their field Employees the

---

[15] The Debtors' executive-level Employees are David H. Welch, me, Richard L. Toothman, Jr., Lisa S. Jaubert, John J. Leonard, Eldon J. Louviere, Thomas L. Messonnier, Keith A. Seilhan, and Florence M. Ziegler.

opportunity to earn bonuses under a safety incentive program (the "Safety Incentive Plan").  The Safety Incentive Plan is a safety-based incentive program, the purpose of which is to motivate Employees that work in the field, at both onshore and offshore sites, to achieve short-term target goals related to the observance of health and safety measures.  The primary objective of the Safety Incentive Plan is to reward Employees for demonstrating safe work practices and reporting hazards as they arise.  I have been informed that, on average, the Debtors pay approximately $151,500 in bonuses on an annual basis under the Safety Incentive Plan.

163.    Under the Stone Energy Corporation 2009 Amended and Restated Stock Incentive Plan (as amended, the "Equity Plan") all levels of Employees may earn awards including, but not limited to, options, stock-appreciation rights, restricted stock units ("Restricted Shares"), performance awards, and other stock-based awards.[16]  Long-term incentive awards with respect to a given year's performance are typically granted to employees in the first quarter of the following year.  I have been informed that the Debtors contract with Computershare Investor Services ("Computershare") to provide plan administration services with respect to the Equity Plan.  It is my understanding that the Debtors are not aware of any amounts owed to Computershare as of the Petition Date with respect to the administration of the Equity Plan.

164.    I have been informed that as of the Petition Date, the Debtors have accrued a total prepetition liability of approximately $1,864,875 under the Performance Bonus Plan and Safety Incentive Plan, which represents approximately two (2) months of bonus accruals in connection with the fourth Quarterly Period in 2016.  It is my understanding that any amounts payable under the Performance Bonus Plan will be determined and paid prior to March 31, 2017.  Any amounts

---

[16] The maximum number of shares that may be issued under the Equity Plan is 1,057,500 shares.  I have been informed that, as of the Petition Date, 236,261 shares are available for grant under the Equity Plan.

payable under the Safety Incentive Plan will be determined within thirty (30) days of December 31, 2016 and paid in the next administratively feasible payroll following that date.

165.     Prior to the Petition Date, the Debtors adopted the Stone Energy Corporation Key Executive Incentive Plan (the "KEIP"), effective as of January 1, 2017, subject to approval of the Court pursuant to the *Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 365(a) and Fed. R. Bankr. P. 6004, 6006 and 9019 Authorizing and Approving (I) Executive Claims Settlement Agreement with Senior Executives and (II) the Assumption of Certain Amended Employment Agreements and Non-Qualified Plan*, filed concurrently herewith (the "Executive Claims Settlement Motion").  The terms of the KEIP are described in the Executive Claims Settlement Motion.  Out of an abundance of caution, the Debtors request authority in the Workforce Obligations Motion to continue to reimburse expenses incurred by the Debtors' management for outside counsel to the management team, Cole Schotz P.C., on a postpetition basis in the ordinary course of business.

b.     Prepetition Employee Reimbursements

166.     ***Business Expenses***.  The Debtors, in the ordinary course of their business, reimburse Employees for a variety of ordinary, necessary, and reasonable business-related expenses that the Employees incur.  These include expenses for business travel (including lodging, automobile rentals, meals, and internet charges), business-related transportation and mileage costs, and other general business-related expenses.  Employees are expected to use sound judgment and good business sense when incurring such expenses.

167.     In certain instances, Employees may be issued corporate credit cards to pay for work-related expenses.  I have been informed that such Employees are issued a company credit card through American Express or ChevronTexaco to be utilized for travel, entertainment, and other business-related expenses.  Each Employee reconciles expenses charged on his or her

issued credit card on a monthly basis by downloading the relevant statement from the account website and properly categorizing and explaining each expense on a reconciliation sheet, which is then reviewed and approved by such Employee's manager and forwarded to the Debtors' accounting department for recordation.   I have been informed that payments to American Express and ChevronTexaco are made via check through the Debtors' normal accounts payable process.

168.     My understanding is that those Employees who have not been issued a credit card are required to enter manually the details of any expenses incurred into the Debtors' software-based expense reimbursement program.  The Employee is reimbursed for his or her work-related expenses via a separate check issued by the Debtors immediately after the expense report is submitted and approved by the applicable manager and accounting staff.  Because Employees are not always prompt in entering expense-reimbursement data into the software system, it is difficult for the Debtors to determine the exact amount outstanding at any particular time.  I have been informed that, on average, Employees take four (4) weeks to submit their expense data.  It is my understanding that, taking into account this four-week lag period, as of the Petition Date, the Debtors' obligation to Employees for accrued, reimbursable expenses (submitted and un-submitted) aggregate approximately $90,858, inclusive of amounts owed to American Express and ChevronTexaco for travel, entertainment, and other business-related expenses owed in connection with the credit cards.

169.     ***Relocation Expenses***.   Additionally, in order to maximize the effectiveness of their work-force, the Debtors have in place a relocation policy (the "Relocation Policy"), depending on the business unit for which the particular Employee works or will work.  My understanding is that, to be eligible for benefits under the Relocation Policy, full-time Employees

or newly hired Employees to be employed, who either rent or own a home, must:  (a) have been requested to move by the Debtors at least a distance of fifty (50) miles and (b) be designated by the Debtors as eligible for benefits under the Relocation Policy.  Consistent with the Debtors' ordinary practice, and depending on the position of the individual, a flat dollar amount between $10,000 and $30,000 is provided by Stone for relocation expenses.  I have been informed that there are no amounts due and owing on account of relocation-related expenses incurred pursuant to the Relocation Policy.  However, I believe it is imperative that the Debtors continue to reimburse newly hired and existing Employees who are asked to relocate and to directly pay certain expenses in connection therewith.

170.   ***Tuition Program***.    Additionally, the Debtors offer Employees that have completed at least one year of service with the Debtors the ability to participate in an educational assistance program (the "**Tuition Program**").  The Tuition Program is designed to enable an eligible Employee to contribute to the Debtors' success by increasing knowledge and skills through professional development.  As it has been explained to me, under the Tuition Program, the Debtors provide reimbursement for one hundred percent (100%) of the eligible tuition and fees, up to a maximum of $5,000 per year.  Reimbursement under the Tuition Program is, however, subject to required management approvals and is only provided for courses in pursuit of a degree that is directly related to the participating Employee's present or prospective role with the Debtors.  Furthermore, according to my understanding, Employees must successfully complete their education and remain employed by the Debtors for a period of twelve (12) months after any tuition reimbursement is made.  Moreover, certain college-level Employees have been approved to participate in additional programs whereby reimbursement may exceed the $5,000 per year cap.  To participate in such additional programs, an Employee must seek prior approval

from his or her manager, department executive, and the Senior Vice President of Human Resources.  I have been informed that there no amounts due and owing on account of the Tuition Program.

171.    ***Miscellaneous Reimbursements***.  The Debtors also provide their Employees a subsidy for health club membership fees (the "Health Club Subsidy").  My understanding is that, pursuant to the Health Club Subsidy, the Debtors reimburse single Employees up to $30 per month, and Employees and their spouses up to $40 per month, with respect to monthly health club membership fees.  To be eligible for the Health Club Subsidy, participating Employees are required to present proof on a rolling basis that they have attended a health club at least two times per week.  I have been informed that, as of the Petition Date, the unpaid obligations on account of the Health Club Subsidy were approximately $1,472.

172.    Additionally, the Debtors offer their Employees and immediate family members a behavioral health program that provides, among other things, confidential, professional assistance for personal and family-related problems (the "Employee Assistance Program"), which is administered by the Debtors' third-party benefit services manager, Gilsbar, LLC ("Gilsbar").  My understanding is that the Employee Assistance Program includes, among other things, short-term counseling, legal services, dependent-care referral services, and financial services.  I have been informed that, on average, the Debtors pay approximately $478 per month in the aggregate on account of the Employee Assistance Program.

173.    The Debtors also provide certain executive-level Employees with miscellaneous benefits for expenses incurred in connection with an annual physical and other health-related screenings (the "Executive Health Program").  I have been informed that such expenses are paid

directly to the provider as invoices are received, and that no amounts are due and owing to any providers on account of expenses incurred in connection with the Executive Health Program.

174.     Aggregating the approximately (a) $90,858 in accrued, reimbursable business-related expenses and (b) $1,472 in reimbursements associated with the Health Club Subsidy, the total prepetition obligations related to reimbursements is estimated to be $92,330 as of the Petition Date (the "Reimbursement Obligations").  As stated above, I do not believe that any amounts are due and owing as of the Petition Date on account of the Relocation Policy, Tuition Program, Employee Assistance Program, or Executive Health Program.

c.      Employee Benefits

175.     Prior to the Petition Date, the Debtors offered Employees and their eligible spouses and dependents various standard employee benefits, including, without limitation, (a) medical, dental, and vision coverage; (b) pre-tax contribution flexible spending accounts; (c) basic term life, supplemental life, and accidental death and dismemberment insurance; (d) long-term disability insurance, (e) retirement, savings, pension, and related benefits, (f) ordinary-course severance including standard severance and reduction-in-force severance; (g) change of control incentive plans, and (h) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the "Employee Benefits").  As of the Petition Date, I understand that the Debtors were obligated to pay certain contributions to or provide benefits under such plans, programs, and policies.

176.     ***Medical, Dental, and Vision Programs***.  All full-time Employees (including certain retired Employees), are eligible to participate in a medical plan (the "Medical Plan") administered by Gilsbar.  The Medical Plan is a partially self-insured "PPO" plan offered through CIGNA Health and Life Insurance Company ("CIGNA"), under which Employees and their family members have the choice to use providers within the network or to use providers

outside the network (the latter option being subject to higher costs).  Current Employees pay ten percent (10%) of the applicable premium[17] for their medical-benefits coverage through pre-tax contributions deducted from their paychecks.  Former Employees, or qualified beneficiaries thereof, who are eligible for continuation coverage under COBRA, pay one-hundred and two percent (102%) of the applicable premium.  The Debtors partially self-insure the Medical Plan[18] by using the premiums paid by Employees to cover the self-insured benefits and do not remit applicable premiums to Gilsbar.[19]  I understand the Debtors anticipate that the premiums paid by Employees will cover the cost of the benefits provided by the Medical Plan.  However, to the extent that the aggregate premiums paid by Employees do not fully cover the incurred liability for benefits incurred under the Medical Plan, then the Debtors would be obligated under the terms of the Medical Plan to cover such expenses up to the self-insured amount.  Tokio Marine HCC ("HCC") provides stop-loss insurance for benefits which are not self-insured by the Debtors.  I have been informed that the monthly premium on the stop-loss insurance is approximately $48,337, which is remitted by the Debtors to Gilsbar for forwarding to HCC.

177.    The Debtors also offer current full-time Employees and certain retired Employees dental benefits through a dental plan (the "Dental Plan") administered by Gilsbar.  The Dental Plan is a self-insured group dental cost-indemnity plan whereby dental claims are processed by Gilsbar under the direction of the Debtors.  Current Employees pay ten percent (10%) of the

---

[17] I have been informed that the applicable premiums are a reasonable estimate of the cost of providing medical coverage for the Employees and their covered dependents and are determined on an actuarial basis.

[18] The Debtors assume the first $150,000 of annual claims liability per participant in the Medical Plan.

