EXECUTION VERSION

# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ---------------------------------------------------------- | x | |
| In re: | : | Chapter 11 |
| | : | |
| STONE ENERGY CORPORATION, et al., | : | Case No. 16-36390 |
| | : | |
| Debtors.[1] | : | Joint Administration Requested |
| ---------------------------------------------------------- | x | |

## FIRST AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION
## OF STONE ENERGY CORPORATION AND ITS DEBTOR AFFILIATES
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

| LATHAM & WATKINS LLP | LATHAM & WATKINS LLP |
|---|---|
| Michael Dillard | David S. Heller |
| 811 Main Street, Suite 3700 | Josef S. Athanas |
| Houston, TX 77002 | Caroline A. Reckler |
| Telephone:  (713) 546-7414 | Matthew L. Warren |
| Facsimile (713) 546-5401 | 330 North Wabash Avenue, Suite 2800 |
| | Chicago, Illinois 60611 |
| | Telephone:  (312) 876-7700 |
| | Facsimile (312) 993-9767 |

Dated: December 14, 2016

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Stone Energy Corporation (5413); Stone Energy Holding, L.L.C. (3151); and Stone Energy Offshore, L.L.C. (8062).  The above-captioned Debtors' mailing address is 625 E. Kaliste Saloom Road, Lafayette, Louisiana 70508.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND
    GOVERNING LAW ..................................................................................................................1
    A.    Defined Terms ...........................................................................................................1
    B.    Rules of Interpretation ............................................................................................12
    C.    Computation of Time ..............................................................................................12
    D.    Governing Law ........................................................................................................12
    E.    Reference to Monetary Figures ...............................................................................13
    F.    Reference to the Debtors or the Reorganized Debtors ...........................................13

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY  CLAIMS AND INTERCOMPANY CLAIMS ............13
    A.    Administrative Claims .............................................................................................13
    B.    Priority Tax Claims .................................................................................................14
    C.    Other Priority Claim ...............................................................................................14
    D.    Intercompany Claims ..............................................................................................14
    E.    Intercompany Interests ............................................................................................14
    F.    Statutory Fees ..........................................................................................................14

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................................15
    A.    Introduction .............................................................................................................15
    B.    Summary of Classification ......................................................................................15
    C.    Treatment of Claims and Interests ..........................................................................15
    D.    Special Provision Governing Unimpaired Claims ..................................................18
    E.    Discharge of Claims ................................................................................................18

ARTICLE IV. ACCEPTANCE REQUIREMENTS ...............................................................................................18
    A.    Acceptance or Rejection of this Plan ......................................................................18
    B.    Confirmation of This Plan Pursuant to Sections 1129(a)(10) and 1129(b) of the
         Bankruptcy Code .....................................................................................................18
    C.    Controversy Concerning Impairment ......................................................................19

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN .....................................................................19
    A.    Transactions Effective as of the Effective Date .....................................................19
    B.    New Debt Documents ..............................................................................................19
    C.    Appalachia Sale .......................................................................................................19
    D.    Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors ..........19
    E.    Issuance of New Securities .....................................................................................19
    F.    Stockholders Agreement .........................................................................................20
    G.    Listing of New Securities and Transfer Restrictions .............................................20
    H.    Cancellation of Securities and Agreements ............................................................20
    I.    Section 1145 Exemption .........................................................................................20
    J.    Corporate Existence ................................................................................................21
    K.    Amended Organizational Documents .....................................................................21
    L.    Vesting of Assets in the Reorganized Debtors .......................................................21
    M.    Directors and Officers of the Debtors and the Reorganized Debtors ....................21
    N.    Management Equity Incentive Program ..................................................................21
    O.    Effectuating Documents; Further Transactions.......................................................21
    P.    Exemption from Certain Taxes and Fees ................................................................22
    Q.    Employee and Retiree Benefits ...............................................................................22
    R.    Preservation of Rights of Action ............................................................................22

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................23
    A.    Assumption of Executory Contracts and Unexpired Leases ..................................23
    B.    Assumption of Indemnification Provisions ............................................................23
    C.    Assumption of Employment and Severance Agreements ......................................23

|   | D. | Assumption of the D&O Insurance Policies and Fiduciary Liability Insurance Policies | 24 |
|---|---|---|---|
|   | E. | Payments Related to Assumption of Executory Contracts and Unexpired Leases | 24 |
|   | F. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases | 24 |
|   | G. | Rejection Damages Claims | 24 |
|   | H. | Contracts and Leases Entered Into After the Petition Date | 24 |
|   | I. | Intercompany Contracts and Leases | 25 |
|   | J. | Modifications, Amendments, Supplements, Restatements or Other Agreements | 25 |
|   | K. | Reservation of Rights | 25 |
|   | L. | Nonoccurrence of Effective Date | 25 |

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ........... 25
|   | A. | Timing and Calculation of Amounts To Be Distributed; Entitlement to Distributions | 25 |
|   | B. | Disbursing Agent | 26 |
|   | C. | Rights and Powers of Disbursing Agent | 26 |
|   | D. | Distributions on Account of Claims or Equity Interests Allowed After the Effective Date | 26 |
|   | E. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 27 |
|   | F. | Compliance with Tax Requirements/Allocations | 27 |
|   | G. | Surrender of Canceled Instruments or Securities | 28 |
|   | H. | Claims Paid or Payable by Third Parties | 28 |

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS ........... 28
|   | A. | Allowance of Claims and Equity Interests | 28 |
|   | B. | Prosecution of Objections to Claims and Equity Interests | 29 |
|   | C. | Procedures Regarding Disputed Claims or Disputed Equity Interests | 29 |
|   | D. | Distributions After Allowance | 30 |

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ........... 30
|   | A. | Conditions Precedent to Confirmation | 30 |
|   | B. | Conditions Precedent to the Effective Date | 30 |
|   | C. | Waiver of Conditions | 31 |
|   | D. | Effect of Nonoccurrence of Conditions | 32 |

ARTICLE X. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ........... 32
|   | A. | Compromise and Settlement of Claims, Interests and Controversies | 32 |
|   | B. | Releases by the Debtors | 32 |
|   | C. | Releases by Holders of Claims and Interests | 32 |
|   | D. | Exculpation | 33 |
|   | E. | Discharge of Claims and Termination of Interests | 33 |
|   | F. | Injunction | 33 |
|   | G. | Setoffs | 34 |
|   | H. | Release of Liens | 34 |
|   | I. | Recoupment | 34 |

ARTICLE XI. BINDING NATURE OF PLAN ........... 34

ARTICLE XII. RETENTION OF JURISDICTION ........... 35

ARTICLE XIII. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ........... 36
|   | A. | Modifications and Amendments | 36 |
|   | B. | Effect of Confirmation on Modifications | 37 |
|   | C. | Revocation or Withdrawal of the Plan | 37 |
|   | D. | Substantial Consummation of the Plan | 37 |

(ii)

ARTICLE XIV. MISCELLANEOUS PROVISIONS ................................................................... 37
    A.    Successors and Assigns ................................................................................. 37
    B.    Reservation of Rights ................................................................................... 37
    C.    Further Assurances ....................................................................................... 37
    D.    Payment of Fees and Expenses .................................................................... 38
    E.    Service of Documents ................................................................................... 38
    F.    Dissolution of Committee ............................................................................ 39
    G.    Nonseverability of Plan Provisions ............................................................. 39
    H.    Return of Security Deposits ......................................................................... 39
    I.    Term of Injunctions or Stays ....................................................................... 39
    J.    Entire Agreement ......................................................................................... 39
    K.    Exhibits ........................................................................................................ 40
    L.    Votes Solicited in Good Faith ..................................................................... 40
    M.    Closing of Chapter 11 Cases ........................................................................ 40
    N.    Conflicts ....................................................................................................... 40
    O.    Filing of Additional Documents ................................................................... 40
    P.    Tax Reporting and Compliance .................................................................... 40

US-DOCS\75004247.8

**<u>SCHEDULES</u>**

SCHEDULE 1     The Debtors

SCHEDULE 2     Restructuring Support Agreement

## INTRODUCTION

Stone Energy Corporation and certain of its affiliates and subsidiaries in the above-captioned Chapter 11 Cases respectfully propose the following joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code.  Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I hereof.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

*A.      Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      *"Accrued Professional Compensation"* means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, success fees) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code before the Effective Date by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount).  To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

2.      *"Administrative Claim"* means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of the Judicial Code; (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases Allowed pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code; and (e) the Plan Supporters' Advisors Fees and the Prepetition Banks' Advisors Fees.

3.      *"Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code.

4.      *"Allowed"* means with reference to any Claim or Interest:  (a) any Claim or Interest as to which no objection to allowance has been interposed (either in the Bankruptcy Court or in the ordinary course of business) on or before the Effective Date or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or as to which any objection has been determined by a Final Order, either before or after the Effective Date, to the extent such objection is determined in favor of the respective Holder; (b) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, either before or after the Effective Date; or (c) any Claim or Interest expressly deemed Allowed by the Plan.

5.      *"Amended Credit Agreement"* means the Prepetition Credit Agreement as amended as of the Effective Date with the terms and conditions set forth in the Restructuring Term Sheet, and which shall be acceptable to the Consenting Banks in their sole discretion (and to the Required Consenting Noteholders in their reasonable discretion) and shall be in substantially the form Filed with the Plan Supplement, to be entered into among Stone, as borrower, the Consenting Banks, Bank of America, N.A., as Prepetition Administrative Agent and issuing bank, Wells Fargo Bank, National Association, Natixis, The Bank of Nova Scotia, Capital One, N.A., and

(1)

Toronto Dominion (New York) LLC, as co-syndication agents, Regions Bank and U.S. Bank, National Association, as co-documentation agents, and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as sole lead arranger and bookrunner, as such agreement may be amended from time to time, providing for a $200 million (or a lesser amount with such reduction being equal to the *pro rata* share of Holders of Prepetition Banks Claims that do not elect to receive the same treatment as the Consenting Banks) revolving credit facility, with (a) a maturity date that is four (4) years from the Effective Date, (b) a letter of credit sub-facility, (c) an interest rate equal to the interest rate under the Prepetition Credit Agreement plus 150 basis points, (d) a borrowing base of $200 million (or a lesser amount with such reduction being equal to the *pro rata* share of Holders of Prepetition Banks Claims that do not elect to receive the same treatment as the Consenting Banks) which shall be subject to an initial redetermination no earlier than November 1, 2017, and thereafter consistent with the time periods set forth in the Prepetition Credit Agreement, *provided*, *however*, that unless the "Amethyst" well has produced at an average of at least 12 MMcfe per day during a testing period consisting of the 45 consecutive days preceding the Effective Date, the maximum availability shall be $150 million (or a lesser amount with such reduction equal to the *pro rata* share of Holders of Prepetition Banks Claims that do not elect to receive the same treatment as the Consenting Banks) which availability and borrowing base shall be subject to an initial redetermination no earlier than November 1, 2017, and thereafter consistent with the time periods set forth in the Prepetition Credit Agreement, and (e) provides for a $75 million escrow on the Effective Date related to projected plugging and abandonment expenditures which shall be reduced dollar for dollar for any payments made by the Reorganized Debtors related to any plugging and abandonment related liabilities.

6.      *"Amended Organizational Documents"* means the amended and restated certificate of incorporation and by-laws or other applicable organizational documents of the Reorganized Debtors in substantially the form Filed with the Plan Supplement, which documents shall be acceptable to the Required Consenting Noteholders in their sole discretion.

7.      *"Appalachia Sale"* means the sale by the Debtors of substantially all of their assets located in the Marcellus and Utica shales in Appalachia pursuant to the Appalachia Sale Agreement.

8.      *"Appalachia Sale Agreement"* means (a) the Purchase and Sale Agreement by and between Stone and TH Exploration III, LLC dated October 20, 2016, as amended, modified or supplemented from time to time in a manner acceptable to the Required Consenting Noteholders and the Required Consenting Banks, pursuant to which Stone seeks to consummate the Appalachia Sale, or (b) such other higher or otherwise better purchase and sale agreement executed by Stone following a marketing process and auction for substantially all of the Debtors' assets located in the Marcellus and Utica shales in Appalachia to the extent required by order of the Bankruptcy Court, which other purchase and sale agreement shall be acceptable to the Required Consenting Noteholders and the Required Consenting Banks.

9.      *"Appalachia Purchaser"* means the purchaser under the Appalachia Sale Agreement.

10.      *"Applicable Treasury Rate"* means the yield to maturity of United States Treasury securities (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two business days prior to the end of the applicable interest period under the New Senior Secured Term Loans (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) with a maturity most nearly equal to the period from the end of such applicable interest period to the maturity date of the New Senior Secured Term Loans; *provided*, that, if no published maturity exactly corresponds with such period, then the Applicable Treasury Rate shall be interpolated or extrapolated on a straight-line basis from the arithmetic mean of the yields for the next shortest and next longest published maturities.

11.      *"Avoidance Actions"* means any and all claims and Causes of Action which any of the Debtors, the Debtors in Possession, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

12.      *"Balloting Agent"* means Epiq Bankruptcy Solutions, LLC.

13.      *"Ballots"* means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in

accordance with the Plan and the procedures governing the solicitation process, and which must be actually received by the Balloting Agent on or before the Voting Deadline.

14. *"Bankruptcy Code"* means Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases.

15. *"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code and/or the Order of the United States District Court for the Southern District of Texas pursuant to section 157(a) of the Judicial Code, the United States District Court for the Southern District of Texas.

16. *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under 28 U.S.C. § 2075 and the general, local and chambers rules of the Bankruptcy Court, as each may be amended from time to time.

17. *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. *"Cash"* means the legal tender of the United States of America or the equivalent thereof.

19. *"Causes of Action"* means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, debts, dues, sums of money, damages, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment and claims, controversies, covenants, promises, judgments, remedies, demands, setoffs, defenses, recoupments, cross claims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date and also includes, without limitation: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

20. *"Certificate"* means any instrument evidencing an extinguished Claim or Interest.

21. *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

22. *"Claim"* means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

23. *"Class"* means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

24. *"Class 5 Notice of Non-Voting Status"* means the notice of non-voting status to be sent to all Holders of Class 5 Equity Interests.

25. *"Committee"* means any official committee of unsecured creditors (and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee may be reconstituted from time to time.

26. *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A hereof having been: (a) satisfied; or (b) waived pursuant to Article IX.C hereof.

(3)

27.    *"Confirmation Date"* means the date upon which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

28.    *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court to consider Confirmation, as such hearing may be adjourned or continued from time to time in consultation with the Required Consenting Noteholders and the Required Consenting Banks.

29.    *"Confirmation Order"* means the order or orders of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order or orders shall be satisfactory to the Required Consenting Noteholders, the Required Consenting Banks and the Debtors.

30.    *"Consenting Banks"* means the Prepetition Banks that are signatories to the Restructuring Support Agreement.

31.    *"Consenting Noteholders"* means the Noteholders that are signatories to the Restructuring Support Agreement.

32.    *"Consummation"* means the occurrence of the Effective Date.

33.    *"Cure Claim"* means a Claim based upon a monetary default, if any, by any Debtor on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

34.    *"D&O Insurance Policies"* means the insurance policies (including runoff endorsements extending coverage for current or former directors, managers and officers of the Debtors for a six-year period after the Effective Date) for directors', managers' and officers' liability maintained by the Debtors and listed on Schedule B to the Restructuring Term Sheet or purchased on or before the Effective Date with the consent of the Required Consenting Noteholders.

35.    *"Debtor"* or *"Debtor in Possession"* means one of the Persons listed on Schedule 1 hereto, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases under sections 1107 and 1108 of the Bankruptcy Code.

36.    *"Disbursing Agent"* means the Reorganized Debtors or the Entity or Entities chosen by the Reorganized Debtors in their sole discretion to make or facilitate distributions pursuant to the Plan.

37.    *"Disclosure Statement"* means the *Proposed Disclosure Statement for Joint Prepackaged Plan of Reorganization of Stone Energy Corporation and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated November 17, 2016, as the same may be amended, supplemented or modified from time to time with the consent of the Required Consenting Noteholders and the Required Consenting Banks, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law.

38.    *"Disputed"* means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

39.    *"Distribution Date"* means the date selected in consultation with the Required Consenting Noteholders and the Required Consenting Banks that is as soon as practicable after the Effective Date, but no later than ten (10) days after the Effective Date.

40.    *"Effective Date"* means the date on which the Confirmation Order becomes a Final Order; provided, however, all of the conditions specified in Article IX.B hereof have been satisfied or waived pursuant to Article IX.C hereof.

(4)

41. *"Employment Agreements"* means such employment agreements as shall be set forth in the Plan Supplement and acceptable to the Required Consenting Noteholders in their sole discretion.

42. *"Entity"* means an entity as defined in section 101(15) of the Bankruptcy Code.

43. "*Equity Interest*" means: (i) any Old Common Stock, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately before the Effective Date; (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing in any of the Debtors and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and put rights; and (4) stock-appreciation rights; and (iii) any Claim against any Debtor subordinated pursuant to section 510(b) of the Bankruptcy Code, in each case as in existence immediately prior to the Effective Date; provided, however, that Equity Interest does not include any Intercompany Interest.

44. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

45. *"Estate"* means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

46. *"Exculpated Claim"* means any Claim related to any act or omission in connection with, relating to or arising out of the Debtors' in- or out-of-court restructuring efforts, the Debtors' Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of New Common Stock or the distribution of property under the Plan or any other agreement; provided, however, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, criminal conduct or fraud.

47. *"Exculpated Party"* means each of:  (a) the Debtors, the Reorganized Debtors and their Affiliates, (b) the Prepetition Administrative Agent and the Prepetition Banks, each in their capacity as such, (c) the Indenture Trustee, the Noteholders, and the members of the Noteholder Committee, each in their capacity as such, (d) the Committee, if any and (e) with respect to each of the foregoing Entities in clauses (a) through (d), such Entities' current or former subsidiaries, affiliates, managed accounts or funds, officers, directors, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals, in their capacity as such.

48. *"Exculpation"* means the exculpation provision set forth in Article X.D hereof.

49. *"Executory Contract"* means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

50. *"Federal Judgment Rate"* means the federal judgment rate, which rate was in effect as of the Petition Date.

51. *"Fee Claim"* means a Claim for Accrued Professional Compensation.

52. *"File," "Filed"* or *"Filing"* means file, filed or filing with the Bankruptcy Court or other court of competent jurisdiction in the Chapter 11 Cases.

53. *"Final Order"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has

(5)

otherwise been dismissed with prejudice, or as to which an appeal or motion for reargument or rehearing is pending, but no stay of the order is in effect.

54.     *"General Unsecured Claim"* means any unsecured Claim against any of the Debtors that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a Fee Claim, an Intercompany Claim or a Prepetition Notes Claim.

55.     *"Governmental Unit"* means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

56.     *"Holder"* means any Person or Entity holding a Claim or an Interest.

57.     *"Impaired"* means any Claim or Interest in an Impaired Class.

58.     *"Impaired Class"* means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

59.     *"Indemnification Provision"* means each of the indemnification provisions currently in place, whether in the bylaws, certificates of incorporation or other formation documents in the case of a limited liability company, board resolutions or employment or service contracts, for the current directors, managers, managing members, officers, members (including any *ex officio members*) and employees of the Debtors, including, but not limited to, those set forth on Schedule B to the Restructuring Term Sheet, as may be amended pursuant to the Restructuring Support Agreement, and such amended documents shall be included in the Plan Supplement.

60.     *"Indemnified Parties"* means, each of the Debtors' respective officers, directors, managers, managing members and employees that served in any such capacity on or after the Petition Date, each in their respective capacities as such before or after the Petition Date.

61.     *"Indenture Trustee"* means The Bank of New York Mellon Trust Company, N.A., as trustee, in its capacity as indenture trustee under the Prepetition Indentures or any such successor indenture trustee(s).

62.     *"Intercompany Claim"* means any Claim held by a Debtor against another Debtor.

63.     *"Intercompany Interest"* means an Equity Security in a Debtor held by another Debtor.

64.     *"Intercreditor Agreement"* means that certain intercreditor agreement among the administrative agent under the Amended Credit Agreement, the Holders of New Senior Secured Term Loans (if any), the New Indenture Trustee, each of the Reorganized Debtors (in their respective capacities as borrower, issuer, and/or guarantor under the Amended Credit Agreement, the New Senior Secured Term Loans (if applicable), the New Secured Notes and each other agreement, instrument or document executed in connection therewith), and each other Person or Entity required to be a party thereto from time to time pursuant to the terms thereof, substantially in the form Filed with the Plan Supplement with the terms and conditions set forth in the Restructuring Support Agreement and which shall be in form and substance satisfactory to the Consenting Banks and the Required Consenting Noteholders in their respective sole discretion.

65.     *"Interests"* means, collectively, Equity Interests and Intercompany Interests.

66.     *"Judicial Code"* means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

67.     *"Lien"* means a lien as defined in section 101(37) of the Bankruptcy Code.

68.     *"Management Equity Incentive Program"* means the management equity incentive program to be established promptly after the Effective Date by Reorganized Stone which shall provide for the grant of up to 10% of the New Common Stock (or warrants or options to purchase New Common Stock or other equity-linked interests)

(6)

on a fully diluted basis to certain members of management, the specific form, allocation and terms of which shall be determined by the Reorganized Stone Board (or a committee thereof).

69.    *"New Affiliate Boards"* means the boards of directors or managers of the Reorganized Debtors other than Reorganized Stone as initially comprised as set forth in this Plan and as comprised thereafter in accordance with the Amended Organizational Documents.

70.    *"New Boards"* means the Reorganized Stone Board and the New Affiliate Boards.

71.    *"New Common Stock"* means the shares of common stock of Reorganized Stone authorized to be issued pursuant to this Plan and the Amended Organizational Documents, which common stock shall be subject to dilution for the Management Equity Incentive Program, the New Warrants and any New Common Stock issued by Reorganized Stone subsequent to the Effective Date.

72.    *"New Indenture"* means the New Indenture governing the New Secured Notes to be entered into between Reorganized Stone and the New Indenture Trustee on the Effective Date, substantially in the form Filed with the Plan Supplement, which New Indenture shall be acceptable to the Required Consenting Noteholders in their sole discretion and to the Required Consenting Banks in their reasonable discretion.

73.    *"New Indenture Trustee"* means The Bank of New York Mellon Trust Company, N.A., as trustee, in its capacity as indenture trustee under the New Indenture.

74.    *"New Secured Notes"* means the $225 million of 7.5% secured notes due 2022 to be issued under the New Indenture and secured by a second-priority security interest in the Prepetition Collateral, subject only to the first-priority security interest securing any New Senior Secured Term Loans issued pursuant to this Plan and the obligations under the Amended Credit Agreement and any refinancing or replacement thereof (and other customary permitted liens), and to be structured such that the "applicable high yield discount obligation" rules under the Internal Revenue Code shall not apply.

75.    *"New Securities"* means, collectively, (a) the New Common Stock and (b) the New Warrants.

76.    *"New Senior Secured Term Loans"* means senior secured term loans with first-priority liens on the Prepetition Collateral (pari passu with liens securing obligations under the Amended Credit Agreement), which term loans (a) mature five years after the Effective Date, (b) bear interest at the Applicable Treasury Rate plus 2.0% per annum, (c) have no principal payments due until the maturity date, (d) may be repaid at any time at par at the election of the Reorganized Debtors,  (e) are guaranteed by Stone Offshore, (f) are not subject to any borrowing base and (g) shall be subject to a quarterly first-lien asset coverage ratio requirement of 1.30:1.00 (with assets calculated based on PV-10 of total proven reserves at strip pricing plus all cash on the balance sheet of the Reorganized Debtors).

77.    "*New Warrant Agent*" means the warrant agent to be identified in the New Warrant Agreement.

78.    "*New Warrant Agreement*" means the New Warrant Agreement governing the New Warrants to be entered into between Reorganized Stone and the New Warrant Agent on the Effective Date, substantially in the form Filed with the Plan Supplement, which New Warrant Agreement shall provide that the New Warrants have an exercise price equal to a total equity value of the Reorganized Debtors that implies a 100% recovery of outstanding principal to Noteholders plus accrued interest through the Effective Date less the face amount of the New Secured Notes and the Prepetition Notes Cash, may be exercised any time prior to the fourth anniversary of the Effective Date, shall contain customary arithmetic anti-dilution protections (against stock splits, stock dividends and similar events) and shall have such other terms that are acceptable to the Required Consenting Noteholders in their sole discretion.

79.    *"New Warrants"* means warrants exercisable into 10% of the New Common Stock, which shall have the terms and conditions set forth in the New Warrant Agreement, subject to dilution solely for the Management Equity Incentive Program and any other issuances of New Common Stock after the Effective Date.

80.      *"Noteholders"* means the Holders of the Prepetition Notes.

81.      *"Noteholder Committee"* means the ad hoc committee of Noteholders.

82.      *"Old Common Stock"* means the shares of common stock issued by Stone and outstanding as of the Voting Record Date.

83.      *"Ordinary Course Professionals Order"* means any order of the Bankruptcy Court permitting the Debtors to retain certain professionals in the ordinary course of their businesses.

84.      *"Other Priority Claim"* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim.

85.      *"Other Secured Claim"* means any Secured Claim that is not a Prepetition Banks Claim.

86.      *"Person"* means a person as defined in section 101(41) of the Bankruptcy Code.

87.      *"Petition Date"* means the date on which the Debtors File their petitions for relief commencing the Chapter 11 Cases.

88.      *"Plan"* means this *First Amended Joint Prepackaged Plan of Reorganization of Stone Energy Corporation and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated December 14, 2016, as the same may be amended, supplemented or modified from time to time with the consent of the Required Consenting Noteholders and the Required Consenting Banks, including, without limitation, any exhibits hereto, which are incorporated herein by reference.

89.      *"Plan Supplement"* means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be Filed on notice to parties-in-interest, including, but not limited to, the following:   (i) the amended and restated certificate of incorporation and amended and restated by-laws of Reorganized Stone, (ii) the Amended Credit Agreement; (iii) the New Indenture, (iv) the New Warrant Agreement, (v) the identity of the members of the Reorganized Stone Board, (vi) the Schedule of Rejected Executory Contracts and Unexpired Leases, (vii) the Registration Rights Agreement, (viii) the Stockholders Agreement (if any) or a notice that the Required Consenting Noteholders determined that a Stockholders Agreement would not be required, (ix) amendments or modifications (if any) to Schedule B to the Restructuring Term Sheet; and (x) a schedule of the Employment Agreements and Severance Agreements.   The Debtors shall File forms of the materials comprising the Plan Supplement no later than the Plan Supplement Filing Date.

