## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| STONE ENERGY CORPORATION, *et al.,*[1] | § | CASE NO. 16-36390 (MI) |
| | § | |
| Debtors. | § | (Joint Administration Pending) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING (I) (A) ASSUMPTION OF PURCHASE AND SALE AGREEMENT, (B) BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (C) FORM AND MANNER OF NOTICE OF THE SALE HEARING AND ASSUMPTION PROCEDURES, AND (D) SOLELY IN THE EVENT AN AUCTION PROCESS IS REQUIRED, (i) THE PURCHASE AND SALE AGREEMENT AS THE STALKING HORSE BID AND (ii) BIDDING PROCEDURES; (II) (A) THE SALE OF CERTAIN ASSETS OF THE DEBTORS LOCATED IN APPALACHIA FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS, INTERESTS AND ENCUMBRANCES EXCEPT FOR PERMITTED TITLE ENCUMBRANCES, AND (B) THE DEBTORS ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) RELATED RELIEF

> **THIS MOTION SEEKS ORDERS THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU OR AS OTHERWISE SET FORTH HEREIN. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY. THE DEBTORS WILL SERVE A SEPARATE NOTICE OF HEARING FOR THIS MOTION.**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"),

hereby apply to this Court (the "Motion") for entry of an order[2] (I) (a) authorizing the Debtors to

---

[1] The Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: Stone Energy Corporation (5413); Stone Energy Holding, L.L.C. (3151); and Stone Energy Offshore, L.L.C. (8062). The above-captioned Debtors' mailing address is 625 E. Kaliste Saloom Road, Lafayette, Louisiana 70508.

[2] The Debtors request entry of the proposed order substantially in the form attached hereto as Exhibit A (the "Assumption and Approval Order"); provided that if the Court requires a Remarketing/Auction with respect to the

assume the Purchase and Sale Agreement, dated October 20, 2016 (as amended by that certain First Amendment to the Purchase and Sale Agreement, dated as of December 9, 2016, the "PSA"),[3] by and between Stone Energy Corporation ("Stone") and TH Exploration III, LLC (the "Buyer" or the "Stalking Horse Bidder"), a copy of which is attached hereto as Exhibit B, pursuant to which the Debtors shall sell substantially all of the Appalachia Assets (as defined below) upon entry of the Sale Order (as defined below), (b) approving the Break-up Fee and the Expense Reimbursement, (c) approving the form and manner of notice of the Sale Hearing and Contract Assumption Procedures (as defined below), and (d) solely in the event this Court requires a remarketing process and/or an auction process with respect to the sale of the Appalachia Assets (a "Remarketing/Auction"), authorizing and approving (I) the assumed PSA as the Stalking Horse Bid (as defined below) and (2) bidding procedures in connection with the sale of the Appalachia Assets; and (II) following the conclusion of the Sale Hearing, an order, the form of which will be filed on the docket of these Chapter 11 Cases prior to the Sale Hearing, authorizing (1) the sale of the Appalachia Assets free and clear of all claims, liens, liabilities, rights, interests and encumbrances except for Permitted Title Encumbrances (as defined in the PSA), (2) the Debtors to assume and assign certain executory contracts and unexpired leases, and (3) related relief (the "Sale Order").[4]  In support of this Motion, the Debtors respectfully state as follows:

---

Appalachia Assets, the Debtors request entry of an order substantially in the form attached hereto as Exhibit C (such alternative order, the "Bidding Procedures Order").

[3] Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in the PSA.

[4] The proposed form of Sale Order will be filed no later than 21 days prior to the Sale Hearing.  The Sale Order will provide, among other things, that upon consummation of the Sale, the Sale Proceeds (as defined below) (other than those required to be held in escrow pursuant to the terms of the PSA) will be placed into a segregated account and will remain in that account until further order of this Court.

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

## JURISDICTION

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are Sections 105(a), 363, 365, 503, 507 and, if applicable, 1146(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing these Chapter 11 Cases.  The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Kenneth H. Beer, Executive Vice President and Chief Financial Officer of Stone Energy Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "Beer Declaration"), filed concurrently herewith and fully incorporated herein by reference.

3.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108.  As of the date hereof, no trustee or examiner has been requested in the Chapter 11 Cases, and no committee has been appointed.

## RELIEF REQUESTED

4.      By this Motion, the Debtors respectfully request entry of the Assumption and Approval Order, pursuant to Bankruptcy Code Sections 105(a) and 365 and Bankruptcy Rules 2002, 6004 and 6006, authorizing and approving the assumption of the PSA, approving the form

3

and manner of notice of the Auction and Sale Hearing (each as defined below) (the "Notice of Sale Hearing"), substantially in the forms attached to the Assumption and Approval Order and Bidding Procedures Order as Annex 2 and Annex 3, respectively; procedures (the "Contract Assumption Procedures") for the assumption and assignment of the Contracts, Leases, and Office Lease (collectively, the "Assumed Contracts") and the setting of (a) the hearing to approve the Sale (the "Sale Hearing") for February 8, 2017 at 10:00 a.m. (prevailing Central Time), before the Honorable Judge Isgur, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas, at 515 Rusk Street, Courtroom 404, Houston, Texas 77002 and (b) January 30, 2017 at 5:00 p.m. prevailing Central Time, as the deadline to object to the Sale transactions and/or the assumption and assignment of the Assumed Contracts and cure amounts related thereto (the "Sale Objection Deadline").

5.      In the event this Court determines that a Remarketing/Auction is required, the Debtors respectfully request, in lieu of the entry of the Assumption and Approval Order, entry of the Bidding Procedures Order authorizing assumption of the PSA, setting the Sale Hearing and approving the Notice of Sale Hearing, the Contract Assumption Procedures, and the Sale Objection Deadline, and in addition:

a)      approving the assumed PSA as the stalking horse bid (the "Stalking Horse Bid");

b)      authorizing and approving bidding procedures in connection with the receipt and analysis of competing bids for certain assets of the Debtors (the "Bidding Procedures"), substantially in the form attached as Annex 1 to the Bidding Procedures Order; and

c)      establishing the following dates and deadlines, subject to modification as needed, relating to competitive bidding:

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

1.     **Bid Deadline**:  February 3, 2017 at 5:00 p.m. (prevailing Central Time), as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline"); and

2.     **Auction**:  February 6, 2017 at 10:00 a.m (prevailing Central Time), as the date and time of the auction (the "Auction"), if one becomes necessary, which will be held at the office of Latham & Watkins LLP, 811 Main Street, Suite 3700, Houston, TX 77002.

## BASIS FOR RELIEF REQUESTED

### A.    The Appalachia Assets

6.      The Debtors are an independent, publicly traded oil and gas company engaged in the acquisition, exploration, exploitation, development, and operation of both onshore and offshore oil and gas properties.  The Debtors are based in Lafayette, Louisiana, with additional offices in New Orleans, Louisiana; Houston, Texas; and Morgantown, West Virginia.  The Debtors' oil and gas properties are principally located in the Gulf of Mexico basin and the Marcellus and Utica shales in the Appalachia regions of Pennsylvania and West Virginia ("Appalachia").

7.      Since 2006, the Debtors have secured numerous oil and gas leasehold interests in the Appalachia basin in Pennsylvania and West Virginia.  As of December 31, 2015, the Debtors held leasehold interests in approximately 89,000 net (104,000 gross) mineral acres and had completed 95 net (136 gross) wells (collectively, the "Appalachia Assets").  The Appalachia Assets are located in Marshall, Wetzel, Tyler, Marion, Monongalia, Gilmer and Ritchie Counties, West Virginia and Clarion, Susquehanna and Wayne Counties, Pennsylvania. As of December 31, 2014, the Debtors' Appalachia properties accounted for approximately 58% of the Debtors' estimated proved oil and gas reserves on a volume equivalent basis.