[19] I have been informed that premiums paid by Employees are applied towards claims submitted under the Medical Plan.  The Debtors fund a separate health-disbursements account to pay claims submitted under the Medical Plan. Gilsbar provides the Debtors with details of outstanding claims that require payment.  After the Debtors review and approve the claims, the Debtors fund the health-disbursements account, and Gilsbar writes checks and initiates electronic funds transfers to medical providers.  I was informed that as of December 9, 2016, the approximate amount of outstanding claims submitted under the Medical Plan was $188,222, which I believe is a reasonable proxy for the amount of outstanding claims as of the Petition Date.

applicable premium for their dental-benefits coverage through pre-tax contributions deducted from their paychecks. Retired Employees pay ninety percent (90%) of the applicable premium.[20] Former Employees, or qualified beneficiaries thereof, who are eligible for continuation coverage under COBRA, pay one-hundred and two percent (102%) of the applicable premium. The Debtors partially self-insure the Dental Plan[21] by using premiums paid by the Employees and do not remit applicable premiums to Gilsbar. I understand that it is expected that the premiums paid by the participants in the Dental Plan will cover the promised benefits. However, to the extent that the aggregate premiums paid by Employees do not fully cover the liability for benefits incurred under the Dental Plan, then the Debtors would be obligated under the terms of the Dental Plan to cover such expenses up to the self-insured amount.

178.   The Debtors also offer Employees vision benefits through a vision plan with Vision Service Plan ("VSP"). Such Employees pay one-hundred percent (100%) of the premium for their vision-benefits coverage through pre-tax contributions deducted from their paychecks, which is remitted monthly to VSP. The Debtors do not incur any obligations on behalf of their current Employees on account of the vision plan with VSP.

179.   I have been informed that the estimated monthly cost to the Debtors under all medical, prescription drug, and dental plans (including claims, but not including any administrator fees) is approximately $588,637, excluding COBRA and retiree premium reimbursements, which amount, I believe, is a reasonable proxy for the Debtors' prepetition obligations under such benefit plans.

---

[20] I have been informed that the applicable premiums are a reasonable estimate of the cost of providing the dental coverage for the Employees and are determined on an actuarial basis.

[21] The Debtors assume the first $2,000 of annual claims liability per participant in the Dental Plan.

180.    ***Pre-Tax Contribution Flexible Spending Accounts***.  The Debtors additionally offer all of their Employees the opportunity to contribute, through pre-tax compensation deductions, to flexible spending accounts ("FSAs") to be used for qualified healthcare-related and dependent-care expenses, subject to limits imposed by federal law.  I understand that FSA deductions are made from Employees' paychecks, and those funds are, upon the participating Employee's submission of a claim, remitted by the Debtors to Gilsbar, which administers the claims under the FSAs and remits reimbursements to the Employees.  I have been informed that the Debtors do not currently owe any amounts on account of FSA deductions to be remitted to Gilsbar.

181.    Furthermore, I have been informed that, as of the Petition Date, the Debtors previously deducted $158,427 from Employees' paychecks on account of contributions made to FSAs in 2016 (the "FSA Contributions").  It is my understanding that, in many cases, Employees have either not incurred, or not yet submitted claims for, qualified healthcare-related and dependent-care expenses, which would be paid from the FSA Contributions.  I have been informed that approximately $36,229 of the total FSA Contributions in 2016 have yet to be used by Employees towards reimbursement from their FSAs.

182.    ***Life Insurance and Accidental Death and Dismemberment Insurance***.  The Debtors provide, at their own cost, full-time Employees working 30 or more hours per week (except those working on a temporary or seasonal basis) with basic life insurance and accidental death and dismemberment ("AD&D") insurance, administered by Reliance Standard Life Insurance Company ("Reliance").  It is my understanding that basic life insurance is provided in an amount equal to two-and-one-half times the Employee's annual earnings, up to a maximum of $500,000.  Additionally, in cases not involving the loss of life but the dismemberment of an

Employee (such as the loss of a hand, a foot, or the total loss of sight in an eye), an AD&D benefit equal to two-and-one-half times the Employee's annual earnings, up to a maximum of $500,000 is also payable. I also have been informed that, for those Employees that are aged 70 and over, the basic life and AD&D benefit is subject to automatic reduction. When Employees are aged 70 to 74 years old, the benefit is reduced by thirty-three percent (33%), and when Employees are aged 75 years or older, the benefit is reduced by an additional seventeen percent (17%). I have been informed that the Debtors' average monthly expense attributable to life insurance programs and AD&D insurance for all Employees is approximately $19,554 per month, which, I believe, is a reasonable proxy for the estimated amount that the Debtors owe as of the Petition Date.[22]

183.    ***Long-Term Disability and Medical Leave Programs***. The Debtors provide, at their own cost, all Employees (except those working on a temporary or seasonal basis) with long-term disability ("LTD") coverage administered by Reliance. My understanding is that Employees are eligible for this benefit after thirty (30) days of continuous employment. The LTD coverage is equal to sixty-six and two-thirds percent (66 2/3%) of the Employee's monthly earnings (offset by sources of income such as social security and other disability benefits) up to a maximum monthly amount that varies based on the classification of the Employee.[23]    I also

---

[22] It is my understanding that Employees may purchase supplemental life insurance, at their own cost, from a minimum coverage limit of $10,000 and up to $500,000. In addition, Employees may purchase supplemental AD&D coverage, at their own cost, from a minimum coverage limit of $10,000 and up to $500,000 (not to exceed ten times the Employee's annual earnings over $150,000). Employees may also purchase supplemental life insurance coverage and AD&D coverage for their spouses and children, which is limited, in certain cases, to a certain percentage of the individual Employee's benefit amount. Employees may also purchase voluntary critical illness insurance, at their own cost, from a minimum coverage limit of $5,000 and up to $50,000. My understanding is that such critical care insurance provides a fixed, lump-sum benefit upon diagnosis of a critical illness, including, for example, heart attack, stroke, paralysis, and other critical illnesses. All supplemental policies are administered by Reliance.

[23] The maximum monthly benefit is (a) $15,000 for all active, full-time executive officers; (b) $12,000 for all active, full-time office personnel that meet the EEOC-1 Professional job classification; and (c) $10,000 for all other active, full-time Employees.

understand that such LTD benefits are generally paid as long as the Employee remains disabled or up to a certain number of years depending on the Employee's age at disablement.  Further, I have been informed that the Debtors also provide Employees up to six (6) weeks of paid leave for, among other things, serious health conditions ("Medical Leave").   Medical Leave is discretionary and is based upon the particular circumstances presented.

184.    I have been informed that, as of the Petition Date, the average monthly premium for LTD coverage for all Employees is $11,692, which I believe is a reasonable proxy of the amounts they owe as of the Petition Date.

185.    ***Savings and Retirement Plans***.    The Debtors sponsor the Stone Energy Corporation 401(k) Profit Sharing Plan (the "401(k) Program") for their Employees.[24]   The 401(k) Program is administered by Stone, with certain recordkeeping, investment-management, and ancillary services provided by Fidelity Investments ("Fidelity"), and is a tax-qualified 401(k) retirement savings plan.   Under the 401(k) Program, an eligible Employee (which includes certain full-time and part-time Employees) may contribute a portion of his or her compensation on a pre-tax basis, through voluntary payroll deductions, to the 401(k) Program, subject to applicable statutory limits.   I understand that these contributions are deducted from the paychecks of participating Employees and contributed by the Debtors to the 401(k) Program. The 401(k) Program does not permit participating Employees to contribute a portion of eligible pay to the 401(k) Program on an after-tax basis.  My understanding is that the total contributions made by a participating Employee for any payroll period (a) must be no less than one percent (1%) of his or her eligible earnings for such period, (b) must be made in one-half percent (½%) increments, and (c) must be contributed before-tax; provided that the total contribution for any

---

[24] An Employee is eligible to participate in the 401(k) Program on the first day of the month on or following employment.  Temporary Employees (including interns), seasonal Employees, and Independent Contractors are not eligible to participate in the 401(k) Program.

payroll period cannot exceed sixty percent (60%) of such Employee's eligible earnings. I have been informed that, currently, approximately eighty-one percent (81%) of eligible Employees participate in the 401(k) Program.

186.    The Debtors have the discretion to make a matching contribution to the 401(k) Program on an annual basis. So long as an Employee that participates in the 401(k) Program remains employed on December 31 of the applicable year, or who becomes disabled, retired, or passes away during the applicable year, such Employee will be eligible for a discretionary matching contribution by the Debtors. I have been informed that the Debtors paid $1,552,599 in connection with matching contributions for fiscal year 2015[25] and expect that the total aggregate amount of contributions in fiscal year 2016 will be similar to the amount paid in fiscal year 2015. I have also been informed that, as of the Petition Date, the Debtors have accrued $1,319,426 on account of discretionary matching contributions under the 401(k) Program. I believe that the Debtors' discretionary matching contributions under the 401(k) Program have been a critical component of the Employees' Total Direct Compensation package, and failure to continue such contributions would negatively impact morale and further reduce the competitive nature of the Debtors' compensation plans, which could result in loss of Employees during these Chapter 11 Cases. Accordingly, the Debtors request authority in the Workforce Obligations Motion to continue their discretionary matching contributions for 2016 consistent with prior years.

187.    ***Non-Qualified Legacy Pension.*** The Debtors also maintain a legacy pension that was previously offered to certain of their executive-level Employees (the "Legacy Pension"). It is my understanding that the Legacy Pension is a non-qualified pension that provides retired, executive-level Employees with monthly income funded by the Debtors. Under the Legacy

---

[25] The Debtors reported a total of $1,784,616 in matching contributions for fiscal year 2015 on the applicable Annual Return/Report of Employee Benefit Plan (Form 5500). I have been informed that the difference of $232,017 was due to adjustments to prior year contributions.

Pension, participating Employees could retire:  (a) at age sixty-five (65) or later, regardless of service credit, (b) at age sixty-two (62) or later, with at least ten (10) years of service credit, or (c) when the participating Employee's age and years of service credit total eighty-five (85) or more.

188.   I have been informed that, as of the Petition Date, under the Legacy Pension, there are three (3) former Employees currently receiving benefits.  No other Employees that retire and become former Employees will be eligible to receive benefits under the Legacy Pension.  I have also been informed that, as of the Petition Date, the Debtors' monthly funding obligations under the Legacy Pension approximate $10,389.

189.   ***Non-Qualified Deferred Compensation Plan.***  Additionally, the Debtors offer a deferred compensation plan (the "Deferred Compensation Plan") that is administered by Fidelity for the benefit of certain management or highly compensated Employees selected by the compensation committee (the "Compensation Committee") of Stone's Board on an annual basis. My understanding is that the Deferred Compensation Plan is a non-qualified plan that is designed to provide covered Employees with the ability to defer compensation.  Under the Deferred Compensation Plan, participating Employees may elect to defer compensation of between five percent (5%) and one-hundred percent (100%) of base salary, or a whole percentage or a percentage above a specified dollar amount of between five percent (5%) and one hundred percent (100%) of bonuses, as specified by the Compensation Committee.

190.   In the Workforce Obligations Motion, the Debtors seek authorization, to the extent required, to continue to honor their obligations under the Deferred Compensation Plan, but reserve all rights to terminate or modify the Deferred Compensation Plan under applicable law and/or pursuant to the terms of the Deferred Compensation Plan.  I have been informed that,

as of the Petition Date, the estimated amount of compensation deferred under the Deferred Compensation Plan is $8,660,444.

191.     ***Retiree Medical Program.***  The Debtors also offer certain eligible Employees the ability to participate in a retiree medical program (the "Retiree Medical Program"), pursuant to which the Debtors subsidize a portion of the cost of the Employee's medical care during the entirety of the Employee's retirement.  To be eligible for benefits under the Retiree Medical Program, Employees must (a) attain the age of fifty-five (55) prior to their departure and (b) have accumulated at least fifteen (15) years of full-time employment experience with the Debtors. The medical plan associated with the Retiree Medical Program is a partially self-insured "PPO" plan offered through CIGNA, under which retired Employees and their covered dependents have the choice to use providers within the network or to use providers outside the network (the latter option being subject to higher costs).