90.      *"Plan Supplement Filing Date"* means the date that is five (5) days prior to the deadline to object to the confirmation of the Plan.

91.      *"Plan Supporters' Advisors Fees"* means the advisor fees and expenses payable to the advisors for the Noteholder Committee pursuant to the Restructuring Support Agreement.

92.      *"Prepetition Administrative Agent"* means Bank of America, N.A., in its capacity as administrative agent under the Prepetition Credit Agreement and related financing documents or any such successor administrative agent.

93.      *"Prepetition Banks"* means those "Banks" under (and as defined in) the Prepetition Credit Agreement as of the Petition Date.

94.      *"Prepetition Banks' Advisors Fees"* means all fees, costs and expenses of professionals and advisors of the Prepetition Administrative Agent and each of the Prepetition Banks payable by the Debtors as provided for under the Prepetition Credit Agreement.

(8)

95.     *"Prepetition Banks Cash"* means Cash in an amount equal to the aggregate amount of unrestricted cash of the Debtors as of the Effective Date in excess of $25,000,000 net of any accrued and unpaid Administrative Claims (including Fee Claims) and other payments, escrows or distributions pursuant to the Plan, Appalachia Sale Agreement or otherwise.

96.     *"Prepetition Banks Claim"* means a Claim arising under the Prepetition Credit Agreement.

97.     *"Prepetition Collateral"* means the "Collateral" as such term is defined in the Prepetition Credit Agreement.

98.     *"Prepetition Convertible Indenture"* means the Indenture dated as of March 6, 2012 among Stone, as issuer, Stone Offshore, as subsidiary guarantor, and the Indenture Trustee, as trustee, as such agreement may have been amended, restated, modified, supplemented or replaced from time to time.

99.     *"Prepetition Convertible Notes"* means the unsecured notes issued under the Prepetition Convertible Indenture.

100.     *"Prepetition Credit Agreement"* means the Fourth Amended and Restated Credit Agreement dated as of June 24, 2014 among Stone, as borrower, the Prepetition Banks, Bank of America, N.A., as Prepetition Administrative Agent and issuing bank, Wells Fargo Bank, National Association, Natixis, The Bank of Nova Scotia, Capital One, N.A., and Toronto Dominion (New York) LLC, as co-syndication agents, Regions Bank and U.S. Bank, National Association, as co-documentation agents, and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as sole lead arranger and bookrunner, as such agreement may have been amended from time to time, providing for a maximum revolving credit facility of $900 million.

101.     *"Prepetition Indentures"* means the Prepetition Convertible Indenture and the Prepetition Senior Indenture.

102.     *"Prepetition Notes"* means the Prepetition Convertible Notes and the Prepetition Senior Notes.

103.     *"Prepetition Notes Cash"* means Cash in an amount equal to $100 million.

104.     *"Prepetition Notes Claim"* means a Claim arising under the Prepetition Notes.

105.     *"Prepetition Senior Indenture"* means the Indenture dated as of November 8, 2012 among Stone, as issuer, Stone Offshore, as subsidiary guarantor, and the Indenture Trustee, as trustee, as such agreement may have been amended, restated, modified, supplemented or replaced from time to time.

106.     *"Prepetition Senior Notes"* means the unsecured notes issued under the Prepetition Senior Indenture.

107.     *"Priority Tax Claim"* means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

108.     *"Pro Rata"* means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interest under the Plan.

109.     *"Professional"* means an Entity:  (a) retained pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date pursuant to sections 327, 328, 329, 330, 363 and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

US-DOCS\75004247.8

110.   *"Registration Rights Agreement"* means the Registration Rights Agreement to be entered into between Reorganized Stone and each investment manager with accounts that in the aggregate receive five percent (5%) or more of the New Common Stock on the Effective Date, substantially in the form Filed with the Plan Supplement, which Registration Rights Agreement shall be acceptable to the Required Consenting Noteholders in their sole discretion.

111.   *"Reinstated"* means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:  (i) curing any such default that occurred before, on or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim or Interest entitles the Holder.

112.   *"Release Opt-Out"* means the items set forth in the Ballots and the Class 5 Notice of Non-Voting Status pursuant to which Holders of Claims and Interests may opt out of the release set forth in Article X.C hereof.

113.   *"Release Opt-Out Deadline"* means 5:00 p.m. (prevailing Central Time) two (2) Business Days prior to the Confirmation Hearing.

114.   *"Released Party"* means each of: (a) the Debtors, the Reorganized Debtors and their Affiliates, (b) the Prepetition Administrative Agent, the Prepetition Banks, the other "Secured Parties" (as defined in the Prepetition Credit Agreement), the co-syndication agents under the Prepetition Credit Agreement, the co-documentation agents under the Prepetition Credit Agreement, and the sole lead arranger and bookrunner under the Prepetition Credit Agreement, each in their respective capacities as such under the "Credit Documents" (as defined in the Prepetition Credit Agreement), (c) the Indenture Trustee, the Noteholders, and the members of the Noteholder Committee, each in their capacity as such, (d) the Committee, if any and (e) with respect to each of the foregoing Entities in clauses (a) through (d), such Entities' current or former subsidiaries, affiliates, managed accounts or funds, officers, directors, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals, in their capacity as such.

115.   *"Releasing Parties"* means all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to Article X.B or Article X.C, discharged pursuant to Article X.E or are subject to Exculpation.

116.   *"Reorganized Debtors"* means from and after the Effective Date, any and all Debtors reorganized under and pursuant to the Plan, or any successor thereto, by merger, consolidation, transfer of all or substantially all assets or otherwise.

117.   *"Reorganized Stone"* means Stone Energy Corporation, as reorganized under and pursuant to the Plan, or any successor thereto, by merger, consolidation, transfer of all or substantially all assets or otherwise, on and after the Effective Date.

118.   *"Reorganized Stone Board"* means the board of directors of Reorganized Stone, the initial  members of which shall be as set forth in the Plan Supplement and as comprised thereafter in accordance with the Amended Organizational Documents.

(10)

119. *"Required Consenting Banks"* means the Consenting Banks holding at least a majority of the principal amount outstanding of all Prepetition Banks Claims held by the Consenting Banks.

120. *"Required Consenting Noteholders"* means the Consenting Noteholders holding at least a majority of the principal amount outstanding of all Prepetition Notes Claims held by the Consenting Noteholders, provided that such Consenting Noteholders holding the majority in principal amount shall include at least three (3) separate Consenting Noteholders (for purposes of this definition, each institution holding Prepetition Notes Claims shall be taken together with each of its controlled affiliates' and subsidiaries' Prepetition Notes Claims holdings and they shall together in the aggregate constitute a single Consenting Noteholder).

121. *"Restructuring Support Agreement"* means that certain Amended and Restated Restructuring Support Agreement dated as of December 14, 2016 by and between the Debtors, the Consenting Banks and the Consenting Noteholders, as amended from time to time in accordance with its terms, a copy of which is attached hereto as <u>Schedule 2</u>.

122. *"Restructuring Term Sheet"* means that certain Restructuring Term Sheet dated as of December 14, 2016 and attached as Exhibit A to the Restructuring Support Agreement, as amended from time to time in accordance with the Restructuring Support Agreement.

123. *"Schedule of Rejected Executory Contracts and Unexpired Leases"* means the schedule of Executory Contracts and Unexpired Leases to be rejected, if any, which schedule shall be prepared by the Debtors and be acceptable to the Required Consenting Noteholders and filed in the Plan Supplement.

124. *"Secured"* means: when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code; or (b) otherwise Allowed pursuant to this Plan as a Secured Claim.

125. *"Secured Claim"* means a Claim that is Secured.

126. *"Securities Act"* means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended.

127. *"Severance Agreements"* means such Severance Agreements as shall be set forth in the Plan Supplement and acceptable to the Required Consenting Noteholders in their sole discretion.

128. *"Stockholders Agreement"* means the stockholders agreement (if any) of Reorganized Stone, if determined by the Required Consenting Noteholders to be necessary or appropriate, to be effective on the Effective Date and binding on all Holders of Prepetition Notes Claims that receive distributions of New Common Stock, substantially in the form Filed with the Plan Supplement, which Stockholders Agreement shall be acceptable to the Required Consenting Noteholders in their sole discretion.

129. *"Stone"* means Stone Energy Corporation, a Delaware corporation.

130. *"Stone Equity Interests"* mean the Equity Interests issued by Stone.

131. *"Stone Offshore"* means Stone Energy Offshore, L.L.C., a Delaware limited liability company.

132. *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

133. *"Unimpaired"* means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

134. *"Unimpaired Class"* means an Unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

135. *"Unsecured Claim"* means a Claim that is not Secured by a Lien on property in which one of the Debtors' Estates has an interest.

136. *"U.S. Trustee"* means the United States Trustee for the Southern District of Texas.

137. *"Voting Classes"* means Holders of Class 2 Claims and Class 3 Claims.

138. *"Voting Deadline"* means 5:00 p.m. (prevailing Central Time) on December 16, 2016.

139. "*Voting Record Date*" means November 9, 2016.

*B.     Rules of Interpretation*

For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) unless otherwise specified, any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference in this Plan to an existing document, schedule or exhibit, whether or not Filed, shall mean such document, schedule or exhibit, as it may have been or may be amended, modified or supplemented; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references in this Plan to Articles are references to Articles of this Plan or to this Plan; (f) the words "herein," "hereof" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (i) unless otherwise set forth in this Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) any term used in capitalized form in this Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (k) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (l) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and (m) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order or approval of the Bankruptcy Court or any other Entity.

*C.     Computation of Time*

In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply.  If a payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act shall instead occur on the next succeeding Business Day, but shall be deemed to have occurred as of the required date.

*D.     Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of this Plan, any agreements, documents, instruments or contracts executed or entered into in connection with this Plan (except as

(12)

otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in Delaware shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PRIORITY
## CLAIMS AND INTERCOMPANY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Other Priority Claims and Intercompany Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims*

1.   General Administrative Claims

Except with respect to Administrative Claims that are Fee Claims, Plan Supporters' Advisors Fees or Prepetition Banks' Advisors Fees and except to the extent that a Holder of an Allowed Administrative Claim, the Required Consenting Noteholders, and the applicable Debtors agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of: (i) the Effective Date; (ii) the date such Administrative Claim is Allowed; and (iii) the date such Allowed Administrative Claim becomes due and payable; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to, such transactions.

2.   Fee Claims

On or immediately prior to the Effective Date, the Debtors shall pay all amounts owing to the Professionals for all unpaid Fee Claims relating to prior periods and for the period ending on the Effective Date.  The Professionals shall estimate Fee Claims due for periods that have not been billed as of the Effective Date.  On or prior to forty-five (45) days after the Effective Date, each Professional shall File with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date; provided that the Reorganized Debtors may pay retained Professionals or other Entities in the ordinary course of business after the Effective Date, without further Bankruptcy Court order; and provided, further, that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.  Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party no later than twenty (20) days after such Fee Claim is Filed with the Bankruptcy Court.  To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.  Within ten (10) days after entry of a Final Order with respect to its final fee application, each

(13)

Professional shall remit any overpayment to the Reorganized Debtors and the Reorganized Debtors shall pay any unpaid amounts to each Professional.

B.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment or has been paid by the Debtors prior to the Effective Date, on or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date on which such Priority Tax Claim becomes Allowed, (c) the date on which such Priority Tax Claim becomes due and payable and (d) such other date as may be mutually agreed to by and among such Holder, the Required Consenting Noteholders, and the Debtors, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed Priority Tax Claim, at the Debtors' option (subject to the consent of the Required Consenting Noteholders), each Holder of such Allowed Priority Tax Claim shall receive on account of such Allowed Priority Tax Claim:  (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such Holder, the Required Consenting Noteholders, the Required Consenting Banks and the Debtors or otherwise determined by an order of the Bankruptcy Court.  To the extent any Priority Tax Claim is not due and owing on the Effective Date, after such Claim becomes Allowed, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

C.      *Other Priority Claim*

Each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors (subject to the consent of the Required Consenting Noteholders), one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Other Priority Claim or (2) such other treatment as may be agreed upon by such Holder, the Required Consenting Noteholders, the Required Consenting Banks and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

D.      *Intercompany Claims*

On the Effective Date, or as soon thereafter as is practicable, all Intercompany Claims will be adjusted, released, waived and discharged, contributed to the capital of the obligor, dividended or continued unimpaired to the extent determined appropriate by the Reorganized Debtors.

E.      *Intercompany Interests*

Intercompany Interests shall be retained and the legal, equitable and contractual rights to which Holders of such Intercompany Interests are entitled shall remain unaltered, except as otherwise provided herein.

F.      *Statutory Fees*

On the Distribution Date, Reorganized Stone shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  On and after the Effective Date, Reorganized Stone shall pay all applicable U.S. Trustee fees until the entry of a final decree in each such Debtor's Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.      Introduction*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

This Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor.  Therefore, the classifications set forth in Article III.B herein apply separately with respect to each Plan proposed by each Debtor.  If there are no Claims or Interests in a particular Class for a particular Debtor, then such Class of Claims or Interests shall not exist for all purposes of the Plan for that Debtor.

*B.      Summary of Classification*

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| | SUMMARY OF STATUS AND VOTING RIGHTS | | |
|---|---|---|---|
| **Class** | **Claim/Interest** | **Status** | **Voting Rights** |
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Prepetition Banks Claims | Impaired | Entitled to Vote |
| 3 | Prepetition Notes Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | Stone Equity Interests | Impaired | Not Entitled to Vote (Presumed to Reject) |

*C.      Treatment of Claims and Interests*

1.   Class 1 – Other Secured Claims

(a)   *Classification*:  Each Class 1 Claim is an Other Secured Claim against the applicable Debtor.  With respect to each Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 1A, Class 1B and so on), so that each Holder of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

(b)   *Treatment*:  The legal, equitable and contractual rights of the Holders of Other Secured Claims will not be altered by this Plan.  Except to the extent a Holder of an Allowed Other Secured Claim has been paid by the Debtors prior to the Effective Date or the Holder of an Allowed Other Secured Claim, the Required Consenting Noteholders, and the Debtors agree to less favorable treatment of such Claim, each Holder of an Allowed Other Secured Claim (including any Claim for postpetition interest accrued until the Effective Date at the non-default rate provided in the applicable contract or, if there is no contract, then at the Federal Judgment Rate, to the extent permissible under Bankruptcy

(15)

Code section 506(a)) shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Other Secured Claim, in the discretion of the Debtors (subject to the consent of the Required Consenting Noteholders), one of the following alternative treatments:

(i)    payment of the Allowed Class 1 Claim in full in Cash on the later of the Distribution Date or as soon as practicable after a particular Claim becomes Allowed;

(ii)   delivery to the Holder of the Allowed Class 1 Claim of the collateral securing such Allowed Class 1 Claim;

(iii)  such other treatment as may be agreed to by the applicable Debtor, the Required Consenting Noteholders, the Required Consenting Banks and the Holder; or

(iv)   the Holder shall retain its Lien on such property and such Allowed Class 1 Claim shall be Reinstated pursuant to section 1124(2) of the Bankruptcy Code.

(c)    *Voting*: Class 1 is Unimpaired.  Holders of Class 1 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.   Class 2 – Prepetition Banks Claims

(a)    *Classification*:  Class 2 consists of all Prepetition Banks Claims.

(b)    *Allowance*:  The Prepetition Banks Claims shall be deemed Allowed in the aggregate principal amount of $341,500,000 plus reasonable and documented fees and expenses of the Prepetition Administrative Agent and the Prepetition Banks, accrued prepetition interest and postpetition interest (at the non-default rate) and all other amounts due and owing under the Prepetition Credit Agreement and the other "Credit Documents" defined thereunder through the Effective Date.

(c)    *Treatment*:  The Consenting Banks shall receive on account of the Prepetition Banks Claims held by such Holders, including obligations relating to issued but undrawn letters of credit under the Prepetition Credit Agreement, (i) their respective Pro Rata share of commitments, and obligations owing to such Holders with respect to outstanding loans, under the Amended Credit Agreement and (ii) their respective Pro Rata share of Prepetition Banks Cash as a partial repayment of such outstanding loans subject to re-borrowing to the extent permitted and pursuant to the terms of the Amended Credit Agreement.  Holders of Prepetition Banks Claims (other than the Consenting Banks) shall have the option to receive either (x) the same treatment as the Consenting Banks or (y) their respective Pro Rata share of the obligations owing to such Holders with respect to the New Senior Secured Term Loans, *provided* that the obligations owing to such Holders of Prepetition Banks Claims with respect to issued but undrawn letters of credit under the Prepetition Credit Agreement shall remain outstanding and be cash collateralized in an amount equal to 103% of the face amount thereof.

(d)    *Voting*: Class 2 is Impaired.  Holders of Prepetition Banks Claims are entitled to vote to accept or reject this Plan.

3.   Class 3 – Prepetition Notes Claims

(a)    *Classification*:  Class 3 consists of all Prepetition Notes Claims.

(16)

(b)      *Allowance*:  The Prepetition Notes Claims shall be deemed Allowed in the aggregate principal amount of $1,075,000,000 plus reasonable and documented fees and expenses of the Indenture Trustee, accrued prepetition interest (at the non-default rate), and all other amounts due and owing under the Prepetition Indentures through the Effective Date.

(c)      *Treatment*:  Holders of Prepetition Notes Claims shall receive their respective Pro Rata share of (i) the Prepetition Notes Cash, (ii) the New Secured Notes and (iii) the number of shares of New Common Stock constituting ninety-six percent (96%) of the shares of New Common Stock to be issued and outstanding pursuant to the Plan on the Effective Date, prior to dilution for the Management Equity Incentive Program and the New Warrants.

(d)      *Voting*:  Class 3 is Impaired.  Holders of Class 3 Prepetition Notes Claims are entitled to vote to accept or reject this Plan.

4.   Class 4 – General Unsecured Claims

(a)      *Classification*: Class 4 consists of all General Unsecured Claims.

(b)      *Treatment*:  Except to the extent that a Holder of a General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each General Unsecured Claim, on or as soon as practicable after the Effective Date or when such obligation becomes due in the ordinary course of business in accordance with applicable law or the terms of any agreement that governs such General Unsecured Claim, whichever is later, each Holder of a General Unsecured Claim shall be paid in full in Cash, or otherwise receive such treatment as to render such Holder Unimpaired; provided, however, that no Holder of a General Unsecured Claim shall receive any distribution for any Claim which has previously been satisfied pursuant to a Final Order of the Bankruptcy Court.

(c)      *Voting*:  Class 4 is Unimpaired.  Holders of Class 4 General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such General Unsecured Claims are not entitled to vote to accept or reject the Plan.

5.   Class 5 – Stone Equity Interests

(a)      *Classification*: Class 5 consists of all of the Stone Equity Interests.

(b)      *Treatment*: On the Effective Date, all Class 5 Equity Interests shall be canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  On or as soon as practicable after the Effective Date, each Holder of Old Common Stock, or other Stone Equity Interests that were exercised or exchanged for Old Common Stock in accordance with their terms prior to the Voting Record Date, that did not submit a valid Release Opt-Out by the Release Opt-Out Deadline shall receive its Pro Rata share of the number of shares of the New Common Stock constituting four percent (4%) of the shares of New Common Stock to be issued and outstanding pursuant to the Plan on the Effective Date, prior to dilution for the Management Equity Incentive Program and the New Warrants and its Pro Rata share of the New Warrants in satisfaction of its Class 5 Equity Interests.  Each Holder of Stone Equity Interests that submits a valid Release Opt-Out by the Release Opt-Out Deadline shall receive no distribution on account of such Stone Equity Interests held by such Holder, and all shares of New Common Stock and New Warrants that would have been otherwise distributed to such Holders of Stone Equity

(17)

Interests shall be distributed, Pro Rata, to those Holders of Stone Equity Interests that did not submit a valid Release Opt-Out.

(c)       *Voting*: Class 5 is Impaired.  Holders of Class 5 Equity Interests are presumed to have rejected this Plan, and therefore Holders of such Stone Equity Interests are not entitled to vote to accept or reject the Plan.

D.        *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights and defenses in respect of any Claim or Interest that is Unimpaired under this Plan, including, without limitation, all rights in respect of (1) legal and equitable defenses to, (2) setoff or recoupment against or (3) counter-claims with respect to any such Unimpaired Claims and Interests.

E.        *Discharge of Claims*

Pursuant to section 1141(c) of the Bankruptcy Code, all Claims and Interests that are not expressly provided for and preserved herein (or in any contract, instrument, release or other agreement or document created pursuant to the Plan) shall be extinguished upon Confirmation, and the Debtors and all property dealt with herein shall be free and clear of all such Claims and Interests, including, without limitation, liens, security interests and any and all other encumbrances.

# ARTICLE IV.

## ACCEPTANCE REQUIREMENTS

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the applicable Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of Allowed Claims in such Class actually voting have voted to accept the applicable Plan.

A.        *Acceptance or Rejection of this Plan*

1.        Voting Classes

Classes 2 and 3 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.        Presumed Acceptance of this Plan

Classes 1 and 4 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.        Presumed Rejection of this Plan

Class 5 is presumed to have rejected the Plan.

B.        *Confirmation of This Plan Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class.  The Debtors request Confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept this Plan pursuant to section 1126(c) of the Bankruptcy Code.  The Debtors reserve the right to modify this Plan in accordance with Article XIII hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

C.       *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests (or any Class of Claims or Interests) are Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.       *Transactions Effective as of the Effective Date*

The transactions contemplated by the Plan shall be approved and effective as of the Effective Date without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their board of directors, or their stockholders, or any other person or entity.

B.       *New Debt Documents*

On the Effective Date, the Reorganized Debtors are authorized to execute and deliver the Amended Credit Agreement, the New Senior Secured Term Loans, if applicable, the New Secured Notes, the Intercreditor Agreement and all related documents and instruments without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization or approval of any Entity.

C.       *Appalachia Sale*

On or prior to the Effective Date, the Debtors will have consummated the Appalachia Sale pursuant to the terms and conditions of the Appalachia Sale Agreement, including, without limitation, selling substantially all of their assets located in the Marcellus and Utica shales in Appalachia to the Appalachia Purchaser free and clear of certain liens and encumbrances to the extent set forth in the Appalachia Sale Agreement, and assuming and assigning to the Appalachia Purchaser certain contracts and unexpired leases.

D.       *Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors*

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the proceeds of the Appalachia Sale or other Cash from the Debtors, including Cash from business operations.  Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

E.       *Issuance of New Securities*

The issuance of the New Securities is authorized without the need for any further corporate action and without any further action by Holders of Claims or Interests.  On the Effective Date (1) the New Common Stock shall be issued to the Holders of Prepetition Notes Claims and Stone Equity Interests in accordance with the terms of this Plan and (2) the New Warrants shall be issued to the Holders of Stone Equity Interests in accordance with the terms of this Plan.

All of the New Securities issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.  Each distribution and issuance referred to in Article VII hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

F.      *Stockholders Agreement*

        The New Common Stock issued on account of the Prepetition Notes Claims may, if determined by the Required Consenting Noteholders to be necessary or appropriate, be subject to the Stockholders Agreement and some or all Holders of Prepetition Notes Claims may be required to enter into such Stockholders Agreement prior to distribution of New Common Stock to such Holder of Prepetition Notes Claims. In the event so determined by the Required Consenting Noteholders, upon the Effective Date, the Stockholders Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms and shall contain provisions governing the rights and obligations of Holders of New Common Stock who receive New Common Stock on account of Prepetition Notes Claims.  In lieu of the form of Stockholders Agreement, a notice shall be included in the Plan Supplement in the event the Required Consenting Noteholders determine that the Stockholders Agreement is not necessary or appropriate.  After such date all forfeited New Common Stock shall revert to Reorganized Stone and the applicable underlying Prepetition Notes Claims shall be discharged and forever barred.

G.      *Listing of New Securities and Transfer Restrictions*

        Reorganized Stone shall use commercially reasonable efforts to list the New Common Stock on a national exchange reasonably acceptable to the Debtors and the Required Consenting Noteholders, with such listing to be effective on the Effective Date.  The New Common Stock distributed to the Holders of Prepetition Notes Claims may be subject to certain transfer and other restrictions pursuant to the Stockholders Agreement (if any), if the Required Consenting Noteholders determine a Stockholders Agreement is necessary or appropriate.

H.      *Cancellation of Securities and Agreements*

        On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Prepetition Credit Agreement, the Prepetition Notes and any other Certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of the Holder of a Claim or Equity Interest shall continue in effect solely for purposes of allowing such Holders to receive distributions under the Plan as provided herein; provided, further, however, such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.

I.      *Section 1145 Exemption*

        The offering, issuance and distribution of any New Secured Notes and New Securities contemplated by the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution or sale of securities pursuant to section 1145(a) of the Bankruptcy Code.  In addition, any New Secured Notes and New Securities issued pursuant to section 1145 of the Bankruptcy Code as contemplated by the Plan will be freely transferable by the recipients thereof, subject to any limitations that may be applicable to Persons receiving such securities that are "affiliates" of Reorganized Stone as determined in accordance with applicable U.S. securities law and regulations.

J.      *Corporate Existence*

Except as otherwise provided herein, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state law).

K.      *Amended Organizational Documents*

On the Effective Date, each Reorganized Debtor shall adopt the Amended Organizational Documents as permitted by the laws of their respective states of incorporation or organization and, in connection therewith, shall make all such required filings with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate or other applicable laws of their respective states of incorporation or organization.  On the Effective Date, the Amended Organizational Documents shall be effective.

L.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action (except those released by the Debtors pursuant to this Plan or otherwise) and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens, if any, granted to secure the obligations under the Amended Credit Agreement, the New Senior Secured Term Loans, if any, and the New Secured Notes).  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

M.      *Directors and Officers of the Debtors and the Reorganized Debtors*

Upon the Effective Date, subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the New Boards shall take office and replace the then-existing boards of directors, boards of managers or similar governing bodies of the Reorganized Debtors.  All members of such existing boards shall cease to hold office or have any authority from and after the Effective Date to the extent not expressly included in the roster of the New Boards.  The Reorganized Stone Board shall, on the Effective Date, be comprised of seven (7) directors, consisting of the chief executive officer of Stone and six (6) directors appointed by the Required Consenting Noteholders.  The New Affiliate Boards shall be comprised of directors designated by the Reorganized Stone Board.

N.      *Management Equity Incentive Program*

The Management Equity Incentive Program will be established after the Effective Date by the Reorganized Stone Board.