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

8.     In response to low commodity prices and the high cost of midstream gathering, processing, and marketing, the Debtors shut in production at their Mary field located in Appalachia on September 1, 2015, which resulted in the curtailment of approximately 100 MMcfe per day of production.  Additionally, the Debtors suspended operations on 25 drilled wells in Appalachia until commodity price and margin improvements could be realized.  The Debtors' 2016 capital expenditure budget assumed only minimal activity in Appalachia.  In late June 2016, however, the Debtors entered into an interim Appalachia midstream contract with one of its production partners in Appalachia, allowing the Debtors to resume production at the Mary field.  The interim agreement provided near-term relief for the Debtors by permitting them to resume profitable production and positive cash flow at the Mary field.  The initial term of the interim agreement was through August 31, 2016, and it continues on a month-to-month basis thereafter unless terminated by either party.   Subsequent to the execution of the interim agreement, production from much of the Mary field resumed in late June and averaged over 75 MMcfe per day in July 2016, with total Appalachia volumes averaging 95 MMcfe per day in July 2016.

**B.     Events Leading to the Sale**

9.     As part of their restructuring efforts, in the first quarter of 2016, the Debtors, in consultation with their advisors, diligently evaluated a number of options, including the sale of their Appalachia Assets.   Thereafter, the Debtors ultimately determined that a sale of the Appalachia Assets was the best way to maximize value for all stakeholders as part of the Debtors' overall restructuring efforts.  In fact, the sale of the Appalachia Assets is a core pillar of the restructuring negotiated between the Debtors and their largest creditor constituencies, the Consenting Holders and certain financial institutions party to the Fourth Amended and Restated

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

Credit Agreement dated as of June 24, 2014 (as amended, restated, modified, supplemented or replaced from time to time, the "Prepetition Credit Agreement") among the Debtors, such financial institutions as lenders thereto (the "Banks"), Bank of America, N.A., as administrative agent (in such capacity, the "Bank Agent", and collectively, with any Bank that may become a party in accordance with Section 13 and 34 of the Restructuring Support Agreement, the "Consenting Banks"), and the consummation of the Sale is a condition precedent to the confirmation of the plan of reorganization filed in the Chapter 11 Cases.

10.     To provide guidance and expertise in this sale process, the Debtors retained Tudor, Pickering, Holt & Co. Advisors, LLC ("TPH") to serve as the Debtors' exclusive financial advisor and investment banker with respect to the sale of the Appalachia Assets.  In February 2016, TPH commenced broad-based marketing initiatives that generated several expressions of interest from various parties.  Specifically, TPH prepared a teaser that was sent to 40 parties.  Of such parties, 20 entered into confidentiality agreements and conducted due diligence with respect to acquisition of the Appalachia Assets.  The Debtors received indications of interest for an acquisition of the Appalachia Assets from five parties.

11.     After considering various inquiries and proposals received as a result of the TPH-led process, and following several months of arms' length and good-faith negotiations, on October 20, 2016, Stone and the Buyer entered into the PSA, pursuant to which, subject to Court approval, the Buyer has agreed to purchase substantially all of the Debtors' Appalachia Assets (as more fully defined and described in the PSA) for approximately $360 million, subject to customary purchase price adjustments and the establishment of escrows as set forth therein.

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

12.     On October 20, 2016, Stone publicly announced its entry into the PSA pursuant to a press release.  Additionally, on October 21, 2016 Stone publicly filed a Form 8-k with the Securities and Exchange Commission that included the PSA as an exhibit.

13.     The principal terms of the PSA are summarized in the following chart:[5]

| PSA Provision | Summary Description |
|---|---|
| **PSA Parties** | <u>Seller:</u>   STONE ENERGY CORPORATION<br><u>Buyer:</u>   TH EXPLORATION III, LLC |
| **Consideration** | The consideration for (a) the purchase, sale and assignment of the Appalachia Assets by Seller to Buyer and (b) the assumption by Buyer of the Assumed Obligations is $360,000,000 as adjusted pursuant to the PSA.  <u>See</u> **PSA, § 3.01.** |
| **Appalachia Assets** | The PSA sets forth the Appalachia Assets to be purchased by the Buyer, including, without limitation, (a) all oil, gas and/or mineral leases of Seller, together with any and all other right, title and interest of Seller in and to the leasehold estates created thereby, located in Marshall, Wetzel, Tyler, Marion, Monongalia, Gilmer and Ritchie Counties, West Virginia and Clarion, Susquehanna and Wayne Counties, Pennsylvania; (b) all rights and interests in, under or derived from all unitization, pooling and communitization agreements in effect with respect to any of the Leases and the units, pools or arrangements created thereby; (c) all wells located on the Leases, Fee Minerals or the Units and all Hydrocarbons produced therefrom or allocated thereto from and after the Effective Time; (d) (i) to the extent that they may be assigned, all Permits, and (ii) other than the Surface Interests, all licenses, servitudes, easements, surface leases, rights-of-way and other surface rights appurtenant to, or used or held for use primarily in connection with the ownership or operation of any of the Leases, Wells, Units or other Assets; (e) all contracts and agreements to which Seller is a party or is bound insofar as such contracts and agreements relate to the other Assets and will be binding on Buyer after Closing; (f) other than the Gathering System, all equipment, machinery, fixtures and other personal, movable and mixed property, operational and non-operational, located on any of the Properties or otherwise primarily attributable to or used in connection therewith; (g) the Gathering System and, to the extent not covered in Section 2.02(d) or Section 2.02(i) of the PSA, Gathering System Easements; (h) all fee mineral interests located in the Specified Counties; (i) other than the properties described in Section 2.02(d) of the PSA, all surface fee interests located in the Specified Counties, together with any fixtures and improvements located thereon; (j) the lease covering the New Martinsville, West Virginia field office, including any and all personal property or equipment located thereon; (k) all Imbalances relating to the Assets; (l) all electronic measurement equipment located at the well site or within the Specified Counties; (m) vehicles and other rolling stock; (n) all proprietary Seismic Data of Seller or its Affiliates to the extent covering any portion of the Properties; (o) originals (where available) and copies of all books, records and files, and reports, to the extent relating to the Assets and/or Seller's ownership and operation thereof and in Seller's or its Affiliates' possession; and (p) |

---

[5] This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the PSA, the latter governs in all respects.  Capitalized terms used but not defined in this chart have the meanings ascribed to them in the PSA.