192.     Under the Retiree Medical Program, certain retired Employees under the age of sixty-five (65) are entitled to continued medical benefits under a partially self-insured medical plan administered by Gilsbar.[26]  The medical plan provides the participating Employees (and their covered dependents) with coverage for a range of health services with applicable deductible and co-payment amounts.  In addition, retired Employees over the age of sixty-five (65) (and their covered dependents) are entitled to certain reduced medical benefits, due to their eligibility for Medicare coverage, under a plan also administered by Gilsbar.  Retired Employees pay ninety percent (90%) of the applicable premium.[27]  My understanding is that there are currently nineteen (19) former Employees enrolled in the Retiree Medical Program, and a total of thirty-

---

[26] I have been informed that the Debtors assume the first $150,000 of annual claims liability per participant in the medical plan.

[27] I have been informed that the applicable premiums are a reasonable estimate of the cost of providing medical coverage for the retirees and their covered dependents and are determined on an actuarial basis.

five (35) participants (inclusive of spouses and/or dependents).  In the Workforce Obligations Motion, the Debtors seek authorization, to the extent required, to continue to honor their obligations under the Retiree Medical Program, but reserve all rights to terminate or modify payments at a later date.  I have been informed that, as of the Petition Date, the estimated monthly amount associated with the Retiree Medical Program is $25,000.

d.   <u>Severance</u>

193.   All full-time Employees working a minimum of thirty (30) hours per week that are not terminated for cause are eligible to receive severance under the Debtors' severance benefit policy, including reduction-in-force severance (the "<u>Severance Policy</u>").   Under the Severance Policy, non-executive Employees receive one (1) week of their base pay as of the date of termination for each full year of service with the Debtors and, at the Debtors' discretion, up to three (3) months of subsidized COBRA premiums and a prorated bonus, if applicable.[28]   In general, executive-level Employees are entitled to one (1) year of base pay as of the date of termination.[29]   With respect to reduction-in-force severance under the Severance Policy, the Debtors provide terminated Employees outplacement services of up to $1,000 as well as a prorated bonus under the Performance Bonus Plan and Safety Incentive Plan, if applicable, to such Employees.

---

[28] The Severance Policy provides a minimum of two (2) weeks of base pay to eligible non-executive Employees that have been employed by the Debtors for less than two (2) years.

[29] By the Workforce Obligations Motion, the Debtors are not requesting authority to make any postpetition severance payments that are beyond the caps imposed by Bankruptcy Code Section 503(c).  Nevertheless, the Debtors reserve their right to request authority from this Court to make such payments in the event that such payments are justified by the facts and circumstances of these Chapter 11 Cases.  Pursuant to the Executive Claims Settlement Motion, the Debtors are seeking approval of a settlement agreement with their executive-level Employees, which, among other things, will modify severance entitlements for such executive-level Employees, subject to this Court's approval of the settlement agreement.

194.    As part of the Debtors' cost-saving initiatives, the Debtors reduced their workforce by approximately one-hundred fifty (150) Employees in 2015 and 2016.[30]  In connection with this reduction in their Workforce, the Debtors provided severance packages pursuant to the Severance Policy, and in accordance with the Debtors' prepetition practices, to Employees that were terminated.  I understand that all severance payments to eligible Employees were paid prior to the Petition Date, and therefore, there are no outstanding severance obligations as of the Petition Date.  In any event, I believe that it is important that the Debtors have the flexibility to maintain their current practice of maintaining and honoring the Severance Policy for purposes of Employee retention and morale.  In the Workforce Obligations Motion, the Debtors seek to continue providing such benefits in the ordinary course of business to Employees, including severance to executive-level Employees, or insiders as defined by Bankruptcy Code Section 101(31), subject to the limitations set forth in Bankruptcy Code Section 503(c)(2).

195.    I understand that, in connection with the proposed sale of the Appalachia Assets, the Debtors have committed to provide special enhanced severance and retention payments for certain Employees that are essential to the sale process (collectively, the "Special Enhanced Severance and Retention Program").  The affected individuals consist of thirty (30) West Virginia-based Employees and one (1) Lafayette-based Employee.  Under the Special Enhanced Severance and Retention Program, such Employees receive one (1) week of pay for every year of service *plus* one (1) week of pay for every full $15,000 of base annual salary and three (3)

---

[30] In calendar year 2016, the Debtors paid severance to fifty-three (53) non-executive Employees in the total amount of $1,436,627 under the Severance Policy, with the average severance amount paid being $27,106.

US-DOCS\46533009.39

months of subsidized COBRA premiums.[31]  I have been informed that the Debtors estimate that the aggregate amount of severance and retention payments under the Special Enhanced Severance and Retention Program will be $800,000.[32]  I understand that the Debtors have also entered into retention agreements, each of which terminates on March 31, 2016, with two (2) West Virginia-based Employees on account of their leadership and expertise being vital to the potential sale of substantially all of the Debtors' Appalachia Assets (the "West Virginia Retention Agreements," and together with the Special Enhanced Severance and Retention Program, the "Sale-Related Employee Arrangements").  Under the West Virginia Retention Agreements, the two (2) West Virginia-based Employees will receive retention payments in the aggregate amount of $163,000, subject to applicable taxes and withholding, which amount equates to six (6) months of current base salary.  I have been informed that none of the foregoing Employees are "insiders" as defined in Bankruptcy Code Section 101(31).  I believe that it is important that the Debtors have the flexibility to maintain and honor the Sale-Related Employee Arrangements and therefore seek to continue providing such benefits in the ordinary course of business to the applicable Employees, subject to the limitations of Bankruptcy Code Section 503(c).

196.    I understand that the Debtors also maintain a change-of-control severance plan for non-executive, full-time Employees working a minimum of thirty (30) hours per week (the "Change of Control Plan").  The Change of Control Plan provides, among other things, the following key benefits after the occurrence of a change-of-control event and termination of the

---

[31] I have been told that the Special Enhanced Severance and Retention Program provides a minimum of twelve (12) weeks and a maximum of twenty-six (26) weeks of base pay to eligible Employees.

[32] I understand that the estimated amount payable under the Special Enhanced Severance and Retention Program assumes that none of the thirty-one (31) Employees will accept an offer of employment from the proposed buyer of the Appalachia Assets.  Any affected Employee that is actually hired by the buyer following the consummation of the sale would not be entitled to payments under the Special Enhanced Severance and Retention Program.

applicable non-executive Employee: (i) one week pay for each full year of service, (ii) one week pay for each $10,000 of annual base (or annualized base rate of pay), but not less than 12 and no more than 52 weeks of pay, (iii) pro rata bonus at 100% of target, (iv) six months of subsidized COBRA premiums, and (v) outplacement services.  The Change of Control Plan also provides the following key benefits after the occurrence of a change-of-control event without regard to termination of the applicable non-executive Employees: (i) payment of annual bonus based on performance through the change-of-control and projecting such performance against quarterly and annual objectives, (ii) 50% match to 401(k) plan, (iii) full vesting in equity awards, and (iv) a cash payment equal to the value of such Employee's targeted restricted shares that the Employee would have received but did not receive in the year of the change-of-control.

197.    The Debtors also maintain a severance plan for their executive-level Employees (the "Executive Severance Plan") and one of the West Virginia-based Employees is eligible for severance pursuant to his West Virginia Retention Agreement (collectively with the Executive Severance Plan, the "Executive Severance Arrangements").

198.    I understand that the Executive Severance Plan provides, upon termination without cause or for constructive termination, severance equal to (a) a multiple of base salary (1.5x for the Chief Executive Officer, 1.25x for the Chief Financial Officer, and 1.0x for all other executives), (b) for the Chief Executive Officer and Chief Financial Officer, an amount equal to their bonus under the KEIP (or following confirmation of the Plan, 100% of their target bonus), (c) subsidized COBRA, and (d) outplacement services.  Additionally, the executive-level Employees would have accelerated vesting in the next tranche of any time-based equity that would otherwise vest absent termination of employment.  The West Virginia-based Employee with severance under his West Virginia Retention Agreement is eligible for severance equal to

2.0x of his annual base salary if he is terminated after the sale of the Appalachia Assets closes or

1.0x of his base salary if he is terminated prior to the closing of such sale.

199.    In the Workforce Obligations Motion, the Debtors are not seeking to make any

payments under the Change of Control Plan or the Executive Severance Arrangements under the

proposed order, and it is my understanding that no amounts are due and owing under the Change

of Control Plan or Executive Severance Arrangements as of the Petition Date.  In any event, I

believe that it is important that the Debtors have the flexibility to maintain their current practice

of maintaining and honoring the Change of Control Plan and Executive Severance Arrangements

and therefore seek to continue providing such benefits in the ordinary course of business to all

covered Employees, including providing such benefits to executive-level Employees, or insiders

as defined by Bankruptcy Code Section 101(31), subject to the limitations of Bankruptcy Code

Section 503(c)(2).

e.    Honoring of Prepetition Employee Benefits

200.    As described above, certain of the Employee Benefits remained unpaid or were

not provided as of the Petition Date—as certain obligations of the Debtors under the applicable

plan, program, or policy accrued, either in whole or in part, prior to the commencement of these

Chapter 11 Cases—but will not be required to be paid or provided in the ordinary course of the

Debtors' business until a later date.  In the Workforce Obligations Motion, the Debtors request

authority to pay or provide, as they become due, all prepetition Employee Benefits that have

already accrued and that are described above.  I have been informed that the aggregate amount of

the prepetition Employee Benefits described above is approximately $13,517,583.

f.    Postpetition Continuation of Workforce Programs

201.    In the Workforce Obligations Motion, the Debtors also request confirmation of

their right to continue to perform their obligations with respect to all of the Workforce Programs,

except as otherwise indicated in the Workforce Obligations Motion. I believe that the Workforce Programs are essential to the Debtors' efforts to maintain Workforce morale, reward performance through certain incentives, minimize attrition, and preserve the continuity and stability of the Debtors' operations. I also believe that the expenses associated with the Workforce Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, loss of productivity, and disruption of business operations that would occur if the Workforce Programs were discontinued.

202.    Notwithstanding the foregoing, the Debtors reserve the right to evaluate all Workforce Programs and to make such modifications, including terminating any particular plan, program, or policy, as may be necessary or appropriate during the pendency of these Chapter 11 Cases.

g.      Payments to Independent Directors

203.    In the ordinary course of business, the Debtors reimburse expenses on a quarterly basis to nine (9) non-Employee members of Stone's Board (the "Independent Directors"). I believe that the Independent Directors' service is necessary for the continued management of the Debtors and, accordingly, I believe that it is essential that the Debtors be authorized to pay all prepetition amounts accrued as of the Petition Date to the Independent Directors. For fiscal year 2016 each Independent Director will receive an annual cash retainer equal to $195,000, ten percent (10%) of which is to be paid as a stock-based award under the Equity Plan.[33] I have been informed that, as of the Petition Date, the aggregate accrued but unpaid amounts owed to the Independent Directors is approximately $332,227. In addition, out of an abundance of caution, the Debtors request authority to continue to reimburse expenses incurred by the

---

[33] Certain Independent Directors in leadership roles, including committee chairmanships, are paid additional retainers, which total approximately $68,000.