O.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Boards are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations or consents except for those expressly required pursuant to the Plan or the Amended Organizational Documents.

P.       *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of or in connection with the Plan (including, without limitation, the Appalachia Sale) or pursuant to: (1) the issuance, distribution, transfer or exchange of any debt, Equity Security or other Interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment or recording of any lease or sublease; or (4) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instruments of transfer executed in connection with any transaction arising out of, contemplated by or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

Q.       *Employee and Retiree Benefits*

On and after the Effective Date, and subject to any additions, deletions, and/or modifications as may be required by the Required Consenting Noteholders pursuant to the Restructuring Term Sheet, the Reorganized Debtors shall: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs and plans for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance and accidental death and dismemberment insurance for the directors, officers and employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time and deferred compensation arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such policy, program or plan. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans. Without limiting the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

R.       *Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the Debtors provided by Article X hereof), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Entity on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of Confirmation or Consummation of the Plan.

S.      *Indenture Trustee Fees*

On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall pay all reasonable and documented fees and expenses (including reasonable and documented fees and expenses of counsel) incurred by the Indenture Trustee through and including the Effective Date to the extent required by the Prepetition Indentures. The Indenture Trustee shall not be required to file any application under sections 330 or 331 of the Bankruptcy Code or otherwise with regard to the allowance of its fees and expenses.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party, including, without limitation, the Appalachia Sale Agreement, unless such contract or lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject Filed on or before the Confirmation Date; or (4) is set forth in the Schedule of Rejected Executory Contracts and Unexpired Leases. Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting assignment, the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before or on the date that the Debtors assume such Executory Contract or Unexpired Lease. Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Notwithstanding the foregoing, before the Effective Date, the Debtors, with the consent of the Required Consenting Noteholders, and after the Effective Date, the Reorganized Debtors, shall have the right to amend the Schedule of Rejected Executory Contracts and Unexpired Leases. In addition, notwithstanding the foregoing, the Reorganized Debtors shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

B.      *Assumption of Indemnification Provisions*

The Debtors, and upon the Effective Date, the Reorganized Debtors, shall assume all of the Indemnification Provisions in place on and before the Effective Date for Indemnified Parties for Claims related to or arising out of any actions, omissions or transactions occurring before the Effective Date, as such Indemnification Provisions may be amended pursuant to the Restructuring Support Agreement. Substantially final forms of the Indemnification Provisions shall be included in the Plan Supplement.

C.      *Assumption of Employment and Severance Agreements*

On the Effective Date, and subject to any additions, deletions, and/or modifications as may be required by the Required Consenting Noteholders pursuant to the Restructuring Term Sheet, the applicable Debtor party to those Employment Agreements and Severance Agreements identified in the Plan Supplement shall assume such Employment Agreements and Severance Agreements pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the applicable Debtors' assumption of those Employment Agreements and Severance Agreements identified in the Plan Supplement.

(23)

D.      *Assumption of the D&O Insurance Policies and Fiduciary Liability Insurance Policies*

      Unless obtained prior to the Petition Date, the Debtors shall, prior to the Effective Date and in consultation with the Required Consenting Noteholders, obtain and fully pay the premium for a non-cancelable extension of the directors' and officers' liability coverage of the Debtors' existing directors' and officers' insurance policies and the Debtors' existing fiduciary liability insurance policies, in each case, for a claims reporting or discovery period of at least six years from and after the Effective Date with terms, conditions, retentions and limits of liability that are no less favorable than the coverage provided under the Debtors' existing policies.  The Debtors, and upon the Effective Date, the Reorganized Debtors, shall assume all of the D&O Insurance Policies and fiduciary liability insurance policies pursuant to section 365(a) of the Bankruptcy Code.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Insurance Policies and fiduciary liability insurance policies.

E.      *Payments Related to Assumption of Executory Contracts and Unexpired Leases*

      Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree (with the consent of the Required Consenting Noteholders and, for any payment in excess of $15 million, the Required Consenting Banks).  In the event of a dispute regarding: (a) the amount of any Cure Claim; (b) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; provided, however, that the Debtors (with the consent of the Required Consenting Noteholders and, for any asserted Cure Claim in excess of $15 million, the Required Consenting Banks), or the Reorganized Debtors, as applicable, may settle any dispute regarding the amount of any Cure Claim without any further notice to or action, order or approval of the Bankruptcy Court.

F.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

      Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

G.      *Rejection Damages Claims*

      All Claims arising from the rejection (if any) of Executory Contracts or Unexpired Leases must be Filed with the clerk of the Bankruptcy Court and served upon counsel for the Reorganized Debtors within thirty (30) days of the occurrence of the Effective Date.  Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a Class 4 General Unsecured Claim.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within the time required by this section will be forever barred from assertion against the Debtors, the Reorganized Debtors, the Estates or the property of the Debtors or the Reorganized Debtors.

H.      *Contracts and Leases Entered Into After the Petition Date*

      Contracts and leases entered into after the Petition Date by any Debtor may be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of business.

(24)

I.        *Intercompany Contracts and Leases*

Any intercompany Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

J.        *Modifications, Amendments, Supplements, Restatements or Other Agreements*

Unless otherwise provided in this Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, whether executed before or during the Chapter 11 Cases, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, extension rights, purchase rights and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or the Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

K.        *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, with the consent of the Required Consenting Noteholders, or the Reorganized Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

L.        *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts or Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.        *Timing and Calculation of Amounts To Be Distributed; Entitlement to Distributions*

1.        Timing and Calculation of Amounts To Be Distributed

Unless otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim or Equity Interest is not an Allowed Claim or Allowed Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Allowed Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Equity Interest against the Debtors shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class.  If and to the extent that there are Disputed Claims or Disputed Equity Interests, distributions on account of any such Disputed Claims or Disputed Equity Interests shall be made pursuant to the provisions set forth in this Article VII.  Except as otherwise provided herein, Holders of Claims shall not be entitled to postpetition interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

    2.   Entitlement to Distributions

On the Effective Date, the Disbursing Agent shall be authorized to recognize and deal only with those Holders of Claims listed on the Debtors' books and records. Accordingly, the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Effective Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims who are Holders of such Claims (or participants therein) as of the close of business on the Effective Date; *provided, however*, that distributions to holders of publicly held securities will be made on or as soon as practicable after the Effective Date in accordance with the surrender provisions of the Plan

B.    *Disbursing Agent*

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. In the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors. The Prepetition Administrative Agent shall be deemed to be the Holder of all Prepetition Banks Claims for purposes of distributions to be made hereunder, and all distributions on account of Allowed Prepetition Banks Claims shall be made to the Prepetition Administrative Agent. The Prepetition Administrative Agent shall hold such distributions for the benefit of the Holders of Allowed Prepetition Banks Claims and shall deliver such distributions to such Holders. The Indenture Trustee shall be deemed to be the Holder of all Prepetition Notes Claims for purposes of distributions to be made hereunder, and all distributions on account of Allowed Prepetition Notes Claims shall be made to the Indenture Trustee. The Indenture Trustee shall hold such distributions for the benefit of the Holders of Allowed Prepetition Notes Claims and shall deliver such distributions to such Holders.

C.    *Rights and Powers of Disbursing Agent*

    1.   Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

    2.   Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Distributions on Account of Claims or Equity Interests Allowed After the Effective Date*

    1.   Payments and Distributions on Disputed Claims or Equity Interests

Distributions made after the Effective Date to Holders of Disputed Claims or Disputed Equity Interests that are not Allowed Claims or Allowed Equity Interests as of the Effective Date but which later become Allowed Claims or Allowed Equity Interests shall be deemed to have been made on the Effective Date.

    2.   Special Rules for Distributions to Holders of Disputed Claims and Disputed Equity Interests

Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by the Debtors, with the consent of the Required Consenting Noteholders, or the Reorganized Debtors, as applicable, (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or a Disputed Equity Interest until all such disputes in connection with such Disputed Claim or Disputed Equity Interest have been resolved by settlement or Final Order and such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Allowed Equity Interest; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim or an Allowed Equity Interest and a Disputed Equity Interest shall not receive any distribution on the Allowed Claim or Allowed Equity Interest unless and until all objections to the Disputed Claim or the Disputed Equity Interest have been resolved by settlement or Final Order and the Disputed Claims or the Disputed Equity Interests have been Allowed.

E.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    Delivery of Distributions in General

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to Holders of Allowed Claims and Allowed Equity Interests at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution.

2.    Minimum Distributions

The Reorganized Debtors shall not be required to make partial distributions or payments of fractions of New Common Stock and such fractions shall be deemed to be zero.

3.    Undeliverable Distributions and Unclaimed Property

(a)    Failure To Claim Undeliverable Distributions

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim or Equity Interest of any Holder to such property or interest in property shall be discharged and forever barred.

(b)    Failure To Present Checks

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred and eighty (180) days after the issuance of such check shall have its Claim for such un-negotiated check discharged and shall be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property. In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

F.    *Compliance with Tax Requirements/Allocations*

In connection with this Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary

(27)

or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens and encumbrances.

G.      *Surrender of Canceled Instruments or Securities*

As a condition precedent to receiving any distribution on account of its Allowed Claim or Allowed Equity Interest, each Holder of a Claim or an Equity Interest shall be deemed to have surrendered the Certificates or other documentation underlying each such Claim or Equity Interest, and all such surrendered Certificates and other documentations shall be deemed to be canceled pursuant to Article V.G hereto, except to the extent otherwise provided herein.

H.      *Claims Paid or Payable by Third Parties*

1.   Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the Distribution Date.

2.   Claims Payable by Third Parties

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

3.   Applicability of Insurance Policies

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS

A.      *Allowance of Claims and Equity Interests*

Except as expressly provided herein or any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), no Claim or Equity Interest shall be deemed Allowed unless and until such Claim or Equity Interest is deemed Allowed under the Bankruptcy Code, under the Plan or the

(28)

Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code.  Except as expressly provided in any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors after Confirmation will have and retain any and all rights and defenses the Debtors had with respect to any Claim or Equity Interest as of the Petition Date.

B.      *Prosecution of Objections to Claims and Equity Interests*

The Debtors (in consultation with the Noteholder Committee) or the Reorganized Debtors, as applicable, shall have the exclusive authority to File, settle, compromise, withdraw or litigate to judgment any objections to Claims or Equity Interests as permitted under this Plan.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim or Disputed Equity Interest without approval of the Bankruptcy Court.  The Debtors (in consultation with the Noteholder Committee) also reserve the right to resolve any Disputed Claim or Disputed Equity Interest outside the Bankruptcy Court under applicable governing law.

C.      *Procedures Regarding Disputed Claims or Disputed Equity Interests*

1.   No Filing of Proofs of Claim or Equity Interests

Except as otherwise provided in this Plan, including, without limitation Article VI.G, Holders of Claims or Equity Interests shall not be required to File a proof of claim or proof of interest, and no parties should File a proof of claim or proof of interest.  The Debtors do not intend to object to the allowance of Claims Filed or Equity Interests Filed; provided, however, that the Debtors and the Reorganized Debtors, as applicable, reserve the right to object to any Claim or Equity Interest that is entitled, or deemed to be entitled, to a distribution under this Plan or is rendered Unimpaired under this Plan.  Instead, the Debtors intend to make distributions, as required by this Plan, in accordance with the books and records of the Debtors.  Unless disputed by a Holder of a Claim or an Equity Interest, the amount set forth in the books and records of the Debtors shall constitute the amount of the Allowed Claim or Allowed Equity Interest of such Holder.  If any such Holder of a Claim or an Equity Interest disagrees with the Debtors' books and records with respect to the Allowed amount of such Holder's Claim or Equity Interest, such Holder must so advise the Debtors in writing, in which event the Claim or Equity Interest will become a Disputed Claim or a Disputed Equity Interest.  The Debtors intend to attempt to resolve any such disputes consensually or through judicial means outside the Bankruptcy Court subject to the consent of the Required Consenting Noteholders. Nevertheless, the Debtors may, in their discretion and in consultation with the Required Consenting Noteholders, File with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to the allowance of any Claim or Equity Interest or any other appropriate motion or adversary proceeding with respect thereto.  All such objections will be litigated to Final Order; provided, however, that the Debtors may, with the consent of the Required Consenting Noteholders, compromise, settle, withdraw or resolve by any other method approved by the Bankruptcy Court any objections to Claims or Equity Interests.

2.   Claims Estimation

Any Debtor or Reorganized Debtor, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.

(29)

*D.     Distributions After Allowance*

To the extent that a Disputed Claim or a Disputed Equity Interest ultimately becomes an Allowed Claim or Allowed Equity Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Equity Interest in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Equity Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Equity Interest the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim or Equity Interest.

**ARTICLE IX.**

**CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE**

*A.     Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that all provisions, terms and conditions hereof are approved in the Confirmation Order.

1.   The Appalachia Sale shall have been approved by the Bankruptcy Court prior to or contemporaneously with Confirmation.

2.   A Confirmation Order shall have been entered by the Bankruptcy Court, in form and substance acceptable in all respects to the Required Consenting Noteholders, the Required Consenting Banks and the Debtors.

3.   The Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing and consummating the other contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in this Plan.

4.   Unless otherwise agreed to in writing by the Required Consenting Noteholders, the Required Consenting Banks, and/or the Consenting Banks, as applicable, to the extent of their respective consent rights as provided in this Plan, the Debtors shall not have submitted any amendment, modification or filing seeking to amend or modify this Plan, the Disclosure Statement or any documents, motions or orders related to the foregoing.

*B.     Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following provisions, terms and conditions are satisfied (or waived pursuant to the provisions of Article IX.C hereof), and the Effective Date shall occur on the date upon which the last of such conditions are so satisfied and/or waived.

1.   The Plan and all documents contemplated thereby, including any amendments, modifications or supplements thereto, shall be acceptable to the Debtors, the Required Consenting Noteholders, the Required Consenting Banks and/or the Consenting Banks, as applicable, to the extent of their respective consent rights as provided in the Plan, and pursuant to the terms of, and in accordance with, the Restructuring Support Agreement.

2.   Prior to or as of the Effective Date, payment in full in Cash of any and all accrued but unpaid reasonable Plan Supporters' Advisors Fees for which the Debtors have received invoices or estimates prior to the Effective Date.

3.   Prior to or as of the Effective Date, payment in full in Cash of any and all accrued but unpaid reasonable Prepetition Banks' Advisors Fees for which the Debtors have received invoices or estimates prior to the Effective Date.

US-DOCS\75004247.8

4.   The Effective Date shall have occurred on or prior to the earlier of: (i) fifteen (15) calendar days after the entry of the Confirmation Order; and (ii) March 13, 2017.

5.   The Confirmation Order shall be a Final Order in form and substance acceptable to the Required Consenting Noteholders, the Required Consenting Banks and the Debtors.  The Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in this Plan.

6.   The Restructuring Support Agreement shall have been assumed by the Debtors and shall not have terminated.

7.   The Amended Credit Agreement and the Intercreditor Agreement shall have been executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

8.   All actions, documents, certificates and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

9.   The cure amounts or other payment obligations of any of the Debtors (including as reorganized under and pursuant to this Plan) arising or otherwise resulting from the assumption of executory contracts or unexpired leases, on a per-contract basis and on an aggregate basis, calculated by the Required Consenting Noteholders and the Required Consenting Banks, in their respective reasonable discretion, does not exceed or is not reasonably expected to exceed an amount acceptable to the Required Consenting Noteholders and the Required Consenting Banks, in their respective sole discretion; *provided*, *however*, that the conditions set forth in this Section B.9 of Article IX shall not constitute a condition precedent to the Effective Date with respect to the discretion of the Required Consenting Banks unless such cure amounts or other payment obligations calculated by the Required Consenting Banks, in their reasonable discretion, exceed or are reasonably expected to exceed $15 million on an aggregate basis.

10.   (a) The Employment Agreements and Severance Agreements (including any additions, deletions, and/or modifications made thereto) are acceptable to the Required Consenting Noteholders in their sole discretion; (b) the Specified Employee Plans (as defined in the Restructuring Term Sheet) (including any additions, deletions and/or modifications made thereto) are acceptable to the Required Consenting Noteholders in their sole discretion; (c) the Indemnification Provisions (including any additions, deletions, and/or modifications made thereto) are reasonably satisfactory to the Required Consenting Noteholders; and (d) the D&O Insurance Policies and fiduciary liability insurance policies (including any additions, deletions, and/or modifications made thereto) are acceptable to the Required Consenting Noteholders in their sole discretion.

11.   The Appalachia Sale shall have closed immediately prior to the Effective Date.

12.   The Debtors shall have resolved issues related to the provision of additional collateral to BOEM on terms acceptable to the Required Consenting Noteholders and the Required Consenting Banks.

*C.*      *Waiver of Conditions*

Each of the conditions to Confirmation and to Consummation set forth in this Article IX may be waived with the consent of the Debtors, the Required Consenting Noteholders and the Required Consenting Banks without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan; *provided, however,* the Debtors, the Required Consenting Noteholders and the Required Consenting Banks, as applicable, shall only have the right to waive any such conditions to the extent such party has the right to consent to the satisfaction of such condition.

(31)

D.      *Effect of Nonoccurrence of Conditions*

If the Consummation of this Plan does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

**ARTICLE X.**

**SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS**

A.      *Compromise and Settlement of Claims, Interests and Controversies*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

B.      *Releases by the Debtors*

**To the extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including, without limitation, the service of the Released Parties to facilitate the expeditious reorganization of the Debtors, the implementation of the restructuring contemplated by the Plan, and the waiver of certain Claims of certain of the Released Parties against the Debtors, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to any act, omission, transaction event or other occurrence taking place on or prior to the Effective Date; provided, however, that the foregoing "Debtor Releases" shall not operate to waive or release any Causes of Action of any Debtor: (1) against a Released Party arising from any contractual obligations owed to the Debtors that are pursuant to an Executory Contract that is not otherwise rejected by the Debtors pursuant to section 365 of the Bankruptcy Code before, after, or as of the Effective Date; (2) expressly set forth in and preserved by the Plan or related documents; or (3) arising from claims for fraud, gross negligence, willful misconduct or criminal conduct. Notwithstanding anything to the contrary in the foregoing, the "Debtor Releases" set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement executed in connection with the Plan with respect to the Debtors, the Reorganized Debtors or the Estates.**

C.      *Releases by Holders of Claims and Interests*

**To the extent permitted by applicable law and approved by the Bankruptcy Court, as of the Effective Date, each Holder of (a) a Claim who does not elect the Release Opt-Out on its Ballot, or (b) an Interest who**

(32)

receives distributions under this Plan and does not submit a valid Release Opt-Out by the Release Opt-Out Deadline, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date; provided, however, that the foregoing release shall not operate to waive or release any Causes of Action of any Releasing Party: (1) against a Released Party arising from any contractual obligations owed to the Releasing Party that are wholly unrelated to the Debtors or the Reorganized Debtors; (2) expressly set forth in and preserved by the Plan or related documents; or (3) arising from claims for fraud, gross negligence, willful misconduct or criminal conduct. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement executed in connection with the Plan.

D.      Exculpation

        Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim, except for fraud, gross negligence, willful misconduct or criminal conduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

E.      Discharge of Claims and Termination of Interests

        Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (2) the Holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

F.      Injunction

        Except as otherwise expressly provided in the Plan or related documents, or for obligations issued pursuant to the Plan, from and after the Effective Date, all Releasing Parties are permanently enjoined from taking any of the following actions against the Debtors or the Reorganized Debtors: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on

US-DOCS\75004247.8

**account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Nothing in the Plan or the Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or the Reorganized Debtors, as applicable, and any such Entity agree in writing that such Entity will:  (a) waive all Claims against the Debtors, the Reorganized Debtors and the Estates related to such action and (b) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

G.      *Setoffs*

Except with respect to Prepetition Notes Claims or as otherwise expressly provided for in the Plan, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any distribution is made on account of such Allowed Claim or Allowed Interest), any claims, rights and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such claims, rights and Causes of Action that such Reorganized Debtor may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any claim, right or Cause of Action of the Debtor or the Reorganized Debtor, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.

H.      *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

I.      *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date.

## ARTICLE XI.

### BINDING NATURE OF PLAN

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article VI, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.    ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.    adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    adjudicate, decide or resolve any and all matters related to Causes of Action;

7.    adjudicate, decide or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.    enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.    adjudicate, decide or resolve any and all matters related to the Appalachia Sale Agreement;

10.   enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code, including, without limitation, any order approving the Appalachia Sale;

11.   resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12.   issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

(35)

13.   resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article X and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

14.   resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VII;

15.   enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

16.   determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

17.   enter an order or final decree concluding or closing the Chapter 11 Cases;

18.   adjudicate any and all disputes arising from or relating to distributions under the Plan;

19.   consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.   determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.   hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

22.   hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.   hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

24.   enforce all orders previously entered by the Bankruptcy Court; and

25.   hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII.

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.      *Modifications and Amendments*

Subject to the limitations and rights contained in this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and with the consent of the Required Consenting Noteholders and the Required Consenting Banks, to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors, with the consent of the Required Consenting Noteholders and the Required Consenting Banks, or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

(36)

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

Subject to the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and to File subsequent chapter 11 plans, in each case solely if the Restructuring Support Agreement has been terminated in accordance with its terms.  If the Debtors revoke or withdraw this Plan subject to the terms hereof and the Restructuring Support Agreement, or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

D.      *Substantial Consummation of the Plan*

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

A.      *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary or guardian, if any, of each Entity.

B.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

C.      *Further Assurances*

For the avoidance of doubt, the Debtors, the Reorganized Debtors, the Consenting Banks, and the Consenting Noteholders shall not violate, and shall otherwise comply, with the Restructuring Support Agreement in all respects, including with respect to the implementation of the Plan and the Effective Date.  The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

D.      *Payment of Fees and Expenses*

       Prior to or as of the Effective Date, the Debtors shall promptly pay in Cash in full any and all accrued but unpaid reasonable Plan Supporters' Advisors Fees and Prepetition Banks' Advisors Fees for which the Debtors have received invoices or estimates prior to the Effective Date.

E.      *Service of Documents*

       Any pleading, notice or other document required by this Plan to be served on or delivered to the Debtors shall be sent by overnight mail to:

>   Stone Energy Corporation
>   625 East Kaliste Saloom Rd
>   Lafayette, LA. 70508
>   Attn:     Lisa S. Jaubert
>             Kenneth H. Beer
>   Direct Dial:  (337) 521-2278
>   Fax:  (337) 521-9916
>   Email:  JaubertLS@StoneEnergy.com
>           BeerKH@StoneEnergy.com
>
>   **with copies to:**
>
>   Latham & Watkins LLP
>   330 North Wabash Avenue, Suite 2800
>   Chicago, Illinois 60611
>   Attn:  David S. Heller
>          Josef  S. Athanas
>          Caroline A. Reckler
>          Matthew L. Warren
>   Direct Dial:  (312) 876-7700
>   Fax:  (312) 993-9767
>   Email: david.heller@lw.com
>          josef.athanas@lw.com
>          caroline.reckler@lw.com
>          matthew.warren@lw.com
>
>   and
>
>   Akin Gump Strauss Hauer & Feld LLP
>   One Bryant Park
>   Bank of America Tower
>   New York, NY 10036-6745
>   Attn:  Michael S. Stamer
>          Meredith A. Lahaie
>   Direct Dial:  (212) 872-1000
>   Fax:  (212) 872-1002
>   Email:  mstamer@akingump.com
>           mlahaie@akingump.com
>
>   and
>
>   O'Melveny & Myers, LLP
>   Times Square Tower
>   7 Times Square

US-DOCS\75004247.8

New York, NY 10036
Attn:   George Davis,
            Suzzanne Uhland
            Michael F. Lotito
Direct Dial:   (212) 326-2000
Fax:  (212) 326-2061
E-Mail:  gdavis@omm.com;
            suhland@omm.com
            mlotito@omm.com

F.      *Dissolution of Committee*

        On the Effective Date, the Committee(s), if any, shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except for purposes of filing applications for Professional compensation in accordance with Article II.A.2 of this Plan.

G.      *Nonseverability of Plan Provisions*

        If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided that any such alteration or interpretation must be in form and substance acceptable to the Debtors; provided, further, that the Debtors may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

H.      *Return of Security Deposits*

        Unless the Debtors have agreed otherwise in a written agreement or stipulation approved by the Bankruptcy Court, all security deposits provided by the Debtors to any Person or Entity at any time after the Petition Date shall be returned to the Reorganized Debtors within twenty (20) days after the Effective Date, without deduction or offset of any kind.

I.      *Term of Injunctions or Stays*

        Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      *Entire Agreement*

        Except as otherwise indicated herein and except for the terms and conditions of the Restructuring Support Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

US-DOCS\75004247.8

K.      *Exhibits*

All exhibits hereto are incorporated into and are a part of the Plan as if set forth in full in the Plan.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

L.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the securities offered and sold under the Plan.

M.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control.  In the event of a conflict between any provision of the Plan and the Confirmation Order, the Confirmation Order shall govern and control.