| PSA Provision | Summary Description |
|---|---|
| | the Appalachia Avoidance Actions. **See PSA, § 2.02.** |
| **Excluded Assets** | The PSA sets forth the assets that will not be purchased by the Buyer, including, without limitation, (a) all of Seller's corporate minute books, financial records and other business records that relate to Seller's business generally (except to the extent relating solely to the Assets); (b) to the extent that they do not relate to the Assumed Obligations for which Buyer is providing indemnification hereunder, all trade credits, all accounts, all receivables of Seller and all other proceeds, income or revenues of Seller attributable to the Assets and attributable to any period of time prior to the Effective Time; (c) all claims of Seller for refunds of, credits attributable to, loss carry forwards with respect to, or similar Tax assets relating to (i) Asset Taxes allocable to Seller pursuant to Section 14.01 of the PSA, (ii) Income Taxes, (iii) Taxes attributable to the Excluded Assets, and (iv) any other Taxes relating to the ownership or operation of the Assets that are attributable to any period (or portion thereof) prior to the Effective Time; (d) except for proceeds or awards related to an Asset to which Buyer is entitled under Section 4.05 of the PSA, all rights and interests of Seller (i) under any policy or agreement of insurance, (ii) under any bond, or (iii) to any insurance or condemnation proceeds or awards arising, in each case, from acts, omissions or events or damage to or destruction of property; (e) Seller's rights with respect to all Hydrocarbons produced from the Assets with respect to all periods prior to the Effective Time (other than Hydrocarbons in storage for which there is a Purchase Price adjustment pursuant to Section 9.02(a)(iii) of the PSA, less any volume of Hydrocarbons sold, exchanged or otherwise disposed of from and after the Effective Time until Closing); (f) all proceeds from the settlements of contract disputes with purchasers of Hydrocarbons from or attributable to the Properties, insofar as said proceeds are attributable to any periods of time prior to the Effective Time; (g) except as described in Section 2.02(l) and Section 2.02(j) of the PSA, all information technology assets; (h) all bonds, letters of credit and guarantees, if any, posted by Seller or its Affiliates with Governmental Authorities and relating to the Assets; (i) all of Seller's proprietary computer software, patents, trade secrets, copyrights, names, trademarks, logos and other intellectual property; (j) all documents and instruments of Seller that may be protected by an attorney-client privilege or any attorney work product doctrine (other than title-related materials such as title opinions); (k) all materials and information that cannot be disclosed to Buyer as a result of confidentiality obligations to Third Parties (provided that Seller uses its commercially reasonable efforts to obtain a waiver of any such confidentiality restriction); (l) to the extent that they do not relate to the Assumed Obligations for which Buyer is providing indemnification hereunder, all audit rights of Seller arising under any of the Contracts or otherwise with respect to any period prior to the Closing or to any of the Excluded Assets; (m) (i) all geophysical and other seismic and related technical data and information relating to the Assets that is not expressly conveyed to Buyer pursuant to Section 2.02(n) of the PSA and (ii) all interpretations of any seismic or technical data; (n) documents prepared or received by Seller or its Affiliates with respect to (1) lists of prospective purchasers for transactions involving the Assets compiled by Seller, (2) bids submitted by other prospective purchasers of the Assets, (3) analyses by Seller or its Affiliates of any bids submitted by any prospective purchaser, (4) correspondence between or among Seller, its representatives, and/or any prospective purchaser other than Buyer, and (5) correspondence between Seller or any of its representatives with respect to any of the bids, the prospective purchasers or the transactions contemplated by this Agreement; (o) all amounts paid by any Third Party to Seller or its Affiliates as overhead for period of time accruing prior to Closing under any joint operating |

9

| PSA Provision | Summary Description |
|---|---|
| | agreement; (p) except for the field office lease described on Exhibit A – Part 8 to the PSA and related personal property, any offices, office leases and any personal property located in or on such offices or office leases; (q) any Contract to which Seller or any of its Affiliates is a party with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; (r) any Debt Contracts of Seller or its Affiliates; (s) all of the personnel files and personnel records of Seller; (t) any Assets described in Section 2.02(d)(i) of the PSA that are not assignable; (u) all Assets retained by Seller and not ultimately transferred to Buyer in accordance with the provisions of Article IV or Section 7.01(b) of the PSA; (v) all rights and obligations arising from the Seller Retained Disputes; (w) all acquisition agreements pursuant to which Seller acquired any portion of the Assets other than those specifically listed on Exhibit A – Part 4 to the PSA; and(x) any assets, properties and matters described on Exhibit B to the PSA. **See PSA, § 2.03.** |
| **Assumption of Contracts and Leases** | All assumed Contracts, Leases, and Office Lease owned by the Seller that are proposed to be assigned to Buyer pursuant to Bankruptcy Code Section 365 in connection with the Sale transactions set forth in the PSA are listed on Exhibit A – Parts 1, 4, and 8 to the PSA.  **See PSA, § 7.16(g).**  The Debtors are assuming and assigning all Contracts and Leases to the Buyer relating to the Appalachia Assets other than two drilling contracts and the lease for the Debtors' facility located in Morgantown, West Virginia. |
| **Closing Conditions** | The PSA includes closing conditions typical and customary for transactions of this kind, including, without limitation:<br><br>• <u>Buyer</u>: (a) the representations and warranties of the Seller in <u>Sections 6.01</u> must be true and correct as of the Closing Date, and (b) Seller shall have materially performed all obligations; (c) no material Proceeding shall be pending before any governmental authority; (d) Seller shall have executed and acknowledged required documents; (e) environmental and title defects will be in compliance as set forth in the PSA; (f) all Encumbrances imposed in connection with any Debt Contract burdening the Appalachia Assets shall have been released at or before Closing with proof of the same; (g) the Court must enter the Sale Order and the Sale Order must be in full force and effect, unmodified, and not subject to a stay; and (h) Seller shall have executed and delivered to Buyer an authorized officer's certificate, dated as of Closing, certifying that the conditions set forth in Section 8.02(a) and Section 8.02(b) of the PSA have been fulfilled.  **See PSA, § 8.02.**<br><br>• <u>Seller</u>: (a) Buyer must perform and comply in all material respects with the representations and warranties required in Sections 6.02 by the PSA prior to Closing; (b) Buyer must have materially performed or complied with all obligations, agreements and covenants contained in this Agreement as to which performance or compliance by Buyer is required; (c) no legal impediment to Closing may be in effect; (d) Buyer shall have obtained, or caused to be obtained, in the name of Buyer or its Affiliates, replacements for Seller's and/or Seller's Affiliates' bonds, letters of credit and guarantees, and such other bonds, letters of credit and guarantees to the |

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

| PSA Provision | Summary Description |
|---|---|
| | extent required by Section 7.05 of the PSA; (e) the Court must enter the Sale Order and the Sale Order must be in full force and effect, unmodified, and not subject to a stay; (f) title and environmental defect matters must have been resolved; and (g) the deliveries described in Section 9.05 of the PSA must have been made and the Buyer shall be ready, willing and able to deliver to Seller the Adjusted Purchase Price. **See PSA, § 8.01.** |
| **Representations, Warranties and Covenants** | The PSA includes representations, warranties and covenants made or agreed to by the parties typical and customary for transactions of this kind, including, without limitation, representations, warranties and covenants relating to (i) organization/good standing, (ii) authorization of transaction, (iii) non-contravention, (iv) legal proceedings, (v) Hydrocarbon Sales; (vi) marketing efforts; (vii) compliance with laws and permits, (viii) outstanding material authorities for expenditures, (ix) brokers' fees, (x) environmental and safety matters, (xi) affiliate ownership, (xii) insurance, (xiii) taxes, (xiv) financial statements, (xv) offset obligations, (xvi) plugging and abandonment, (xvii) employees and Benefit Plans, (xviii) regulatory matters, including bonding, (xix) Seller' operations prior to the Closing Date, and (xx) availability of funds and solvency of Buyer. **See PSA, §§ 6.01; 6.02.** |
| **Buyer Protections** | Expense Reimbursement and Break-up Fee upon certain triggering conditions including (a) a breach of the PSA by the Debtors or (b) the Debtors' selection of an alternative bid as a higher and better bid in the event this Court requires a Remarketing/Auction.   The Break-up Fee is $10,800,000.   The Expense Reimbursement is capped at $3,600,000, inclusive of the amount of the $1,750,000 Work Fee. |
| **Work Fee** | The Debtors provided a Work Fee (as defined in the PSA) of $1,750,000 which will be returned to the Debtors in the event of certain breaches of the PSA by the Buyer |
| **Deposit** | An aggregate amount of $36,000,000, consisting of (a) $31,000,000 to be provided upon entry the Assumption and Approval Order or the Bidding Procedures Order and (b) the $5,000,000 previously deposited with the Debtors following the Execution Date in accordance with Section 3.02(a)(i) of the PSA. **See PSA, § 3.02(a)(iii).** |
| **No Shop** | The PSA provides that, unless otherwise required by the Court, the Debtors may not take (or authorize or permit any investment banker, financial advisor, attorney, accountant or other similar Person acting for or on behalf of Seller or any such Affiliate to take), directly or indirectly, any action to solicit or negotiate (including by furnishing confidential information with respect to the Appalachia Assets or permitting access to the Appalachia Assets or books and records of Seller) any offer or inquiry from any Person concerning such Person's direct or indirect acquisition of the Appalachia Assets other than Buyer or its Affiliates.  Notwithstanding the foregoing, the Consenting Holders and their legal and financial advisors are not restricted or prohibited from taking any action to negotiate any unsolicited offer or inquiry received by the Debtors or the Consenting Holders from any person concerning such person's acquisition of the Assets. **See PSA, § 7.04(b).** |

14.     Upon consummation of the Sale contemplated under the PSA, all proceeds of the

Sale (other than those required to be held in escrow pursuant to the terms of the PSA) (the "Sale

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

Proceeds") will be placed into a segregated account set up by the Debtors and will remain in that account until further order of this Court.  All liens, claims, interests and encumbrances will attach to the Sale Proceeds to the same extent and with the same priority as existed prior to consummation of the Sale.