Independent Directors, including, without limitation, fees and expenses for outside counsel to the Board, Andrews Kurth LLP, on a postpetition basis in the ordinary course of business.

h.    Payments to Third Parties and Administrators

204.    With respect to the Employee Workforce Programs described above, the Debtors contract with several vendors and third parties to administer and deliver payments or other benefits to their Employees (the "Administrators").  The Debtors pay these Administrators' fees and expenses incurred in connection with providing such services.

205.    For example, the Debtors, in the ordinary course of business, pay amounts to UltiPro in connection with their payroll and human resources functions; Computershare in connection with the administration of the Equity Plan; Iberia Bank, American Express and ChevronTexaco in connection with the business credit cards; Gilsbar in connection with the administration of the FSAs and the Medical and Dental Plans; Regions Insurance in connection with insurance-brokerage services and oversight of benefit plans; Reliance in connection with basic-term life insurance, AD&D coverage, and LTD coverage provided by the Debtors for each Employee; and Fidelity in connection with the 401(k) Program and the Deferred Compensation Plan, all of which, as I have been informed, total approximately $185,000 per month.  The Debtors may also, from time to time, incur obligations for actuarial, accounting, trustee, or administrative fees in connection with special projects related to the 401(k) Program, when the costs of such projects are not payable out of plan assets.

206.    In conjunction with the Debtors' payment of the Prepetition Workforce Obligations and continued performance under the Workforce Programs, I believe that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted delivery of certain benefits to the Workforce.  I also believe that the Administrators may refuse

to adequately and timely perform or may terminate (whether rightly or wrongly) their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred. A need to engage replacement Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Workforce. Accordingly, I believe that the payment of claims owed to the Administrators is in the best interest of the Debtors' estates.

i.   <u>Honoring of Prepetition Checks</u>

207.   I understand that, prior to the Petition Date, the Debtors paid certain of their Prepetition Workforce Obligations with checks that had not been presented for payment as of the Petition Date. To ensure the orderly payment of the Prepetition Workforce Obligations, the Debtors request that the Court enter an order requiring the Debtors' banks to honor any such checks which are drawn on the Debtors' accounts, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to the Workforce Obligations Motion. To the extent that any such checks are nevertheless refused payment, I believe it is important to Workforce morale that the Debtors receive the requested authority to issue replacement checks and to reimburse their Workforce for any loss resulting from the dishonoring of any checks issued prior to the Petition Date.

**D.   Tax Motion**

208.   In the Tax Motion, the Debtors seek entry of an order authorizing but not requiring them to pay, in consultation with the Required Consenting Noteholders and Required Consenting Banks, any prepetition tax and fee obligations including, without limitation, sales, use, and excise taxes; income or gross receipts taxes; franchise taxes; net worth; real and personal property taxes; or other business, occupation, withholding, or regulatory taxes or fees; any other types of taxes, fees or charges; and any penalty, interest, or similar charges

(collectively, the "Taxes and Fees")[34] owing to the federal, state, and local governmental entities listed on Exhibit A attached to the Tax Motion (the "Governmental Units").

209.    It is my understanding that payment of the Taxes and Fees pursuant to the Tax Motion would be discretionary, subject to the consultation rights of the Required Consenting Noteholders, allowing the Debtors, among other things, to pay the Taxes and Fees that would subject their officers and directors to personal liability in the event of nonpayment prior to any other Taxes and Fees.  Likewise, I understand that the Tax Motion would extend to the payment of Taxes and Fees relating to tax audits that have been completed, are in progress, or arise from prepetition periods.  In addition, I believe that authorization sought pursuant to the Tax Motion would be without prejudice to the Debtors' rights to contest the amounts of the Taxes and Fees on any grounds.

210.    By paying the Taxes and Fees in the ordinary course of business, as and when due, I believe the Debtors will avoid unnecessary disputes with the Governmental Units - and expenditures of time and money resulting from such disputes - over myriad issues that are typically raised by such units as they attempt to enforce their rights to collect Taxes and Fees.

211.    I understand that, prior to the Petition Date, the Debtors incurred obligations to federal, state, and local governments.  Although, as of the Petition Date, I have been informed that the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period were not yet due.  Certain prepetition Taxes and Fees will not be due until the applicable monthly, quarterly, or annual payment dates -- in some cases immediately and in others not until next year.  I have been

---

[34] I understand that the Debtors incur various taxes related to their employees and are separately required to withhold certain amounts from each employee's paycheck on account of things such as social security and FICA.  I understand that such payroll, withholding, and other employee-related tax obligations are separately addressed in the Workforce Obligations Motion.

informed that, as of the Petition Date, the Debtors' accrued and unpaid liabilities for the Taxes and Fees were approximately $1,650,000.

212.    I believe that the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful chapter 11 process.  If such obligations are not timely paid, I believe that the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Governmental Unit's applicable laws, including whether (a) the obligations are priority, secured or unsecured in nature, (b) they are proratable or fully prepetition or postpetition, and (c) penalties, interest, attorneys' fees and costs can continue to accrue on a postpetition basis, and, if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

213.    Moreover, I believe that nonpayment or delayed payment of the Taxes and Fees may also subject the Debtors to efforts by certain Governmental Units, whether or not permissible under the Bankruptcy Code, to revoke the Debtors' licenses and other privileges either on a postpetition or post-confirmation basis.  Moreover, certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment.  In such events, I believe that collection efforts by the Governmental Units would create obvious distractions for the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

214.    Lastly, I understand that certain of the Governmental Units have not been paid or have been sent checks or fund transfers for the Taxes and Fees that may or may not have been presented or cleared as of the Petition Date.  Similarly, in other cases, the Taxes and Fees have

accrued or are accruing, or are subject to audit or review, but have not yet become due and payable and, thus, any checks or fund transfers will be issued on a postpetition basis. Accordingly, in the Tax Motion, the Debtors seek entry of an order authorizing and directing their banks and other financial institutions to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers issued by the Debtors to the Governmental Units in payment of Taxes and Fees that had not been honored and paid as of the Petition Date.  Further, in the Tax Motion, the Debtors seek entry of an order authorizing the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of the Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

### E.      Utilities Motion

215.    In the Utilities Motion, the Debtors request entry of interim and final orders, approving procedures that would provide adequate assurance of payment to their utility service providers (the "Utility Companies") under Bankruptcy Code Section 366, while allowing the Debtors to avoid the threat of imminent termination of electricity, water, natural gas, waste removal, telephone, internet, alarm, telecommunication and similar utility products and services (collectively, the "Utility Services") from the Utility Companies.  Specifically, the Debtors request entry of interim and final orders (a) approving the Debtors' deposit of $69,363 (which is approximately 50% of the estimated monthly cost of the Utility Services, based on historical averages over the prior twelve (12) months) into a newly created, segregated, interest-bearing account, as adequate assurance of postpetition payment to the Utility Companies pursuant to Bankruptcy Code Section 366(b), (b) approving the additional adequate assurance procedures described below as the method for resolving disputes regarding adequate assurance of payment

to the Utility Companies, and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing services to the Debtors except as may be permitted by the proposed procedures.

216.     I have been informed that, as of the Petition Date, approximately 35 Utility Companies provide Utility Services to the Debtors at various locations through approximately 115 accounts.    I understand that the Utility Companies primarily service the Debtors' Headquarters in Lafayette, Louisiana and the Debtors' operations and facilities related to oil and gas production and development in Louisiana, Texas, and West Virginia.   On average, prior to the Petition Date, I understand that the Debtors spent approximately $138,727 each month on utility costs and generally made timely payments of utility costs.   I am not currently aware of any past due amounts owed to any of the Utility Companies.   Based on the timing of the filings in relation to the Utility Companies' billing cycles, however, there may be utility costs that have been invoiced to the Debtors for which payment is not yet due and utility costs for services provided since the end of the last billing cycle that have not yet been invoiced to the Debtors.

217.     I believe that the Utility Services are crucial to the Debtors' operations.   If the Utility Companies refuse or discontinue service, even for a brief period, I believe the Debtors' business operations would be severely disrupted.

218.     I understand that the Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner.   Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, I have been informed that the Debtors will deposit $69,363, which is an amount equal to approximately fifty percent (50%) of the estimated monthly cost of the Utility Services, into a newly created, segregated, interest-bearing account, within twenty (20) days of the Petition Date (the "<u>Adequate Assurance Deposit</u>").   The Adequate Assurance Deposit will be maintained during the Chapter 11 Cases with a minimum balance

equal to fifty percent (50%) of the Debtors' estimated monthly cost of Utility Services, which may be adjusted by the Debtors to account for the termination of Utility Services by the Debtors or other arrangements with respect to adequate assurance of payment reached with individual Utility Companies.

### F.    Equity Transfer Motion

219.    In the Equity Transfer Motion, the Debtors seek authorization to preserve net operating losses (the "NOLs"), tax credits, and certain other tax attributes (collectively, the "Tax Attributes") by establishing notification and hearing procedures regarding the transfer of Stone equity interests that must be complied with before transfers of such equity interests become effective.  It is my understanding that these procedures will generally apply to any person or shareholder that owns, directly or indirectly, more than a certain percentage of Stone common stock.  I believe that the relief sought in the Equity Transfer Motion will allow the Debtors to monitor certain transfers of Stone equity interests so that the Debtors can act expeditiously to prevent such transfers, if necessary, and preserve the potential value of their Tax Attributes.  I believe this will allow the Debtors to confirm their Plan, which will provide substantial tax and non-tax benefits to the Debtors and all of their stakeholders that include: (i) leaving the Debtors' business intact and substantially de-levered, providing for the permanent reduction of at least a net $1.2 billion of debt and a net $46 million of annual cash interest expense; (ii) allowing the Debtors' management team to focus on operational performance and value creation due to a significantly improved balance sheet; and (iii) providing recoveries to all of the Debtors' stakeholders; and (iv) maximizing the potential value of the Debtors' Tax Attributes by allowing the Debtors to take advantage of Tax Code without risking an impairment of the Debtors' Tax Attributes prior to confirmation of the Plan.  I believe that the relief sought by the Debtors in the

Equity Transfer Motion is necessary to preserve the status quo and allow the Debtors to move towards confirmation of the Plan.

220.     I understand that the Debtors' Tax Attributes are valuable assets of the Debtors' estates because the Internal Revenue Code of 1986, as amended (the "Tax Code"), generally permits corporations to carry forward their net operating losses and tax credits to offset future taxable income, thereby reducing their U.S. federal income tax liability in future periods. Depending upon future operating results of the Debtors and absent any intervening limitations prior to the effective date of the Debtors' Plan, I believe the Debtors' Tax Attributes could allow the Debtors to significantly reduce future U.S. federal income tax liability, including by offsetting any taxable income that may result from transactions completed in connection with the Debtors' Plan.  I believe these savings could substantially enhance the Debtors' value and contribute to the Debtors' efforts toward a successful reorganization.

221.     I have been informed that the ability of a corporation to use its Tax Attributes to reduce future U.S. federal income tax liability is subject to certain limitations under Section 382 of the Tax Code ("Section 382").  It is my understanding that, in general, if a corporation undergoes an "ownership change," Section 382 annually limits the corporation's ability to use its Tax Attributes to offset future taxable income.  Under Section 382, an ownership change occurs when the percentage (by value) of a corporation's equity held by one or more "5-percent shareholders" (as such term is defined in Section 382) increases by more than fifty (50) percentage points over the lowest percentage of stock owned by such shareholders at any time during a three-year rolling testing period, or since the last ownership change, as applicable.