O.      *Filing of Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

P.      *Tax Reporting and Compliance*

The Reorganized Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

Dated:  December 14, 2016

Respectfully submitted,

**STONE ENERGY CORPORATION,**
a Delaware corporation

By: _____

Kenneth H. Beer, Executive Vice President and Chief
Financial Officer

**STONE ENERGY OFFSHORE , L.L.C.,**
a Delaware limited liability company, by
Stone Energy Corporation, its sole member

By: _____

Kenneth H. Beer, Executive Vice President and Chief
Financial Officer

**STONE ENERGY HOLDING, L.L.C.,**
a Delaware limited liability company, by
Stone Energy Corporation, it sole member

By: _____

Kenneth H. Beer, Executive Vice President and Chief
Financial Officer

**Schedule 1**

**Stone Energy Corporation**
**Stone Energy Offshore, L.L.C.**
**Stone Energy Holding, L.L.C.**

**Schedule 2**

Restructuring Support Agreement

[see attached]

*EXECUTION VERSION*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR, AS APPLICABLE, PROVISIONS OF THE BANKRUPTCY CODE.**

**AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT**

**by and among**

**STONE ENERGY CORPORATION AND ITS SUBSIDIARIES PARTY HERETO**

**and**

**THE UNDERSIGNED CREDITOR PARTIES**

**dated as of December 14, 2016**

1

This Amended and Restated Restructuring Support Agreement (together with the exhibits and schedules attached hereto, which include, without limitation, the Term Sheet (as defined below), as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of December 14, 2016, is entered into by and among: (i) Stone Energy Corporation ("***Stone***"), Stone Energy Holding, L.L.C. ("***Stone Holdings***") and Stone Energy Offshore, L.L.C. ("***Stone Offshore***" and, together with Stone and Stone Holdings, each a "***Stone Party***" and collectively, the "***Stone Parties***"); (ii) the holders of notes (the "***Noteholders***") issued pursuant to: (a) the Indenture dated as of March 6, 2012 (as amended, restated, modified, supplemented or replaced from time to time, the "***Convertible Indenture***") among Stone, as issuer, Stone Offshore, as subsidiary guarantor, and The Bank of New York Mellon Trust Company, N.A., as trustee and (b) the Second Supplemental Indenture dated as of November 8, 2012 to Senior Indenture dated as of January 26, 2010 (as amended, restated, modified, supplemented or replaced from time to time, the "***Senior Indenture***" and, together with the Convertible Indenture, the "***Indentures***") among Stone, as issuer, Stone Offshore, as subsidiary guarantor, and The Bank of New York Mellon Trust Company, N.A., as trustee (in such capacity, under each of the Indentures, together with any successor thereto under either or both Indentures, the "***Indenture Trustee***"), that hold claims against the Stone Parties arising on account of the Indentures and the notes issued thereunder, the "***Notes Claims***"), in each case, and that are signatories hereto (collectively, with any Noteholder that may become a party hereto in accordance with <u>Sections 13</u> and <u>34</u> of this Agreement, the "***Consenting Noteholders***") and (iii) the financial institutions party to the Fourth Amended and Restated Credit Agreement dated as of June 24, 2014 (as amended, restated, modified, supplemented or replaced from time to time, the "***Credit Agreement***") among Stone, as borrower, such financial institutions, as lenders (the "***Banks***"), Bank of America, N.A., as administrative agent (in such capacity, the "***Bank Agent***") and issuing bank, Wells Fargo Bank, National Association, Natixis, The Bank of Nova Scotia, Capital One, N.A., and Toronto Dominion (New York) LLC, as co-syndication agents, Regions Bank and U.S. Bank, National Association, as co-documentation agents, and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as sole Lead Arranger and Bookrunner, that hold claims against the Stone Parties arising on account of the Credit Agreement (the "***Banks Claims***"), in each case, that are signatories hereto (collectively, with any Bank that may become a party hereto in accordance with <u>Section 13</u> and <u>34</u> of this Agreement, the "***Consenting Banks***").[1]   This Agreement collectively refers to the Stone Parties, the Consenting Noteholders and the Consenting Banks as the "***Parties***" and each individually as a "***Party***."  Unless otherwise noted, capitalized terms used but not defined herein have the meanings ascribed to them at a later point in this Agreement or in the Term Sheet (as defined herein).

## <u>RECITALS</u>

**WHEREAS**, as of the date of this Agreement, the Banks hold Banks Claims against the Stone Parties in an aggregate principal amount of approximately $341,500,000;

---

[1]   As used in this Agreement, "Consenting Bank" shall only refer to the unit or division of such Consenting Bank identified on the signature page to this Agreement.  Each Consenting Bank shall only be bound to this Agreement to the extent of such Consenting Bank's holdings identified on Annex B.

**WHEREAS**, as of the date of this Agreement, the Noteholders hold Notes Claims against the Stone Parties in aggregate principal amount of approximately $1,075,000,000;

**WHEREAS**, on October 20, 2016, the Stone Parties and the Consenting Noteholders entered into that certain Restructuring Support Agreement (together with all exhibits and attachments thereto), as amended by the First Amendment to the Restructuring Support Agreement, dated as of November 4, 2016, the Second Amendment to the Restructuring Support Agreement, dated as of November 9, 2016 and the Third Amendment to the Restructuring Support Agreement, dated as of November 15, 2016 (as amended by such amendments, the "***Existing Restructuring Support Agreement***");

**WHEREAS**, on October 20, 2016, Stone entered into a purchase and sale agreement for the sale of the Appalachian Assets (as defined in the Term Sheet) with TH Exploration III, LLC ("***Buyer***") for a cash purchase price of $360 million (the "***Appalachia PSA***") subject to adjustment in accordance with the Appalachia PSA;

**WHEREAS**, (i) in accordance with the terms of the Existing Restructuring Support Agreement, on November 17, 2016, the Debtors commenced solicitation of the *Joint Prepackaged Plan of Reorganization of Stone Energy Corporation and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (the "***Original Plan***"), reflecting the terms of the Existing Restructuring Support Agreement (including the Term Sheet (as defined therein)) and (ii) the deadline for submitting a ballot containing a vote to accept or reject the Original Plan is December 16, 2016 at 5:00 p.m. (Prevailing Central Time) (the "***Voting Deadline***")(which Voting Deadline shall also apply to the Plan, as defined below);

**WHEREAS**, the Stone Parties, the Consenting Noteholders and the Consenting Banks have agreed to enter into this Agreement to amend and restate the Existing Restructuring Support Agreement in its entirety and, among other things, amend the Original Plan pursuant to the *First Amended Joint Prepackaged Plan of Reorganization of Stone Energy Corporation and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, a copy of which is attached hereto as **Exhibit B**, the "***Plan***");

**WHEREAS**, the Stone Parties will seek to restructure the Banks Claims, the Notes Claims and certain of their other obligations, to cancel the existing equity interests of Stone and to consummate the transactions in accordance with, and subject to the terms and conditions of, the Appalachia PSA (as defined below) and to recapitalize in accordance with the terms provided in the restructuring term sheet attached hereto as **Exhibit A** (the "***Term Sheet***") and incorporated herein pursuant to Section 3 of this Agreement through jointly-administered voluntary cases commenced by the Stone Parties (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") pursuant to the Plan (the "***Restructuring Transactions***");

**WHEREAS**, each of the Parties has reviewed, or has had the opportunity to review, the Term Sheet and this Agreement with the assistance of legal and financial advisors of its own choosing; and

**WHEREAS**, subject to the commitments of the Stone Parties set forth in this Agreement regarding the Restructuring Transactions, each Consenting Noteholder and each Consenting Bank desires to support and vote to accept the Restructuring Transactions, and the Stone Parties desire to obtain the commitment of the Consenting Noteholders and the Consenting Banks to support and vote to accept the Restructuring Transactions, in each case subject to the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

<u>**AGREEMENT**</u>

1.      <u>**RSA Effective Date.**</u>  This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "***RSA Effective Date***") that each of the following conditions shall have been satisfied:

        (a)      Each Stone Party has duly executed and delivered signatures pages to this Agreement;

        (b)      Consenting Noteholders holding, in the aggregate, at least 66-2/3% of the outstanding aggregate principal amount of all Notes Claims have duly executed and delivered signatures pages to this Agreement, and

        (c)      Consenting Banks holding, in the aggregate, at least 66-2/3% of the outstanding aggregate principal amount of all Banks Claims have duly executed and delivered signatures pages to this Agreement.

2.      <u>**Form of Restructuring Transactions.**</u>   The Stone Parties shall, as soon as practicable but subject to the satisfaction or waiver of the conditions precedent contained in the Definitive Documentation, effectuate the Restructuring Transactions through confirmation and consummation of the Plan and the execution and delivery of the Definitive Documentation, in each case on terms and conditions consistent with the Term Sheet, in the Chapter 11 Cases.

3.      <u>**Exhibits and Schedules Incorporated by Reference.**</u>  Each of the exhibits and schedules attached hereto (including, without limitation, the Term Sheet) and each of the schedules to such exhibits (collectively, the "***Exhibits and Schedules***") is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern and control to the extent of such inconsistency except that, in the event of any inconsistency between this Agreement and the Term Sheet, the Term Sheet shall govern and control.

4.      <u>**Definitive Documentation.**</u>

(a)     The definitive documents and agreements governing the Restructuring Transactions (collectively, the "**Definitive Documentation**") shall include:

(i)     the Stone Parties' Disclosure Statement with respect to the Plan setting forth the terms and conditions of the Restructuring Transactions (together with all exhibits thereto, the "**Disclosure Statement**") and any Credit Agreement amendment, intercreditor agreement, indenture, notes, equityholder agreements or other agreements required to memorialize the Restructuring Transactions (the Disclosure Statement together with any other solicitation materials with respect to the Plan, collectively, the "**Solicitation Materials**");

(ii)    the Plan, including any plan supplement documents (including, without limitation, the identity of the officers and directors of the reorganized Stone Parties, any Credit Agreement amendment, intercreditor agreement, indenture, notes, the governance documents for the reorganized Stone Parties, and any equityholders' agreements with respect to the reorganized Stone Parties), the order of the Bankruptcy Court approving the Disclosure Statement (the "**Disclosure Statement Order**"), the order of the Bankruptcy Court confirming the Plan (the "**Confirmation Order**"), an order of the Bankruptcy Court authorizing the assumption of this Agreement (the "**RSA Assumption Order**"), the Assumption and Procedures Order (as defined in the Appalachia PSA) in regard to the transactions contemplated in the Appalachia PSA (the "**Assumption and Procedures Order**"), the bidding procedures (if any) approved by the Bankruptcy Court in respect of the Appalachian Assets (whether pursuant to the Assumption and Procedures Order or other order of the Bankruptcy Court) (the "**Bidding Procedures**"), the order of the Bankruptcy Court approving the Appalachia PSA and the transactions contemplated thereby (the "**Appalachia Sale Order**"), the motions seeking approval of each of the foregoing, the All Trade Motion, the Cash Collateral Motion and the Royalty Motion; and

(iii)   any document or filing identified in the Term Sheet as being subject to approval or consent rights under Section 4(b) of this Agreement.

(b)     The Definitive Documentation identified in Section 4(a) of this Agreement will, after the RSA Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including the Term Sheet) in all respects, and shall otherwise be in form and substance reasonably satisfactory to the Stone Parties, on the one hand, and the

5

Required Consenting Noteholders[2], on the other hand; provided, however, that—

(i)     the form, terms and provisions of the constitutional, organizational and other documents of the Stone Parties setting forth the rights of stockholders or noteholders after the Consummation Date, including, but not limited to, any charters, bylaws, operating agreements, indentures, warrants, stockholders' or unitholders' agreements, registration rights agreements, management incentive plan, or other similar agreements shall, in each case, be consistent with the Term Sheet and otherwise satisfactory to the Required Consenting Noteholders in their sole discretion;

(ii)    the form, terms and provisions of the amended Credit Agreement shall be consistent with the Term Sheet and otherwise satisfactory to the Consenting Banks in their sole discretion and to the Required Consenting Noteholders in their reasonable discretion;

(iii)   and the form, terms and provisions of any indenture and notes issued in connection therewith shall in each case be satisfactory to the Required Consenting Noteholders in their sole discretion and to the Required Consenting Banks in their reasonable discretion;[3] and

(iv)    the form, terms and provisions of the intercreditor agreement shall be consistent with the Term Sheet and otherwise satisfactory to the Required Consenting Noteholders and the Consenting Banks in their respective sole discretion;

(v)     the Disclosure Statement, the Disclosure Statement Order, the Assumption and Procedures Order, the Bidding Procedures (if any), the Cash Management Order, the Motion for Approval of the Assumption and Procedures Order, the Appalachia Sale Order; the Motion for Approval of the Appalachia Sale Order, the Motion for Approval of the Disclosure Statement and Solicitation Procedures, the Plan, the Confirmation Order, Motion to Approve RSA, RSA Assumption Order, All Trade Motion, Cash Collateral Motion, any interim or final orders approving the use of cash collateral, and Royalty Motion shall, in each case, be satisfactory to the Required Consenting Noteholders, the Required Consenting Banks and the Stone Parties.

---

[2] "***Required Consenting Noteholders***" shall mean, subject to Section 28, the Consenting Noteholders, holding at least a majority of the principal amount outstanding of all Notes Claims held by the Consenting Noteholders, provided that, such Consenting Noteholders holding the majority in principal amount shall include at least three (3) separate Consenting Noteholders (for purposes of this definition, each institution holding Notes Claims shall be taken together with each of its controlled affiliate's and subsidiary's Notes Claims holdings and they shall together in the aggregate constitute a single Consenting Noteholder).

[3]     "***Required Consenting Banks***" shall mean the Consenting Banks holding at least a majority of the principal amount outstanding of all Banks Claims held by the Consenting Banks.

6

(c)   The Stone Parties shall provide to the Noteholder Committee's legal counsel and the Consenting Banks' legal counsel drafts of all motions or applications, including proposed orders, and other documents that the Stone Parties intend to file with the Bankruptcy Court not less than three (3) Business Days before the date when the Stone Parties intend to file any such motion, application or document, including for the avoidance of doubt, all first day motions and orders; provided, however, that in the event that three (3) Business Days' notice is impossible or impracticable under the circumstances, the Stone Parties shall provide draft copies of any motions, applications, including proposed orders and any other documents the Stone Parties intend to file with the Bankruptcy Court to the Noteholder Committee's legal counsel and the Consenting Banks' legal counsel within one (1) Business Day, or as soon as otherwise practicable, before the date when the Stone Parties intend to file any such motion, application or document.   The Stone Parties shall notify the Noteholder Committee's legal counsel and the Consenting Banks' legal counsel telephonically or by electronic mail to advise them of the documents to be filed and the facts that make the provision of advance copies not less than three (3) Business Days before submission impossible or impracticable.

5.     **Mutual Agreement of the Parties to Support the Restructuring Transactions**. Each of the Parties to this Agreement agrees, severally and not jointly, from the RSA Effective Date until the occurrence of a Termination Date (as defined in <u>Section 12</u> of this Agreement) applicable to such Party, to:

(a)   use commercially reasonable best efforts to support and cooperate with the other Parties to this Agreement and use reasonable best efforts to take or cause to be taken all actions reasonably necessary to consummate the Restructuring Transactions on the terms and subject to the conditions set forth in the Term Sheet and this Agreement; and

(b)   negotiate in good faith any terms of the Definitive Documentation that are subject to negotiation as of the RSA Effective Date.

6.     **Commitments of Consenting Noteholders and Consenting Banks.**   Subject to <u>Section 12(b)</u>, each Consenting Noteholder agrees, severally and not jointly, as applicable, and each Consenting Bank agrees, severally and not jointly, as applicable, from the RSA Effective Date until the occurrence of a Termination Date (as defined in <u>Section 12(a)</u> of this Agreement), with respect to the Consenting Noteholders, and until the occurrence of a Consenting Bank Termination Event (as defined in <u>Section 12(b)</u> of this Agreement) with respect to the Consenting Banks, so long as it remains the legal owner, beneficial owner and/or investment advisor or manager of or with power and/or authority to bind any Notes or Banks Claims (provided that, any transfer of Notes or Banks Claims is made in accordance with <u>Section 13</u> herein), to:

(a)    in the case of each Consenting Noteholder, tender for exchange all Notes beneficially owned by such Consenting Noteholder or for which it is the nominee, investment manager, or advisor for beneficial holders thereof pursuant to the Disclosure Statement and in accordance with the applicable procedures set forth therein, in each case as specified by such Consenting Noteholder next to its name on **Annex A**;

(b)    (i) subject to receipt of the Disclosure Statement, vote all of its Notes Claims and/or Banks Claims against, or interests in, as applicable, the Stone Parties now or hereafter owned by such Consenting Noteholder or Consenting Bank (or which such Consenting Noteholder or Consenting Bank now or hereafter has voting control over) to accept the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and the Solicitation Materials that meet the requirements of applicable law, including sections 1125 and 1126 of the Bankruptcy Code; (ii) timely return a duly-executed ballot in connection therewith; and (iii) not "opt out" of or object to any releases or exculpation provided under the Plan (and, to the extent required by such ballot, affirmatively "opt in" to such releases and exculpation);

(c)    not withdraw, amend, change, or revoke (or seek to withdraw, amend, change, or revoke) its tender, consent, or vote with respect to the Plan; *provided*, *however*, that the tender, consent, or votes of the Consenting Noteholders and the Consenting Banks shall be immediately revoked and deemed void *ab initio* upon the occurrence of the Termination Date;

(d)    not (i) object to, delay, impede, or take any other action (including to instruct or direct the Indenture Trustee or the Bank Agent) to interfere with the prompt consummation of the Restructuring Transactions or the Definitive Documentation (including the entry by the Bankruptcy Court of an order approving the Disclosure Statement and the Confirmation Order, if applicable); (ii) propose, file, support, or vote for any restructuring, workout, reorganization, liquidation, or chapter 11 plan or other Alternative Transaction (as defined below) for any of the Stone Parties, other than the Restructuring Transactions and the Plan; or (iii) encourage or support any other person or entity to do any of the foregoing;

(e)    support and not object to or take any other action (including to instruct or direct the Indenture Trustee or the Bank Agent) that would, or would be reasonably expected to, interfere with the prompt consummation of the transactions contemplated in the Appalachia PSA (including the entry by the Bankruptcy Court of the Assumption and Procedures Order and the Appalachia Sale Order);

(f)    not take any other action, including, without limitation, initiating or joining in any legal proceeding, that is materially inconsistent with its obligations under this Agreement, that could unreasonably hinder, delay,

or prevent the timely consummation of the Restructuring Transactions and the confirmation and consummation of the Plan and entry of the Confirmation Order;

(g)    not file with the Bankruptcy Court a motion, application, or adversary proceeding, or support any motion, application, or adversary proceeding filed or commenced by any party in interest, (i) challenging the validity, enforceability, scope, perfection or priority of, or seeking avoidance or subordination of, the Notes Claims or the Banks Claims, or any liens, mortgages, deeds of trust or security interests securing or intended to secure the Banks Claims or (ii) asserting any other cause of action against the Consenting Noteholders or the Consenting Banks; and

(h)    during the Interim Period (as defined in the Appalachia PSA) no Consenting Noteholder shall, directly or indirectly (including through the financial advisor or legal counsel thereto), solicit any offer or inquiry from any Person concerning such Person's direct or indirect acquisition of the assets subject to the Appalachia PSA.

Notwithstanding the foregoing, nothing in this Agreement, and neither a vote to accept the Plan by any Consenting Noteholder or Consenting Bank, nor the acceptance of the Plan by any Consenting Noteholder or Consenting Bank shall: (w) be construed to limit consent and approval rights provided in this Agreement and the Definitive Documentation; (x) be construed to prohibit any Consenting Noteholder or Consenting Bank from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, or exercising rights or remedies specifically reserved herein; (y) be construed to prohibit any Consenting Noteholder or Consenting Bank from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the transactions contemplated in, subject to the terms and conditions of, the Appalachia PSA and consummation of the Restructuring Transactions; or (z) impair or waive the rights of any Consenting Noteholder or Consenting Bank to assert or raise any objection expressly permitted under this Agreement in connection with any hearing in the Bankruptcy Court, including, without limitation, any hearing on confirmation of the Plan. For the avoidance of doubt and notwithstanding the foregoing, nothing in this Agreement shall or shall be deemed to limit the rights of the Stone Parties set forth in the Appalachia PSA (including sections 7.04(b), 7.16(b) and 11.01(h), but subject to section 3.02(e), thereof) to conduct a marketing and auction process for the assets subject to the Appalachia PSA if required by the Bankruptcy Court, terminate the Appalachia PSA and select an Alternative Bid (as defined in the Appalachia PSA, an "*Alternative Bid*"), and the obligations of the Consenting Noteholders pursuant to this Agreement in respect of the Appalachia PSA and the transactions contemplated therein are expressly subject to the right of the Consenting Noteholders to consider any unsolicited offer or inquiry presented to a Consenting Noteholder or the Stone Parties, engage in discussions with the party submitting such unsolicited offer or inquiry and the Stone Parties in respect thereof (including by furnishing confidential information with respect to the assets subject to the Appalachia PSA or permitting access to such assets or the books and records of the Stone Parties) and, if such unsolicited offer or inquiry is determined in good faith by the

Required Consenting Noteholders, after seeking the advice of outside legal counsel, to be superior to the transactions contemplated in the Appalachia PSA for the purpose of maximizing the value of the assets of the Stone Parties, seek an order or directive from the Bankruptcy Court requiring the Stone Parties to conduct a further marketing process and/or a competitive auction for the assets subject to the Appalachia PSA, and, if the result of such marketing and/or auction process is a higher or otherwise better offer as compared to the Appalachia PSA (including as the same may have been proposed to be modified by the Buyer with respect thereto) in the determination of the Required Consenting Noteholders, to support approval of such higher or otherwise better offer by the Bankruptcy Court and termination of the Appalachia PSA by the Stone Parties pursuant to section 11.01(h) thereof.  The Consenting Noteholders, on the one hand, and the Stone Parties, on the other hand, as the case may be, shall promptly, and no later than three (3) Business Days following receipt of an unsolicited offer or inquiry with respect to the assets subject to the Appalachia PSA, notify legal counsel to the other and, in the case of the Consenting Noteholders, Buyer (as defined in the Appalachia PSA) of the receipt and material terms of such offer or inquiry.

7.    **Commitment of the Stone Parties.**  Each of the Stone Parties agrees, from the RSA Effective Date until the occurrence of a Termination Date, to:

(a)    use reasonable best efforts to implement the Restructuring Transactions in accordance with the applicable milestones set forth in **Schedule 1** hereto (collectively, the "*Milestones*"), which Milestones may only be extended in accordance with Section 28 of this Agreement;

(b)    not undertake any action that is inconsistent with this Agreement, or which could unreasonably hinder, delay or prevent the timely consummation of the Restructuring Transactions and the Definitive Documentation, including, without limitation, filing any motion to reject this Agreement in the Bankruptcy Court;

(c)    support and take all actions as are reasonably necessary and appropriate to obtain any and all required regulatory and/or third-party approvals to consummate the Restructuring Transactions;

(d)    file, within two (2) calendar days after the date the Chapter 11 Cases are commenced by filing bankruptcy petitions with the Bankruptcy Court (such date, the "*Petition Date*"), a motion seeking to assume this Agreement;

(e)    timely pay all fees and expenses as set forth in Section 15 of this Agreement;

(f)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code),

10

(ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases;

(g)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Stone Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(h)    subject to the next paragraph, not seek, solicit, or support any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets (other than the sale of the Appalachian Assets), any debt or equity financing or re-financing, or restructuring of the Stone Parties (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code other than the sale of the Appalachian Assets), other than the Plan and Restructuring Transactions, and to not cause or allow any of their agents or representatives to solicit any agreements relating to an Alternative Transaction (as defined below);

(i)    notwithstanding anything to the contrary herein, use reasonable best efforts to exercise their rights under Section 2.17(b) of the Credit Agreement to the extent necessary to implement the modifications to the Credit Agreement referenced in <u>Section 4(b)(ii)</u> and as set forth in the Term Sheet;

(j)    (i) not take an action or fail to act in such a manner as would be reasonably likely to result in a breach or failure of any of the conditions to closing set forth in the Appalachia PSA; (ii) use reasonable best efforts to cure any breach of the terms and conditions of the Appalachia PSA by any of the Stone Parties signatory thereto that would be reasonably likely to result in a breach or failure of the conditions to closing set forth therein; (iii) not terminate the Appalachia PSA or reduce, amend or modify the purchase price set forth therein to an amount in cash less than $350 million (other than as a result of adjustments provided for therein); and (iv) otherwise use reasonable best efforts to satisfy its obligations under the Appalachia PSA and consummate the transactions with Buyer contemplated thereby, subject to the last sentence of <u>Section 6</u> of this Agreement;

(k)    through the Closing Date (as defined in the Appalachia PSA) (i) upon the written request of the Consenting Noteholders or Consenting Banks, provide in writing to the Consenting Noteholders or Consenting Banks, as applicable, a then current good faith estimate of the Stone Parties, together with such documentation as reasonably requested by the Consenting Noteholders or Consenting Banks in support of such estimate, of the purchase price under the Appalachia PSA after giving effect to any

reductions that would be taken into account by the Consenting Noteholders or Consenting Banks in determining the "net purchase price" as determined in accordance with Section 8(v) and (ii) promptly notify the Consenting Noteholders and Consenting Banks in writing of any change, event, circumstance, development, condition, occurrence or effect which the Stone Parties become aware of that would reasonably be expected to result in a failure of any of the conditions to closing set forth in the Appalachia PSA or in any reduction in the "net purchase price," as determined in accordance with Section 8(v).  To the extent the notice is in respect of a potential adjustment to "net purchase price," such notice shall include the amount of the resulting reduction along with such documentation as reasonably requested by the Consenting Noteholders or Consenting Banks in support of such amount; and

(l)     through the effective date of the Plan, (i) upon the written request of the Consenting Noteholders or the Consenting Banks, or their respective counsel, provide in writing to counsel to the Consenting Noteholders and counsel to the Consenting Banks a then current good faith estimate of the Stone Parties, together with such documentation as reasonably requested by the Consenting Noteholders or Consenting Banks, or their respective counsel, in support of such estimate, of any cure amounts or other payment obligations of any of the Stone Parties (including as reorganized under and pursuant to the Plan) arising or otherwise resulting from the assumption of executory contracts or unexpired leases, on a per contract basis and on an aggregate basis (each such amount, an "***Estimated Payment Obligation***" and collectively, the "***Estimated Payment Obligations***"), and (ii) promptly notify counsel to the Consenting Noteholders and counsel to the Consenting Banks in writing of any change, event, circumstance, development, condition, occurrence or effect which the Stone Parties become aware of that would reasonably be expected to materially increase the Estimated Payment Obligations, individually or taken together as a whole.

Notwithstanding anything to the contrary herein, the Stone Parties shall be entitled, at any time prior to the entry by the Bankruptcy Court of the Confirmation Order, to accept or pursue (but not to solicit or initiate of its own accord): (i) a competing plan of reorganization or other financial and/or corporate restructuring of the Stone Parties; (ii) the issuance, sale or other disposition of any equity or debt interests, or any material assets, of the Stone Parties; or (iii) a merger, consolidation, business combination, liquidation, recapitalization, any debt or equity financing or refinancing, or similar transaction involving the Stone Parties (each, an "***Alternative Transaction***"), in each case to the extent the Board of Directors of Stone determines, after seeking the advice of outside legal counsel and outside financial advisors, in good faith, and consistent with their fiduciary duties, that (i) such Alternative Transaction best maximizes value for the Stone Parties and their stakeholders, and (ii) proceeding with the Plan and Restructuring Transactions would be inconsistent with the Board of Directors of Stone's applicable fiduciary duties, and provided that the Stone Parties shall have first exercised their right in accordance with Section 9(c) of this Agreement to declare a Company Termination Event prior to the date on

which the Stone Parties enter into a definitive agreement in respect of such an Alternative Transaction or make a public announcement regarding their intention to do so. The Stone Parties shall give the legal counsel to the Consenting Noteholders and legal counsel to the Consenting Banks not less than three (3) Business Days' prior written notice before the termination of this Agreement in accordance with <u>Section 9(c)</u> of this Agreement. At all times prior to the date on which the Stone Parties enter into a definitive agreement in respect of such an Alternative Transaction or make a public announcement regarding their intention to do so, the Stone Parties shall (x) provide a copy of any written offer or proposal (and notice of any oral offer or proposal) for such Alternative Transaction within three (3) Business Days[4] of the Stone Parties' or their advisors' receipt of such offer or proposal received to the legal counsel to and the financial advisors to the Consenting Noteholders and the Consenting Banks and (y) provide such information to the advisors to the Consenting Noteholders and the Consenting Banks regarding such discussions (including copies of any materials provided to such parties hereunder) as necessary to keep the Consenting Noteholders and Consenting Banks contemporaneously informed as to the status and substance of such discussions.