**C.      Buyer Protections**

15.      To induce the Buyer to expend the time, energy and resources necessary to negotiate and execute the PSA, the Debtors have agreed to provide the Buyer with, and seek this Court's approval of, certain protections pursuant to the terms of the PSA regardless of whether a Remarketing/Auction is required.  The PSA provides for the payment to the Buyer of a break-up fee equal to $10,800,000 in cash (*i.e.*, 3% of the Purchase Price) (the "Break-up Fee") in certain circumstances, including if all or substantially all of the Appalachia Assets are purchased by another purchaser.  In addition, the PSA provides for the reimbursement of the Buyer's costs and expenses (an amount equal to the reasonable documented out-of-pocket costs and expenses of the Buyer paid or payable to any third party related to the negotiation of the PSA and the Buyer's due diligence relating to Stone and the Appalachia Assets, not to exceed an aggregate amount equal to $3,600,000 (*i.e.*, 1% of the Purchase Price), inclusive of the amount of the $1,750,000 Work Fee (as defined in the PSA) in certain circumstances, including if all or substantially all of the Appalachia Assets are purchased by another purchaser (the "Expense Reimbursement," and together with the Break-up Fee, the "Buyer Protections").  The PSA further provides that the Debtors' obligation to pay the Buyer Protections pursuant to the PSA shall constitute an administrative expense of the Debtors under Bankruptcy Code Sections 503(b) and 507.

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

**D.     The Debtors Do Not Believe a Remarketing/Auction Is Necessary**

16.     The Debtors believe that, after the prepetition marketing process conducted by the Debtors with the assistance of TPH above, the PSA with the Buyer represents the highest and best offer available to the Debtors and their estates for the Appalachia Assets.  The Debtors and TPH currently have no reason to believe that a Remarketing/Auction is necessary because it is unlikely to result in a higher or better offer for the Appalachia Assets.  The PSA provides that the Buyer will assume essentially all of the Contracts and Leases relating to the Appalachia Assets – avoiding tens of millions of dollars of rejection damages claims and the attendant costly litigation resolving such claims.  In contrast to other potential bidders, the Buyer has a significant existing position and relationships with service and midstream providers in the Appalachia Basin that permits them to assume such contracts.  Moreover, the Buyer has already completed substantially all of the due diligence, including the months of title diligence necessary to consummate any acquisition in the upstream oil and gas industry, on the Debtors' thousands of real property assets comprising the core of the Appalachia Assets.  An alternative buyer would likely take many months to complete such diligence, significantly delaying the Debtors' Chapter 11 Cases and increasing the costs in connection therewith and jeopardizing the Debtors' ability to close on the PSA and thereby confirm a chapter 11 plan in accordance with the time frame established by the Restructuring Support Agreement (as defined in the Beer Declaration).

17.     Indeed, shortly after signing the PSA while the Debtors (but not the Consenting Holders) were subject to a prohibition on soliciting or negotiating inquiries or offers for the Appalachia Assets, the Debtors are aware of at least two unsolicited inquiries with respect to the Appalachia Assets that were received by the Consenting Holders seeking updated due diligence information.  Neither of these two inquiries have, to date, progressed into a valid and binding

13

offer for the Appalachia Assets the Purchase Price offered by of the Buyer.  Each of these inquiries was received as a result of the public disclosure of the PSA.  For all of these reasons, the Debtors submit that a Remarketing/Auction is unnecessary and and would be wasteful to the Debtors and their estates.

18.     Notwithstanding the foregoing, and although the Debtors do not at present believe that a Remarketing/Auction is necessary, the Debtors have structured the PSA with maximum flexibility such that the Buyer has agreed to serve as a traditional Bankruptcy Code Section 363 stalking horse bidder within the timeframe set forth in the PSA solely if the Court finds that a Remarketing/Auction process is necessary.

**E.     Bidding Procedures**

19.     In the event that the Court determines that a Remarketing/Auction is required, the Debtors believe the proposed Bidding Procedures summarized below, and attached as Annex 1 to the Bidding Procedures Order, are fair and appropriate.  Should this Court determine that a Remarketing/Auction is necessary, the Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, manner, while ensuring that the highest and best bid is generated for the Appalachia Assets.

20.     Because the Bidding Procedures are attached as Annex 1 to the Bidding Procedures Order, they are not restated in their entirety herein.  The Bidding Procedures provide, among other things, the following:

- Bids must be for all or substantially all of the Appalachia Assets pursuant to an executed purchase agreement based on the PSA as a form that only proposes changes that are, taken in the aggregate, not adverse to the Debtors;

- A bid for all or substantially all of the Appalachia Assets must provide for cash in at least an amount equal to the Purchase Price in the PSA plus the Break-up Fee and Expense Reimbursement.  Accordingly, any bid or combination of bids for all

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

or substantially all of the Appalachia Assets must provide for aggregate consideration of at least $378 million, including cash consideration equal to the Break-up Fee and Expense Reimbursement;

- Bids shall not contain any financing or due diligence contingencies to closing on the proposed transaction;

- Bidders shall be required to provide an executed escrow agreement in substantially the same form as the Escrow Agreement (as defined in the PSA) with the Buyer and a good-faith deposit in the form of a wire transfer or certified check in the amount of at least ten percent (10%) of its designated purchase price prior to the Bid Deadline;

- Bids must provide for the payment of the Break-up Fee and Expense Reimbursement owed to the Buyer in full in cash upon closing of an alternative bid, and such Break-up Fee and Expense Reimbursement are to be paid from the consideration proposed to be paid by the alternative bidder and not in addition to the consideration proposed to be paid by the alternative bidder;

- Bids must be accompanied by evidence of committed financing or other financial ability to consummate the transaction in a timely manner.  If the bidder is an entity formed for the purpose of the proposed transaction, a guarantee or other credit support must be provided;

- Bids cannot be conditioned upon the Court's approval of any buyer protections, such as a break-up fee, termination fee, expense reimbursement, work fee or similar type of payment;

- If the Auction takes place, it shall occur on or before February 8, 2017.  Each supplemental bid at the auction shall be made in minimum increments of at least $200,000 higher than the previous bid;

- The Buyer shall be entitled to include as part of any and all of its supplemental bids a credit bid for the amount of the Break-up Fee and the Expense Reimbursement;

- Unless otherwise consented to by the Buyer, or such other bidder selected as the highest and best bid at the conclusion of the Auction, the Debtors shall not consider any bids submitted after the conclusion of the Auction and any and all such bids shall be deemed untimely and shall under no circumstances constitute a qualified bid; and

- The Debtors shall not be entitled to waive or modify terms of the Bidding Procedures without the consent of (i) the Buyer (which consent shall not be unreasonably withheld) and (ii) the Consenting Holders (which consent shall not be unreasonably withheld).