222.     I have also been informed that Section 382 annually limits the amount of taxable income that can be offset by a pre-change-of-ownership loss to the long-term tax exempt bond

rate (as published by the United States Treasury), as of the ownership change date, multiplied by the value of the stock of the corporation immediately before the ownership change (a "Section 382 Limitation").   It is my understanding that, under certain circumstances, built-in losses recognized during the five-year period after the ownership change date are subject to similar annual limitations.  Accordingly, I believe an ownership change under Section 382 prior to the effective date of the Plan may hinder or significantly reduce the ability of the Debtors to use their Tax Attributes on a reorganized basis, thereby resulting in a loss of potential value to the Debtors' estates.

223.    I believe that by establishing procedures for continuously monitoring the transfers of Stone equity interests, the Debtors can preserve their ability to request substantive relief at the appropriate time, particularly if it appears that additional transfers may jeopardize the full use of the Debtors' Tax Attributes.   Accordingly, I believe that the relief requested in the Equity Transfer Motion imposes a minimal burden to achieve a substantial benefit for the Debtors, their creditors, and other interested parties.

### G.    Insurance and Security Program Motion

224.    In the Insurance and Security Program Motion, the Debtors seek entry of an order, authorizing the Debtors to (i)(a) continue their insurance policies on an uninterrupted basis in accordance with the same practices and procedures in effect prior to the Petition Date and to renew their insurance policies or obtain replacement or new coverage, as needed in the ordinary course of business, without further approval from this Court; (b) pay, in consultation with the Required Consenting Noteholders and Required Consenting Banks, all undisputed premiums, taxes, claims, deductibles, self-insured retentions, charges, fees, indemnity obligations and other obligations, including broker's fees, relating to the Insurance Policies, as applicable, that relate to the period before or after the Petition Date and are due and payable (collectively, the "Insurance

Obligations"); and (c) liquidate in an appropriate forum or settle such Insurance Obligations as necessary; and (ii)(a) continue their existing financial assurance program and obtain new surety bonds, letters of credit, U.S. Treasury Security, decommissioning escrow agreements or other similar forms of financial assurance (collectively, the "Security Program") and enter into collateral agreements if required by any sureties as needed in the ordinary course of business, without further approval of this Court; and (b) pay, in consultation with the Required Consenting Noteholders and Required Consenting Banks, all undisputed premiums, taxes, claims, charges, fees, indemnity obligations and other obligations relating to the Security Program or any new form of financial assurance, that relate to the period before or after the Petition Date and are due and payable, and provide, in consultation with the Required Consenting Noteholders and Required Consenting Banks, collateral to secure these financial assurances (collectively, the "Security Program Obligations").

225.    While I do not believe Court approval is required to maintain, amend, extend, or renew the Insurance Policies or the Security Program, or to procure new insurance policies or financial assurance instruments, in the ordinary course of business following the Petition Date, out of an abundance of caution, the Debtors request entry of an order authorizing them to pay their Insurance Obligations and their Security Program Obligations, if any, which are necessary to maintain their Insurance Policies and Security Program or new insurance policies or financial assurance instruments, if any.

a.       The Debtors' Insurance Obligations

226.    In the ordinary course of the Debtors' businesses, the Debtors maintain certain insurance policies that are administered by multiple third-party insurance carriers (the "Insurance Carriers"), that provide coverage for, among other things: onshore and offshore property damage; control of well; offshore construction risk and builder's risk; charterer's legal liability;

oil spill financial responsibility under the Oil Pollution Act of 1990; directors and officers liability; fiduciary liability; employment practices liability; commercial crime; employed lawyers professional liability; commercial general liability; excess liability; foreign trip risk; onshore environmental pollution liability; workers' compensation and employer's liability; automobile liability; and non-owned aircraft and aviation premises liability (collectively, as such policies may be supplemented, amended, extended, renewed or replaced, the "Insurance Policies").  A detailed list of the Insurance Policies that are currently held by the Debtors is attached to the Insurance and Security Program Motion as Exhibit A.  I believe that the Insurance Policies are essential to the preservation of the Debtors' businesses, properties, and assets, and, in some cases, such coverage is required by various federal and state laws and regulations, as well as the terms of the Debtors' various commercial contracts.  It is my understanding that the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

227.    I believe that maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation of the Debtors' businesses and, indeed, it is my understanding that it is required under the UST Requirements, the federal laws and regulations applicable to the Debtors' business, the laws of the various states in which the Debtors operate and the Debtors' various contractual commitments.  Thus, I believe the Debtors should be authorized, but not directed, to continue to pay premiums, taxes, claims, deductibles, self-insured retentions, charges, fees, indemnity obligations and other obligations, including broker's fees, owed under or with respect to the Insurance Policies as such obligations come due in the ordinary course of the Debtors' business.  Moreover, I believe the Debtors' maintenance of their

relationships with the Insurance Carriers is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods.

228.   I understand that, with the exception of the insurance policy numbered B0901BM1610378000 (the "Energy Package"), premiums under the Insurance Policies are paid annually in advance in either May or July, depending on the policy.   As a result, it is my understanding that the non-Energy Package Insurance Obligations are largely paid in advance, and therefore do not relate to prepetition obligations.

229.   The Energy Package provides coverage for offshore property damage, drilling and producing control of well and resultant pollution liability, offshore builder's risk and charterer's legal liability.   I understand that non-ultra-deepwater control of well premiums for estimated drilling activity are assessed a 25% advance deposit and builder's risk premiums for estimated construction activity are assessed a 50% advance deposit; both of which are paid, along with the annual premiums for the remaining Energy Package coverage types, 34% in June, 33% in September and 33% in December.   Drilling control of well and builder's risk premiums are based on actual drilling and construction activity, respectively, and are netted against the renewal deposits.   Once the renewal deposits are eroded, the remaining premiums owed are paid in arrears 1-2 months after the end of each insurance quarter.   I have been informed that the Debtors owe approximately $1,000,000 in Energy Package premiums as of the Petition Date.

230.   In addition to the premiums, I understand that the Insurance Policies impose various deductibles and self-insured retentions for claims asserted under the Insurance Policies.   I also understand that certain of the Debtors' obligations, specifically the deductibles under the Insurance Policies related to (i) commercial general liability and (ii) workers' compensation, are backed by letters of credit in the amounts of $737,000 and $165,000, respectively.   Deductibles

under the workers' compensation policies are further supported by $23,000 deposited in an escrow account held by the underwriters thereof.  I have been informed that the Debtors do not owe any prepetition amounts in connection with insurance deductibles.  However, in accordance with the terms of certain of the Insurance Policies, it is my understanding that requests for payment of amounts attributable to the prepetition period may be received from Insurance Carriers from time to time after the Petition Date.

231.    For example, I have been informed that the Debtors have an interest in the Ship Shoal 114 No. 44 well ("SS114#44") located in the Gulf of Mexico.  SS114#44 was drilled and completed by a prior owner of the Ship Shoal 114 lease in the early 1980s and the well produced oil until June 1983.  In December 1985, SS114#44 was plugged and abandoned, and, subsequently, the Debtors acquired the well.  Thereafter, SS114#44 experienced an integrity breach and the Debtors installed a cap on the well stub and installed monitoring equipment to monitor potential pollution from the well.  Although I am not aware of any prepetition insurance claims or amounts owed in connection with deductibles and/or self-insured retentions on account of any pollution claims related to SS114#44, the Debtors request in the Insurance and Security Program Motion that they be authorized, but not directed, to pay amounts that could be attributable to the prepetition period that may be received from Insurance Carriers in the postpetition period.  Likewise, the Debtors request that they be authorized, but not directed, to pay in the ordinary course of business any postpetition amounts that may be necessary to reenter and re-plug SS114#44 to preserve the integrity of the well, and prevent potential environmental events.  I have been informed that these undertakings are required by applicable law and could constitute administrative expenses under the Bankruptcy Code.

232.     Though the Debtors recently renewed a portion of their Insurance Policies in May and July 2016, I believe the Debtors may be required to renew the expiring policies or desire to enter into new insurance policies and to make required premium payments in that regard while these cases are pending.   I believe that renewal of the Insurance Policies or entry into new insurance arrangements, as noted above, is necessary to comply with the UST Requirements, various applicable federal and state laws, regulations, contractual commitments, and prudent business practices.   Though it is my view that the renewal of or entry into new insurance policies and the payment of any associated premiums would be in the ordinary course of the Debtors' business and would not require the Court's approval, the Debtors request such approval in the Insurance and Security Program Motion out of an abundance of caution.

233.     Finally, JLT Specialty Insurance Services, Inc. ("JLT") serves as the Debtors' insurance agent/broker, and also manages the Debtors' relationships with the Insurance Carriers, under the Insurance Policies.   Among other things, JLT represents the Debtors in various ongoing negotiations with the Debtors' Insurance Carriers.   The employment of JLT as broker has allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner and to realize savings in the procurement of such policies.

234.     I understand that the Debtors' relationship with JLT is governed by an annual contract, the "Broker Compensation Agreement").[35]   Under the Broker Compensation Agreement, the Debtors' have negotiated a $500,000 annual fee for JLT's services that is paid quarterly in advance of services.   I have been informed that there are no amounts owed to JLT under the Broker Compensation Agreement.

---

[35] The term of the Broker Compensation Agreement runs from January 1, 2016 through January 1, 2017, with two (2) separately exercisable options to extend for twelve months.

235.    I believe that it is in the best interests of their creditors and estates to continue their business relationship with JLT.  Accordingly, the Debtors seek the Court's authorization to continue their prepetition practice of paying brokerage and agent fees to JLT in the ordinary course of business.

b.    The Debtors' Security Program

236.    In the ordinary course of business, I understand that the Debtors are required by certain applicable statutes, rules, agreements and regulations to maintain the Security Program, pursuant to which the Debtors provide forms of financial assurance to certain third parties to secure the Debtors' payment or performance of certain obligations, often to governmental units, other public agencies, lessors under lease agreements, or assignors under purchase and sale agreements.  The Security Program covers a range of obligations, including, among other things: (a) security-posting obligations in connection with drilling and producing wells and plugging and abandonment obligations for both onshore and offshore wells, pipelines, and platforms; (b) surface damage obligations; (c) obligations related to federal and state leases and licenses; and (d) utilities (the "Covered Obligations").  A detailed list of the surety bonds and letters of credit that relate to the Covered Obligations and are currently maintained by the Debtors is attached to the Insurance and Security Program Motion as Exhibit B.

237.    I believe that the Security Program provides coverage that is typical in scope and amount for businesses within the Debtors' industry.  I have been informed that certain statutes and ordinances often require companies in the upstream oil and gas industry to demonstrate financial assurance or post security to secure the Covered Obligations.  For example, (a) the operator of an offshore well must obtain a minimum $500,000 lease development bond; (b) either the operator or the lessee is required to obtain a financial assurance instrument guaranteeing performance of all contractual obligations under the lease; (c) either the operator or

the lessee must post financial assurance instruments prior to the issuance of an offshore lease, a right-of-way grant, and a right of use and easement grant (for maintaining offshore platforms operational on expired offshore leases); (d) security must be posted in favor of BOEM prior securing a permit to drill on federally owned lands; and (e) additional security must be posted in favor of BOEM following their assessment of additional plugging and abandonment requirements associated with federal leases, pipelines, and platforms.  As a result, I believe that the success of the Debtors' efforts to operate effectively and efficiently will depend on the maintenance of the Security Program on an uninterrupted basis.  To continue their business operations, I believe the Debtors must be able to provide financial assurances to federal and state governments, regulatory agencies, and other third parties.  According to my understanding, this in turn requires the Debtors to maintain the existing Security Program, including paying the Security Program Obligations as they come due, as well as renewing or potentially acquiring additional security as needed in the ordinary course of their businesses; requesting releases from obsolete Security Program Obligations; and executing other agreements in connection with the Security Program.