8.    **Consenting Noteholder and Consenting Bank Termination Events.** The Required Consenting Noteholders shall have the right, but not the obligation, upon written notice to the other Parties, to terminate the obligations of the Consenting Noteholders under this Agreement upon the occurrence of any of the following events (a "***Consenting Noteholder Termination Event***"), and the Required Consenting Banks shall have the right, but not the obligation, upon written notice to the other Parties, to terminate the obligations of the Consenting Banks under this Agreement upon the occurrence of any of the following events (a "***Consenting Bank Termination Event***"), unless waived, in writing, separately by each of the Required Consenting Noteholders and Required Consenting Banks, as applicable, on a prospective or retroactive basis:

    (a)    the failure of the Stone Parties to meet any Milestone;

    (b)    the termination of the Appalachia PSA or any reduction, amendment or modification of the purchase price set forth therein to an amount in cash less than $350 million (other than as a result of adjustments in the purchase price as provided for in the Appalachia PSA), other than termination of the Appalachia PSA by the Stone Parties signatory thereto pursuant to section 11.01(h) thereof for the purpose of selecting an Alternative Bid acceptable to the Required Consenting Noteholders and the Required Consenting Banks;

    (c)    the Bankruptcy Court enters an order converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases;

    (d)    the Bankruptcy Court enters an order appointing a trustee, receiver, or examiner with expanded powers beyond those set forth in

---

[4] "***Business Day***" means any day, other than a Saturday, Sunday, or legal holiday, in each case, in New York, New York.

section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(e)    the Definitive Documentation identified in <u>Section 4(b)(i)</u> does not conform to the Term Sheet without the prior written consent of the Required Consenting Noteholders or otherwise is not acceptable to the Required Consenting Noteholders; *provided* that the occurrence of the events described in this <u>Clause (e)</u> shall not constitute a Consenting Bank Termination Event;

(f)    the Definitive Documentation identified in <u>Section 4(b)(ii)</u> does not conform to the Term Sheet without the prior written consent of the Consenting Banks or otherwise is not acceptable to the Consenting Banks in their sole discretion; *provided* that the occurrence of the events described in this <u>Clause (f)</u> shall not constitute a Consenting Noteholder Termination Event;

(g)    the Definitive Documentation identified in <u>Section 4(b)(ii)</u> is not acceptable to the Required Consenting Noteholders in their reasonable discretion; *provided* that the occurrence of the events described in this <u>Clause (g)</u> shall not constitute a Consenting Bank Termination Event;

(h)    the Definitive Documentation identified in <u>Section 4(b)(iii)</u> is not acceptable to the Required Consenting Noteholders in their sole discretion; provided that the occurrence of the events described in this Clause (h) shall not constitute a Consenting Bank Termination Event;

(i)    the Definitive Documentation identified in <u>Section 4(b)(iii)</u> is not acceptable to the Required Consenting Banks in their reasonable discretion; *provided* that the occurrence of the events described in this <u>Clause (i)</u> shall not constitute a Consenting Noteholder Termination Event;

(j)    the Definitive Documentation identified in <u>Section 4(b)(iv)</u> does not conform to the Term Sheet without the prior written consent of the Consenting Banks or otherwise is not acceptable to the Consenting Banks in their sole discretion; *provided* that the occurrence of the events described in this <u>Clause (j)</u> shall not constitute a Consenting Noteholder Termination Event;

(k)    the Definitive Documentation identified in <u>Section 4(b)(iv)</u> does not conform to the Term Sheet without the prior written consent of the Required Consenting Noteholders or otherwise is not acceptable to the Required Consenting Noteholders in their sole discretion; *provided* that the occurrence of the events described in this <u>Clause (k)</u> shall not constitute a Consenting Bank Termination Event;

14

(l) the Definitive Documentation identified in <u>Section 4(b)(v)</u> is not acceptable to the Required Consenting Banks; *provided* that the occurrence of the events described in this <u>Clause (l)</u> shall not constitute a Consenting Noteholder Termination Event;

(m) the Definitive Documentation identified in <u>Section 4(b)(v)</u> is not acceptable to the Required Consenting Noteholders; *provided* that the occurrence of the events described in this <u>Clause (m)</u> shall not constitute a Consenting Bank Termination Event;

(n) any Stone Party files with the Bankruptcy Court any motion or application seeking authority to sell any material assets that is not contemplated in the Term Sheet without the prior written consent of the Required Consenting Noteholders and the Required Consenting Banks;

(o) any Stone Party materially breaches its obligations under this Agreement, which breach is not cured within five (5) Business Days after the giving of written notice of such breach, or files, publicly announces, or informs the Consenting Noteholders and the Consenting Banks of its intention to file a chapter 11 plan that contains terms and conditions that: (i) do not provide the Consenting Noteholders and Consenting Banks with the economic recovery set forth on the Term Sheet or (ii) are not otherwise consistent with this Agreement and the Term Sheet; *provided*, *however*, that no Consenting Noteholder or Consenting Bank may seek to terminate this Agreement based upon a material breach or any failure of any material condition in this Agreement primarily caused by such Consenting Noteholder or Consenting Bank, as applicable, in breach of this Agreement;

(p) a material breach by any Stone Party of any representation, warranty, or covenant of such Stone Party set forth in this Agreement that (to the extent curable) remains uncured for a period of five (5) Business Days after written notice and a description of such breach is provided to the Stone Parties; *provided*, *however*, that the Required Consenting Noteholders or Required Consenting Banks may not seek to terminate this Agreement based upon a breach of this Agreement by a Stone Party primarily caused by the Required Consenting Noteholders or the Required Consenting Banks, as applicable, in breach of this Agreement;

(q) either (i) any Stone Party files with the Bankruptcy Court a motion, application, or adversary proceeding (or any Stone Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (A) challenging the validity, enforceability, scope, perfection or priority of, or seeking avoidance or subordination of, the Notes Claims or the Banks Claims, or any liens, mortgages, deeds of trust or security interests securing the Bank Claims (B) asserting any other cause of action against the Consenting Noteholders or the Consenting

15

Banks or (ii) the Bankruptcy Court enters an order providing relief against any Consenting Noteholder or any Consenting Bank with respect to any of the foregoing causes of action or proceedings filed by any Stone Party;

(r)     if the Bankruptcy Court or other governmental authority with jurisdiction shall have issued any order, injunction, or other decree or taken any other action, in each case, which has become final and non-appealable and which restrains, enjoins, or otherwise prohibits the implementation of the Restructuring Transactions or the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement and the Term Sheet;

(s)     any Stone Party terminates its obligations under and in accordance with this Agreement;

(t)     if the Stone Parties execute or file with the Bankruptcy Court any Definitive Documentation that is inconsistent with the requirements set forth in Section 4(b) of this Agreement;

(u)     if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Stone Parties' exclusive right to file a plan or plans of reorganization pursuant to section 1121 of the Bankruptcy Code;

(v)     if the net purchase price, calculated by the Required Consenting Noteholders or the Required Consenting Banks, in their respective sole discretion, in accordance with this Section 8(v) is less than $335.0 million. The net purchase price as used in this Section 8(v) shall be calculated by reducing the purchase price by (i) any purchase price adjustments (excluding adjustments related to interim operations between the Effective Time of the Appalachia PSA and the Closing Date (each as defined in the Appalachia PSA)) and (ii) any escrowed amounts, holdbacks or other similar deferred payments under the Appalachia PSA.  Absent a finding of manifest error, the calculation of net purchase price by the Required Consenting Noteholders or Required Consenting Banks, as applicable, shall be final and binding on the parties with respect to this Section 8(v). The Stone Parties shall provide such assistance in good faith as reasonably requested by the Consenting Noteholders or the Required Consenting Banks in the calculation of the net purchase price used in this Section 8(v);

(w)

        (i) solely with respect to the Required Consenting Noteholders, if the Estimated Payment Obligations, calculated by the Required Consenting Noteholders, in their reasonable discretion, exceed or would be reasonably expected to exceed an amount acceptable to the Required Consenting Noteholders, in their sole discretion; and

16

(ii) solely with respect to the Required Consenting Banks, if the Estimated Payment Obligations, calculated by the Required Consenting Banks, in their reasonable discretion, exceed or would be reasonably expected to exceed an amount acceptable to the Required Consenting Banks, in their sole discretion, *provided, however*, that the right of the Required Consenting Banks to exercise the termination rights described in this Section 8(w)(ii) are exercisable only if the Estimated Payment Obligations, calculated by the Required Consenting Banks, in their reasonable discretion, exceed or are reasonably expected to exceed $15 million.

Absent a finding of manifest error, the calculation or the Estimated Payment Obligations by the Required Consenting Noteholders or the Required Consenting Banks, as applicable, shall be final and binding on the Parties with respect to this Section8(w). The Stone Parties shall provide such assistance in good faith as reasonably requested by the Consenting Noteholders and the Consenting Banks in the calculation of the Estimated Payment Obligations;

(x) if (i) the additions, deletions and modifications to the Specified Employee Plans are not acceptable to the Required Consenting Noteholders in their sole discretion, and (ii) the additions, deletions and modifications to the Indemnification Provisions for the purpose of making such Indemnification Provisions consistent with current market practice are not reasonably satisfactory to the Required Consenting Noteholders; or

(y) if, as the result of an event or occurrence following the RSA Effective Date, the Stone Parties cannot, or are reasonably expected by the Required Consenting Noteholders or the Required Consenting Banks unable to meet the projections contained in their 12/2 "Modified Case" business plan such that the effect is reasonably expected to result in materially lower EBITDA, Free Cash Flow, or liquidity.

9.    **The Stone Parties' Termination Events.**  The Stone Parties shall have the right, but not the obligation, upon written notice to the Consenting Noteholders and the Consenting Banks, to terminate their obligations (jointly) under this Agreement upon the occurrence of any of the following events (each a "***Company Termination Event***," and together with the Consenting Noteholder Termination Events and the Consenting Bank Termination Events, the "***Termination Events***"), unless waived, in writing, by the Stone Parties on a prospective or retroactive basis:

(a) solely with respect to the Consenting Noteholders, a breach by a Consenting Noteholder of any representation, warranty, or covenant of such Consenting Noteholder set forth in this Agreement that would reasonably be expected to have a material adverse impact on the timely consummation of the Restructuring Transactions that (to the extent curable) remains uncured for a period of five (5) Business Days after

17

written notice and a description of such breach is provided to the Consenting Noteholders; *provided*, *however*, that the Stone Parties may not seek to terminate this Agreement based upon a breach of this Agreement by a Consenting Noteholder arising primarily out of the Stone Parties' own actions in breach of this Agreement; and provided, further, that so long as non-breaching Consenting Noteholders party hereto continue to hold at least 66-2/3% of the outstanding Notes Claims, such termination shall be effective only with respect to such breaching Consenting Noteholders;

(b)     solely with respect to the Consenting Banks, a breach by Consenting Banks that hold at least 33-1/3% of the outstanding Banks Claims of any representation, warranty, or covenant of such Consenting Banks set forth in this Agreement that would reasonably be expected to have a material adverse impact on the timely consummation of the Restructuring Transactions that (to the extent curable) remains uncured for a period of five (5) Business Days after written notice and a description of such breach is provided to the Consenting Banks; *provided*, *however*, that, notwithstanding the introductory provision of this Section 9, upon the occurrence of such a breach that remains uncured (to the extent curable), the Stone Parties' right to terminate their obligations under this Agreement shall be limited solely to those provisions relating to the Consenting Banks but not to the Agreement as a whole; and, *provided, further,* that the Stone Parties may not seek such a termination based upon a breach of this Agreement by Consenting Banks arising primarily out of the Stone Parties' own actions in breach of this Agreement; and provided, further, that so long as non-breaching Consenting Banks party hereto continue to hold at least 66-2/3% of the outstanding Banks Claims, such termination shall be effective only with respect to such breaching Consenting Banks;

(c)     subject to the prior notice required in the last paragraph of <u>Section 7</u>, if the Board of Directors of Stone desires to terminate this Agreement pursuant to the exercise of its fiduciary duties, after seeking the advice of outside legal counsel and financial advisor, to accept an Alternative Transaction, or make a public announcement regarding their intention to do so, as contemplated in the last paragraph of <u>Section 7</u> of this Agreement; or

(d)     if the Bankruptcy Court or other governmental authority with jurisdiction shall have issued any order, injunction, or other decree or taken any other action, in each case, which has become final and non-appealable and which restrains, enjoins, or otherwise prohibits the implementation of the Restructuring Transactions.

10.     **Individual Termination.**  Any Consenting Noteholder or any Consenting Bank may terminate this Agreement as to itself only, upon written notice to the other Parties, in the event that: (a) such Consenting Noteholder or such Consenting Bank has transferred all (but not less than all) of its Notes Claims or Banks Claims, as applicable, in accordance with <u>Section 13</u>

of this Agreement (such termination shall be effective on the date on which such Consenting Noteholder or Consenting Bank has effected such transfer, satisfied the requirements of <u>Section 13</u> and provided the written notice required above in this <u>Section 10</u>); or (b) this Agreement is amended without its consent in such a way as to alter any of the material terms hereof in a manner that is disproportionately adverse to such Consenting Noteholder or such Consenting Bank as compared to similarly situated Consenting Noteholders or Consenting Banks, by giving ten (10) Business Days' written notice to the Stone Parties and the other Consenting Noteholders or other Consenting Banks; *provided*, that such written notice shall be given by the applicable Consenting Noteholder or applicable Consenting Bank within five (5) Business Days of such amendment, filing, or execution.

11.     **Mutual Termination; Automatic Termination.**  Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically and all of the obligations of the Parties hereunder shall be of no further force or effect in the event that: (i) the Restructuring Transactions are consummated in accordance with this Agreement and the Term Sheet; (ii) the Restructuring Transactions are not consummated in accordance with this Agreement and the Term Sheet by the one-hundredth (100th) calendar day after the Petition Date, as such date may be extended upon joint written notice by the Required Consenting Noteholders and Required Consenting Banks  to the Company to such later date as indicated thereby; or (iii) the Stone Parties, Required Consenting Banks and the Required Consenting Noteholders mutually agree to such termination in writing.

12.     **Effect of Termination.**

(a)     Subject to <u>Section 12(b)</u>, the earliest date on which termination of this Agreement as to a Party is effective in accordance with <u>Sections 8</u>, <u>9</u>, <u>10</u>, or <u>11</u> of this Agreement shall be referred to, with respect to such Party, as a "***Termination Date***."  Upon the occurrence of a Termination Date, all Parties' obligations under this Agreement shall be terminated effective immediately, and all Parties hereto shall be released from all commitments, undertakings, agreements, and obligations; *provided*, *however*, that each of the following shall survive any such termination: (a) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall not be prejudiced in any way; (b) the Stone Parties' obligations in <u>Section 15</u> of this Agreement accrued up to and including such Termination Date; and (c) <u>Sections 12</u>, <u>15</u>, <u>18</u>, <u>19</u>, <u>22</u>, <u>23</u>, <u>25</u>, <u>27</u>, <u>29</u>, <u>31</u>, and <u>37</u> of this Agreement.  The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

(b)     Notwithstanding anything to the contrary in this Agreement, upon the occurrence of a Consenting Bank Termination Event pursuant to Clauses (a), (f), (i), (j), (*l*), (n), (o), (p), (t), (u), (v) (except to the extent the net purchase price, calculated by the Required Consenting Banks in their sole discretion in accordance with Section 8(v), is less than $300 million)

or <u>(w)(ii)</u> (except to the extent the Estimated Payment Obligations, calculated by the Required Consenting Banks in their reasonable discretion, exceed or would be reasonably expected to exceed $25 million) of <u>Section 8</u> or a Company Termination Event pursuant to <u>Section 9(b)</u> (each, a "***Specified Termination Event***"), the termination of obligations under this Agreement shall apply solely to the rights and obligations of the Consenting Banks and no Specified Termination Event shall give rise to a Termination Event; *provided*, *however*, that if any Consenting Noteholder or Consenting Noteholders are in breach of this Agreement such that the Stone Parties are able to declare a Company Termination Event pursuant to <u>Section 9(a)</u> as of the occurrence of a Specified Termination Event, the terms of this <u>Section 12(b)</u> shall be of no force and effect. The date upon which this Agreement is terminated as to the Consenting Banks as a result of a Specified Termination Event shall be referred to as a "Consenting Bank Termination Date." Upon the occurrence of a Consenting Bank Termination Date, this Agreement shall be treated by the Stone Parties and the Consenting Noteholders as a nullity and they shall proceed on the basis of the Existing Restructuring Support Agreement and seek to implement the Restructuring Transactions (as defined in the Existing Restructuring Support Agreement) pursuant to the Original Plan; *provided*, *however*, that the Stone Parties shall not be required to proceed on the basis of the Existing Restructuring Support Agreement or to seek to implement the Restructuring Transactions (as defined in the Existing Restructuring Support Agreement) pursuant to the Original Plan, if doing so would be inconsistent with the Stone Parties' Board of Directors' applicable fiduciary duties, as determined by the Board of Directors of the Stone Parties after consultation in good faith with outside legal counsel and outside financial advisors. The rights of the Consenting Banks in respect of the Original Plan following a Consenting Bank Termination Date (including, without limitation, the right to assert prepetition and postpetition interest accruing at the default rate) are reserved in all respects.

13.     **<u>Transfers of Claims and Interests</u>.**

(a)     No Consenting Noteholder and no Consenting Bank shall (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, any of its right, title, or interest in respect of any of such Consenting Noteholder's or Consenting Bank's claims against any Stone Party, as applicable, in whole or in part, or (ii) deposit any of such Consenting Noteholder's or Consenting Bank's claims against any Stone Party, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in <u>Clauses (i)</u> and <u>(ii)</u> are collectively referred to herein as a "***Transfer***" and the Consenting Noteholder or Consenting Bank making such Transfer is referred to herein as the "***Transferor***"), unless such Transfer is to another Consenting Noteholder or Consenting Bank or any

other entity (a "***Transferee***") that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the Stone Parties a Transferee Joinder substantially in the form attached hereto as **Exhibit B** (the "***Transferee Joinder***").  With respect to claims against or interests in a Stone Party held by the relevant Transferee upon consummation of a Transfer in accordance herewith, such Transferee is deemed to make all of the representations, warranties, and covenants of a Consenting Noteholder or Consenting Bank, as applicable, set forth in this Agreement as of the date of such Transfer.  Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer and any remedies with respect to such claim) under this Agreement to the extent of such transferred rights and obligations.  Any Transfer made in violation of this Section 13 shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Stone Parties and/or any Consenting Noteholder and/or any Consenting Bank, and shall not create any obligation or liability of any Stone Party, any other Consenting Bank or any other Consenting Noteholder to the purported transferee.

(b)     Notwithstanding anything to the contrary herein, (i) the foregoing Clause (a) of this Section 13 shall not preclude any Consenting Noteholder from transferring Notes Claims to affiliates of such Consenting Noteholder (each, a "***Consenting Noteholder Affiliate***"), which Consenting Noteholder Affiliate shall be automatically bound by this Agreement upon the transfer of such Notes Claims; (ii) the foregoing Clause (a) of this Section 13 shall not preclude any Consenting Bank from transferring Banks Claims to affiliates of such Consenting Bank or to other units or divisions within the organization of such Consenting Bank (each, a "***Consenting Bank Affiliate***"), which Consenting Bank Affiliate shall be automatically bound by this Agreement upon the transfer of such Banks Claims; and (iii) a Qualified Marketmaker[5] that acquires any of the Notes Claims or Banks Claims with the purpose and intent of acting as a Qualified Marketmaker for such Notes Claims or Banks Claims shall not be required to execute and deliver to counsel a Transferee Joinder or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker transfers such Notes Claims or Banks Claims (by purchase, sale, assignment, participation, or otherwise) to a Consenting Noteholder, Consenting Bank or a Transferee (including, for the avoidance of doubt, the requirement that such Transferee execute a Transferee Joinder).

---

[5] As used herein, the term "Qualified Marketmaker" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Stone Parties (or enter with customers into long and short positions in claims against the Stone Parties), in its capacity as a dealer or market maker in claims against the Stone Parties and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

14.     **Further Acquisition of Claims or Interests.**   Except as expressly set forth in Section 13 of this Agreement, nothing in this Agreement shall be construed as precluding any Consenting Noteholder or Consenting Bank from acquiring additional claims against or interests in any Stone Parties; *provided*, *however*, that any such claims or interests shall automatically be subject to the terms and conditions of this Agreement.   Upon any such further acquisition by a Consenting Noteholder or Consenting Bank, such Consenting Noteholder or such Consenting Bank shall promptly notify in writing the Stone Parties, legal counsel to the Consenting Banks and legal counsel to the Noteholder Committee (as defined below).

15.     **Fees and Expenses.**   The Stone Parties shall pay or reimburse all fees, costs and expenses (regardless of whether such fees, costs and expenses were incurred before or after the Petition Date) of the Bank Agent and each of the Consenting Banks as provided for under the Credit Agreement; *provided*, *however*, that all outstanding invoices of the Bank Agent's and each of the Consenting Bank's professionals and advisors shall be paid in full immediately prior to the Petition Date.   Subject to Section 12 of this Agreement, the Stone Parties shall pay or reimburse all reasonable and documented fees and out-of-pocket expenses (regardless of whether such fees and expenses were incurred before or after the Petition Date and in each case, in accordance with (and when due under) any applicable engagement letter or fee reimbursement letter with the Stone Parties) of the following professionals and advisors to an ad hoc committee of Noteholders (the "***Noteholder Committee***"):   (a) Akin Gump Strauss Hauer & Feld LLP and one local law firm, as legal counsel to the Noteholder Committee, and (b) Intrepid Financial Partners, L.L.C., as the financial advisor retained on behalf of the Noteholder Committee; *provided*, *however*, that all outstanding invoices of the Noteholder Committee's professionals and advisors shall be paid in full immediately prior to the Petition Date.[6]

16.     **Consents and Acknowledgments.**   Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for consents to the Plan.   The acceptance of the Plan by each of the Consenting Noteholders and each Consenting Bank has been solicited pursuant to the Disclosure Statement and related ballots in accordance with applicable law, and subject to sections 1125, 1126, and 1127 of the Bankruptcy Code.   This Agreement does not constitute, and shall not be deemed to constitute, an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, or any other federal, state, or provincial law or regulation.

17.     **Representations and Warranties.**

(a)     Each Consenting Noteholder and each Consenting Bank hereby represents and warrants on a several and not joint basis, for itself and not for any other person or entity, that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the RSA Effective Date:

---

[6] Subject to (i) the receipt by O'Melveny & Myers LLP of a prepetition advance payment sufficient to bring the aggregate amount on account up to $500,000, (ii) the receipt by RPA Advisors, LLC, of a prepetition advance payment sufficient to bring the aggregate amount on account up to $250,000, (iii) the receipt by Akin Gump of a prepetition advance payment sufficient to bring the aggregate amount on account up to $500,000, and (iv) the receipt by Intrepid of a prepetition advance payment in the amount of $250,000.

(i)      it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)     the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)    the execution, delivery, and performance by it of this Agreement does not violate any provision of law, rule, or regulation applicable to it or any of its affiliates, or its certificate of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates;

(iv)    the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, other than, for the avoidance of doubt, the actions with governmental authorities or regulatory bodies required in connection with implementation of the Restructuring Transactions;

(v)     subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(vi)    it has sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement and the Term Sheet, and has been afforded the opportunity to discuss the Plan and other information concerning the Stone Parties with the Stone Parties' representatives, and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction;

(vii)   it (A) either (1) is the sole owner of the claims and interests identified next to its name on **Annex A** attached hereto, with respect to each Consenting Noteholder, or **Annex B** attached hereto, with respect to each Consenting Bank, and in the amounts set forth therein, or (2) has all necessary investment or voting discretion with respect to the claims and interests identified next to its name on **Annex A** or **Annex B**, as applicable, and has the

23

power and authority to bind the owner(s) of such claims and interests to the terms of this Agreement; (B) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such claims and interests; (C) in the case of each Consenting Noteholder, does not directly or indirectly own or control any principal amount of notes issued pursuant to the Indentures or other claims not arising under the Indentures or constituting Notes Claims against or interests in any Stone Party other than as identified next to its name on **Annex A** attached hereto (which annex, for the avoidance of doubt, shall not be publically disclosed or filed); and (D) in the case of each Consenting Bank, does not directly or indirectly own or control any Banks Claims constituting principal outstanding or letters of credit outstandings other than as identified next to its name on **Annex B** attached hereto (which annex, for the avoidance of doubt, shall not be publically disclosed or filed); and

(viii)   other than pursuant to this Agreement, the claims and interests identified on **Annex A** and/or **Annex B** free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind, that would adversely affect in any material way such Consenting Noteholder's or such Consenting Bank's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

(b)   Each Stone Party hereby represents and warrants on a joint and several basis (and not any other person or entity other than the Stone Parties) that the following statements are true, correct, and complete as of the RSA Effective Date:

(i)   it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)   the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)   the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the

24

Chapter 11 Cases or any Stone Party's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party;

(iv)     the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, other than, for the avoidance of doubt, the actions with governmental authorities or regulatory bodies required in connection with implementation of the Restructuring Transactions;

(v)      subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(vi)     it has sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement and the Term Sheet, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction;

(vii)    Stone has filed or furnished, as applicable, all forms, filings, registrations, submissions, statements, certifications, reports, and documents required to be filed or furnished by it with the U.S. Securities and Exchange Commission (the "**SEC**") under the U.S. Securities Exchange Act of 1934, as amended, or the U.S. Securities Act of 1933, as amended (collectively, "***SEC Filings***"), since December 31, 2014 (the SEC Filings since December 31, 2014 and through the RSA Effective Date, including any amendments thereto, the "***Company Reports***").   As of their respective dates (or, if amended prior to the date hereof, as of the date of such amendment), each of the Company Reports, as amended, complied in all material respects with the applicable requirements of the Exchange Act and the Securities Act, and any rules and regulations promulgated thereunder applicable to the Company Reports.  As of their respective dates (or, if amended prior to the date hereof, as of the date of such amendment), the Company Reports did not contain any untrue statement of a material fact or omit to state a material fact required to be stated

US-DOCS\74992523.4

therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading; and

(viii)    the Stone Parties' consolidated financial statements (including, in each case, any notes thereto) contained in the Company Reports were prepared: (i) in accordance with generally accepted accounting principles in the United States of America ("**GAAP**") applied on a historically consistent basis throughout the periods indicated (except as may be indicated in the notes thereto or, in the case of interim consolidated financial statements, where information and footnotes contained in such financial statements are not required under the rules of the SEC to be in compliance with GAAP) and (ii) in compliance, as of their respective dates of filing with the SEC, in all material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto, and in each case, such consolidated financial statements fairly presented, in all material respects, the consolidated financial position, results of operations, changes in stockholder's equity and cash flows of the Stone Parties, as applicable, and its consolidated subsidiaries as of the respective dates thereof and for the respective periods covered thereby (subject, in the case of unaudited statements, to normal year-end adjustments).