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

F.     **Contract Assumption Procedures**

21.     The Debtors also request confirmation that the assumption notice (the "Assumption Notice"), substantially in the forms attached to the Assumption and Approval Order and the Bidding Procedures Order as Annex 1 and Annex 2, respectively, and as approved by this Court pursuant to the *Order (I) Scheduling Combined Hearing On (A) Adequacy Of Disclosure Statement and (B) Confirmation Of Prepackaged Plan; (II) Fixing Deadline To Object To Disclosure Statement And Prepackaged Plan; (III) Approving Prepetition Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Conditionally (A) Directing The United States Trustee Not To Convene Section 341 Meeting Of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets And Liabilities; (V) Approving Procedures For Equity Holders To Opt Out Of Releases; (VI) Approving Notice and Procedures For The Assumption Of Executory Contracts And Unexpired Leases; and (VII) Granting Related Relief*, was proper and sufficient to provide notice pursuant to the Contract Assumption Procedures.  To facilitate the Sale the Debtors seek authority to assume and assign the Assumed Contracts to the Buyer (or if the Buyer is not the prevailing bidder, then to the prevailing bidder) in accordance with the Contract Assumption Procedures.  The Contract Assumption Procedures are as follows:

- Within fourteen (14) calendar days after the Petition Date (the "Assumption Notice Deadline"), the Debtors shall file with the Court and serve on each counterparty (each, a "Counterparty," and collectively, the "Counterparties") to an Assumed Contract the Assumption Notice.

- The Assumption Notice shall include, without limitation, the cure amount (each, a "Cure Amount"), if any, that the Debtors believe is required to be paid to the applicable Counterparty under Bankruptcy Code Section 365(b)(1)(A) and (B) for each of the Assumed Contracts.  If a Counterparty objects to the Cure Amount or to a lack of adequate assurance of future performance by the Buyer, the Counterparty must file with the Court and serve on the Contract Objection Notice

16

Parties (as defined below) a written objection (a "Contract Objection") on or before the Contract Objection Deadline (as defined below).

- Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules; (iii) be filed with the Clerk of the Court, 515 Rusk Street, Houston, Texas 77002, together with proof of service, on or before 5:00 p.m. (prevailing Central Time) on January 24, 2017 (the "Contract Objection Deadline"); (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Contract Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under Bankruptcy Code Sections 365(b)(1)(A) and (B) for the applicable Assumed Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

- The "Contract Objection Notice Parties" are as follows:  (i) counsel to the Debtors:  Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611 (Attn: Caroline A. Reckler, Esq. and Matthew L. Warren, Esq.); (ii) counsel for the administrative agent for the Debtors' prepetition secured financing:  O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036 (Attn: George Davis, Esq.); (iii) counsel to the Consenting Holders:  Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, NY 10036 (Attn: Michael S. Stamer, Esq. and Meredith A. Lahaie, Esq.); and (iv) counsel for the Buyer:  Vinson & Elkins LLP, 2001 Ross Avenue, Suite 3700, Dallas, TX 75201 (Attn: Paul E. Heath, Esq. and Bradley R. Foxman, Esq.).

- If, after the Assumption Notice Deadline, additional executory contracts or unexpired leases of the Debtors are determined to be Assumed Contracts, as soon as practicable thereafter and in no event less than one (1) business day before the date of the Sale Hearing, the Debtors shall file with the Court and serve, by overnight delivery, on the applicable Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than (a) the Contract Objection Deadline in the event that such Assumption Notice was filed and served at least ten (10) days prior to the Contract Objection Deadline, (b) two (2) days prior to the Sale Hearing in the event that such Assumption Notice was filed and served at least seven (7) days prior to the commencement of the Sale Hearing, and (c) two (2) hours prior to the commencement of the Sale Hearing in the event that such Assumption Notice was filed and served less than seven (7) days prior to the commencement of the Sale Hearing.

- In the event a Remarketing/Auction is required, and if the Buyer is not the prevailing bidder at the Auction, as soon as practicable thereafter and in no event less than one (1) business day before the date of the Sale Hearing, the Debtors

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

shall file with the Court and serve, by overnight delivery, on the Counterparties a notice identifying such prevailing bidder, and the Counterparties shall file any Contract Objections solely on the basis of adequate assurance of future performance not later than two (2) hours prior to the commencement of the Sale Hearing.

• At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Buyer (or if the Buyer is not the prevailing bidder, then to the prevailing bidder) of only those Assumed Contracts that have been selected by the Buyer (or if the Buyer is not the prevailing bidder, then by the prevailing bidder) to be assumed and assigned (collectively, the "Selected Assumed Contracts"). The Debtors and their estates reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Selected Assumed Contracts.

• If no Contract Objection is timely received with respect to a Selected Assumed Contract: (i) the Counterparty to such Selected Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Buyer (or if the Buyer is not the prevailing bidder, then to the prevailing bidder) of the Selected Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Buyer (or if the Buyer is not the prevailing bidder, then by the prevailing bidder)); (ii) any and all defaults under the Selected Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code Section 365(b)(1)(A) and (B) upon payment of the Cure Amount set forth in the Assumption Notice for such Selected Assumed Contract; and (iii) the Cure Amount set forth in the Assumption Notice for such Selected Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other Claims related to such Selected Assumed Contract against the Debtors and their estates or the Buyer (or if the Buyer is not the prevailing bidder, then against the prevailing bidder), or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections and the Sale Order.

• To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under Bankruptcy Code Sections 365(b)(1)(A) and (B) (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtors and assigned to

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

the Buyer (or if the Buyer is not the prevailing bidder, then to the prevailing bidder) provided that the cure amount the Counterparty asserts is required to be paid under Bankruptcy Code Section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

22.     Any party failing to timely file a Contract Objection with respect to the assumption and assignment of any Assumed Contract or related Cure Amount specified on an Assumption Notice will be barred from objecting thereto, including asserting any additional cure or other default amounts against the Debtors or any of the Debtors' estates, the Buyer, or other prevailing bidder with respect to such Assumed Contract and shall be deemed to consent to the Sale and the assumption and assignment of such Assumed Contract assumed and assigned in connection therewith.

## BASIS FOR RELIEF

### A.     Assumption of the PSA is a Proper Exercise of the Debtors' Business Judgment

23.     The Debtors seek authority, pursuant to Bankruptcy Code Sections 365(a) and 105(a), to assume the PSA.  Bankruptcy Code Section 365(a) provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  When determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease, courts apply the "business judgment" rule.  *See In re Pisces Energy, LLC*, No. 09-36591(KKB), 2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) (to determine whether a debtors' decision to assume an executory contract is supported by valid business justification, "[c]ourts apply the business judgment test, which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment."); *see also In re Armstrong*

*World Indus.*, 348 B.R. 136, 162 (D. Del. 2006) (explaining that courts defer to a debtor's business judgment to reject a contract under Bankruptcy Code Section 365(a)); *In re Federated Dep't. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases").

24.     Under the business judgment rule, debtors are usually given significant discretion when requesting to assume or reject an executory contract or unexpired lease.  *See In re Continental Airlines Corp.*, 57 B.R. 845, 851 (Bankr. S.D. Tex. 1985) (stating that, in the absence of a showing of bad faith or an abuse of business discretion, the Debtors' business judgment will not be altered); *In re Chipwich, Inc.*, 54 B.R. 427, 430-31 (Bankr. S.D.N.Y. 1985) (finding that a court should not interfere with a debtor's decision to assume or reject "absent a showing of bad faith or abuse of business discretion").  Accordingly, so long as a debtor's decision is reasonable and in the best interests of the bankruptcy estate, courts generally defer to the business judgment of the debtor's management.

25.     Here, the Debtors' decision to assume the PSA satisfies the business judgment test.  The Debtors marketed the Appalachia Assets prior to the Petition Date and were unable to find a buyer willing to pay a higher and better price for the Appalachia Assets, and as such believe that the sale price reflected in the PSA accurately represents the fair market value of the Appalachia Assets.  Accordingly, the assumption of the PSA is in the best interests of the Debtors, their estates, and their stakeholders.