238.    The issuance of a security instrument shifts the risk of the Debtors' nonperformance or nonpayment of their obligations covered by the security from the beneficiary of the security holder to the security holder.  If the Debtors fail to pay the Covered Obligations, the applicable surety will pay the Debtors' obligations up to a specified amount.

239.    Notably, however, unlike an insurance policy, it is my understanding that if a surety incurs a loss on a surety bond, the surety is entitled to recover the full amount of that loss from the Debtors.  To that end, the Debtors are parties to certain indemnity agreements that set forth the sureties' rights to recover from the Debtors (the "Surety Indemnity Agreements").

Pursuant to the Surety Indemnity Agreements, the Debtors agree to indemnify the surety from any loss, cost, or expense which the surety may incur on account of the issuance of any bonds on behalf of the Debtors.  Additionally, the Surety Indemnity Agreements allow the sureties to request collateral security from the Debtors from time to time.[36]

240.     I have been informed that, as of the Petition Date, the Debtors' outstanding surety bonds were issued by five separate sureties: (a) ACE INA Insurance (one surety bond totaling approximately  $100,000);  (b)  RLI  Insurance  Company  (eleven  surety  bonds  totaling approximately  $4.746  million);  (c)  Argonaut  Insurance  Company  (seventeen  surety  bonds totaling approximately $25.898 million); (d) Ironshore Indemnity Inc. (one surety bond totaling approximately $20.560 million); and (e) U.S. Specialty Insurance (three surety bonds totaling approximately $80.774 million) (each, a "Surety," and collectively, the "Sureties").

241.     My understanding is that the premiums for the surety bonds are generally determined on an annual basis and are paid by the Debtors when the bonds are issued and annually upon renewal.  I have been informed that the total amount owed in annual premiums and payments associated with all of the Debtors' current surety bonds is approximately $1.829 million.  I have also been informed that, as of the Petition Date, all premium payments due and owing with respect to the Security Program have been paid in full, and I am not aware of any pending requests for payment or collateral by the Sureties.  However, in the event that a request for collateral or for the payment of amounts attributable to the period prior to the Petition Date is outstanding or is received by the Debtors in accordance with the Security Program, the Debtors request  authority  to  pay  such  prepetition  amounts  as  the  Debtors  deem  necessary  in  their

---

[36] I have been informed that, as of the Petition Date, Argonaut Insurance Company has obtained collateral security from the Debtors totaling $7.3 million pursuant to that certain Collateral Security Agreement dated April 25, 2016. No other surety holds any collateral security.

business judgment and in consultation with the Required Consenting Noteholders and Required Consenting Banks.

242.    Finally, Petro-Marine Underwriters, Inc. ("P-M") currently serves as the Debtors' surety bond agent and manages many of the Debtors' relationships pursuant to the Security Program.  I believe that the employment of P-M as agent has allowed the Debtors to obtain the bond coverage necessary to operate their businesses in a reasonable and prudent manner.  The Debtors' relationship with P-M is governed by two (2) contracts:  (a) a compensation agreement (the "Agent Compensation Agreement") and (b) that certain Agreement on Managing Bonds Placed by Marsh ("Management of Marsh Bonds Agreement").[37]    Under the Agent Compensation Agreement, my understanding is that P-M receives a commission on the annual bond premiums paid to surety underwriters on certain surety bonds.  Under the Management of Marsh Bonds Agreement, I understand that the Debtors' have negotiated a $50,000 annual fee for P-M's services related to certain bond placements that is paid on a monthly basis in the amount of $4,166.67 in advance of such services.  I believe that the Debtors do not owe P-M any amounts as of the Petition Date and that it is in the best interests of the Debtors' creditors and estates to continue their business relationship with P-M at this juncture of the Chapter 11 Cases. Accordingly, the Debtors seek the Court's authorization to continue their prepetition practice of paying agent fees to P-M in the ordinary course of business.

---

[37] The term of the Agent Compensation Agreement ran from February 11, 2015 through February 11, 2016, whereby it began automatically renewing on a month-to-month basis subject to a ten (10) day notice of cancellation by either party; provided, however, P-M will remain Agent of Record for all surety bonds placed or renewed through P-M for as long as such surety bonds remain on the affected properties and the Debtors have an interest therein.  The term of the Management of Marsh Bonds Agreement, dated June 22, 2015, arranges for monthly payments to P-M of $4,166.67 to be paid on the first day of each month until cancelled with sixty (60) days' notice.

### H.      Hedging Motion

243.     In the Hedging Motion, the Debtors seek an order (a) authorizing the Debtors to enter into and perform Postpetition Hedging Transactions, in consultation with the Required Consenting Noteholders (as defined in the RSA) secured under the Prepetition Credit Agreement, (b) providing administrative-expense status on account of the Debtors' obligations under Postpetition Hedging Transactions, and (c) modifying the automatic stay.

244.     I understand that, pursuant to the Restructuring Support Agreement and the Plan, the Debtors' Amended Credit Agreement will require that a minimum of twenty-five percent (25%) of the Debtors' production for the year following the Effective Date be hedged within thirty (30) days of the Effective Date and a minimum of fifty percent (50%) of the Debtors' production for the two years following the Effective Date be hedged within 120 days following the Effective Date with a maximum of seventy-five (75%) of the Debtors' production for the two years following the Effective Date hedged.  I understand that the Plan and the Restructuring Support Agreement contemplate that all hedging is to be provided by the Required Consenting Banks that will be party to the Amended Credit Agreement.

245.     To limit exposure to fluctuations in market prices with respect to their oil, natural gas, and natural gas liquids production activities, the Debtors, like most other large, complex oil and gas exploration and production businesses, have historically hedged a portion of their oil, natural gas, and/or natural gas liquids production through the use of financial derivative transactions.   These transactions include cash-settled swaps, with creditworthy financial counterparties, and the use of physically settled forward contracts under which the Debtors agree to physically deliver natural gas or crude oil at a fixed delivery point over a fixed period of time for a fixed price, each as specified in the applicable confirmation.  I understand that these transactions were contemplated and permitted under the terms of the Prepetition Credit

Agreement, which stated that Stone "may continue its current production hedging program policy, including swaps, puts, and collars, to reduce price risk on quantities less than its total production."

246.    I understand that the Prepetition Credit Agreement provides that a "Specified Swap Contract" is "any Swap Contract entered into between any Credit Party and any Person which is a Bank or an Affiliate of any Bank, or was a Bank or an Affiliate of any Bank at the time such Swap Contract was executed."[38]  I have been informed that Obligations of the Debtors under any Specified Swap Contract are included as "Obligations" under the Prepetition Credit Agreement but paid from the proceeds of any exercise of remedies only after certain other Obligations are paid under the Prepetition Credit Agreement pursuant to Section 7.7 thereof.

247.    I also understand that on October 16, 2015, the Board approved that certain Amended and Restated Hedging Policy (the "Hedging Policy"), pursuant to which the Debtors are authorized to enter into futures and hedging activities that are consistent with prudent risk-management practices and that correlate with the Debtors' business needs.  Subject to approval by certain management members,[39] the Debtors may enter into physical and financial hedging

---

[38] The Prepetition Credit Agreement provides that "Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement, in each case, expressly including any such transactions in which a Person hedges the price to be received by it for future production from the Oil and Gas Properties."

[39] Each hedge contract must be approved by three of the following five individuals, at least one of whom must be the CEO, or in the CEO's absence, the CFO: CEO, CFO, Vice President of Marketing, Principal Accounting Officer and Marketing Manager.

transactions covering up to sixty percent (60%) of the Debtors' forecast production for a given month.  Consistent with the Hedging Policy, no individual contract may be entered into that would cover more than twenty-five percent (25%) of the Debtors' forecast production for a given month.  Moreover, I understand that the Debtors are only permitted to enter into hedging transactions with (1) the Prepetition Lenders or their subsidiaries, parents and affiliates; (2) any and all Goldman Sachs entities, BP Energy Company entities and Morgan Stanley entities, and their respective subsidiaries, parents and affiliates; or (3) similarly qualified purchasers of hydrocarbons.

248.    I have been informed that the Debtors' various hedging transactions (the "Prepetition Hedging Arrangements") have consisted of over-the-counter commodity hedging transactions primarily in the form of (a) swap contracts that are designed to provide a fixed price and (b) from time to time, put options that are designed to provide a fixed price floor with the opportunity for upside.  The Debtors have entered into Prepetition Hedging Arrangements with respect to a portion of their projected production or consumption to provide an economic hedge of the risk related to future commodity prices.  I understand that the Debtors' determine the volume and price at which to hedge their production based upon their view of existing and forecasted production volumes and current and future market conditions.  I understand that though the Debtors have historically entered into fixed-price swaps and costless collars, going forward, the Debtors' preferred hedging instruments will be fixed-price swaps and put options, and the Debtors will be required to obtain the consent of the Required Consenting Noteholders (through their advisors) to enter into any hedging instruments other than fixed-price swaps and put options.  I understand that all of the current hedge counterparties to the Debtors' existing

hedge instruments are Prepetition Lenders.  As of September 30, 2016, I have been informed that the fair market value of the Debtors' hedging arrangements was approximately $1.2 million.

249.    I have been informed that because commodity prices have improved recently, the Debtors, the Required Consenting Banks, and the Required Consenting Noteholders have discussed and agreed that certain hedging levels would be appropriate, and these levels are reflected in the Restructuring Support Agreement, as discussed above.  I believe that it would be beneficial to the Debtors to enter into some or all of the contemplated hedging transactions in the period between the Petition Date and the Effective Date, rather than waiting to enter into such transactions until following the Effective Date.   Moreover, I believe that entry into Postpetition Hedging Transactions with the certain Consenting Banks at the current price levels and commercials terms would be in the best interest of the Debtors and their estates and would be a significant and, most importantly, low-risk means to reduce the impact of commodity-price volatility on the Debtors' cash-flow stream.

250.    The Hedging Motion thus requests that the Court enter an order, which will authorize the Debtors, in consultation with the Required Consenting Noteholders, to enter into Postpetition Hedging Transactions with certain of the Consenting Banks and to secure the Debtors' Obligations under such Postpetition Hedging Transactions under the Prepetition Credit Agreement, which such transactions will be, following the Effective Date, secured under the Amended Credit Agreement and treated as "Specified Swap Contracts" thereunder.  To provide additional assurance to the Consenting Banks with respect to the Postpetition Hedging Transactions, I understand that the Debtors are requesting that the proposed order provide that the claims of the Consenting Banks that are counterparties to the Postpetition Hedging Transactions have administrative-expense status and relief from the automatic stay to the extent

necessary to allow the counterparties the benefits of netting provisions and other rights and remedies provided pursuant to the Postpetition Hedging Transactions.

## III.    CONTINUING VENDOR MOTIONS

### A.    Royalty Motion

251.    In the Royalty Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to pay in the ordinary course of business, whether such obligations were incurred prepetition or will be incurred postpetition, (i) Royalty Payments, (ii) Working Interest Disbursements, and (iii) Lease Obligations, and (b) granting related relief.

252.    As noted above, the Debtors are publicly traded oil and natural gas companies engaged in the acquisition, exploration, exploitation, development, and operation of onshore and offshore oil and gas properties with headquarters in Lafayette, Louisiana, additional offices in New Orleans, Louisiana; Houston, Texas; and Morgantown, West Virginia, and principal operations in the GOM and Appalachia.  In the ordinary course of their business, the Debtors operate certain wells for the production and sale of oil and natural gas on their own behalf and on behalf of certain Royalty Interest Owners, Working Interest Owners, and other parties pursuant to Oil and Gas Leases and/or Joint Operating Agreements (each as defined in the Debtors' Royalty Motion).