18.    **Survival of Agreement.**  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a financial restructuring of the Stone Parties and in contemplation of chapter 11 filings by the Stone Parties, and the exercise of the rights granted in this Agreement after the commencement of the Chapter 11 Cases shall not be a violation of the automatic stay provisions of section 362 of the Bankruptcy Code.

19.    **Settlement.**  This Agreement and the Restructuring Transactions are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement, the exhibits attached hereto, the Plan, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement or the exhibits attached hereto (as applicable).

20.    **Relationship Among Parties.**  Notwithstanding anything herein to the contrary, the duties and obligations of the Consenting Noteholders and the Consenting Banks under this Agreement shall be several, not joint, with respect to each Consenting Noteholder and each Consenting Bank.  No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity, and it is hereby expressly acknowledged by the Consenting Noteholders and the Consenting Banks, on the one hand, and the Stone Parties, on the other, that they are in privity with each other and that no Consenting Noteholder is in privity with any other Consenting Noteholder or any Consenting Bank, and no Consenting Bank is in privity with any other Consenting Bank or any Consenting Noteholder, in connection with this Agreement or any

26

of the transactions contemplated hereby.  The Consenting Noteholders represent and warrant that as of the date hereof and for so long as this Agreement remains in effect, the Consenting Noteholders have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Stone Parties.  The Consenting Banks represent and warrant that as of the date hereof and for so long as this Agreement remains in effect, the Consenting Banks have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Stone Parties. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement, and each Consenting Noteholder and each Consenting Bank shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement, and it shall not be necessary for any other Consenting Noteholder or any Consenting Bank to be joined as an additional party in any proceeding for such purpose.  Nothing contained in this Agreement, and no action taken by any Consenting Noteholder pursuant hereto is intended to constitute the Consenting Noteholders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that any Consenting Noteholder is in any way acting in concert or as a member of a "group" with any other Consenting Noteholder or Consenting Noteholders within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.  Nothing contained in this Agreement, and no action taken by any Consenting Bank pursuant hereto is intended to constitute the Consenting Banks as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that any Consenting Bank is in any way acting in concert or as a member of a "group" with any other Consenting Bank or Consenting Banks within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended

21.  **Specific Performance.**  It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

22.  **Governing Law and Consent to Jurisdiction and Venue.**  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to such state's choice of law provisions which would require or permit the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding shall be brought in the federal or state courts located in the City of Wilmington, in New Castle County and in the State of Delaware, and each of their respective appellate courts, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding.  Notwithstanding the foregoing consent to Delaware jurisdiction, upon the commencement of any Chapter 11 Cases and until the effective date of the Plan, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.  By executing and delivering this

Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

23.      **<u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  EACH OF THE PARTIES WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY ACTION, PROCEEDING, COUNTERCLAIM, OR DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN ANY OF THE PARTIES ARISING OUT OF, CONNECTED WITH, RELATING TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT.  INSTEAD, ANY DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.**

24.      **<u>Successors and Assigns</u>.**  Except as otherwise provided in this Agreement and subject to <u>Section 13</u> of this Agreement, neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party hereto, without the prior written consent of the other Parties hereto, and then only to a person or entity that has agreed to be bound by the provisions of this Agreement.  This Agreement is intended to and shall bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

25.      **<u>No Third-Party Beneficiaries</u>.**  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

26.      **<u>Notices</u>.**  All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service or messenger; registered, certified or overnight mail; e-mail, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing.  Any notice of termination or breach shall be delivered to all other Parties.

(a)      If to any Stone Party:

Stone Energy Corporation
625 East Kaliste Saloom Rd.
Lafayette, LA 70508
Attn:   Lisa S. Jaubert and
           Kenneth H. Beer
Phone:  (337) 521-2278
Fax:  (337) 521-9916
E-mail:  JaubertLS@StoneEnergy.com; and
           BeerKH@StoneEnergy.com.

*with a copy to:*

Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Attn:   David S. Heller;
        Josef S. Athanas,
        Caroline A. Reckler, and
        Matthew L. Warren
Phone:  (312) 876-7700
Fax:  (312) 993-9767
E-mail: david.heller@lw.com,
        josef.athanas@lw.com,
        caroline.reckler@lw.com, and
        matthew.warren@lw.com

        -and-

Andrews Kurth LLP
600 Travis, Suite 4200
Houston, TX 77002
Attn: Robin Russell
Phone: (713) 220-4086
Fax: (713) 238.7192
E-mail: rrussell@andrewskurth.com

(b)     If to any Consenting Noteholder:

To the notice address provided on **Annex A**.

*with a copy to:*

Akin Gump Strauss Hauer & Feld LLP
One Bryan Park
Bank of America Tower
New York, NY 10036-6745
Attn:  Michael S. Stamer;
        Meredith Lahaie, and
        Stephen B. Kuhn.
Phone:  (212) 872-1000
Fax:  (212) 872-1002
E-mail:  mstamer@akingump.com,
        mlahaie@akingump.com, and
        skuhn@akingump.com.

(c)     If to any Consenting Bank:

To the notice address provided on **Annex B**.

29

*with a copy to:*

O'Melveny & Myers, LLP
Times Square Tower
7 Times Square
New York, NY 10036
Attn:    George A. Davis
          Suzzanne Uhland
          Michael F. Lotito
Phone:  (212) 326-2000
Fax:    (212) 326-2061
E-      gdavis@omm.com
Mail:
          suhland@omm.com
          mlotito@omm.com

27.    **Entire Agreement.**  This Agreement (and the exhibits and schedules attached hereto) constitutes the entire agreement of the Parties with respect to the transactions contemplated herein, and supersedes all prior negotiations, discussions, promises, representations, warranties, agreements, and understandings, whether written or oral, between or among the Parties with respect thereto; *provided*, *however*, that, for the avoidance of doubt, any confidentiality agreement executed by any Consenting Noteholder or by any Consenting Bank shall survive this Agreement and shall continue to be in full force and effect in accordance with its terms; *provided*, *further*, that the Parties intend to enter into the Definitive Documentation after the date hereof to consummate the Restructuring Transactions.

28.    **Amendments.**  Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented, and no term or provision hereof or thereof waived, without the prior written consent of the Stone Parties, the Required Consenting Banks and the Required Consenting Noteholders, *provided* that, (i) the written consent of each Consenting Noteholder, each Consenting Bank and the Stone Parties shall be required for any amendments, amendments and restatements, modifications, or other changes to Section 10 and this Section 28, (ii) the written consent of each Consenting Noteholder and the Stone Parties shall be required for any amendment or modification of the defined term "Required Consenting Noteholders," and (iii) the written consent of each Consenting Bank and the Stone Parties shall be required for any amendment or modification of the defined term "Required Consenting Banks" and *provided, further,* that any amendments, amendments and restatements, modifications, or other changes to the Term Sheet shall require the prior written consent of Consenting Noteholders, holding at least two-thirds of the principal amount outstanding of all Notes Claims held by the Consenting Noteholders provided that, such Consenting Noteholders holding at least two-thirds of the principal amount shall include at least two (2) separate Consenting Noteholders (for purposes of this provision, each institution holding Notes Claims shall be taken together with each of its controlled affiliate's and subsidiary's Notes Claims holdings and they shall together in the aggregate constitute a single Consenting Noteholder).

29.    **Reservation of Rights.**

30

(a)    Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies, and interests, including without limitation, its claims against any of the other Parties.

(b)    Without limiting <u>Clause (a)</u> of this <u>Section 29</u> in any way, if the Restructuring Transactions are not consummated in the manner and on the timeline set forth in this Agreement, or if this Agreement is terminated for any reason in accordance with its terms, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims, and defenses, subject to <u>Section 19</u> of this Agreement.  This Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

30.    **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

31.    **Public Disclosure.**  This Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality agreements executed by and among any of the Parties as of the date hereof; *provided*, *however*, that, after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement or any other material term of the Restructuring Transactions contemplated herein without the express written consent of the other Parties.  For the avoidance of doubt and notwithstanding the generality of the foregoing, under no circumstances may any Party make any public disclosure of any kind that would disclose either: (i) the holdings of any Consenting Noteholder (including **Annex A**, which shall not be publicly disclosed or filed) or of any Consenting Bank (including **Annex B**, which shall not be publicly disclosed or filed)  or (ii) the identity of any Consenting Noteholder or Consenting Bank without the prior written consent of such Consenting Noteholder or such Consenting Bank or the order of a Bankruptcy Court or other court with competent jurisdiction.

32.    **Creditors' Committee.**  Notwithstanding anything herein to the contrary, if any Consenting Noteholder is appointed to, and serves on an official committee of creditors in the Chapter 11 Cases, the terms of this Agreement shall not be construed so as to limit such Consenting Noteholder's exercise of its fiduciary duties arising from its service on such committee; *provided*, *however*, that service as a member of a committee shall not relieve such Consenting Noteholder of its obligations to affirmatively support the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Term Sheet and the transactions with Buyer on the terms and .conditions set forth in this Agreement and the Appalachia PSA.

33.     **Severability.**   If any portion of this Agreement shall be held to be invalid, unenforceable, void or voidable, or violative of applicable law, the remaining portions of this Agreement insofar as they may practicably be performed shall remain in full force and effect and binding on the Parties.

34.     **Additional Parties.**   Without in any way limiting the provisions hereof, additional Noteholders may become Parties by executing and delivering to the other Parties a duly executed counterpart hereof.  Such additional Parties shall become Consenting Noteholders or Consenting Banks, as applicable, under this Agreement in accordance with the terms of this Agreement.

35.     **Time Periods.**  If any time period or other deadline provided in this Agreement expires on a day that is not a Business Day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding Business Day.

36.     **Headings.**   The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

37.     **Interpretation.**   This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.  For purposes of this Agreement, unless otherwise specified: (a) each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) all references herein to "Articles," "Sections," and "Exhibits" are references to Articles, Sections, and Exhibits of this Agreement; and (c) the words "herein," "hereof," "hereunder," and "hereto," refer to this Agreement in its entirety rather than to a particular portion of this Agreement.  The phrase "reasonable best efforts" or words or phrases of similar import as used herein shall not be deemed to require any party to enforce or exhaust their appellate rights in any court of competent jurisdiction, including, without limitation, the Bankruptcy Court.

38.     **Remedies Cumulative; No Waiver.**   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.  The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon strict compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such strict compliance.

39.     **Amendment and Restatement**.    The Stone Parties and the Consenting Noteholders agree that, upon (i) the execution and delivery by each of the parties hereto of this Agreement and (ii) satisfaction of the conditions to the RSA Effective Date set forth in <u>Section 1</u>,

the terms and provisions of the Existing Restructuring Support Agreement shall be and hereby are amended, superseded and restated in their entirety by the terms and provisions of this Agreement.

[*Signatures and exhibits follow.*]

US-DOCS\74992523.4

Dated:  December 14 , 2016

Respectfully submitted,

**STONE ENERGY CORPORATION,**
a Delaware corporation

By: _____

Kenneth H. Beer, Executive Vice President and Chief
Financial Officer

**STONE ENERGY OFFSHORE , L.L.C.,**
a Delaware limited liability company, by
Stone Energy Corporation, its sole member

By: _____

Kenneth H. Beer, Executive Vice President and Chief
Financial Officer

**STONE ENERGY HOLDING, L.L.C.,**
a Delaware limited liability company, by
Stone Energy Corporation, it sole member

By: _____

Kenneth H. Beer, Executive Vice President and Chief
Financial Officer

**Schedule 1**

**Milestones**

(a)     the Stone Parties shall commence the Chapter 11 Cases by filing bankruptcy petitions with the Bankruptcy Court no later than December 14, 2016 (such filing date, the "***Petition Date***");

(b)     within two (2) calendar days after the Petition Date, the Stone Parties shall file with the Bankruptcy Court: (i) a motion seeking to assume this Agreement (the "***RSA Assumption Motion***"), (ii) the Plan and Disclosure Statement, and (iii) a motion (the "***Disclosure Statement and Solicitation Motion***") seeking, among other things: (A) approval of the Disclosure Statement; (B) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan; and (C) to schedule the hearing to consider confirmation of the Plan (the "***Confirmation Hearing***");

(c)     no later than thirty (30) calendar days from the Petition Date, the Bankruptcy Court shall have entered an order authorizing the assumption of this Agreement (the "***RSA Assumption Order***");

(d)     no later than seventy-five (75) calendar days after the Plan and Disclosure Statement are filed, the Bankruptcy Court shall have entered the Confirmation Order;

(e)     no later than fifteen (15) calendar days after entry of the Confirmation Order by the Bankruptcy Court, the Stone Parties shall consummate the transactions contemplated by the Plan (the date of such consummation, the "***Plan Effective Date***"); and

(f)     no later than the Plan Effective Date, the Stone Parties shall have received at least $350 million from the sale of the Appalachian Assets (as defined in the Term Sheet) subject to adjustment in accordance with the Appalachia PSA.

US-DOCS\74992523.4

**<u>Exhibit A</u> to the Restructuring Support Agreement**

**Term Sheet**

[See Attached]

EXECUTION VERSION

STONE ENERGY CORPORATION
RESTRUCTURING TERM SHEET

December 14, 2016

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN OF REORGANIZATION PURSUANT TO THE BANKRUPTCY CODE.   ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND, IF APPLICABLE, PROVISIONS OF THE BANKRUPTCY CODE.   THIS TERM SHEET IS BEING PROVIDED IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS ENTITLED TO PROTECTION PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR FEDERAL OR STATE RULE OF EVIDENCE.   THE TRANSACTIONS DESCRIBED IN THIS TERM SHEET ARE SUBJECT IN ALL RESPECTS TO, AMONG OTHER THINGS, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION AND SATISFACTION OR WAIVER OF THE CONDITIONS PRECEDENT SET FORTH THEREIN.**

NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS AND DEFENSES OF THE LENDERS, THE COMPANY, AND ANY CREDITOR PARTY.  THIS TERM SHEET DOES NOT INCLUDE A DESCRIPTION OF ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE DEFINITIVE DOCUMENTATION, WHICH REMAIN SUBJECT TO DISCUSSION, NEGOTIATION AND EXECUTION.

SUMMARY OF PRINCIPAL TERMS
OF PROPOSED RESTRUCTURING TRANSACTIONS

        This term sheet (the "**Term Sheet**") sets forth certain key terms of a proposed restructuring transaction (the "**Transaction**") with respect to the existing debt and other obligations of Stone Energy Corporation ("**Stone**"), Stone Energy Offshore, L.L.C. ("**Stone Offshore**") and Stone Energy Holdings, L.L.C. (each a "**Stone Party**" and collectively, the "**Stone Parties**" or the "**Company**").  This Term Sheet is the "Term Sheet" referenced as Exhibit A in that certain Amended and Restated Restructuring Support Agreement, dated as of December 14, 2016 (as the same may be amended, modified or supplemented, the "**Support Agreement**"), by and among the Stone Parties, the Consenting Banks and the Consenting Noteholders party thereto.  Capitalized terms used but not otherwise defined in this Term Sheet shall have the meanings given to such terms in the Support Agreement.  This Term Sheet supersedes any proposed summary of terms or conditions regarding the subject matter hereof and dated prior to the date hereof.  Subject to the Support Agreement, the Transaction will be implemented through prepackaged Chapter 11 Cases pursuant to the Plan.

TREATMENT OF CLAIMS AND INTERESTS

        The below summarizes the treatment to be received on or as soon as practicable after the Consummation Date (as defined below) by holders of claims against, and interests in, the Company pursuant to the Transaction.

| | |
|---|---|
| **Administrative, Priority, and Tax Claims** | Allowed administrative, priority, and tax claims will be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **Banks Claims** | The Consenting Banks shall receive on account of their respective pro rata share of allowed Banks Claims held by such Banks (the "**Pro Rata Share**"), including obligations relating to issued but undrawn letters of credit, (i) their Pro Rata Share of commitments, and obligations owing to such Consenting Banks with respect to outstanding loans, under an amended Credit Agreement with the terms set forth on Exhibit 1(a) hereto and (ii) their respective Pro Rata Share of Prepetition Banks |

Cash as a partial repayment of such outstanding loans subject to re-borrowing to the extent permitted and pursuant to the terms of the Amended Credit Agreement. The holders of allowed Banks Claims other than Consenting Banks shall have the option to receive either (x) the same treatment as the Consenting Banks or (y) their respective Pro Rata Share of the obligations owing to such Holders with respect to the New Senior Secured Term Loans with the terms set forth on <u>Exhibit 1(b)</u> hereto; <u>provided</u> that the obligations owing to such holders of allowed Banks Claims with respect to issued but undrawn letters of credit shall remain outstanding and be cash collateralized in an amount equal to 103% of the face amount thereof.

"Prepetition Banks Cash" shall mean cash in an amount equal to the aggregate amount of unrestricted cash of the Debtors as of the Consummation Date in excess of $25,000,000 net of any accrued and unpaid administrative claims (including fee claims) and other payments, escrows or distributions pursuant to the Plan, Appalachia PSA or otherwise.

| | |
|---|---|
| **Other Secured Claims** | Secured claims (other than Bank Claims) shall be unaltered and paid in full in the ordinary course of business to the extent such claims are undisputed. |
| **Notes Claims** | Each holder of an allowed Notes Claim shall receive its *pro rata* share of (a) $100 million of the net cash proceeds from the sale of the Appalachian Assets, (b) 96% of the common stock in reorganized Stone (the "**New Equity Interests**"), subject to dilution by the Warrants, the Management Incentive Plan (each as defined below) and subsequent issuances of common stock (including securities or instruments convertible into common stock) by Stone from time to time after the Consummation Date, as set forth herein, and (c) $225 million of 7.5% notes due 2022 secured by a silent second-priority security interest on all assets securing the obligations owing to the holders of Bank Claims, with the terms set forth on <u>Exhibit 2</u> hereto (the "**New Notes**"), subject to terms of the Intercreditor Agreement on the terms set forth with the terms set forth in <u>Schedule C</u>. |
| **General Unsecured Claims** | Unsecured claims other than Notes Claims shall be unaltered and paid in full in the ordinary course of business to the extent such claims are undisputed. |
| **Intercompany Claims** | Intercompany claims shall be reinstated, compromised, or cancelled, at the election of the Company and the Required Consenting Noteholders such that intercompany claims are treated in a tax-efficient manner. |
| **Equity Interests** | All existing common stock and other equity interests and rights in Stone shall be extinguished as of the Consummation Date.  Each holder of existing common stock in Stone shall receive its *pro rata* share of 4% of the New Equity Interests and warrants on terms and conditions consistent with the term sheet attached hereto as <u>Exhibit 3</u> (the "**Warrants**"), which New Equity Interests shall be subject to dilution by the Warrants and the Management Incentive Plan and subsequent issuances of common stock (including securities or instruments convertible into common stock) by Stone from time to time after the Consummation Date. |

<u>OTHER TERMS OF THE TRANSACTION</u>

| | |
|---|---|
| **Sale of Appalachian Assets** | Prior to or simultaneously with the Consummation Date, the Company shall have sold substantially all of its assets located in the Marcellus and Utica shales in Appalachia (the "**Appalachian Assets**") for at least $350 million subject to adjustments as provided for in the purchase and sale agreement. |
| **Corporate Governance** | The terms and conditions of the new corporate governance documents of the |

reorganized Company (including the bylaws and certificates of incorporation or similar documents, among other governance documents) shall be acceptable to the Required Consenting Noteholders in their sole discretion.

The Parties expect that the reorganized Company following the Consummation Date will continue as a public reporting company under applicable U.S. securities laws and, consequently, the terms and conditions of the new corporate governance documents of the reorganized Company will be appropriate for such a public reporting company.  The New Equity Interests issued to the Noteholders may, if so determined by the Required Consenting Noteholders (including if the Company will not be a public reporting company immediately following the Consummation Date), be subject to a stockholders agreement (the "**New Stockholders Agreement**") containing terms and conditions that are appropriate for a private company and otherwise are acceptable to the Required Consenting Noteholders in their sole discretion.  Such New Stockholders Agreement (if any) would govern the composition of the board or other governing body of reorganized Stone (the "**New Board**") and will include customary approval rights for major stockholders and customary minority protections, including, but not limited to, transfer restrictions for the New Equity Interests issued to the Noteholders (solely for the purpose of assuring the Company would not be forced to become a public reporting company prior to such time as may be determined by the New Board), tag-along rights, drag-along rights, preemptive rights, information rights, and other customary protections for transactions of this type.

| | |
|---|---|
| **Board of Directors** | The New Board shall initially consist of seven (7) directors selected by the Required Consenting Noteholders, one of whom will be the chief executive officer of Stone; *provided*, *however*, that the Required Consenting Noteholders shall interview any existing Board member who wishes to continue as a member of the New Board. |
| **Management Incentive Plan** | On the Consummation Date, reorganized Stone shall adopt a management incentive plan (the "**Management Incentive Plan**") which shall provide for the grant of up to 10% of the New Equity Interests (or warrants or options to purchase New Equity Interests or other equity-linked interests) on a fully diluted basis to certain members of management.  The form, allocation and any limitations on the Management Incentive Plan shall be determined by the New Board (or a committee thereof). |
| **Releases & Exculpation** | The amended Credit Agreement, the indenture for the New Notes, the Plan, and the Confirmation Order will contain customary mutual releases and other exculpatory provisions in favor of the Company, the Bank Agent, the Consenting Banks, the Consenting Noteholders, the Indenture Trustee, the holders of existing common stock in Stone that provide a release, and each of their respective current and former affiliates, subsidiaries, members, professionals, advisors, employees, directors, and officers, in their respective capacities as such.  Such release and exculpation shall include, without limitation, any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions, of the Company or the Reorganized Company, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Company would have been legally entitled to assert in its own right (whether individually or collectively), or on behalf of the holder of any claim or equity interest (whether individually or collectively) or other entity, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time prior to or on the |

Consummation Date arising from or related in any way in whole or in part to the Company, the Credit Agreement, the Indentures, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is affected by the Transaction or treated in the Plan, or the negotiation, formulation, or preparation of the Definitive Documentation or related agreements, instruments, or other documents, in each case other than claims, actions, or liabilities arising out of or relating to any act or omission that constitutes willful misconduct, actual fraud, or gross negligence as determined by final order of a court of competent jurisdiction.  To the maximum extent permitted by applicable law, any such releases shall bind all parties who affirmatively agree or vote to accept the Plan, those parties who abstain from voting on the Plan if they fail to opt-out of the releases, and those parties that vote to reject the Plan unless they opt-out of the releases.

| | |
|---|---|
| **Injunction & Discharge** | The Plan and Confirmation Order will contain customary injunction and discharge provisions. |
| **Cancellation of Instruments, Certificates, and Other Documents** | On the Consummation Date and immediately prior to or concurrent with the distributions contemplated in this Term Sheet, except to the extent otherwise provided herein or in the Definitive Documentation, all instruments, certificates, and other documents evidencing debt of or equity interests in Stone and its subsidiaries shall be cancelled, and the obligations of Stone and its subsidiaries thereunder, or in any way related thereto, shall be discharged. |
| **Employee Compensation and Benefit Programs** | The employment agreements and severance policies, and all employment, compensation and benefit plans, policies, and programs of the Company applicable to any of its employees and retirees, including, without limitation, all workers' compensation programs, savings plans, retirement plans, deferred compensation plans, SERP plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans listed on <u>Schedule A</u> attached hereto that are approved by, and with such additions, deletions, and modifications as may be required by, the Required Consenting Noteholders (collectively, the "**<u>Specified Employee Plans</u>**"), shall be maintained, continued in full force and effect and assumed by the Company (and assigned to the reorganized Stone Parties, if necessary) pursuant to section 365(a) of the Bankruptcy Code, either by a separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan.  All claims arising from the Specified Employee Plans shall be treated in accordance with the Bankruptcy Code.  Any plans, programs or arrangements that are not Specified Employee Plans relating to employees, compensation, or employee benefits shall be terminated or rejected, as appropriate. |
| **Tax Issues** | The Transaction shall, subject to the terms and conditions of the Support Agreement, be structured to achieve a tax-efficient structure, in a manner acceptable to the Company and the Required Consenting Noteholders. |
| **Exemption Under Section 1145 of the Bankruptcy Code** | The Plan and Confirmation Order shall provide that the issuance of any securities thereunder, including the New Notes, the New Equity Interests and the Warrants, will be exempt from securities laws in accordance with section 1145 of the Bankruptcy Code and such New Notes, New Equity Interests and Warrants shall be, following the Consummation Date, freely transferable by the respective holders thereof to the furthest extent permissible pursuant to section 1145 and applicable securities law and regulations (other than with respect to any such holders that are affiliates of the reorganized Company). |

EXECUTION VERSION

| | |
|---|---|
| **Registration Rights** | The Company shall enter into a registration rights agreement with any party that receives 5% or more of the New Equity Interests. The registration rights agreement shall contain customary terms and conditions, including provisions with respect to demand rights, piggyback rights and blackout periods and shall be acceptable to the Consenting Noteholders in their sole discretion. |
| **SEC Reporting** | The Company shall continue as a public reporting company under applicable U.S. securities laws and shall continue to file annual, quarterly and current reports in accordance with the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder. |
| **Stock Exchange** | The Company shall use commercially reasonable efforts to list the New Equity Interests for trading on the New York Stock Exchange, The NASDAQ Global Market, the NASDAQ Global Select Market or any other national securities exchange reasonably acceptable to the Stone Parties and the Required Consenting Noteholders with such listing to be effective on the Consummation Date. |
| **D&O Liability Insurance Policies with Runoff Endorsements, and Indemnification** | Prior to the Petition Date, the Company shall purchase runoff endorsements to the Company's existing Directors' and Officers' liability insurance policies (collectively, "**D&O Liability Insurance Policies**") set forth on <u>Schedule B</u> hereto, extending coverage for current or former directors, managers, and officers of the Stone Parties for a six-year period after the Consummation Date for covered liabilities arising from activities occurring prior to the Consummation Date (collectively, "**Runoff Endorsements**"). The Company shall purchase new D&O Liability Insurance Policies for directors, managers, and officers of reorganized Stone and its subsidiaries from and after the Consummation Date on terms and conditions acceptable to the Required Consenting Noteholders.