26.     Bankruptcy Code Section 105(a) provides additional authority for the Court to authorize the assumption of the PSA.  Bankruptcy Code Section 105(a) provides, in pertinent part, that a court may "issue any order, process, or judgment that is necessary or appropriate to

carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Entry of an order authorizing the assumption of the PSA would be an appropriate exercise of the Court's equitable powers, as the requested relief is in the best interests of the Debtors and their estates, is consistent with the Bankruptcy Code, and will maximize value for the Debtors' stakeholders.

27.     Based on the foregoing, the Debtors respectfully submit that they have exercised reasonable business judgment to assume the PSA and that such assumption is in the best interests of all parties in interest in these Chapter 11 Cases.  Accordingly, the Court should authorize the Debtors to assume the PSA.

**B.     The Contract Assumption Procedures Are Appropriate and Should Be Approved**

28.     In connection with the potential assumption and assignment of the Assumed Contracts, whether such assignment be to the Buyer or an alternative bidder, the Debtors believe it is necessary to establish a process by which (i) the Debtors and the Counterparties can reconcile cure obligations, if any, in accordance with Bankruptcy Code Section 365, and (ii) such Counterparties can object to the assumption and assignment of the Contracts and Leases and any applicable Cure Amounts.

29.     As set forth in the Contract Assumption Procedures, the Debtors are also requesting that any Counterparty that fails to object to the proposed assumption and assignment of any Assumed Contract be deemed to consent to the assumption and assignment of the applicable Assumed Contract pursuant to Bankruptcy Code Section 365 and on the terms set forth in the Sale Order, notwithstanding any anti-alienation provision or other restriction on assignment contained in the applicable contract or lease.  *See, e.g., Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding that by not

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

objecting to sale motion, creditor was deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

30.     The Debtors believe that the Contract Assumption Procedures are fair and reasonable, provide sufficient notice to the Counterparties to the Assumed Contracts regarding the potential assumption and assignment of the Assumed Contracts, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof.   Accordingly, the Debtors request that the Court approve the Contract Assumption Procedures.

**C.      Approval of the Buyer Protections Is Appropriate**

31.     The Debtors believe that the Buyer Protections are fair and reasonable under the circumstances.   The Break-up Fee and the Expense Reimbursement were negotiated at arms' length and in good faith and are necessary to secure the Buyer's participation in the proposed sale transaction regardless of whether a Remarking/Auction is required.   In the event a Remarketing/Auction is required, the Buyer has agreed to serve as the Stalking Horse Bidder and, moreover, the Buyer's efforts to date will increase the chances that the Debtors will receive the highest or otherwise best offer for the Appalachia Assets to the benefit of the Debtors' estates.   Courts have acknowledged that the approval of break-up fees and expenses in connection with substantial sales in bankruptcy is warranted to compensate an unsuccessful acquirer whose initial offer served as the basis and catalyst for higher or better offers.   *See Asarco, Inc. v. Elliot Mgmt. (In re Asarco, LLC)*, 650 F.3d 593, 597-98, 601-03 & n.9 (5th Cir. 2011); In re JW Res., Inc., 536 B.R. 193, 195-96 (Bankr. E.D. Ky. 2015); *In re Hupp Industries, Inc.*, 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992).   As listed in *Hupp Indus.*, courts consider various factors in determining whether to authorize break-up fees, such as:

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

- whether the fee requested correlates with a maximization of value to the debtor's estate;

- whether the transaction in the negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;

- whether the principal secured creditors are supportive of the concession;

- whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;

- the existence of available safeguards beneficial to the debtor's estate; and

- whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

*In re Hupp Indus.*, 140 B.R. at 194-96; *see also In re JW Res.*, 536 B.R. at 195 (approvingly noting Hupp Industries' multi-factor test).

32.     To warrant court approval of such break-up fees and expenses, the Fifth Circuit in *Asarco* required a showing that the requested fees and expenses must be supported by a sound business justification. *In re Asarco*, 650 F.3d at 602-03 (favoring business judgment standard governing use of assets outside of ordinary course of business, rather than the standard for administrative expenses, in assessing propriety of fees and expenses incurred by bidders).

33.     Here, the Buyer Protections to be paid under the circumstances described herein and in the PSA satisfy the foregoing tests because they are: (i) actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of Bankruptcy Code Sections 503(b) and 507(a)(2); (ii) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Buyer; (iii) reasonable and appropriate, in light of the size and nature of the proposed sale transaction and comparable transactions, to the commitments that have been made and the efforts that have been and will be expended by the Buyer; and (iv) necessary to induce the Buyer to continue to pursue the Sale transaction and to continue to be bound by the

23

PSA.  Indeed, the Buyer Protections will enable the Debtors to secure an adequate floor price for the Appalachia Assets, thereby ensuring that competing bids (in the event a Remarketing/Auction is required) would be materially higher or otherwise better than the PSA – a clear benefit to the Debtors' estates.  Moreover, the Stalking Horse Bidder would not agree to act as a stalking horse bidder without being granted the Buyer Protections.  Without the Buyer Protections, the Debtors might lose the opportunity to obtain the highest and best offer for the Appalachia Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.

34.    Moreover, the Buyer has expended, and will continue to expend, considerable time, money and energy in connection with the Sale and has engaged in extended and lengthy good faith negotiations.  In particular, the PSA is the culmination of a marketing effort and part of a process undertaken by the Debtors, TPH, and the Debtors' other professionals to identify and negotiate a transaction that the Debtors believe to be the highest and best proposal for an acquisition of the Appalachia Assets.  For all of the foregoing reasons, the Debtors' believe that granting the Buyer Protections set forth in the PSA will maximize the value realized for the benefit of the Debtors' estates, their creditors, and other parties in interest.

35.    Finally, payment of the Buyer Protections in the context of a sale to another purchaser will not diminish the Debtors' estates to the extent they become payable, as the Bidding Procedures require that any competing bid must exceed the Stalking Horse Bid by an amount in excess of the Break-up Fee and Expense Reimbursement or will be paid in other

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

agreed and customary circumstances.[6]  Accordingly, based on the foregoing, the Debtors submit that the Buyer Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

**D.      The Form and Manner of the Notice of Sale Hearing Should Be Approved**

36.      Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c)(1), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

37.      Within five (5) business days after entry of the Assumption and Approval Order or the Bidding Procedures Order (as applicable), or as soon thereafter as practicable, the Debtors will serve the Notice of Sale Hearing upon the following parties: : (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the agent for the Debtors' prepetition secured bank group; (c) the indenture trustee for the Senior Convertible Notes due 2017; (d) the indenture trustee for the Senior Notes due 2022; (e) counsel to the Consenting Holders; (f) the Securities and Exchange Commission; (g) counsel to the Buyer; (h) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002; (i) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (j) all taxing authorities having jurisdiction over any of the Appalachia Assets, including the Internal Revenue Service; (k) all persons and entities known or reasonably believed to have asserted a lien or other interest in any of the Appalachia Assets; (l) the counterparties to the Assumed Contracts; (m) all persons or entities (other than the Buyer) known or reasonably

---

[6] The Buyer Protections are also payable in other circumstances that may not result in the consummation of a competing Sale.  However, those circumstances are generally, though not entirely, within the Debtors' control, and therefore, the Debtors can take steps to minimize the occurrence of such circumstances.

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

believed to have expressed an interest in acquiring all or substantially all the Appalachia Assets within the last six months; (n) the attorneys general in the jurisdictions where the Appalachia Assets are located; (o) the Environmental Protection Agency; (p) all state and local environmental agencies in Appalachia where the Debtors own or have owned or used real property; and (q) all other known creditors of the Debtors.[7]

38.     In addition, within five (5) business days after entry of the Assumption and Approval Order or the Bidding Procedures Order (as applicable), the Debtors will, subject to applicable submission deadlines, publish the Notice of Sale Hearing once in a national publication the Debtors deem appropriate.