253.    Where the Debtors are the Operator (as defined in the Debtors' Royalty Motion), on a well – which I understand is the case in the vast majority of the wells for which the Debtors receive revenue – the Debtors are obligated, pursuant to the terms of the applicable Oil and Gas Leases, Joint Operating Agreements, or other agreements, to make certain payments to Royalty Interest Owners, Working Interest Owners and other parties.  I have been informed that under applicable state law and the Bankruptcy Code, certain of the Royalty Interests and Working Interests may not be considered to be property of the Debtors' estates, and, in such event, the

Debtors could hold payments on account of such interests in trust for the benefit of Royalty Interest Owners and Working Interest Owners and such payments may not be distributable to the Debtors' creditors. I understand that, for the same reasons, it is unclear whether the automatic stay would prevent Royalty Interest Owners and Working Interest Owners from bringing actions against the Debtors or asserting liens against the Debtors' assets to recover or protect amounts owed on account of such owners' interests. As such, I believe that the relief sought in the Debtors' Royalty Motion will avoid unnecessary litigation relating to the foregoing issues, will allow the Debtors to continue their operations in the ordinary course of business without interruption, and is in the best interests of the Debtors' estates.

a.      Royalty Payments

254.    The Debtors are parties to approximately 5,428 Oil and Gas Leases located in the GOM and Appalachia, each of which is subject to one or more Royalty Interests. It is my understanding that the Debtors primarily make Royalty Payments on account of Oil and Gas Leases in which the Debtors serve as the Operator. For Oil and Gas Leases where the Debtors hold a Non-Operating Working Interest, my understanding is that Royalty Payments generally are paid by a third-party Operator before the Debtors receive their periodic pro rata Working Interest Disbursements.[40]

255.    Although the average monthly amount of the Debtors' Royalty Payments varies based on actual production, I have been informed that, over the last twelve (12) months, the Debtors made an average of approximately 232 Royalty Payments each month, ranging from as many as 513 Royalty Payments in a month to as few as 71 Royalty Payments in a month, in the

---

[40] In certain instances, the Debtors as Non-Operating Working Interest Owners do not elect to have the Operator of the well market the Debtors' production, opting instead to receive payment "in-kind" (i.e., in the form of oil or gas). In such instances, the Debtors market the oil and gas for their own account and make the appropriate Royalty Payments to the Royalty Interest Owners.

average amount of approximately $4.2 million,[41] and ranging from $3.4 million to $5.2 million.[42]  I understand that the Debtors make Royalty Payments to Royalty Interest Owners by the end of the month following the month of production with respect to oil production.[43]  With respect to natural gas and natural gas liquids ("NGLs"), my understanding is that the Debtors generally make Royalty Payments to Royalty Interest Owners during the second month following the month of production.  With respect to natural gas and NGLs-related Royalty Payments to be made to the federal government for leases in the GOM, however, I understand that the Debtors pay an estimate of such Royalty Payments in the month following the month of production, with a subsequent reconciliation in the second month following the month of production.

256.    I have been informed that, as of the Petition Date, there are approximately $11.5 million in unpaid prepetition Royalty Payments.  I believe that failure to pay Royalty Payments could result in actions seeking the forfeiture, cancellation, or termination of the Oil and Gas Leases under the terms thereof.  Accordingly, I believe that the Debtors should be authorized to (a) remit up to $5.0 million of such prepetition Royalty Payments on an interim basis, and any

---

[41] Of this amount, I have been informed that approximately $3.2 million in average monthly royalties were remitted to the Office of Natural Resources Revenue relating to the offshore Oil and Gas Leases and approximately $1 million in average monthly royalties were remitted to individual corporations and persons.

[42] I have been informed that this amount does not account for the approximately $4.9 million dollars relating to the Debtors' unleased or unverified mineral interests (e.g., disputed amounts) (the "Unleased Mineral Interests").  The Unleased Mineral Interests represent amounts that may be due and owing to certain Mineral Interest Owners but are otherwise unpayable for a variety of reasons, including on-going disputes or uncertainty over ownership of the underlying interest, incorrect contact information, and the delay that accompanies entry of newly drilled wells into the Debtors' accounting system.  Further, I understand that certain Royalty Interest Owners perform regular audits ("Royalty Audits") to determine whether the amounts owed by the Debtors should be recalculated based upon the production from the relevant Oil and Gas Leases.  In the ordinary course of business, my understanding is that the Debtors provide additional payments to Royalty Interest Owners if a Royalty Audit determines that the Debtors have underpaid a Royalty Interest Holder.

[43] For example, when oil is produced and sold in January, the first purchaser would make payment to the Operator for the oil sold by the 20th day of February, and the Operator would distribute the revenues to Royalty Interest Owners by the end of February.  I have been informed that the Debtors typically make Royalty Interest Payments on the last day of the month following the month of production.

and all prepetition Royalty Payments upon entry of a final order granting the relief requested in the Debtors' Royalty Motion, and (b) continue making such Royalty Payments in the ordinary course of business on a postpetition basis, irrespective of when accrued.

b.    Working Interest Disbursements

257.    Working Interests are created when a Mineral Interest Owner conveys its rights to extract minerals from its land to a third party.  Unlike Royalty Interest Owners, I understand that Working Interest Owners pay the costs of exploration, development, and operation of a mineral interest.

258.    The Debtors hold Working Interests in various Oil and Gas Leases, primarily in the GOM and Appalachia, which entitle the Debtors to exploit the oil and gas on the lands associated with each particular Working Interest.  In most cases, the Debtors serve as the Operator pursuant to Joint Operating Agreements covering both the Debtors' Working Interests and the Working Interests of third parties.  As the Debtors extract oil and gas, they sell their production to "first purchasers."  I have been informed that, typically, first purchasers remit payment to the Debtors for purchased oil on or before the 20th of the month following production and for purchased gas on or before the 25th of the month following production.[44]

259.    The Debtors make Working Interest Disbursements and generally receive payment for Joint Interest Billings from Non-Operating Working Interest Owners <u>after</u> the Debtors pay the Operating Expenses.[45]  I have been informed that, pursuant to applicable state law, the Working Interest Disbursements held by the Debtors prior to remittance to the appropriate Working Interest Owners may not be property of the Debtors' estates.  Moreover, I

---

[44] As noted above, receipts for NGLs are received slightly later, typically on or around the last day of the month following production or in some cases on or around the last day of the second month following production.

[45] Where the Debtors hold Non-Operating Working Interests, they are responsible for paying to the Operators the Joint Interest Billings in accordance with their Joint Operating Agreements.

US-DOCS\46533009.39

believe that failure to make Working Interest Disbursements could expose the Debtors to certain statutory enforcement mechanisms. Additionally, my understanding is that Non-Operating Working Interest Owners often have contractual remedies under the applicable Joint Operating Agreements, including the grant of a security interest in production, the right to remove the Debtors as Operator, and the right to interest payments on the amount owed.

260. As with Royalty Payments, the Debtors make Working Interest Disbursements to Non-Operating Working Interest Owners by the end of the month in which the Debtors receive production receipts for oil production, and by the end of the following month with respect to natural gas and NGLs production.[46] I have been informed that, over the last twelve (12) months, the Debtors generated approximately, on average, $35 million in revenue each month from operations on Oil and Gas Leases for which the Debtors serve as the Operator. These revenues were then divided among the Debtors, Working Interest Owners, and Royalty Interest Owners of the underlying Oil and Gas Leases through the payment of Working Interest Disbursements.

261. I have also been informed that, in the twelve (12) months preceding the Petition Date, the Debtors remitted approximately $4.7 million in Working Interest Disbursements. My understanding is that Operating Expenses vary according to the work performed on a given well and, accordingly, Working Interest Disbursements are not uniform or entirely predictable on a month-to-month basis.[47] Regardless of when the Debtors may receive reimbursements from the Non-Operating Working Interest Owners, my understanding is that the Debtors are typically required to pay Operating Expenses within 30 to 60 days of receiving an invoice from the

---

[46] For example, when oil is produced and sold in January, the first purchaser would make payment to the Operator for the oil sold by the 20th day of February, and the Operator would distribute the revenues to Working Interest Owners by the end of February. I have been informed that the Debtors typically make Working Interest Distributions to Working Interest Owners on the last day of the month in which payment is due.

[47] For example, maintenance, repair, or replacement of well equipment, expenses arising from severe weather, and similar expenses vary from month to month. Such expenses are treated as Operating Expenses and shared among all Working Interest Owners of an Oil and Gas Lease.

US-DOCS\46533009.39

Mineral Contractors and other third-party providers.  In turn, at the end of each calendar month, the Debtors generate, and promptly mail or post on a web-based billing system, a Joint Interest Billing invoice (the "JIB Statement") for each holder of a Non-Operating Working Interest.  I have been informed that Non-Operating Working Interest Owners typically remit payment to the Debtors within 30 to 60 days following the receipt of their JIB Statement.

262.   In the Royalty Motion, the Debtors request authority from the Court to remit undisputed, prepetition Working Interest Disbursements in the ordinary course of business.  I have been informed that, as of the Petition Date, the Debtors estimate that they have generated and currently hold prepetition Working Interest Disbursements owed to Working Interest Owners in the amount of approximately $1.2 million.  In the Royalty Motion, the Debtors further request authority, in consultation with the Required Consenting Noteholders and Required Consenting Banks, to (a) remit up to $450,000 of such prepetition Working Interest Disbursements on an interim basis, pending entry of a final order granting the relief requested in the Debtors' Royalty Motion, and (b) continue making such Working Interest Disbursements in the ordinary course of business on a postpetition basis, irrespective of when accrued.[48]

263.   In addition, I have been informed that, in the twelve (12) months preceding the Petition Date, the Debtors paid approximately $388 million in Operating Expenses.  Of that amount, the Non-Operating Working Interest Owners reimbursed the Debtors for approximately $16 million on account of Joint Interest Billings.

---

[48] As of the Petition Date, I have been informed that the Debtors owe Hunt Oil Company ("Hunt"), a Non-Operating Working Interest Owner with respect to certain wells in the Pompano field, on account of Working Interest Disbursements due after netting amounts owed to the Debtors with respect to Joint Interest Billings and a prepayment by Hunt from cash calls made pursuant to the applicable Joint Operating Agreement.  In connection with an audit report received from Hunt in April 2016, the Debtors expect to continue their discussions with Hunt regarding the appropriate amount of audit exceptions that should be granted to Hunt with respect to certain JIB Statements issued prior to the Petition Date.  Out of an abundance of caution, the Debtors seek authority to pay any amounts owed to Hunt in the ordinary course of business after the parties reach an understanding regarding the total net amount owed to Hunt.

264.     In certain cases, the Debtors hold a Non-Operating Working Interest and are the recipient or payee under JIB Statements received from the non-Debtor Operator. I also understand that this constitutes a minority of the Debtors' overall interests and revenue – applicable to approximately 19 operating wells. Where the Debtors hold a Non-Operating Working Interest, I have been informed that the relevant Joint Operating Agreement and applicable law often grant the non-Debtor Operator a contractual or statutory lien, as the case may be, on the Debtors' Non-Operating Working Interest to secure the Debtors' payment obligations owed to the non-Debtor Operator pursuant to JIB Statements issued by such non-Debtor Operator. As such, I believe that failure by the Debtors to timely pay Joint Interest Billings may result in non-Debtor Operators asserting liens on the Debtors' interests in the wells, the Oil and Gas Leases, or the Debtors' pro rata share of the production or revenue therefrom, as well as exercising other remedies provided under the applicable Joint Operating Agreements.