The Company shall assume (and assign to the reorganized entities if necessary), pursuant to section 365(a) of the Bankruptcy Code, either by a separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan, (a) the existing D&O Liability Insurance Policies with Runoff Endorsements, and (b) all indemnification provisions in existence as of the date of the Support Agreement, including, but not limited to, those set forth on <u>Schedule B</u> hereto that, solely in respect of any indemnification agreements and other indemnification obligations (but not the existing D&O Liability Insurance Policies with Runoff Endorsements) are approved by, and with such additions, deletions, and modifications to such indemnification agreements and obligations as may be required by the Required Consenting Noteholders to make such indemnification agreements and obligations consistent with current market practice to the reasonable satisfaction of the Required Consenting Noteholders, for directors, managers and officers of the Company (whether in by-laws, certificate of formation or incorporation, board resolutions, employment contracts, or otherwise), such indemnification provisions, the "**Indemnification Provisions**"; provided, however, that no such Indemnification Provisions shall be deleted from Schedule B unless such deletion is agreed to by each of the Required Consenting Noteholders and the Stone Parties. All claims arising from the existing D&O Liability Insurance Policies with Runoff Endorsements and such Indemnification Provisions shall be unaltered by the Transaction. |
| **Notice Procedures** | The Company shall provide written notice and publication notice of the bar date, if applicable, and the hearing to consider confirmation of the Plan to holders of claims in a manner acceptable to the Required Consenting Noteholders and the Required Consenting Banks. |

Page 5

| | |
|---|---|
| **Consummation Date** | The date on which the Transaction shall be fully consummated in accordance with the terms and conditions of the Definitive Documentation, which shall be the effective date of the Plan (the "**Consummation Date**"). |
| **Conditions to the Consummation Date** | It shall be a condition to the Consummation Date that the following conditions precedent are satisfied (or waived pursuant to the terms hereof), and the Consummation Date shall occur on the date upon which the last of such conditions are so satisfied and/or waived. |

Except as provided below, each of the following conditions to the Consummation Date may be waived with the written consent of each of the Debtors, the Required Consenting Banks and the Required Consenting Noteholders without notice, leave or order of the Bankruptcy Court or any formal action or other proceeding to consummate the Plan.

(i)     the Company shall have sold the Appalachian Assets for a purchase price of at least $350 million subject to adjustments as provided for in the purchase and sale agreement;

(ii)    unless waived by the Debtors, the Required Consenting Noteholders, and/or the Consenting Banks, as applicable, each document or agreement constituting Definitive Documentation shall be in form and substance consistent with this Term Sheet and the Support Agreement and be otherwise approved consistent with the terms of section 4(b) of the Support Agreement and the Plan;

(iii)   the Bankruptcy Court shall have entered an order confirming the Plan in form and substance consistent with this Term Sheet and the Support Agreement and such order shall otherwise be approved consistent with the terms of section 4(b) of the Support Agreement, and such order shall not have been stayed, modified or vacated;

(iv)    unless waived by the Debtors, the Required Consenting Noteholders, and/or the Consenting Banks, as applicable, each of the schedules, documents, supplements, and exhibits to the Plan and Disclosure Statement shall be in form and substance consistent with this Term Sheet and the Support Agreement and such documents shall otherwise be approved consistent with the terms of section 4(b) of the Support Agreement;

(v)     unless waived by the Required Consenting Noteholders and the Required Consenting Banks, the Support Agreement shall be in full force and effect and shall have been assumed by the Company pursuant to an order of the Bankruptcy Court satisfactory to the Required Consenting Noteholders and the Required Consenting Banks;

(vi)    all governmental approvals and consents that are legally required for the consummation of the Transaction shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall have

expired;

(vii)     unless waived by the Required Consenting Noteholders, each of the contracts listed on <u>Exhibit 4</u> hereto shall have been renegotiated on terms acceptable to the Required Consenting Noteholders; and

(viii)    unless waived by the Required Consenting Noteholders and the Required Consenting Banks, the Company shall have resolved issues related to the provision of additional collateral to BOEM on terms acceptable to the Required Consenting Noteholders and the Required Consenting Banks.

**EXECUTION VERSION**

| | |
|---|---|
| **Fees and Expenses of the Noteholder Committee and Bank Agent** | The Stone Parties shall pay or reimburse all reasonable and documented fees and out-of-pocket expenses of the Banks, the Bank Agent and the Consenting Noteholders as set forth in the Support Agreement and the Plan. |

US-DOCS\74998296.6

**Exhibit 1(a)**

**Terms of the amended Credit Agreement**

- 4-year RBL exit facility, on terms substantially consistent with the pre-petition RBL facility, except:
    - Facility size reduced to $200 million (assuming 100% participation by holders of Banks Claims);
    - Borrowing base reduced from $360 million to $200 million (or a lesser amount with such reduction being equal to the *pro rata* share of holders of Banks Claims that do not elect to receive the same treatment as the Consenting Banks) on the Consummation Date until the first borrowing base redetermination date; <u>provided</u> that unless the Debtors' "Amethyst" well has produced at an average of at least 12 MMcfe per day during a testing period consisting of the 45 consecutive days preceding the Consummation Date, the maximum availability shall be $150 million (or a lesser amount with such reduction being equal to the *pro rata* share of holders of Banks Claims that do not elect to receive the same treatment as the Consenting Banks) until the first borrowing base redetermination date;
    - The facility size and borrowing base are subject to ratable reduction in the event less than 100% of Banks Claims accept the Plan. For example, if 75% of Banks Claims accept the Plan, the facility size shall be $150 million and, unless the Debtors' "Amethyst" well has produced at an average of at least 12 MMcfe per day during a testing period consisting of the 45 consecutive days preceding the Consummation Date, the maximum availability shall be $112.5 million until the first borrowing base redetermination date;
    - Anti-hoarding covenants set at $25 million for draws, $50 million triggering repayments;
    - Borrowing base holiday with first redetermination to be on or after November 1, 2017 (redetermination methodology to be Bank deck pricing);
    - $75 million held in a restricted account to satisfy future P&A liabilities with all P&A payments reducing the balance dollar for dollar until fully exhausted by P&A spending;
    - 150bps increase in the Applicable Margin (i.e., L + 3.00% - 4.00%);
    - Covenant levels to be reset at levels to be agreed (consistent with the Company's base case projections, updated for current strip pricing);
        - Total Leverage:
            - Q1 2017: 2.75x
            - Q2 2017: 2.50x
            - Q3 2017: 3.00x
            - Q4 2017: 2.75x
            - Q1 2018: 2.50x
            - Q2 2018: 2.50x
            - Q3 2018: 2.50x
            - Q4 2018: 2.50x
            - Q1 2019: 2.75x
            - Q2 2019: 3.00x
            - Q3 2019: 3.50x
            - Q4 2019: 3.50x
            - Q1 2020: 3.00x
            - Q2 2020: 2.75x
            - Q3 2020: 2.75x
            - Q4 2020: 2.50x
            - Q1 2021: 2.50x
        - Interest Coverage: proposed ratio is increased from 2.50x in the current Credit Agreement to 2.75x and held constant.
        - Minimum Liquidity: the proposed covenant requires the Company to maintain liquidity in an amount no less than 20% of the borrowing base then in effect. Liquidity shall be defined as available cash on hand plus availability under the RBL facility.
    - Change of control covenant threshold to be increased from 35% to 45% and modified to permit the Restructuring Transactions;

EXECUTION VERSION

- o  Mortgage requirement increased to 95%;
- o  Requirement of minimum of 25% of production hedged for 1 year within 30days following the Consummation Date and minimum of 50% of production for 2 years within 120 days following the Consummation Date with a maximum of 75% of production for 2 years (hedging to be provided by Consenting Banks).

- All obligations under the RBL exit facility shall be guaranteed by Stone Offshore.
- Fee of 25 bps to lenders under RBL exit facility and fee of 25 bps to the administrative agent as arranger under RBL exit facility (pursuant to a fee letter), payable on the Consummation Date.
- Intercreditor agreement reflecting a "silent" second lien with bankruptcy waivers (including cramdown waiver) and the other terms set forth on Schedule C hereto.
- Reporting covenants, restricted payments and debt/lien baskets to be agreed between the Required Consenting Banks and the Company, with the consent of the Required Consenting Noteholders in their reasonable discretion, based on market terms for a credit emerging from bankruptcy.

EXECUTION VERSION

**Exhibit 1(b)**

**Terms of the New Senior Secured Term Loans**

- Senior secured term loans with first-priority liens (pari passu with liens securing obligations under the amended Credit Agreement) on the same assets securing the obligations under the amended Credit Agreement, which term loans:
    - mature five years after the Consummation Date;
    - bear interest at the Applicable Treasury Rate plus 2.0% per annum;
    - have no principal payments due until the maturity date;
    - may be repaid at any time at par at the election of the Company;
    - are guaranteed by Stone Offshore;
    - are not subject to any borrowing base;
    - shall be subject to a quarterly first-lien asset coverage ratio requirement of 1.30:1.00 (with assets calculated based on PV-10 of total proven reserves at strip pricing plus all cash on the balance sheet of the Company)

EXECUTION VERSION

**Exhibit 2**

**Terms of New Notes**

- Interest rate of 7.5% per annum, payable in cash
- Maturity of May 31, 2022.
- Secured by second-priority liens (junior in priority to the liens securing the obligations under the amended Credit Agreement and the New Senior Secured Term Loans) on the same assets securing the obligations under the amended Credit Agreement and the New Senior Secured Term Loans.
- Investments in joint ventures and acquisitions by the Company and its subsidiaries shall be permitted on terms acceptable to the Required Consenting Noteholders.
- Redemption/Make Whole:  The Company may redeem the New Notes at any time, subject to paying the following make whole amounts:
  - If the Company prepays the New Notes prior to the third anniversary of issuance, the prepayment amount shall be at par, plus accrued interest, plus a make whole payment equal to the spread over a comparable treasury note plus 50 basis points.
  - If the Company prepays the New Notes after the third anniversary, but prior to the fifth anniversary, of issuance, the prepayment amount shall be at 105.625% of par, plus accrued interest.
  - If the Company prepays the New Notes on or after the fifth anniversary of issuance, the prepayment amount shall be at par plus accrued interest.
- Amendment, modification, and waiver under the indenture for the New Notes shall require the consent of a majority of the principal amount outstanding of all New Notes other than provisions that require unanimous consent to amend pursuant to the Trust Indenture Act and/or other applicable law.
- The New Notes shall be subject to an intercreditor agreement in form and substance satisfactory to the Consenting Banks and the Required Consenting Noteholders in their respective sole discretion.

EXECUTION VERSION

## Exhibit 3

**Warrant Term Sheet**

| | |
|---|---|
| **Shares Represented** | 10% of the New Equity Interests, subject to dilution on account of the Management Incentive Plan and future issuances of common stock by Stone from time to time after the Consummation Date. |
| **Strike Price** | Strike price equal to a total equity value of reorganized Stone that implies a 100% recovery of outstanding principal to holders of the Notes Claims plus accrued interest through the Consummation Date. |
| **Maturity** | Four (4) years from the Consummation Date. |
| **Other Terms** | The agreement governing the Warrants shall contain terms and conditions, including, without limitation, basic anti-dilution protection (against stock splits, stock dividends and similar events) customary for transactions of this type and otherwise acceptable to the Company and the Required Consenting Noteholders. |

EXECUTION VERSION

**Exhibit 4**

**Contracts to Be Renegotiated**

NONE

EXECUTION VERSION

## Schedule A[1]

### Specified Employee Plans

1. Stone Energy Corporation Executive Change of Control and Severance Plan
2. Stone Energy Corporation Employee Change of Control Severance Plan
3. Severance Pay Policy (Non-Executive Employees)
4. Letter Agreement dated December 2, 2008 between Stone Energy Corporation and David H. Welch
5. Letter Agreement dated May 19, 2005 between Stone Energy Corporation and Kenneth H. Beer
6. Letter Agreement dated August 10, 2016 by and between Stone Energy Corporation and Richard L Toothman Jr.
7. Stone Energy Corporation Amended and Restated Revised Annual Incentive Compensation Plan
8. Stone Energy Corporation 2016 Performance Incentive Compensation Plan
9. Stone Energy Corporation 2009 Amended and Restated Stock Incentive Plan (As Amended and Restated December 17, 2015), as amended

### Employee Benefit Plans

1. Stone Energy Corporation Employee Benefit Plan (Medical)
2. Stone Energy Corporation Dental Plan
3. Stone Energy Corporation Vision Service Plan
4. Stone Energy Corporation Group Basic Life & AD&D and Dependent Life Insurance Plan
5. Stone Energy Corporation Long Term Disability Insurance Plan
6. Stone Energy Corporation Voluntary Group AD&D Insurance Plan
7. Stone Energy Corporation Voluntary Group Critical Illness Insurance Plan
8. Stone Energy Corporation Medical Flexible Spending Account & Dependent Care Flexible Spending Account
9. Stone Energy Corporation 401(k) Profit Sharing Plan
10. Stone Energy Corporation Deferred Compensation Plan
11. Workers Compensation and Employers Liability Insurance Policy (American Zurich Insurance Company)

### Miscellaneous Benefits

1. Executive physicals at Lafayette General
2. Safety Incentive Program
3. Health club subsidy
4. Discretionary 401(k) Employer Match
5. Payout of field ETO (maximum 84 hours per employee – 61 field employees)

---

[1] Subject to the completion of due diligence and additions and/or deletions to the foregoing list of plans and other agreements and amendments thereto acceptable to the Required Consenting Noteholders. For the avoidance of doubt, the Required Consenting Noteholders have not agreed to the foregoing list of plans and other agreements and, therefore, such list remains subject to change.

**Schedule B**

**Directors & Officers Liability Insurance Policies
and Indemnification Provisions**

D&O Liability Insurance Policies

1. Directors & Officers and Corporate Liability Insurance Policy by and between Stone Energy Corporation and Allied World Insurance Company; policy number 0309-5636 effective May 1, 2015 to May 1, 2017.
2. Excess Edge policy, following Item 1 above, by and between Stone Energy Corporation and National Union Fire Insurance Company of Pittsburgh, PA; policy number 01-274-27-25 effective May 1, 2015 to May 1, 2017.
3. Excess Policy, following Item 1-2 above , by and between Stone Energy Corporation and XL Specialty Insurance Company; policy number ELU138853-15 effective May 1, 2015 to May 1, 2017.
4. Excess Insurance Policy, following Item 1-3 above, by and between Stone Energy Corporation and Continental Casualty Company; policy number 425137486 effective May 1, 2015 to May 1, 2017.
5. Management Liability and Professional Liability Follow Form Excess, following Item 1-4 above, by and between Stone Energy Corporation and Liberty International Underwriters; policy number DO3CH217344-215 effective May 1, 2015 to May 1, 2017.
6. Zurich Executive Universal Select Insurance Policy (A-Side Directors & Officers Liability Insurance Policy with Advancement of Defense Costs), following Item 1-5 above, by and between Stone Energy Corporation and Zurich American Insurance Company; policy number DOC 5889339 10 effective May 1, 2015 to May 1, 2017.
7. Follow Form Excess Management Liability Insurance Policy, following Item 1-6 above, by and between Stone Energy Corporation and Endurance American Insurance Company; policy number ADX10006950200 effective May 1, 2015 to May 1, 2017.

Indemnification Agreements[2]

1. Indemnification Agreement between Stone Energy Corporation and Kenneth H. Beer, dated as of March 23, 2009
2. Indemnification Agreement between Stone Energy Corporation and B.J. Duplantis, dated as of March 23, 2009
3. Indemnification Agreement between Stone Energy Corporation and Florence M. Ziegler, dated as of March 23, 2009
4. Indemnification Agreement between Stone Energy Corporation and Donald E. Powell, dated as of March 23, 2009
5. Indemnification Agreement between Stone Energy Corporation and George R. Christmas, dated as of March 23, 2009
6. Indemnification Agreement between Stone Energy Corporation and Kay G. Priestly, dated as of March 23, 2009
7. Indemnification Agreement between Stone Energy Corporation and Richard A. Pattarozzi, dated as of March 23, 2009
8. Indemnification Agreement between Stone Energy Corporation and Peter D. Kinnear, dated as of March 23, 2009
9. Indemnification Agreement between Stone Energy Corporation and David H. Welch, dated as of March 23, 2009
10. Indemnification Agreement between Stone Energy Corporation and Eldon J. Louviere, dated as of March 23, 2009

---

[2] Subject to the completion of due diligence and additions and/or deletions to the foregoing list of agreements and amendments thereto acceptable to the Required Consenting Noteholders.  For the avoidance of doubt, the Required Consenting Noteholders have not agreed to the foregoing list of agreements and, therefore, such list remains subject to change.

EXECUTION VERSION

11. Indemnification Agreement between Stone Energy Corporation and Richard L. Toothman, Jr., dated as of February 1, 2011

12. Indemnification Agreement between Stone Energy Corporation and Keith A. Seilhan, dated as of February 1, 2013

13. Indemnification Agreement between Stone Energy Corporation and Lisa S. Jaubert, dated as of May 23, 2013

14. Indemnification Agreement between Stone Energy Corporation and David T. Lawrence, dated as of October 9, 2013

15. Indemnification Agreement between Stone Energy Corporation and Karl D. Meche, dated as of December 11, 2014

16. Indemnification Agreement between Stone Energy Corporation and Craig Castille, dated as of December 17, 2014

17. Indemnification Agreement between Stone Energy Corporation and David Kennedy, dated as of December 17, 2014

18. Indemnification Agreement between Stone Energy Corporation and Michael Deville, dated as of December 17, 2014

19. Indemnification Agreement between Stone Energy Corporation and Tom Messonnier, dated as of May 21, 2015

20. Indemnification Agreement between Stone Energy Corporation and John J. Leonard, dated as of December 30, 2013

21. Indemnification Agreement between Stone Energy Corporation and Phyllis Taylor, dated as of January 20, 2012.


Corporate Organizational Documents Containing Indemnification Provisions

1. Amended and Restated Bylaws of Stone Energy Corporation, a Delaware corporation, dated as of May 15, 2008 (as amended, December 19, 2013)

**EXECUTION VERSION**

**Schedule C**

**Terms of Intercreditor Agreement**

EXECUTION VERSION

## Stone Energy: Intercreditor Agreement Term Sheet

Reference is made to (i) that certain Fourth Amended and Restated Credit Agreement, dated as of June 24, 2014, as amended by Amendment No. 1 dated as of May 1, 2015, Amendment No. 2 dated as of February 3, 2016, Amendment No. 3 dated as of June 14, 2016, and Amendment No. 4 dated as of December 9, 2016 (as amended, amended and restated, modified or supplemented in connection with the Restructuring (as defined below) and from time to time (the "**First Lien Credit Agreement**," together with all "Credit Documents" defined therein, the "**First Lien Credit Documents**")), among Stone Energy Corporation (in its capacity as borrower under the First Lien Credit Agreement, the "**Borrower**") and certain other parties; and (ii) certain second lien notes (the "**Second Lien Notes**") to be issued by Stone Energy Corporation (in its capacity as issuer under the applicable indenture, the "**Issuer**"; such indenture, the "**Second Lien Indenture**"; and the Second Lien Indenture together with the Second Lien Notes and the guarantees and security agreements in connection therewith, the "**Second Lien Documents**") in connection with the Restructuring, which Second Lien Notes will be secured by liens on the Collateral (as defined below) that are subordinate and junior to the liens securing the First Lien Obligations (as defined below) to the extent provided by, and in accordance with, the terms of the Intercreditor Agreement.

"**Restructuring**" means the transactions related to the restructuring of outstanding indebtedness of the Borrower and its affiliates. For purposes of this term sheet, the Advances and Commitments (each as defined in the First Lien Credit Agreement) under the First Lien Credit Agreement (and the advances and commitments provided in any refinancings, substitutions, extensions or replacements thereof) are herein referred to collectively as the "**First Lien Credit Facility**" and the First Lien Credit Facility together with the Second Lien Notes (and any refinancings, substitutions, extensions or replacements thereof) are referred to herein individually as a "**Debt Facility**" and collectively as the "**Debt Facilities**". Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the First Lien Credit Agreement as in effect as of the date hereof.

| | | |
|---|---|---|
| **Parties:** | (i) | Bank of America, N.A., as administrative agent (in such capacity, together with its successors and permitted assigns in such capacity, the "**First Lien Administrative Agent**") under the First Lien Credit Agreement. |
| | (ii) | [The Bank of New York Mellon Trust Company, N.A.,] as trustee for the Second Lien Notes (in such capacity, together with its successors and permitted assigns in such capacity, the "**Second Lien Notes Trustee**"), and [The Bank of New York Mellon Trust Company, N.A.,] as collateral trustee (in such capacity, together with its successors and permitted assigns in such capacity, the "**Second Lien Collateral Agent**") for the Second Lien Notes. |
| | (iii) | Each other Person required to be a party to the |

Intercreditor Agreement from time to time pursuant to the terms of the Intercreditor Agreement, the First Lien Credit Documents and the Second Lien Notes, including, without limitation, each Hedge Bank from time to time.

Any reference to "**Collateral Agent**" hereunder shall mean the First Lien Administrative Agent and/or the Second Lien Collateral Agent, as the context may require.

**Loan Parties:**

(i)   The Borrower under the First Lien Credit Agreement.

(ii)  Each guarantor under the First Lien Credit Documents (each, individually, a "**First Lien Guarantor**"). **NTD**: For the avoidance of doubt, each Second Lien Guarantor will also be required to be a First Lien Guarantor.

(iii) The Issuer under the Second Lien Notes.

(iv)  Each guarantor under the Second Lien Notes (each, a "**Second Lien Guarantor**"). **NTD**: For the avoidance of doubt, each First Lien Guarantor will also be required to be a Second Lien Guarantor.

**Purpose:**

To establish the relative rights and privileges of the parties with respect to the Collateral.

**First Lien Claimholders:**

The Administrative Agent, Issuing Bank and Banks under the First Lien Credit Agreement (and any refinancings, substitutions, extensions or replacements thereof) (the "**First Lien Lender Parties**"), the Hedge Banks under any Specified Swap Contract and the Cash Management Banks under any Specified Cash Management Agreement from time to time.

**First Lien Obligations:**

All obligations of every nature of each Loan Party from time to time owed to the First Lien Claimholders under the applicable secured documents, whether for principal, interest, breakage costs, fees, expenses, premium (if any), payments of early termination of or ordinary course settlement payments under interest rate protection agreements and commodity hedge agreements, indemnification payments, letter of credit reimbursement obligations, and all guarantees of the foregoing.

**First Lien Priority Obligations:**

An amount equal to all First Lien Obligations to the extent

2

not incurred by the Loan Parties, excluding obligations under any Specified Swap Contract and any Specified Cash Management Agreement, in excess of the greater of:

(i)     $250 million;

(ii)    115% of the Borrowing Base as defined in, and as in effect from time to time under, the First Lien Credit Agreement; and

(iii)   $100 million plus 35% of Modified ACNTA

(such amount, the "**First Lien Priority Cap**").

"**Excess First Lien Obligations**" means any First Lien Obligations in excess of the First Lien Priority Cap.  The parties agree that the Intercreditor Agreement will provide that, upon Discharge of the First Lien Priority Obligations and to the extent applicable, the relative priority of the liens securing the Second Lien Obligations over those securing the Excess First Lien Obligations will be substantially similar to the relative priority of the liens securing the First Lien Priority Obligations over those securing the Second Lien Obligations prior to such Discharge of the First Lien Priority Obligations.

**Second Lien Claimholders:**     The agents, trustees and note holders of the Second Lien Notes (and any refinancings, substitutions, extensions or replacements thereof) (the "**Second Lien Noteholders**") and the Second Lien Collateral Agent.

The First Lien Claimholders and the Second Lien Claimholders are the "**Secured Parties**."

**Second Lien Obligations:**     All obligations of every nature of each Loan Party from time to time owed to the Second Lien Claimholders under the applicable secured documents, whether for principal, interest, breakage costs, fees, expenses, premium (if any), indemnification payments, and all guarantees of the foregoing.

"**Excess Second Lien Obligations**"  means Second Lien Obligations in excess of a cap to be agreed upon.

**Collateral:**     The First Lien Obligations and the Second Lien Obligations shall be secured by liens on the same Collateral (other than Excluded Collateral (as defined below)).  No Loan Party shall grant any liens on any asset or property to secure

3

obligations under either Debt Facility unless it has granted a lien on such asset or property to secure the other Debt Facility. The Collateral will consist of the following, collectively:

(i)    all property constituting and intended to constitute the "Collateral" (as such term is defined in the First Lien Credit Agreement) (the "**Credit Facility Collateral**"); and

(ii)    all other existing and future assets and property, and all proceeds thereof, of each Loan Party (except as expressly excluded from the applicable "Security Documents" (as defined in the First Lien Credit Agreement)) (the "**Additional Collateral**").

**Excluded Collateral:**    Notwithstanding anything to the contrary herein, certain accounts (e.g., cash collateral accounts for the benefit of the Issuing Bank) maintained pursuant to the credit documents for the benefit of the Issuing Bank, in such capacity, shall solely be for the benefit of the Issuing Bank ("**Excluded Collateral**").

No First Lien Claimholder or Second Lien Claimholder shall be required to share any amounts received or deemed received by it in respect of any First Lien Obligation or Second Lien Obligation owed to it from separate insurance, credit default swap protection or other protection against loss (x) that is arranged by such First Lien Claimholder or Second Lien Claimholder (as applicable) for its own account in respect of any such First Lien Obligation or Second Lien Obligation and (y) the provider of which insurance or protection shall have no recourse to the Collateral (which insurance or other protection amounts shall be for the sole benefit of such First Lien Claimholder or Second Lien Claimholder (as applicable)).