39.     The Notice of Sale Hearing will also be posted on (a) the Court's website at http://www.txs.uscourts.gov and (b) the case website maintained by the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC.

40.     The Debtors submit that notice of this Motion and the related hearing to consider entry of the Assumption and Approval Order or the Bidding Procedures Order, coupled with service of the Notice of Sale Hearing as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and in satisfaction of, the applicable requirements of Bankruptcy Rules 2002, 6004, and 6006.

**E.     If a Remarketing/Auction Is Required, the Bidding Procedures Order Should Be Entered on the Terms Proposed**

41.     The Debtors understand that the Court may also require a Remarketing/Auction. In such a scenario, under the terms of the PSA, the Buyer has agreed to be, and the Board of

---

[7] The Notice of Sale Hearing will direct parties to contact TPH, the Debtors' exclusive financial advisor and investment banker with respect to the Appalachia Assets, for more information and will provide that any party in interest that wishes to obtain a copy of any related document (including the PSA), subject to any necessary confidentiality agreement, may make a request in writing as specified in the Notice of Sale Hearing.

Directors of Stone (the "Board") has approved the Buyer as, the Stalking Horse Bidder for the Appalachia Assets. For the reasons set forth below, the Debtors believe the Bidding Procedures are reasonable and appropriate and should be approved as proposed in the event that the Court requires a Remarketing/Auction.

       i.       The Bidding Procedures Are Fair and Appropriate and Should Be Approved

42.     "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold." John J. Jerome & Robert D. Drain, *Bankruptcy Court Is Newest Arena for M&A Action*, N.Y.L.J., June 3, 1991.

43.     Here, the Debtors submit that the Bidding Procedures are fair and appropriate under the circumstances, consistent with procedures routinely approved by courts, and in the best interest of the Debtors' estates should a Remarketing/Auction be required. The Debtors also submit that the Bidding Procedures demonstrate a sound exercise of the Debtors' business judgment, as such procedures are designed to maximize the value to be received by the Debtors' estates for the Appalachia Assets in the event the Court requires additional marketing thereof.

44.     If the Court requires a Remarketing/Auction, the Bidding Procedures will provide the Debtors with an adequate opportunity to consider competing bids and select the highest and best offer for the Appalachia Assets. Entry into the PSA with the Stalking Horse Bidder ensures that the Debtors obtain the highest and best consideration for the Appalachia Assets by setting a floor price that can be tested in the marketplace. Nevertheless, the Debtors' business judgment is that the PSA with the Buyer represents the best offer available for the Appalachia Assets under the circumstances and that a Remarketing/Auction will not yield higher and better offers for such assets.

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

**F.      Approval of the Sale Is Appropriate and in the Best Interests of the Debtors' Estates**

      i.      The Sale Should Be Approved as an Exercise of the Debtors' Sound Business Judgment

     45.    Bankruptcy Code Section 363(b) provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.  Although Bankruptcy Code Section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification," as established by the Second Circuit in *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983), which decision has been adopted in this circuit.  *See Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Asarco*, 650 F.3d at 601; *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *38 (Bankr. S.D. Tex. Mar. 21, 2014); *In re St. Marie Clinic PA*, No. 10-70802, 2013 WL 5221055, at *9 (Bankr. S.D. Tex. Sept. 17, 2013); *In re Particle Drilling Techs., Inc.*, No. 09-33744, 2009 WL 2382030, at *2 (Bankr. S.D. Tex. July 29, 2009); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).  Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  *In re S.N.A. Nut Co.*, 186 B.R. 98

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

(Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

46.     The Debtors have a sound business justification for selling the Appalachia Assets pursuant to the terms of the PSA, and, if required, pursuant to a competitive-bidding process consistent with the Bidding Procedures.  Notably, the PSA was executed after arms' length and good-faith negotiations with the Buyer.  Indeed, it was only after (a) potential alternatives were evaluated, (b) the Appalachia Assets were marketed over the last several months by TPH, and (c) the Sale and alternatives thereto were presented to the Debtors' management and Board (in conjunction with advice from experienced professionals, including TPH) that the Debtors' management and Board determined to pursue the Sale on the terms set forth in the PSA, subject to competitive bidding (if required by the Court).  Based on the results of their analysis of the Debtors' ongoing and future business prospects, the Debtors' management and Board concluded that a sale of the Appalachia Assets in accordance with the terms of the PSA, subject to a competitive-bidding process (if required by the Court), would be the best way to maximize recoveries for creditors in connection with the Debtors' restructuring efforts in these Chapter 11 Cases.

47.     Thus, the Debtors submit that the PSA (or, if a Remarketing/Auction is required and the Buyer is not the prevailing bidder, an alternative bid resulting from the Bidding Procedures) will constitute the highest and best offer for the Appalachia Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Appalachia Assets pursuant to the

terms of the PSA (or through a competitive-bidding process as provided for in the Bidding Procedures) is a valid and sound exercise of the Debtors' business judgment.

48.    The Debtors believe that they have proposed a fair process for obtaining the highest and best offer and sale of the Appalachia Assets for the benefit of the Debtors' estates and their creditors.  As stated above, the Debtors believe that the PSA represents the best available offer for the Appalachia Assets in light of the marketing process undertaken by the Debtors and TPH prior to executing the PSA with the Buyer.  If, however, the Court requires a Remarketing/Auction notwithstanding the Debtors' prior marketing efforts, the Appalachia Assets will be subject to competing bids, possibly enhancing the Debtors' ability to receive the highest or otherwise best value therefor.  In such a scenario, the fairness and reasonableness of the consideration to be received by the Debtors would be demonstrated by a second "market check" through the Auction.

        ii.        Adequate and Reasonable Notice of the Sale Will Be Provided

49.    As set forth above, the Notice of Sale Hearing (a) will be served in a manner that provides at least 21-days' notice of the date, time and location of the Sale Hearing, (b) informs interested parties of the deadlines for objecting to the Sale, and (c) otherwise includes all information relevant to parties interested in or affected by the Sale.  Significantly, the form and manner of the Notice of Sale Hearing will have been approved by this Court pursuant to the Assumption and Approval Order or the Bidding Procedures Order (as applicable), after notice and a hearing, before it is served on parties in interest, and, as such, the Debtors are confident that the Notice of Sale Hearing will be properly vetted by the time of service thereof.

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

iii.    The Sale Has Been Proposed in Good Faith and Without Collusion, and the Buyer Is a "Good Faith Buyer"

50.    Pursuant to Bankruptcy Code Section 363(m), a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *O'Dwyer v. O'Dwyer (In re O'Dwyer)*, 611 Fed. App'x 195, 200 (5th Cir. 2015); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007); *see also In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders).

51.    In other words, a party would have to show fraud or collusion between the buyer and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith.  An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

52.    The Debtors submit that the Buyer, or other successful bidder arising from the Auction (if any), is or would be a "good faith" purchaser within the meaning of Bankruptcy Code Section 363(m).  Moreover, the PSA, or any marked version thereof, is or would be a good-faith agreement on arm's-length terms entitled to the protections of Bankruptcy Code Section 363(m).[8]  First, the consideration to be received by the Debtors pursuant to the PSA is

---

[8] Bankruptcy Code Section 363(m) provides that:

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

substantial, fair and reasonable.  Second, the parties entered into the PSA in good faith, and after arm's-length negotiations, during which both parties were represented by competent counsel.  Third, there is no indication of any fraud or collusion between the Buyer and other potential bidders or the Debtors, or an attempt to take grossly unfair advantage of other bidders or similar conduct that would cause or permit the Sale or PSA to be avoided under Bankruptcy Code Section 363(n).  Finally, the Stalking Horse Bidder's offer was evaluated and approved by the Board in consultation with the Debtors' professionals (including TPH) after completion of a marketing process.  Accordingly, the Debtors believe that the Buyer (or other successful bidder) and the PSA (or marked PSA) should be entitled to the full protections of Bankruptcy Code Section 363(m).

       iv.      The Sale Should Be Approved "Free and Clear" Under Bankruptcy Code Section 363(f)

53.      Bankruptcy Code Section 363(f) permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).  As Bankruptcy Code Section 363(f) is stated in the disjunctive, when proceeding pursuant to Section 363(f), it is only necessary to meet one of the five conditions of section 363(f).  *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned

---

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

See 11 U.S.C. § 363(m).