265.     I have been informed that, in the twelve (12) months preceding the Petition Date, the Debtors paid approximately $12.5 million on account of Joint Interest Billings relating to their Non-Operating Working Interests. As of the Petition Date, my understanding is that the Debtors have approximately $3.1 million of prepetition Joint Interest Billings incurred but not invoiced or paid under the terms of their Joint Operating Agreements with respect to their Non-Operating Working Interests. To preserve and protect their share of production and revenue from these properties and maintain their relationships with the Operators of these properties, both during and after the pendency of these Chapter 11 Cases, I believe that the Debtors should be authorized, in consultation with the Required Consenting Noteholders and Required Consenting Banks, to (a) pay up to $375,000 in prepetition Joint Interest Billings on an interim basis, and up to $3.1 million in prepetition Joint Interest Billings upon entry of a final order granting the relief

requested in the Debtors' Royalty Motion and (b) continue making such Joint Interest Billings in the ordinary course of business on a postpetition basis, irrespective of when accrued.

c.      Additional Lease Obligations

266.    As described in greater detail in the Royalty Motion, when the Debtors receive revenues from first purchasers and remit and distribute revenues, I understand that the Debtors are required to pay certain taxes and make certain payments on behalf of Royalty Interest Owners and Working Interest Owners.

267.    It is my understanding that the Debtors are required to pay taxes imposed in connection with the removal of nonrenewable resources such as crude oil and natural gas (the "Severance Taxes") to certain taxing authorities each month – largely in connection with the Debtors' operations in Appalachia.  I understand that, typically, the Operator is responsible for the payment of all Severance Taxes on behalf of all Working Interest Owners, based upon the pro rata portion of such taxes that was withheld from the Working Interest Owners in the revenue distribution process.  I have been informed that failure to pay the Severance Taxes when due could result in penalties, liens to secure payment of outstanding Severance Taxes, and disruption of the Debtors' operations.

268.    In certain circumstances, an Operator may be entitled to a refund of a portion of the Severance Taxes (the "Severance Tax Refunds").  For example, an Operator may be entitled to a Severance Tax Refund upon review and approval of the applicable taxing authority for certain qualifying producing wells, including, but not limited to, horizontally drilled wells, enhanced oil recovery projects, high-cost gas wells, and economically at-risk wells.  If an Operator receives a Severance Tax Refund, the Operator must remit the pro rata share of the refund to each respective Working Interest Owner in the well or unit.

269.   The Debtors may also be required to make payments to Oil and Gas Lease lessors in addition to Royalty Payments, including, but not limited to, Non-Royalty Lease Payments such as delay rental payments, lease extension payments, shut-in royalty payments, minimum royalty payments (such Non-Royalty Lease Payments, collectively with the Severance Taxes and the Severance Tax Refunds, the "Lease Obligations"; and the Lease Obligations, collectively with the Royalty Payments and the Working Interest Disbursements, the "Obligations").  It is my understanding that the payment of the Delay Rentals effectively postpones the Working Interest Holder's obligation to explore and develop the leased property for the period for which the Delay Rentals are paid.  Thus, if the Delay Rentals are paid on or before the anniversary date for each year during the primary term of a particular Oil and Gas Lease, then such Oil and Gas Lease will remain in full force and effect, and the Working Interest Holder will not be required to engage in exploration and development.  It is my understanding that if the Delay Rentals are not paid, and the Working Interest Owner does not engage in initial exploration and development, the Oil and Gas Lease may terminate.  Accordingly, I believe that failure to pay the Delay Rentals could similarly have a material adverse effect upon all Working Interest Owners, including, inter alia, the loss of the underlying Oil and Gas Lease.

270.   Likewise, it is my understanding that failure to make Shut-In Payments could cause an Oil and Gas Lease to terminate.  The term of an Oil and Gas Lease is typically for a period of years (the primary term), and as long thereafter as oil and/or gas are produced.  Where a well in a unit is capable of producing oil or gas, but an Operator does not actually produce oil or gas from the unit, the Oil and Gas Lease terminates in accordance with its terms.  By making a Shut-In Payment, a Working Interest Owner can fulfill production obligations under the Oil and Gas Lease and avoid termination.  Accordingly, I believe that failure to pay the Shut-In

Payments could have a material adverse effect upon all Working Interest Owners, including, inter alia, the loss of the underlying Oil and Gas Lease.

271.    Where the Debtors serve as Operator, I understand that the Debtors are usually obligated to pay the Lease Obligations on behalf of itself and Non-Operating Working Interest Owners pursuant to the terms of the applicable Oil and Gas Leases and Joint Operating Agreements, respectively.  I have been informed that, as of the Petition Date, the Debtors owe approximately $600,000 on account of prepetition Lease Obligations.[49]  Accordingly, I believe that the Debtors should be authorized, in consultation with the Required Consenting Noteholders and Required Consenting Banks, to remit (i) up to $325,000 of such prepetition Lease Obligations, on an interim basis and (ii) any and all prepetition Lease Obligations upon entry of a final order granting the relief requested in the Debtors' Royalty Motion, and to continue making such Lease Obligation payments in the ordinary course of business on a postpetition basis.

### B.      All Trade Motion

272.    In the All Trade Motion, the Debtors seek entry of interim and final orders (a) authorizing them, in consultation with the Required Consenting Noteholders and Required Consenting Banks, to pay, in the ordinary course of business, all liquidated, noncontingent, and undisputed prepetition claims (collectively, the "Trade Claims") held by the Trade Creditors (as defined below), including, as applicable, in accordance with the terms and conditions of the Debtors' prepetition relationships with the Trade Creditors in an amount up to $10.0 million on an interim basis and an additional $9.2 million upon entry of the proposed final order, and (b) granting related relief.

---

[49] I have been informed that the Debtors owe approximately $460,000 on account of Severance Taxes, and $65,000 on account of Severance Refunds.

273.     In addition, the Debtors request that the orders entered require that (a) a Trade Creditor that is subject to a prepetition contract with the Debtors maintain or apply, as applicable, contractual or ordinary course terms during the pendency of these Chapter 11 Cases that are at least as favorable as those terms existing as of the Petition Date ("Customary Terms") as a condition to receiving any payment under the orders entered; and (b) if a Trade Creditor, after receiving payment under the orders entered, ceases to provide Customary Terms, then the Debtors may, in consultation with the Required Consenting Noteholders, (i) deem such payment to apply instead to any postpetition amount that may be owing to such Trade Creditor or (ii) treat such payment as an avoidable postpetition transfer recoverable by the Debtors upon a motion by the Debtors to enforce the terms requested in the All Trade Motion.

### a.     The Trade Creditors

274.     In connection with the Debtors' business, the Debtors depend on certain general unsecured creditors that provide goods and services that facilitate the Debtors' corporate offices and field operations (collectively, the "Trade Creditors").  I understand that the Trade Creditors provide the Debtors with goods and services such as inspection services, surveying and mapping services, lift services, disposal services, engineering services, repair services, diving services, decommissioning services, professional services, equipment and equipment rentals, vessels and rigs, chemicals, lubricants, midstream and marketing services, information technology, software, and other goods and services that I believe are essential to the Debtors' continued operations and the administration of their estates.

### b.     The Trade Claims

275.     The Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Trade Creditors in the ordinary course of business.  I have been informed that for the twelve (12) months prior to the Petition Date, the Debtors' average monthly payment to

the Trade Creditors was approximately $41.3 million. I understand that, as of the Petition Date, the Debtors owe a total of approximately $19.1 million on account of undisputed Trade Claims. The following table summarizes the types of Trade Claims held by the Trade Creditors and provides the Debtors' estimate of the total amount of each category of Trade Claim outstanding as of the Petition Date, including estimates for the portion of such total coming due (i) within twenty-one (21) days of the Petition Date, (ii) after such period but before a hearing granting relief on a final basis, and (iii) after such a final hearing:[50]

---

[50] For the purpose of this calculation, the Debtors assume that the final hearing on the All Trade Motion will be held on or around January 13, 2017.

| Category | Description of Services Provided | Estimated Total Amount Outstanding as of Petition Date | Estimated Amount Due Within 21 Days of Petition Date | Additional Estimated Amount Due Before Final Hearing | Estimated Amount Due After Final Hearing |
|---|---|---|---|---|---|
| Corporate Expenses | Legal services, general operations and human resources services, accounting, audit, tax, and other corporate-support services | $4,241,584 | $3,354,036 | $887,548 | N/A |
| Marketing Expenses | Marketing or midstream service providers that transport oil and gas from extraction sites through transportation pipelines, gathering systems, and processing plants into markets located in the GOM and Appalachia | $3,021,625 | $1,619,375 | $534,394 | $867,856 |
| Logistical Expenses | Shipping companies and other common carriers to ship, shore base providers, and warehousemen to store, drilling pipes, machinery, and other equipment belonging to the Debtors | $457,010 | $217,010 | $150,000 | $90,000 |
| Operating Expenses | Services of various providers of goods and services related to the Debtors' exploration, drilling, and production operations, which in certain instances may include, but are not limited to, fuel supply, well service operations, inspection and maintenance, production supplies and materials, lift boats and helicopter transportation, salt water removal, seismic surveys, drilling supplies and materials, technical services related to data transmission, and information technology and other computer-related services[51] | $11,397,956 | $8,548,467 | $2,849,489 | N/A |

---

[51] The Debtors have sought separate relief regarding royalty payments, working interest disbursements, and lease obligations in the *Emergency Motion of Debtors for Order under 11 U.S.C. §§ 105(a), 363(b), 541, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of (I) Royalty Payments, (II) Working Interest Disbursements, and (III) Lease Obligations in the Ordinary Course of Business* (the "Royalty Motion"), filed contemporaneously herewith. Accordingly, the Trade Claims relating to operating expenses do not include royalty payments, working interest disbursements, and lease obligations, which are separately addressed in the Royalty Motion.

US-DOCS\46533009.39

| Total: | | $19,118,175 | $13,521,763 | $4,421,431 | $1,174,981 |
|---|---|---|---|---|---|

276.    The Debtors are not seeking to pay the above-described amounts immediately or in one lump sum; rather, the Debtors intend to pay these amounts as they become due and payable in the ordinary course of the Debtors' business.  I have been informed that, as of the Petition Date, the Debtors have over $160 million in cash on hand.  I believe that the Debtors' cash on hand and cash generated by the Debtors' business will provide ample liquidity for payment of the Trade Claims and continued operation in the ordinary course of business during the administration of these Chapter 11 Cases.

277.    I believe that the goal of these Chapter 11 Cases should be to deleverage the Debtors' balance sheet with minimal interruption of their business operations.  I further believe that disruption to the Trade Creditors providing necessary goods and services to the Debtors could negatively impact the Debtors' performance of exploration and production activities, which would harm their business by damaging market reputation and possibly leading to termination of the Debtors' interests in their oil and gas leases.  It is therefore imperative that the Debtors maintain positive relationships with the suppliers of the goods and services essential to the Debtors' business operations throughout the course of these Chapter 11 Cases.  Under the Plan, allowed general unsecured claims (including the Trade Claims), other than the claims of the Prepetition Notes Claims, will be paid in full in cash on the effective date of the Plan (or as soon thereafter as practicable) or in the ordinary course of business.

## IV.    CONCLUSION

278.    The Debtors' ultimate goal in these Chapter 11 Cases is to restructure their capital structure and maximize value for all stakeholders.  In the near term, however, to minimize any loss of value of their businesses during these Chapter 11 Cases, the Debtors' immediate objective

is to maintain a business-as-usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful reorganization of the Debtors' businesses will be substantially enhanced.

279.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of December, 2016.

**STONE ENERGY CORPORATION, <u>et al</u>.**
Debtors and Debtors in Possession

Kenneth H. Beer
Executive Vice President and Chief Financial Officer