**Permitted Liens:**    The Secured Parties' rights with respect to the Collateral shall be subject only to other liens permitted to exist on the Collateral under the First Lien Credit Agreement.

**Lien Subordination:**    The liens securing the Second Lien Obligations (the "**Second Priority Liens**") shall be expressly junior and subordinated in all respects to the liens securing the First Lien Priority Obligations (the "**First Priority Liens**"), irrespective of the time, order or method of creation, attachment or perfection of such Second Priority Liens or

4

First Priority Liens or any failure, defect or deficiency or alleged failure, defect or deficiency in any of the foregoing. After the Discharge of the First Lien Priority Obligations, the liens securing the Excess First Lien Obligations shall be expressly junior and subordinated in all respects to Second Priority Liens irrespective of the time, order or method of creation, attachment or perfection of such Second Priority Liens or First Priority Liens or any failure, defect or deficiency or alleged failure, defect or deficiency in any of the foregoing.

Any reference to "**Discharge of the First Lien Obligations**" or "**Discharge of the First Lien Priority Obligations**" means,

(i)   irrevocable payment in full in cash of the principal of and interest (including accruing on or after the commencement of an insolvency proceeding, whether or not such interest would be allowed in the proceeding) on all outstanding indebtedness constituting, as applicable, First Lien Obligations or First Lien Priority Obligations;

(ii)  irrevocable payment in full in cash of all other monetary, as applicable, First Lien Obligations or First Lien Priority Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (other than indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time);

(iii) termination or expiration of any unfunded commitments to extend credit that would be First Lien Obligations; and

(iv)  termination or cash collateralization (in an amount and manner reasonably satisfactory to First Lien Administrative Agent, but in no event greater than 103% of the aggregate undrawn face amount) of all Letters of Credit.

**Limitations on Enforcement:**   Until the Discharge of the First Lien Obligations, but subject to the Second Lien Claimholders' rights after a Standstill Period:

(i)   the Second Lien Claimholders shall not (nor shall

5

they instruct the Second Lien Collateral Agent to) exercise or seek to exercise any rights, power or remedies (including setoff) with respect to, or take any action in respect of, any of the Collateral and shall not (nor shall they instruct the Second Lien Collateral Agent to) institute any action or proceeding (whether judicial or non-judicial) with respect to such rights, powers or remedies.

(ii)   none of the Second Lien Claimholders will take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including setoff) with respect to any Collateral in contravention of the aforementioned lien priority; and

(iii)   the Second Lien Claimholders shall recognize the rights of the First Lien Claimholders under, and to the extent provided in, the Intercreditor Agreement.

"**Standstill Period**" means a period of 210 days from the date of delivery of a written notice to the First Lien Administrative Agent of a Second Lien Claimholder's intention to exercise any rights or remedies with respect to any Collateral in respect of any Second Lien Obligations, which notice may be delivered only following the occurrence of and during the continuation of an Event of Default (as defined in any Second Lien Debt Document) with respect to the Second Lien Obligations.

After the expiration of the Standstill Period, the Second Lien Collateral Agent may exercise any rights or remedies with respect to the Collateral; *provided* that in no event shall any Second Lien Claimholder exercise or continue to exercise any such rights or remedies if, notwithstanding the expiration of the Standstill Period, (a) any First Lien Claimholder shall have commenced and be diligently pursuing the exercise of rights and remedies with respect to any of the Collateral, or (b) an insolvency or liquidation proceeding shall have been commenced in respect of the Loan Parties; *provided, further*, that in any insolvency or liquidation proceeding commenced by or against the Loan Parties, the Second Lien Claimholders may take any action expressly permitted by the Intercreditor Agreement.

At all times prior to the Discharge of the First Lien Obligations, subject to the Second Lien Claimholders' rights after a Standstill Period, the First Lien Claimholders shall control (as described under the caption "**Voting**" below) all

6

decisions related to the exercise of remedies in respect of the Collateral (subject to the terms of the First Lien Credit Agreement and the collateral documents entered into to secure the First Lien Obligations (the "**First Lien Collateral Documents**") and any amendments and waivers thereunder (subject to customary provisions requiring consent of the First Lien Claimholders and the Second Lien Claimholders)). The First Lien Administrative Agent shall have the right to initiate a vote of the First Lien Claimholders with respect to the exercise of remedies.

No Secured Party will oppose or otherwise contest any lawful exercise by the First Lien Administrative Agent of the right to credit bid the secured obligations at any sale or foreclosure of the liens granted to the First Lien Administrative Agent, for the benefit of the Secured Parties so long as such bid is approved separately by the requisite First Lien Claimholders; provided that this section will not impair the Second Lien Claimholders rights under the "Purchase Right" section of this term sheet.

The terms of the Intercreditor Agreement shall govern even if part or all of the First Lien Obligations or Second Lien Obligations or the liens securing payment and performance thereof are not perfected or are avoided, disallowed, set aside or otherwise invalidated in any judicial proceeding or otherwise.

**No Interference:**

Until the Discharge of the First Lien Priority Obligations, each Second Lien Claimholder will agree that:

(i)      it will not support, take or cause to be taken any action to make any Second Priority Lien *pari passu* with, or to give such Second Lien Claimholder any preference or priority relative to, any First Priority Lien with respect to the Collateral subject to such First Priority Lien and Second Priority Lien or any part thereof;

(ii)      it will not challenge or question in any proceeding the validity or enforceability of any First Lien Obligations or First Lien Collateral Documents, or the validity, attachment, perfection or priority of any lien securing the First Lien Obligations, or the validity or enforceability of the priorities, rights or duties established by or other provisions of the Intercreditor Agreement;

(iii)      it will not support, take or cause to be taken any

action to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral subject to any Second Priority Lien by any First Lien Claimholder or the First Lien Administrative Agent acting on behalf of the First Lien Claimholders;

(iv)     it shall have no right to (A) direct any First Lien Claimholder to exercise any right, remedy or power with respect to the Collateral subject to any Second Priority Lien or (B) consent to the exercise by any First Lien Claimholder or the First Lien Administrative Agent acting on behalf of the First Lien Claimholders of any right, remedy or power with respect to the Collateral subject to any Second Priority Lien;

(v)     it will not institute any suit or assert in any suit or insolvency or liquidation proceeding any claim against any First Lien Claimholder seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to, and no First Lien Claimholder shall be liable to any Second Lien Claimholder for, any action taken or omitted to be taken by such First Lien Claimholder or the First Lien Administrative Agent acting on behalf of the First Lien Claimholders with respect to any Collateral securing such Second Lien Obligations that is subject to any Second Priority Lien;

(vi)     it will not seek, and shall waive any right, to have any Collateral subject to any Second Priority Lien or any part thereof marshaled upon any foreclosure or other disposition of such Collateral; and

(vii)     it will not, directly or indirectly, whether by judicial proceedings or otherwise, challenge the enforceability of any provision of the Intercreditor Agreement.

**Voting:**                    Until the Discharge of the First Lien Obligations, but subject to the Second Lien Claimholders' rights after a Standstill Period, with respect to any remedies proposed to be taken by Secured Parties with respect to the Collateral and all other matters relating to the Collateral or the First Lien Collateral Documents, the First Lien Administrative Agent will take direction from the "Majority Banks" under the First Lien Credit Agreement.

Except as otherwise provided herein, with respect to the

Second Lien Collateral Agent, the Second Lien Collateral Agent will take direction from the holders of a majority of all Second Lien Obligations then outstanding.

**Distributions of Collateral:**

Following the occurrence of and during the continuation of an Event of Default and delivery of a remedies instruction to apply proceeds of the Collateral in accordance with the cash waterfall provisions below, the proceeds of any application of amounts received in accordance with account control rights exercised by either Collateral Agent (irrespective of whether such control rights have been exercised pursuant to a remedies instruction), liquidation, foreclosure or similar transaction related to the sale of Collateral (other than the Excluded Collateral), and all distributions (including, and to the extent not considered proceeds of Collateral, with respect to any debtor or equity securities distributed pursuant to a chapter 11 plan of reorganization or liquidation, in whole or partial satisfaction (or waiver) of any secured claim of any Second Lien Claimholder) with respect to secured claims in bankruptcy will be applied in the following order of priority:

(i)  First, on a pro rata basis, to pay fees, expenses and indemnities (including, but not limited to, fees, expenses and disbursements of legal counsel) of the First Lien Administrative Agent and each letter of credit issuer (other than letter of credit reimbursement obligations) due and payable under the First Lien Credit Documents;

(ii)  Second, to payment of the First Lien Priority Obligations to be applied in accordance with the First Lien Credit Documents until Discharge of the First Lien Priority Obligations;

(iii)  Third, on a pro rata basis, to pay fees, expenses and indemnities (including, but not limited to, fees, expenses and disbursements of legal counsel) of the Second Lien Collateral Agent and the Second Lien Trustee due and payable under the Second Lien Documents;

(iv)  Fourth, to payment of the Second Lien Obligations to be applied in accordance with the Second Lien Debt Documents until payment in full of the Second Lien Obligations;

(v)  Fifth, to payment of the Excess First Lien

9

Obligations to be applied in accordance with the First Lien Credit Documents until Discharge of the First Lien Obligations that remain after Discharge of the First Lien Priority Obligations in accordance with clause (ii);

(vi)     <u>Sixth</u>, to payment of the   Excess Second Lien Obligations to be applied in accordance with the Second Lien Documents until payment in full of the Excess Second Lien Obligations; and

(vii)    <u>Seventh</u>, any remaining proceeds to the applicable Loan Party or as a court of competent jurisdiction may direct.

Any (x) net casualty and condemnation proceeds and (y) asset sale proceeds and extraordinary receipts, if with respect to any Collateral, shall also be applied in accordance with the terms of the First Lien Credit Facility until the Discharge of the First Lien Priority Obligations or thereafter in accordance with this term sheet.

**Turnover Provisions:**    Until the Discharge of the First Lien Priority Obligations, any Collateral, proceeds thereof, payments or other distributions received by a Second Lien Claimholder in respect of claims made against Collateral, to the extent secured by, or otherwise in respect of Collateral (or, subject to the rights of the Second Lien Claimholders as unsecured creditors, as a result of lien avoidance or similar action as mutually agreed in the Intercreditor Agreement), including, and to the extent not considered proceeds of Collateral, with respect to any debt or equity securities distributed pursuant to a chapter 11 plan of reorganization or liquidation, in whole or partial satisfaction (or waiver) of any secured claim of any Second Lien Claimholder, whether in connection with any enforcement action, insolvency proceeding or otherwise, will be (i) segregated and held in trust and (ii) promptly turned over or paid over to the First Lien Administrative Agent in the form received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  For the avoidance of doubt, no mandatory or voluntary prepayments of Second Lien Obligations will be permitted prior to the Discharge of the First Lien Obligations; *provided* that nothing in the Intercreditor Agreement will prohibit the scheduled payment of interest with respect to the Second Lien Notes (so long as there is not an event of default arising from a failure to pay principal or

interest under the First Lien Credit Documents or an event of default resulting in the acceleration of obligations under the First Lien Credit Documents); *provided further* that any judgment lien granted with respect to the Second Lien Obligations will be subject to the Intercreditor Agreement.

If a First Lien Claimholder receives payment or property on account of a First Lien Priority Obligation, and the payment is subsequently invalidated, avoided, declared to be fraudulent or preferential, set aside, or otherwise required to be transferred to a trustee, receiver, or the estate of Borrower or other Grantor (a "**Recovery**"), then, to the extent of the Recovery, the First Lien Priority Obligations intended to have been satisfied by the payment will be reinstated as First Lien Priority Obligations on the date of the Recovery, and no Discharge of the First Lien Priority Obligations will be deemed to have occurred for all purposes under the Intercreditor Agreement. If the Intercreditor Agreement is terminated prior to a Recovery, the Intercreditor Agreement will be reinstated in full force and effect, and such prior termination will not diminish, release, discharge, impair, or otherwise affect the obligations of the parties thereto from the date of reinstatement. No Second Lien Claimholder may benefit from a Recovery, and any distribution made to a Second Lien Claimholder as a result of a Recovery will be paid over to the First Lien Administrative Agent for application in accordance with the distribution provisions under the "Distribution of Collateral" section of this term sheet.

If, for any reason, a Secured Party does not have a valid and perfected lien (either directly or through any applicable Collateral Agent) on any portion of the Collateral, proceeds on such portion received by the other Secured Parties will be paid over to the extent necessary to reflect the distribution provisions under the "Distribution of Collateral" section of this term sheet as if all Secured Parties held such a lien.

Until the Discharge of the First Lien Priority Obligations, if any Second Lien Claimholder obtains knowledge of or is notified by the First Lien Administrative Agent that a payment or distribution made to a First Lien Claimholder in respect of First Lien Priority Obligations is rescinded for any reason whatsoever, such Second Lien Claimholder shall promptly pay or remit to the First Lien Administrative Agent any payment or distribution received by it in respect of any Collateral subject to any First Priority Liens securing such

First Lien Priority Obligations, and the provisions set forth in the Intercreditor Agreement shall be reinstated as if such payment or distribution had not been made.

**Restrictions on Amendments:** Without the prior written consent of the First Lien Administrative Agent, no collateral documents entered into to secure the Second Lien Obligations (such collateral documents, the "**Second Lien Collateral Documents**") may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second Lien Collateral Document, would be prohibited by, or would require any Loan Party to act or refrain from acting in a manner that would violate, any of the terms of the Intercreditor Agreement.

Without the prior written consent of the Second Lien Claimholders, no First Lien Collateral Documents may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new First Lien Collateral Document, would be prohibited by, or would require any Loan Party to act or refrain from acting in a manner that would violate, any of the terms of the Intercreditor Agreement.

In the event that the First Lien Claimholders or the First Lien Administrative Agent enters into any amendment, waiver or consent in respect of any of the First Lien Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Lien Collateral Document or changing in any manner the rights of the First Lien Administrative Agent, the First Lien Claimholders, the Borrower or any other Loan Party thereunder (including the release of any liens in Collateral to the extent permitted as described below under "Release of Liens"), then such amendment, waiver or consent shall apply automatically to any comparable provision of the comparable Second Lien Collateral Document without the consent of the Second Lien Collateral Agent or any Second Lien Claimholder and without any action by the Second Lien Collateral Agent, the Borrower or any other Loan Party; *provided* that any such amendment, waiver or consent may not (a) release Collateral securing the Second Lien Obligations unless there is a corresponding release of the Collateral with respect to the First Lien Obligations, (b) impose duties on any of the Second Lien

Claimholders without their consent, (c) permit liens on the Collateral not permitted under the Second Lien Documents, or (d) be prejudicial to the interest of Second Lien Claimholders to a greater extent than First Lien Claimholders (other than by virtue of their relative priorities and rights and obligations hereunder).

The Intercreditor Agreement may not be amended without the consent of the First Lien Administrative Agent and the Second Lien Collateral Agent.

**Effective Date Acknowledgments:**

On the Effective Date (to be defined as the date of consummation of the Restructuring), each of the Secured Parties will recognize the existence and the permissibility of the other Secured Parties and their respective debt and/or lien obligations and rights as set forth herein.

**Release of Liens:**

The Intercreditor Agreement will provide that in the event the First Lien Administrative Agent releases its lien on and/or sells all or any portion of Collateral that is (a) permitted to be sold or transferred pursuant to the First Lien Credit Agreement, (b) sold in a foreclosure or similar transactions in accordance with the terms of the First Lien Credit Agreement or (c) Excluded Collateral, in each case, the Second Priority Lien on such Collateral shall be automatically released without the consent of any of the Second Lien Claimholders or the Second Lien Collateral Agent being required, such release being made free and clear of all liens of the Secured Parties, so long as (except in the case of clause (c)) all First Priority Liens and Second Priority Liens attach to the proceeds of the sale for application in accordance with the distribution provisions under the "Distribution of Collateral" section of this term sheet, and each Second Lien Claimholder shall be deemed to have consented to such release or sale.

In addition, the requirement that a Second Priority Lien attach to, or be perfected with respect to, Collateral shall be waived automatically and without further action so long as the requirement that a First Priority Lien attach to, or be perfected with respect to, such property or assets is waived by the First Lien Administrative Agent.

**Refinancings:**

The First Lien Credit Facility and the Second Lien Notes may be replaced, refunded or refinanced, in whole or in part, (each, a "**Replacement**") without notice to, or the consent of any Secured Party, all without affecting the Lien priorities

13

provided for under the Intercreditor Agreement or the other provisions thereof; *provided, however*, that no Excess First Lien Obligations result therefrom and the First Lien Administrative Agent and the Second Lien Notes Trustee shall receive on or prior to the incurrence of the Replacement:

(i)      an officers' certificate from the Borrower or Issuer, as applicable, stating that (A) the Replacement is permitted by each applicable collateral document to be incurred (or, if required, any relevant consent has been obtained) and (B) customary legending requirements, if any, have been satisfied, and

(ii)      a "Priority Confirmation Joinder" (to be defined in the Intercreditor Agreement) from the holders or lenders of any indebtedness that replaces the First Lien Credit Facility or the Second Lien Notes, as the case may be (or an authorized agent, trustee or other representative on their behalf).

Upon the consummation of such Replacement and the satisfaction of certain other requirements, the holders or lenders of the indebtedness incurred pursuant to such Replacement and any authorized agent, trustee or other representative thereof will be entitled to the benefits of the Intercreditor Agreement.

**Bankruptcy or Insolvency/Liquidation:**      Until the Discharge of the First Lien Priority Obligations in the event of an insolvency or liquidation proceeding of a Loan Party, whether voluntary or involuntary, if the First Lien Administrative Agent shall desire to permit the use of cash collateral or to permit such Loan Party to obtain debtor-in-possession financing (a "**DIP Financing**"), then the Second Lien Claimholders will agree that they will raise no objection to such use of cash collateral (or any grant of administrative expense priority under the Bankruptcy Code) or DIP Financing and will not request adequate protection or any other relief in connection therewith, so long as such DIP Financing does not exceed an amount equal to (x) the greater of (i) 120% of the First Lien Priority Obligations outstanding at the time of such event or proceeding and (ii) 115% of the First Lien Priority Cap] plus (y) $15 million solely to pay the costs and expenses incurred in connection with the retention of professionals and the payment of adequate protection (such amount, the "**DIP Cap**"). The Second Lien Claimholders will subordinate their respective liens in the

Collateral to the liens securing such DIP Financing, subject to the DIP Cap, to the extent the liens securing the First Lien Priority Obligations are subordinated or are *pari passu* with such DIP Financing.  Until the Discharge of the First Lien Priority Obligations, the Second Lien Claimholders agree that they shall not be entitled to provide any DIP Financing unless the First Lien Claimholders have elected not to provide or permit such DIP Financing.

**Adequate Protection:**

Until the Discharge of the First Lien Priority Obligations, no Second Lien Claimholders will file or prosecute in any insolvency or liquidation proceeding any motion for adequate protection (or any comparable request for relief) based upon their interest in the Collateral under the Second Priority Liens (other than (x) replacement Liens on property in which the First Lien Administrative Agent is granted replacement liens as adequate protection and (y) subordinated super-priority claims or if the First Lien Claimholders are granted super-priority claims as adequate protection), nor will it object to or contest (i) any request by the First Lien Administrative Agent or First Lien Claimholders for adequate protection or (ii) any objection by the First Lien Administrative Agent or First Lien Claimholders to any motion, relief, action or proceeding based on the First Lien Claimholders claiming a lack of adequate protection, except that the Second Lien Claimholders may freely seek and obtain any relief upon a motion for adequate protection (or any comparable relief), without any condition or restriction whatsoever, at any time after the Discharge of the First Lien Priority Obligations.

**Automatic Stay Relief:**

Until the Discharge of the First Lien Priority Obligations, the Second Lien Claimholders will not oppose or otherwise contest any motion for relief from the automatic stay made by the First Lien Administrative Agent or the First Lien Claimholders.

**No Objection:**

No Second Lien Claimholder will object to or oppose a sale or other disposition of any Collateral (or any portion thereof) under section 363 of the Bankruptcy Code or any other provision of the Bankruptcy Code if the First Lien Administrative Agent shall have consented to such sale or disposition of such Collateral and all First Priority Liens and Second Priority Liens will attach to the proceeds of the sale for application in accordance with the distribution provisions under the "Distribution of Collateral" section of this term

sheet.

**Waiver of Claims:**    Each of the Second Lien Claimholders will waive any claim such Second Lien Claimholders may have against the First Lien Administrative Agent or any other First Lien Claimholders (or their representatives) arising out of any election by the First Lien Administrative Agent or any First Lien Claimholders, in any proceeding instituted under the Bankruptcy Code, of the application of section 1111(b)(2) of the Bankruptcy Code.

**Plan support:**    Notwithstanding the provisions of Section 1129(b)(1) of the Bankruptcy Code, the Second Lien Collateral Agent, on behalf of itself and each of the Second Lien Claimholders agree that they will not directly or indirectly propose, sponsor, support, agree to or vote in favor of any plan of reorganization or liquidation of the Borrower or the Issuer that (i) is pursuant to Section 1129(b) of the Bankruptcy Code with respect to the treatment of all or any portion of the First Lien Obligations or the First Lien Claimholders; (ii) is inconsistent with the Intercreditor Agreement; or (iii) without the consent of the First Lien Administrative Agent, does not provide for the  Discharge of the First Lien Obligations on the effective date of such plan.

**Separate grants:**    Each of the First Lien Claimholders and the Second Lien Claimholders will agree that (a) the grants of liens under the First Lien Collateral Documents and the Second Lien Collateral Documents are separate and distinct grants and (b) First Lien Obligations and Second Lien Obligations must be separately classified in any bankruptcy.

**Rights As Unsecured Creditors:**    The Second Lien Claimholders may exercise rights and remedies as unsecured creditors against any of the Loan Parties, *provided* that the Second Lien Claimholders will not exercise such rights and remedies in a manner inconsistent with the Intercreditor Agreement .

**Insurance:**    Until Discharge of the First Lien Obligations, the First Lien Administrative Agent shall have the sole right (subject to the Borrower's rights under the First Lien Credit Agreement, and the other documents relating thereto) to adjust and settle insurance claims with respect to the Collateral and approve awards granted with respect to the Collateral in any condemnation or similar proceeding, subject to the First Lien Credit Documents until Discharge of the First Lien Obligations, and thereafter subject to the Loan Parties' rights

16

|  | to reinvest any such proceeds in accordance with the Debt Facilities, all proceeds of which to be applied in accordance with the distribution provisions under the "Distribution of Collateral" section of this term sheet. |
|---|---|
| **Purchase Right:** | If an Event of Default under and as defined in the First Lien Credit Agreement has occurred and is continuing and the amount of any claim or claims any First Lien Obligations has been determined, the Second Lien Claimholders will be permitted within an agreed exercise period of not less than 10 days after receipt of notice to purchase the entire amount of such claim or claims at par plus any accrued interest (and payment of any outstanding fees and expenses) from such First Lien Claimholders during a call period to be agreed upon of not less than 10 additional days. |
| **Permitted Actions:** | Notwithstanding the provisions under the "Limitation on Enforcement" and "No Interference" sections of this term sheet, or any provision of the Intercreditor Agreement, a Second Lien Claimholder may, (i) file a proof of claim, (ii) vote on any plan of reorganization subject to the "Plan Support" section of this term sheet, make other filings and make any arguments and motions that, in each case, do not contravene this Intercreditor Agreement Term Sheet, (iii) take action to create, perfect, preserve, or protect its liens on the Collateral (so long not adverse to the First Priority Liens), (iv) file necessary pleadings in opposition to a claim objecting to or otherwise seeking the disallowance of Second Lien Obligations or a Second Priority Lien, (v) join (but not control) any foreclosure or other judicial lien enforcement proceeding with respect to the Collateral initiated by the First Lien Administrative Agent, (vi) receive any Collateral or proceeds of Collateral on account of its Second Lien Obligations after the Discharge of the First Lien Priority Obligations has occurred, and (vii) accelerate the maturity of, or demand as immediately due and payable, all or any part of the Second Lien Obligations. |
| **Governing Law; Jurisdiction:** | The State of New York. |

The foregoing is intended to summarize certain basic terms of the Intercreditor Agreement and is not intended to be a definitive list of all of the terms of the Intercreditor Agreement.

**Exhibit B** to the Restructuring Support Agreement

***First Amended Joint Prepackaged Plan of Reorganization of Stone Energy Corporation and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code***

[See Attached]

**Exhibit C** **to the Restructuring Support Agreement**

**Form of Transferee Joinder**

[See Attached]

**Form of Transferee Joinder**

This joinder (this "***Joinder***") to the Amended and Restated Restructuring Support Agreement (the "***Agreement***"), dated as of [__, 20__], by and among:  (i) Stone Energy Corporation and each of the other Stone Parties thereto, (ii) the Consenting Banks and (iii) the Consenting Noteholders, is executed and delivered by [_____] (the "***Joining Party***").  Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to such term in the Agreement.

1.      **Agreement to be Bound.**  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as **Annex 1** (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the [Consenting Noteholders][Consenting Banks].

2.      **Representations and Warranties.**  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the claims next to its name on **Annex 2** (which annex shall not be publically disclosed or filed), and (b) makes, as of the date hereof, the representations and warranties set forth in Section 17 of the Agreement to each other Party.

3.      **Governing Law.**  This Joinder shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to any conflicts of law provisions which would require or permit the application of the law of any other jurisdiction.

4.      **Notice.**  All notices and other communications given or made pursuant to the Agreement shall be sent to the Joining Party at the address next to its name on **Annex 2** (which annex shall not be publically disclosed or filed):

*****

US-DOCS\74992523.4

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By:_____
      Name:
      Title:

**<u>Annex 1</u> to the Form of Transferee Joinder**

[Annex - 1 to the Joinder Agreement]

**Annex 2 - Form of Consenting Noteholder Claims or Consenting Banks Claims and Notice Address**

(ANNEX 2 SHALL NOT BE PUBLICALLY DISCLOSED OR FILED)

| Name of Consenting [Noteholder][Bank] | Address for Notices: | Debt Holdings under the Credit Agreement | Debt Holdings under the Convertible Indenture | Debt Holdings under the Senior Indenture | Shares of Common Stock Held |
|---|---|---|---|---|---|
| [__] | [__]<br>[__]<br>[__]<br>Attention:<br>Phone:<br>Fax:<br>E-mail: | $[__] | $[__] | $[__] | [__] |

[Annex - 2 to the Joinder Agreement]

US-DOCS\74992523.4