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

conditions contained in § 363(f) are satisfied.").  The Debtors believe that they will be able to demonstrate at the hearing on this Motion that they have satisfied one or more of these conditions.

      v.      <u>Assumption and Assignment of Contracts Should Be Approved</u>

          a.      *The Assumption of the Assumed Contacts Reflects the Debtor's Sound Business Judgment*

54.      Bankruptcy Code Section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *Mirant Corp. v. Potomac Electric Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 524-25 & n.5 (5th 2004); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *In re Gucci*, 193 B.R. 411 (S.D.N.Y. 1996); *In re Pisces Energy, LLC*, No. 09-36591H5-11, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009).  Under the business judgment test, a court should approve a debtor's proposed assumption of executory contracts if such assumption will benefit the estate.  *In re Pisces Energy*, 2009 WL 7227880, at *6; *In re Gunter Hotel Assocs.*, 96 B.R. 696, 698 (Bankr. W.D. Tex. 1988); *In re Food City, Inc.*, 94 B.R. 91, 93-94 (Bankr. W.D. Tex. 1988).  Any more exacting scrutiny would slow the administration of a debtor's estates, increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially.  *See Richmond Leasing*, 762 F.2d 1303 at 1311.  Moreover, pursuant to Bankruptcy Code Section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

55.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  Bankruptcy Code Section 365(f) specifically provides that contract provisions seeking to prohibit or limit assignment are unenforceable.  *See* 11 U.S.C. § 365(f)(1); *see also In re Amidee Capital Group, Inc.*, No. 10-20041, 2010 WL 5141276, at *5 (Bankr. S.D. Tex. Oct. 7, 2010) (treating such prohibitions or limitations as null and void under section 365(f)); *In re Office Prods. of Am., Inc.*, 140 B.R. 407 (Bankr. W.D. Tex. 1992) (provisions that work as a restriction on assignment of leases should be struck down); *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he code generally favors free assignability as a means to maximize the value of the debtor's estate").

56.     Bankruptcy Code Section 365(f) provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999) (internal quotations omitted); *see also Carlisle Homes. Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that the debtor will thrive).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Accord In re PRK Enters.*, 235 B.R. at 603 ("The financial evidence presented by [assignee] demonstrates the likelihood that it has the financial capacity to perform

34

its future obligations under the lease agreements and that its principal officers are serious in their commitment to rehabilitate this corporation."); *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

57.     Upon the Closing Date (as defined in the PSA), the Buyer will have financial resources that are more than sufficient to perform under any Assumed Contracts it seeks to have assumed and assigned by the Debtors under the PSA.  Moreover, if necessary, the Debtors will adduce facts at the Sale Hearing on any objection demonstrating the financial wherewithal of the Buyer (or if the Buyer is not the prevailing bidder, then of the prevailing bidder), and their willingness and ability to perform under the Assumed Contracts to be assigned to them.  The Sale Hearing therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge, the ability of the Buyer (or if the Buyer is not the prevailing bidder, then of the prevailing bidder) to provide adequate assurance of future performance with respect to the Assumed Contracts to be assumed and assigned.

58.     The Debtors respectfully submit that the proposed Contract Assumption Procedures are appropriate and reasonably tailored to provide adequate notice in the form of the Assumption Notice, including the proposed Cure Amounts be communicated pursuant thereto. The Counterparties will then be given an opportunity to object to such Cure Amounts.  If a Contract Objection is timely filed, such objection will be heard at the Sale Hearing or at a later hearing, in accordance with the Court's schedule.

59.     Furthermore, to the extent that any monetary defaults exist under any Assumed Contracts, the Debtors (or, in certain cases, the Buyer, as applicable under the PSA) will cure any

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16

such defaults prior to assuming and assigning the Assumed Contracts.  Accordingly, the Debtors submit that implementation of the proposed Contract Assumption Procedures is appropriate in these Chapter 11 Cases.  The Debtors submit that this Court therefore should authorize the Debtors to assume and assign the Assumed Contracts as may be set forth in the PSA.

**G.**   **The Court Should Waive the Stay of Bankruptcy Rules 6004 and 6006**

60.   Because time is of the essence in regard to the transactions contemplated in the PSA, the Debtors request that the Court waive the 14-day stay (i) provided in Bankruptcy Rule 6004(h) in all orders requested to be entered herein and (ii) provided in Bankruptcy Rule 6006(d) in the Sale Order.

**NOTICE**

61.   Notice of this Motion will be given to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the agent for the Debtors' prepetition secured bank group; (c) counsel to Consenting Holders; (d) the indenture trustee for the Senior Convertible Notes due 2017; (e) the indenture trustee for the Senior Notes due 2022; (f) the Securities and Exchange Commission; (g) counsel to the Buyer; (h) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002; (i) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (j) all taxing authorities having jurisdiction over any of the Appalachia Assets, including the Internal Revenue Service; (k) all persons and entities known or reasonably believed to have asserted a lien or other interest on any of the Appalachia Assets; (l) all persons or entities (other than the Buyer) known or reasonably believed to have expressed an interest in acquiring all or substantially all the Appalachia Assets within the last six months; (m) the attorneys general in the jurisdictions in which the Appalachia Assets are located; (n) the Environmental Protection Agency; and (o) all

36

state and local environmental agencies in Appalachia where the Debtors own or have owned or used real property.  The Debtors submit that, under the circumstances, no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court enter:   (I) (A) the Assumption and Approval Order, substantially in the form attached hereto as <u>Exhibit A</u>, or, (B) alternatively, in the event the Court requires a Remarketing/Auction, the Bidding Procedures Order, substantially in the form attached hereto as <u>Exhibit C</u>, and (II) the Sale Order granting the relief requested in this Motion and such other and further relief as may be just and proper.

37

Dated: December 14, 2016        Respectfully,
      Houston, Texas

/s/ John F. Higgins
John F. Higgins (TX Bar No. 09597500)
Joshua W. Wolfshohl (TX Bar No. 24038592)
Aaron J. Power (TX Bar No. 24058058)
Brandon J. Tittle (TX Bar No. 24090436)
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone:  (713) 226-6000
Facsimile:  (713) 226-6295
Email: jhiggins@porterhedges.com
       jwolfshohl@porterhedges.com
       apower@porterhedges.com
       btittle@porterhedges.com

- and -

Michael E. Dillard (TX Bar No. 05866000)
**LATHAM & WATKINS LLP**
811 Main Street, Suite 3700
Houston, TX 77002
Telephone:  (713) 546-7414
Facsimile:  (713) 546-5401
Email: michael.dillard@lw.com

- and -

David S. Heller (*pro hac vice* admission pending)
Josef S. Athanas (*pro hac vice* admission pending)
Caroline A. Reckler (*pro hac vice* admission pending)
Matthew L. Warren (*pro hac vice* admission pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9667
Email: david.heller@lw.com
       josef.athanas@lw.com
       caroline.reckler@lw.com
       matthew.warren@lw.com

*Proposed Counsel for the Debtors and Debtors in Possession*

US-DOCS\73273367.6
US 4788593v.7
US-DOCS\73273367.16